```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3

 4  MELINDA MICHAELS,              )
                                   )
 5          Plaintiff,             ) CASE NO.
                                   ) 24-cv-60984-
 6      vs.                        ) Rosenberg/Augustin-
                                   ) Birch
 7  SEAWATER PRO LLC, AND          )
    MICHAEL SPANOS A/K/A MIKE      )
 8  SPANOS,                        )
                                   )
 9          Defendants.            )
    _____)
10

11

12                    DEPOSITION OF

13                   MICHAEL SPANOS

14

15

16          Wednesday, January 22, 2025

17               10:18 a.m.

18

19

20

21             Remote Proceeding

22

23

24             Chelsie Enciso
               Digital Reporter
25        Commission No. HH 238730
```



```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff MELINDA MICHAELS:

 4        KOZ LAW, P.A.
          Attorneys at Law
 5        800 East Cypress Creek Road
          Suite 421
 6        Fort Lauderdale, Florida 33334
          786-924-9929
 7        dc@kozlawfirm.com
          BY:  DILLON S. CUTHBERTSON, ESQ.

 8

 9   On behalf of the Defendant SEAWATER PRO LLC:

10        FAIRLAW FIRM
          Attorneys at Law
11        135 San Lorenzo Avenue
          Suite 770
12        Miami, Florida 33146
          305-230-4884
13        brian@fairlawattorney.com
          BY:  BRIAN H. POLLOCK, ESQ.

14

15   Also present:

16        Melinda Michaels, Plaintiff

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX TO EXAMINATION
 2   EXAMINATION                                    PAGE
 3   Direct Examination By Mr. Cuthbertson          5
 4   Cross-Examination By Mr. Pollock               107
 5   Redirect Examination By Mr. Cuthbertson        112
 6
 7                     INDEX TO EXHIBITS
 8   NO.                   DESCRIPTION              PAGE
 9   Plaintiff's Exhibit 1    Business Bank Card     27
10   Plaintiff's Exhibit 2    Text Message with Dillon 38
11   Plaintiff's Exhibit 3    Seawaters Response to
12                            Production             46
13   Plaintiff's Exhibit 4    Comment from Bailey    47
14   Plaintiff's Exhibit 5    List of Orders, Protocols 64
15   Plaintiff's Exhibit 6    Marketing for Water Makers
16                            1995 Auto              70
17   Plaintiff's Exhibit 7    1442 reviews from
18                            Customers              75
19   Plaintiff's Exhibit 8    Video Body Cam Jan 12,
20                            2021                   80
21   Plaintiff's Exhibit 9    Wells Fargo Bank
22                            Statements             84
23   Plaintiff's Exhibit 10   Michael Response to
24                            Melinda First Set of
25                            Interrogatories        101
```



1          THE REPORTER:  We are on the record.  The time

2     is 10:18 a.m. Eastern Standard Time.  The date is

3     January 22nd, 2025.  We are here to take the deposition

4     of Michael Spanos in the case of Melinda Michaels v.

5     SeaWater Pro, LLC.

6          Good afternoon.  My name is Chelsie Enciso, a

7     Florida state notary and a digital court reporter,

8     assigned by Esquire Deposition Solutions in the state of

9     Florida.  Pursuant to the Florida Rules of Civil

10    Procedure, I will be capturing the verbatim record of

11    today's proceedings using electronic audio equipment, a

12    computer, and specialized recording software, which is

13    not a form of stenography.  The witness is presently

14    located in person in Fort Lauderdale, Florida, and has

15    identified themselves as Michael Spanos with a driver's

16    license issued by the Florida Department of Motor

17    Vehicles.

18      Will Counsel in attendance please identify

19    yourselves for the record and state who you represent,

20    beginning with the Plaintiff's Counsel?

21          MR. CUTHBERTSON:  Dillon Cuthbertson for the

22    plaintiff, Melinda Michaels.

23          MR. POLLOCK:  And Brian Pollock for the

24    defendants.

25          THE REPORTER:  Thank you.  And I will now



```
 1  swear in the witness.

 2           Mr. Spanos, please raise your right hand.

 3                     MICHAEL SPANOS,

 4    having first been duly sworn, testified as follows:

 5           THE REPORTER:  Thank you.

 6           And, Counsel, you may begin.

 7           MR. CUTHBERTSON:  As a preliminary matter, I'd

 8  like to address something that happened that occurred

 9  before the deposition took place this morning at

10  approximately 10:05 a.m.  In the room was Court Reporter

11  Chelsie, Court Reporter Tatiana (phonetic), myself, and

12  the plaintiff, Melinda Michaels.  The defendant, Mr.

13  Spanos, asked Ms. Michaels directly whether she had

14  fucked me yet because she had already fucked all of her

15  other attorneys.

16           THE WITNESS:  So what is the answer?

17           MR. CUTHBERTSON:  I didn't ask you a question,

18  Mr. Spanos.

19                     DIRECT EXAMINATION

20  BY MR. CUTHBERTSON:

21  Q.   Mr. Spanos, have you ever been in a deposition

22  before?

23  A.   No.

24  Q.   Can you please state your --

25  A.   I'm surprised we're on the first one.
```



1  Q.   Can you please state your full name for the record?

2  A.   Michael Spanos.

3  Q.   Do you have a middle name?

4  A.   No.

5  Q.   Do you have any aliases?

6  A.   No.

7  Q.   Have you been known by any other name?

8  A.   Spanoudis.

9  Q.   Can you spell that?

10 A.   S-P-A-N-O-U-D-I-S.

11 Q.   Spanoudis?

12 A.   Yes.

13 Q.   Okay.  And just another preliminary matter.  You're

14 here today testifying on behalf of yourself,

15 individually, and on behalf of the company SeaWater Pro;

16 is that correct?

17 A.   That is correct.

18 Q.   Okay.

19      THE REPORTER:  Sorry, Counsel.

20 BY MR. CUTHBERTSON:

21 Q.   And, Mr. Spanos, are you currently under the

22 influence of any mood-altering substance or anything

23 that would affect your ability to answer these questions

24 truthfully and accurately?

25 A.   No.



1  Q.   Is there anything else happening outside of this

2  deposition today that would affect your ability to

3  answer these questions truthfully and accurately?

4  A.   Absolutely not.

5  Q.   A sick dog, a dying relative?

6  A.   Nope.

7  Q.   Okay.  So as the corporate representative of

8  SeaWater Pro, do you understand what questions you're

9  here to ask today -- to answer today?

10  A.   I understand.

11  Q.   Okay.  Good.  Are you ready to testify about the

12  company's policies?

13  A.   Absolutely.

14  Q.   And company's practices?

15  A.   Sure.

16  Q.   Any decisions related to the Fair Labor Standards

17  Act?

18  A.   I'm not sure I understand.

19  Q.   Sure.  So for your employees that fall under the

20  Fair Labor Standards Act, are you able to testify how

21  you would determine whether they were exempt or not

22  exempt?

23  A.   To my best ability.

24  Q.   Okay.  And then how you pay your wages, your

25  timekeeping mechanism, all that, you can testify about



1  too?

2  A.    To the best of my ability.

3  Q.    Okay.  All right.  Mr. Spanos, what is your role

4  with SeaWater Pro?

5          MR. POLLOCK:  And just before we get

6  started --

7          MR. CUTHBERTSON:  Sure.

8          MR. POLLOCK:  -- were there areas of inquiry

9  for the corp rep that's on 30(b)(6)?

10          MR. CUTHBERTSON:  There were, yes.

11          MR. POLLOCK:  (inaudible) the notice just

12  designating Mr. Spanos, which I don't think is

13  appropriate, but he's going to appear anyway.  But it

14  just looks like the notice of taking 30(b)(b) depo

15  doesn't have any -- it's two pages.  It doesn't have any

16  areas of inquiry.

17          MR. CUTHBERTSON:  You want me to note that?

18          MR. POLLOCK:  So Mr. Spanos is here as the

19  representative, but without having designated areas of

20  inquiry to the extent that there's questions that he's

21  not prepared to answer because of the lack of

22  inappropriate notice.  But you can go forward anyway.

23          THE REPORTER:  Counsel, bear with me one

24  moment.  I'm just going to move your mic.

25          MR. POLLOCK:  I'll let you drive.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                      9

```
 1              THE REPORTER:  Thank you.
 2              MR. CUTHBERTSON:  May I have that yellow piece
 3   of paper with the Wi-Fi?  Thank you.  You guys look good
 4   to go.
 5   BY MR. CUTHBERTSON:
 6   Q.   All right.  Mr. Spanos, what is your role with
 7   SeaWater Pro?
 8   A.   The founder.
 9   Q.   And are you the CEO, president?
10   A.   I'm -- I'm a member of the LLC.
11   Q.   Member of the --
12   A.   Sole proprietor.
13   Q.   And when did you found the company?
14   A.   December of 2017.
15   Q.   And you incorporated in the state of Florida?
16   A.   Yes.
17   Q.   Where did you grow up, Mr. Spanos?
18   A.   Where did I grow up?
19   Q.   Uh-huh.
20   A.   San Francisco and Arizona.
21   Q.   Where did you go to high school?
22   A.   Athens, Greece.
23   Q.   Did you finish?
24   A.   Yes.
25   Q.   What year did you graduate?
```



```
 1    A.    '84.

 2    Q.    Did you go to college?

 3    A.    Yes.

 4    Q.    Where did you go?

 5    A.    San Francisco State.

 6    Q.    Did you get a bachelor's?

 7    A.    Yes.

 8    Q.    What was that in?

 9    A.    Computer science.

10    Q.    What year was that?

11    A.    '91.

12    Q.    And are you an aeronautical engineer, Mr. Spanos?

13    A.    No.

14    Q.    Were you ever married?

15    A.    Yes.

16    Q.    To whom?

17    A.    To a woman.

18    Q.    What was her name?

19    A.    Katerina (phonetic) Boukouvala.

20    Q.    Can you spell the last name?

21    A.    B-O-U-K-O-U-V-A-L-A.

22    Q.    Did you get divorced?

23    A.    Yes.

24    Q.    When were you divorced?  What year were you

25    divorced?
```



```
 1   A.   I think 2013 or 2014.

 2   Q.   Do you have any children?

 3   A.   No.

 4   Q.   And where does Katerina live now?

 5   A.   I believe she is in San Diego.

 6   Q.   When did you first meet the plaintiff, Ms.

 7   Michaels?

 8   A.   Sometime in 2014.

 9   Q.   How did you meet?

10   A.   Online.

11   Q.   Were you working at the time?

12   A.   I was starting a business.

13   Q.   When you say starting, were you --

14   A.   I was a partner in a -- in a startup.

15   Q.   And what did that startup do?

16   A.   Manufacturing.

17   Q.   What were you manufacturing?

18   A.   Guns.

19   Q.   And what happened to that business?

20   A.   I decided to leave the state, and my partners kept

21   it.

22   Q.   Were you paid anything?

23   A.   Yes.

24   Q.   What were you paid?

25        MR. POLLOCK:  Don't answer that.
```



```
 1              He's entitled to a financial privilege under
 2    the Florida Constitution, so we're not going to answer
 3    that question based on his right to financial privacy.
 4    BY MR. CUTHBERTSON:
 5    Q.   Mr. Spanos, what percent owner were you in that
 6    one?
 7    A.   One-third.
 8              THE REPORTER:  Just a reminder.  Can we wait
 9    for Counsel to finish asking the question before you
10    start your answer?  Thank you.
11              THE WITNESS:  Counsel?  Who's the counsel?
12              MR. CUTHBERTSON:  I am.
13              THE REPORTER:  Both.
14              THE WITNESS:  You are?  Okay.  I'm sorry.
15    BY MR. CUTHBERTSON:
16    Q.   Yes.
17    A.   I forgot.  I thought you were just a boyfriend.
18    Q.   And what was the name of that company, Mr. Spanos?
19    A.   It was Independence Parts (phonetic).
20    Q.   Independence Parts?
21    A.   Independence Parts.
22    Q.   And that was incorporated where?
23    A.   LLC in Arizona.
24    Q.   Are they still in operation?
25    A.   I don't know.
```



```
 1   Q.   After you met Ms. Michaels and you had left
 2   Independence Parts, were you working anywhere else?
 3   A.   No.  I sold my share and I went to work -- was it a
 4   year or two later?  I was working for the U.S.  Navy.
 5   Q.   As a civilian?
 6   A.   As a civilian contractor.
 7   Q.   And what did you do for the Navy?
 8   A.   Engineering.
 9   Q.   What type?
10   A.   Designing and manufacturing submarine parts.
11   Q.   And when did you leave the employment of the Navy?
12   A.   December of -- January of 2018.
13   Q.   December or January?
14   A.   January of 2018 --
15   Q.   January?
16   A.   -- was my last paycheck.
17   Q.   So you incorporated SeaWater Pro in December 2017,
18   and your last paycheck was January 2018 from the Navy,
19   correct?
20   A.   Yes.
21   Q.   Okay.  What did you do for income in between
22   December and January 2017 and 2018?
23   A.   I had savings.
24   Q.   Okay.  And was Ms. Michaels paying anything of your
25   household expenses?
```



MICHAEL SPANOS                                                  January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                                  14

```
 1   A.   Absolutely nothing.

 2   Q.   When did you move to Florida?

 3   A.   I don't recall exactly, but I think it was around

 4   2015, '16, '15.  It's '15 or 16.

 5   Q.   And that was with Ms. Michaels?

 6   A.   That was with Ms. Michaels.

 7   Q.   And where did you first live when you moved to

 8   Florida?

 9   A.   We lived in an RV.

10   Q.   In an RV?  In an RV Park or --

11   A.   RV Park.

12   Q.   Where was that located?

13   A.   I don't remember.

14   Q.   Was it in South Florida?  Was it --

15   A.   Yeah, it was South Florida.  It was somewhere in or

16   near Fort Lauderdale.

17   Q.   And whose idea was it to open SeaWater Pro?

18   A.   Mine.

19   Q.   How did you come up with that idea?

20   A.   I just came up with it like I come up with all

21   ideas.  I think about them.

22   Q.   When you first started SeaWater Pro, how many

23   employees did you have?

24   A.   Just myself.

25   Q.   When did you hire your first employee?
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                  15

```
 1  A.   It was within six months after I started the
 2  business.  So it was -- my -- best of my recollection.
 3  I could be wrong.  If I started the corporation in
 4  January of 2018, within three to six months, I had an
 5  employee.
 6            THE REPORTER:  Can you come closer to the mic,
 7  please?
 8  BY MR. CUTHBERTSON:
 9  Q.   What was that employee's name?
10  A.   Trevor Fletcher (phonetic).
11  Q.   Does Trevor --
12  A.   Trevor Fletcher.
13  Q.   Okay.  Does he still work for you?
14  A.   No.  He's in California.
15  Q.   When did he leave SeaWater Pro?
16  A.   About two years ago.  Two years ago in July.  So
17  what is that?  '25, '24, '23.  July of '23 sometime.
18  Q.   And what did Trevor do for you at SeaWater Prep?
19  A.   He did everything.
20  Q.   Can you be more specific?
21  A.   No.  Anything that needed to be done, he did it,
22  from sweeping floors, to packing boxes, to assembling
23  machines, to answering the phones, answering technical
24  questions, talking to customers.  He was my right hand.
25  Q.   Who took over as your right hand after Trevor left?
```



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          16

1   A.   Oh, there were several between the time Trevor

2   left.  I had several employees.  So nobody took over.

3   We just added more employees.

4   Q.   After you hired Trevor, who did you hire next?

5   A.   I can tell you who was hired, but not in a

6   necessary -- in a timely manner.  It was Glenn.  It was

7   Natalie.  It was Jessie, AJ (phonetic), Bailey.  That's

8   the best I can recollect.  There's probably more.  I'm

9   sure there are more, but I can't think them off my head

10  right now.

11  Q.   For approximately how long was it just you and

12  Trevor?

13  A.   Six months.

14  Q.   So you testified that between three and six months

15  after you opened the company is when you hired Trevor,

16  correct?

17  A.   I estimate, yes.

18  Q.   So basically for the first year, it was you plus

19  Trevor?

20  A.   Yes.

21  Q.   Okay.  So in that second year, did you hire more

22  people?

23  A.   Yes.

24  Q.   How many people that year?

25  A.   I don't remember.



MICHAEL SPANOS                                            January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          17

1  Q.   Approximately?

2  A.   Two, three, four.

3  Q.   What about during COVID?  Did you hire anybody

4  during COVID?

5  A.   Yeah, we had -- I think it was Trevor.

6  Q.   You rehired Trevor?

7  A.   It was pretty much -- no.  Trevor was there.

8  Q.   Okay.

9  A.   He didn't leave until '23, right?

10 Q.   Who else worked during COVID?

11 A.   Who was it?  There was a guy that I moved to Texas.

12 He was there for about -- about two months.  What was

13 his name?  I don't remember his name.  But there were a

14 couple of guys that came and left.

15 Q.   So a couple?  So approximately four of you during

16 COVID?

17 A.   Approximately.

18 Q.   Approximately four of you during COVID?

19 A.   Yeah, three or four.

20 Q.   Would you say that business was good during COVID?

21 A.   It was good.

22 Q.   And why was that?

23 A.   I felt that it was good.

24 Q.   Was it more supply, more demand, more because of

25 the restrictions people wanted to make their own water?



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    18

```
 1   A.   Yeah.  I don't know if that's --
 2            MR. POLLOCK:  Objection --
 3        Hold on.
 4        Objection to form of the last question.
 5        You can go ahead and answer.
 6   BY MR. CUTHBERTSON:
 7   Q.   You can answer.
 8   A.   I don't believe it's --
 9            THE REPORTER:  I'm sorry.  Can you repeat the
10   objection?
11            MR. POLLOCK:  Objection to the form of the
12   question.
13            You can go ahead and answer.
14            THE WITNESS:  I don't know if that was related
15   to COVID or the fact that my business would have grown
16   anyways.  I -- I suspect may have something to do with
17   COVID, but the business hasn't stopped growing, so I
18   really couldn't tell you that it was COVID or not.
19   BY MR. CUTHBERTSON:
20   Q.   Okay.  All right.  Mr. Spanos, in a typical day,
21   what were the hours that you went to SeaWater Pro?
22            MR. POLLOCK:  Object to form --
23   BY MR. CUTHBERTSON:
24   Q.   You can answer.
25            MR. POLLOCK:  Same objection.
```



```
 1            THE WITNESS:  I went approximately between --
 2   around 11:00 and left by -- we would go out, have lunch.
 3   Or I would bring lunch, feed everybody, and then I'd be
 4   out of there, depending on the work, sometimes by 3:00,
 5   4:00, sometimes at 5:00, 6:00, 7:00.
 6   BY MR. CUTHBERTSON:
 7   Q.   And did you work at night?
 8   A.   Not really.  Extremely rare.
 9   Q.   If you did work at night, what sort of things would
10   you do?
11   A.   It -- it was so rare, I -- I couldn't even remember
12   going to work at night for any reason whatsoever.
13   Q.   Did you ever conduct any work outside of the
14   physical location of SeaWater Pro?
15   A.   Not really.
16   Q.   No, you did not?
17   A.   No.  No.  If you're referring to servicing boats
18   outside of work and doing installations, then no.
19   Everything was online sales with UPS.  We're not a
20   service company.  We're just a reseller.
21   Q.   Did you attend trade shows, Mr. Spanos?
22   A.   Yes, one.
23   Q.   Did you have any business trips?
24   A.   Not really.
25   Q.   Not really or no?
```



```
 1   A.    Maybe -- maybe one to Puerto Rico.  At the time,

 2   one to Puerto Rico and one trade show.  It was the Fort

 3   Lauderdale Boat Show in Fort Lauderdale.

 4   Q.    And when were those?

 5   A.    Once a year.

 6           THE REPORTER:  I'm sorry?

 7   BY MR. CUTHBERTSON:

 8   Q.    When were those shows?

 9   A.    That was the Fort Lauderdale Boat Show, October

10   28th through November 2nd or something, once a year.

11   Q.    Did that happen during COVID?

12   A.    Yes.  That's how I was able to get in.

13   Q.    And when was that business trip to Puerto Rico?

14   A.    Oh, man.  I want to say '19.  It was spring of

15   either '19 or '20, and I took one employee with me.

16   Q.    Who was that employee?

17   A.    It was Bailey.

18   Q.    What's Bailey's last name?

19   A.    Freederes (sic).

20   Q.    Can you spell that?

21   A.    F-R-E-E-D-E-R-E-S (sic).

22   Q.    How long did Bailey work for you?

23   A.    Bailey worked for me, don't quote me on that, from

24   approximately 2019 -- I believe she was on 2018 for a

25   while and then went back home.  Came back, I believe,
```



 1   2019.  And she stayed until about a year ago, 20 -- I

 2   think it was '24, middle of '24, I believe, but I could

 3   be wrong.

 4   Q.   And did she quit or was she fired?

 5   A.   She was fired.

 6   Q.   Why was she fired?

 7   A.   Because she was not attentive.  She was not showing

 8   up on time.

 9   Q.   Was that a repeated pattern?

10   A.   Yes.

11   Q.   Would you say she was unreliable?

12   A.   I wouldn't say she was unreliable, but there were

13   times that she should be at work.  And we were very

14   busy, and she would be -- she would be -- she would not

15   be there.

16   Q.   Did you have a romantic relationship with Bailey?

17   A.   No.

18   Q.   Did you have a sexual relationship with Bailey?

19   A.   No.  Bailey was a lesbian.  She had a girlfriend.

20   Q.   Did the girlfriend also work at SeaWater Pro?

21   A.   Yes.

22   Q.   What was her name?

23   A.   AJ.

24   Q.   AJ?

25   A.   AJ.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    22

1  Q.   Does she have a last name?

2  A.   I don't remember.

3  Q.   Was she on your payroll?

4  A.   Yes.

5  Q.   How long did AJ work at SeaWater Pro?

6  A.   I'm estimating about a year.

7  Q.   And that was during what period?  When --

8  A.   That was around --

9  Q.   -- Bailey was there?

10  A.   -- '23, '24, somewhere in there.

11  Q.   And did AJ quit or was she fired?

12  A.   Excuse me.  Could have been '22.  She was fired.

13  Those two went together.

14  Q.   And why was she fired?

15  A.   Because she was out with Bailey.

16  Q.   You mean out with Bailey, not showing up for work?

17  A.   Not showing up for work.

18  Q.   All right.  Mr. Spanos, do you do the payroll for

19  SeaWater Pro?

20  A.   No.

21  Q.   Who does the payroll?

22  A.   Right now, it's done by my secretary.  Her name

23  is -- I have to -- I'm blank right now.

24          MR. POLLOCK:  If you want a minute to take,

25  you can't look at your phone, but it's more of a memory



```
 1   test.  If you want to take a minute or come back to it,
 2   you know, you can -- you can say --
 3   BY MR. CUTHBERTSON:
 4   Q.   I'll give you like ten seconds while I take a sip
 5   of coffee.
 6   A.   Yeah.  Her name is Priscilla (phonetic).  I'm
 7   sorry.
 8          MR. POLLOCK:  Your coffee sparked his memory.
 9   BY MR. CUTHBERTSON:
10   Q.   Priscilla must bring you coffee, Mr. Spanos.
11   A.   No, I don't drink coffee.  I was laughing all
12   night.
13   Q.   How long has Priscilla worked for you?
14   A.   Approximately two years.
15   Q.   And who did your payroll before Priscilla?
16   A.   Natalie.
17   Q.   Who is Natalie?
18   A.   Natalie is my first bookkeeper.
19   Q.   When did you hire Natalie?
20   A.   I believe it was around 2019.
21   Q.   So Natalie did payroll?  Did she do anything else?
22   A.   Did payroll, packaged boxes, managed inventory,
23   answer the phones, did everything for me.
24   Q.   And who did payroll before Natalie?
25   A.   I did.
```



MICHAEL SPANOS                                        January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                        24

1   Q.   Mr. Spanos, do you pay your employees via check --

2   A.   Yes.

3   Q.   -- direct deposit?

4   A.   Yes.  Direct deposit and check.

5   Q.   Have you've always done that?

6   A.   Some get checks.  Some give direct deposits.

7   Q.   Are all your employees W-2 employees?

8   A.   Yes.  No.  Well, contractors are 1099.

9        MR. POLLOCK:  Objection to the form.

10        Go ahead.

11        THE WITNESS:  Contractors are 1099.  Regular

12   employees, who show up on a timely manner, are W-2.

13   BY MR. CUTHBERTSON:

14   Q.   In a timely manner.  Do you say -- is that a set

15   schedule?

16   A.   Well, according to the law, if the employee is

17   required to be at the shop to perform his duties within

18   a specified time, you have to put him on a W-2.  If he

19   is just coming for a few hours doing some -- some work,

20   some work out of the house, then you can 1099.

21   Q.   So you said a specified time.  What was that

22   specified --

23   A.   Set schedule.

24   Q.   Yeah.  What was that set schedule?

25   A.   The set schedule -- of those who have a set



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          25

1   schedule, they're going at -- they're coming at 9:00 to

2   5:00.

3   Q.   And that's Monday through Friday?

4   A.   Monday through Friday.

5   Q.   Do you have employees who work Saturdays and

6   Sundays?

7   A.   No.

8   Q.   Never?

9   A.   Never.  If somebody is working Saturdays and

10  Sundays, it would be me.

11  Q.   Tell me about that.  So on Saturday, what would you

12  typically work?

13  A.   I would go in at 10:00 and leave by 3:00.

14  Q.   Is that most Saturdays?

15  A.   No, extremely rare.  Maybe once every three months.

16  Q.   And then what about Sundays?

17  A.   I cannot remember the last Sunday I had to go to

18  work.

19  Q.   All right.  Mr. Spanos, your current secretary,

20  Priscilla, does she sign those paychecks?

21  A.   Yes.

22  Q.   And before her, Natalie, did she sign those

23  paychecks?

24  A.   Yes.

25  Q.   And did you sign the paychecks before her?



MICHAEL SPANOS                                        January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                        26

1   A.   Yes.

2   Q.   Did anybody else sign paychecks?

3   A.   Maybe Melinda.

4   Q.   Maybe or definitely?

5   A.   Maybe.  I don't remember.  You're asking me

6   something that happened five years ago.

7   Q.   And why would Melinda have signed paychecks?

8   A.   Why would Melinda have paychecks?  She was helping

9   me out sometimes.

10  Q.   Did she have the legal authority to sign a

11  paycheck?

12  A.   Yes.  We were on the -- on the checking account.

13  It was a personal checking account the business was

14  running in the early days, and Melinda was a -- we were

15  joint holders of the account.  She had access to

16  everything and anything because it was our personal

17  account, which we've had for years before the business.

18  Q.   Did you have any business accounts -- business

19  banking accounts?

20  A.   I -- I later started a -- when the business

21  actually became a business, I -- I started another

22  account.  I opened another account.

23  Q.   Was that with Wells Fargo?

24  A.   Wells Fargo.

25  Q.   Was Ms. Michaels also on that account?



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    27

```
 1  A.   No.

 2  Q.   Was she a signer on that account?

 3  A.   She was a -- she had a power of attorney on that

 4  account.

 5  Q.   Power of attorney meaning she could sign?

 6  A.   She could go to the bank and sign, request checks.

 7  Q.   Business checks?

 8  A.   Yes.  It was a business account, so --

 9  Q.   And did Ms. Michaels have a business debit card?

10  A.   Yes, sir.  It was a personal debit card, not the

11  business account that she had.  Correction.

12        MR. CUTHBERTSON:  I am going to introduce

13  Plaintiff's Exhibit 1.

14      (Exhibit 1 was marked for identification.)

15        MR. CUTHBERTSON:  Brian, would you like it?

16        MR. POLLOCK:  Sure.  Thank you.

17  BY MR. CUTHBERTSON:

18  Q.   Mr. Spanos, can you read what it says on that debit

19  card?

20  A.   It says, "Melinda F. Michaels, SeaWater Pro LLC."

21  Q.   What does it say on the top left of that card?

22  A.   "Platinum debit card."

23  Q.   What else does it say?

24  A.   "Wells Fargo."

25  Q.   What else does it say?
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    28

1  A.   "PLA 1530."

2  Q.   Anything else?

3  A.   "Exhibit 1."

4  Q.   Under Wells Fargo, what is the next line?

5  A.   "Debit card."

6  Q.   No.  There's a line in between Wells Fargo and

7  debit card.

8  A.   Business platinum debit card."  I said that

9  already.

10  Q.   Business platinum debit card?

11  A.   Yes.

12  Q.   So that's a business debit card?

13  A.   Yes.  That was from the second account I opened.

14  Q.   Okay.  You just testified that she had a debit card

15  to your personal account?

16  A.   She had, definitely, one on the personal account

17  because it was 50/50.  And I guess she had one from the

18  business.  I told you she was an authorized signer.  She

19  had the power of attorney.

20  Q.   Mr. Spanos, we requested copies of your business

21  banking statements from Wells Fargo and have yet to be

22  produced, showing Ms. Michaels was a signer on that

23  account.  Are you producing those statements?

24  A.   On the business, you will never see that on the

25  business.  On the personal, you will see her name.  She



MICHAEL SPANOS                                      January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                      29

 1 │ had a power of attorney.  Not -- she was not -- her name
 2 │ was not on the account.
 3 │ Q.   Do you have a copy of that power of attorney?
 4 │ A.   No.  The bank might.
 5 │ Q.   Could you get that from Wells Fargo?
 6 │ A.   I can try.  It's a standard POA.  You show up, you
 7 │ sign, you walk away.  They do not offer it anymore, from
 8 │ what I understand.  You have to produce your own power
 9 │ of attorney.
10 │ Q.   Do you remember going to Wells Fargo to put her on
11 │ that account, Mr. Spanos?
12 │ A.   No.
13 │ Q.   Do you remember what year that was?
14 │ A.   No.
15 │ Q.   Do you remember what year the account was open?
16 │ A.   No.
17 │ Q.   Do you have any other business accounts where Ms.
18 │ Michaels was a signer?
19 │ A.   No.
20 │ Q.   Was Ms. Michaels provided a credit card for the
21 │ business?
22 │ A.   The only one I'm aware of is the one on Exhibit 1.
23 │ I am not aware of another one.
24 │ Q.   Okay.
25 │ A.   But I could be wrong.



```
 1              THE WITNESS:  Who wants this?

 2              MR. POLLOCK:  You can just put it face down,

 3    and then that way we'll keep them in order.

 4              THE WITNESS:  Is this for us?

 5              MR. POLLOCK:  That's for them.  That's for the

 6    court reporter or Dillon.  It goes attached to the

 7    record.

 8              THE WITNESS:  Okay.  All right.  No problem.

 9              MR. CUTHBERTSON:  But I have a copy here.

10    BY MR. CUTHBERTSON:

11    Q.   All right.  Mr. Spanos, do you pay Natalie by the

12    hour?

13    A.   Yes.

14    Q.   And how much does Natalie make an hour?

15    A.   Natalie --

16              MR. POLLOCK:  I don't -- I don't believe that

17    that's -- has any bearing on this case at all.  It --

18              MR. CUTHBERTSON:  We'll note your objection.

19              MR. POLLOCK:  And I think that she has a right

20    to privacy as to how much she's paid per hour.  And I

21    don't think it's appropriate for Mr. Spanos to testify

22    about what other employees make.

23              MR. CUTHBERTSON:  It's directly relevant.  I'm

24    getting there.

25              MR. POLLOCK:  I don't -- I don't think it's
```



```
 1   proportional to the needs of this case, which involves

 2   Ms. Michaels' claim that she was an employee and owed

 3   minimum wages.  So how much somebody else was paid has

 4   no bearing.

 5   BY MR. CUTHBERTSON:

 6   Q.   Mr. Spanos, did you pay Ms. Natalie by the hour?

 7   A.   Yes, I believe so.

 8   Q.   And Priscilla by the hour?

 9   A.   Priscilla is full -- yes, by the hour now.

10   Q.   Are all of your employees paid by the hour?

11            MR. POLLOCK:  Objection.

12            THE WITNESS:  Not all of them.

13            MR. POLLOCK:  Objection.  Form.

14   BY MR. CUTHBERTSON:

15   Q.   Not all of them?

16   A.   Not all of them.

17   Q.   Okay.

18   A.   Some are full-time.  Some are hourly.

19   Q.   And how do you keep track of their hours?

20            MR. POLLOCK:  Form.

21            THE WITNESS:  QuickBooks.

22   BY MR. CUTHBERTSON:

23   Q.   Can you elaborate?  So do they clock in and out?

24   A.   They clock in and out.

25   Q.   Is that through an app?
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    32

1    A.   We've had an app for those who are hourly, yes.

2    Their phone.

3    Q.   They use their own device?

4    A.   I believe so.

5    Q.   Did you ever maintain record keeping with paper

6    time sheets or attendance records or --

7    A.   Yeah.

8    Q.   You did?

9    A.   Oh, yeah.

10   Q.   And when did you stop that practice, or do you

11   still continue to do that?

12   A.   No, we don't do that anymore because we do

13   everything online now.  Everything is digital.

14   Q.   So when did you start with the QuickBooks?

15   A.   I would have to ask Natalie and Priscilla.  They

16   may know that.  I don't mess with payroll.

17   Q.   So approximately in the last year, the last couple

18   years?

19   A.   Could be the last year.  It could be the last

20   couple of years.  I don't know.

21   Q.   Okay.  When you were signing the paychecks, how

22   were you maintaining the records of the time that people

23   were giving you?

24   A.   When I was signing the paychecks, they would hand

25   me a sheet with their hours, and I would write them a



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          33

```
 1    check.
 2    Q.    And did you ever have employees work off the clock,
 3    Mr. Spanos?
 4    A.    No.
 5    Q.    Did you ever have an employee come to you and say,
 6    I forgot to tell you these hours.  Please add them?
 7    A.    No.  It was usually the other way around.  They
 8    worked -- they logged more than they actually worked.
 9    I've had that happen a couple of times.
10    Q.    And you never had an employee that was hourly come
11    in Saturday or Sunday?
12    A.    Come again?
13    Q.    You never had an employee come in Saturday or
14    Sunday that was hourly?
15    A.    Extremely rare.  I don't remember.  Almost never.
16    Q.    Did you pay for holidays or vacations, Mr. Spanos?
17    A.    No.
18    Q.    So you had no accruing time off policies, nothing
19    like that?
20    A.    Zero.
21    Q.    Did you pay any bonuses?
22    A.    No.
23    Q.    Okay.  Any other compensation that you gave that
24    was not hourly related?  Any sort of one-time cash bonus
25    or anything like that?
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    34

1   A.    Yeah.   Christmas, maybe, to a couple of guys.

2   Q.    Did you at least pay minimum wage for the hourly

3   employees?

4   A.    Way over a minimum wage.   Nobody works for minimum

5   wage.

6   Q.    Did you ever have an employee complain about any

7   working conditions?

8          MR. POLLOCK:   Form.

9          THE WITNESS:   I don't recall.

10  BY MR. CUTHBERTSON:

11  Q.    Did you ever have employees complain about the time

12  they were working?

13  A.    Never.

14  Q.    Did you ever have an employee complain about not

15  being compensated properly?

16  A.    Never.

17  Q.    And how often is your pay cycle?

18  A.    Weekly.   Oh, on Thursday.

19  Q.    And that's for the prior Thursday to Wednesday

20  or --

21  A.    To Wednesday.   No.   I take it back.   It is to

22  Thursday, to that day.   We do payroll after 5:00 on

23  Thursday and includes Thursday.

24  Q.    For that same week or for the prior week?

25  A.    For the same week.



MICHAEL SPANOS                                         January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                        35

1   Q.   Okay.

2   A.   Nobody's owed anything.

3   Q.   Okay.  So there's no gap in work and pay?

4   A.   Zero.  To add something, if I may?

5   Q.   Go ahead.

6   A.   If you're okay with that.  I have employees that

7   got fired that are begging me back for their job right

8   now, because I was -- they were paid so well, and they

9   loved working for me.  And if you need evidence, I think

10  I can find it a couple of texts right now.  Will that

11  help you?

12  Q.   No.

13  A.   No.  I didn't think so.

14  Q.   Okay.  Tell me about how you reprimanded employees

15  for not coming in on time or missing a day.  How would

16  that happen?

17  A.   I gave the -- the one employee that only did it was

18  Bailey.  She was given a couple of warnings.

19  Q.   Verbal?

20  A.   Verbal.  And she was terminated verbally over the

21  phone.

22  Q.   Does that same thing go for AJ?

23  A.   Same with AJ.  Those two went together.

24  Q.   Verbal warnings?

25  A.   I fired them both at the same time with the same



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                         36

```
 1   phone call.
 2   Q.   What about other employees you fired?
 3   A.   I fired one employee because he was harassing
 4   Bailey.
 5   Q.   Okay.  And that was verbal?
 6   A.   He was fired verbally.
 7   Q.   And when was that, approximately?
 8   A.   I want to say somewhere around either '22 or '23.
 9   Q.   And what was his name?
10   A.   His name was Dillon.
11   Q.   Can you spell that?
12   A.   I believe it's D-I-L-L-O-N.
13   Q.   Do you remember his last name?
14   A.   No.
15   Q.   And to be clear, this is not Ms. Michaels' son,
16   correct?
17   A.   No.
18   Q.   This is the other Dillon.
19   A.   No.  Ms. Michaels' son quit the same day without a
20   warning.  Disappeared in the middle of the day.
21   Q.   That was in about 2022, 2023?
22   A.   Somewhere in there.  It was -- I have never
23   witnessed such employee behavior.  Not -- not even heard
24   of it -- such thing.  Getting up, not a warning.
25           I was looking for him and then came back like,
```



1  guys, where's Dillon?

2       Like, we don't know.  Well, hold on.  He was going

3  to the airport.  He's leaving.

4            I'm like, he's leaving for where?

5       He goes, oh, no.  He's -- she just quit his job and

6  left.

7            I'm like, are we talking about the same

8  Dillon?

9       Yeah.  He's just like --

10      So I called Melinda.  I said, Melinda, where's

11 Dillon?

12 Q.   Have you communicated with Dillon since he quit?

13 A.   No.  No.  Yeah.  He sent me a nasty text once he

14 called me a -- an asshole and some other nasty names.

15 Q.   Do you remember when that was?

16 A.   No.  It's -- it's part of that text when I sent

17 Melinda $3,000.  I talked to Dillon.  I talked some

18 sense into him.

19            I explained to him what's happening, and I

20 said, please help your mother.  Please give her some

21 money.  She's refusing to take money from me.  She's

22 living on a boat.  She's probably not eating well.

23      And Dillon said -- should I continue or -- because

24 this is not going to work well for you.

25 Q.   I'm going to ask you to --



MICHAEL SPANOS                                        January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                       38

1  A.   Want me to skip it all together?

2  Q.   I'm sorry?

3  A.   Do you want me to skip the -- what I'm saying, or

4  you want me to continue?

5  Q.   I'm going to introduce what you're referring to on

6  the record.

7  A.   Okay.  Let's put it on the record.

8        MR. CUTHBERTSON:  This is Plaintiff's Exhibit

9  2, text message with Dillon Tucker (phonetic).

10       (Exhibit 2 was marked for identification.)

11       THE WITNESS:  Okay.  And we'll start?

12 BY MR. CUTHBERTSON:

13 Q.   Give me one second.

14       MR. CUTHBERTSON:  Brian, would you like that?

15       MR. POLLOCK:  Sure.  Thank you.  Thank you.

16 BY MR. CUTHBERTSON:

17 Q.   So we're looking at SeaWater 251 through 255.  All

18 right, Mr. Spanos.  So this is the only text message

19 that you received?

20 A.   There is actually a --

21       MR. POLLOCK:  Wait for him to answer -- ask

22 his question, and then you can answer it.

23       THE WITNESS:  Yeah.  Sorry.  You got it.

24 BY MR. CUTHBERTSON:

25 Q.   This is the only text communication you've had with



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    39

1   Dillon since he quit?

2   A.   This is the last of it, but there is more ahead of

3   this.  I did not screenshot everything.  I only

4   screenshot what I thought was relevant.

5   Q.   And you've had no other communication with him?

6   A.   Since then, no.

7   Q.   What about communication with any other members of

8   Melinda's family?

9   A.   No, I haven't had any.

10  Q.   None since she left?

11  A.   None since she left.

12  Q.   What about during the time you were with Ms.

13  Michaels?  Did you communicate with any members of her

14  family?

15  A.   Yes.

16  Q.   Who?

17  A.   Her son, Nick.

18  Q.   And how frequent were those communications?

19  A.   Very rare.  He did a little bit of work for me

20  remotely, and then I -- I called him once when Melinda

21  attempted suicide when I took her to the hospital.

22  Q.   Do you remember when that was, when he did the work

23  for you?

24  A.   No.  It was -- we were living on Tropic Isle.  I

25  don't remember the year.  I would have to look through



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                         40

 1  the leases.  If that's -- if you have to have, I can go

 2  through the leases and things.

 3  Q.   Anybody else in her family?

 4  A.   Tarak's (phonetic) husband, maybe, once or twice.

 5  Q.   Was that via text?

 6  A.   Via phone.  And then her sister.  I forgot about

 7  that.

 8  Q.   That was via text?

 9  A.   That was via text, then phone, and she visited me.

10  Q.   During this time you were with Ms. Michaels?

11  A.   During and after.  We're still very good friends.

12  Q.   And what's her sister's name?

13  A.   Laura.

14  Q.   When's the last time you communicated with Laura?

15  A.   I am guessing six months ago.

16  Q.   Does Laura know about this lawsuit?

17  A.   I believe she does.  Not sure.

18  Q.   And Melinda's son Nick.  When was the last time you

19  communicated with him?

20  A.   That was when Mindy attempted suicide.  I called

21  him to let him know and notify his family because I have

22  no other ties.

23  Q.   So nothing recent?

24  A.   Nothing recent.

25  Q.   So the only member of Melinda's family that you've



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                         41

```
 1   communicated with relatively recently is her sister?
 2   A.   Her sister would be the earliest one.
 3   Q.   Okay.
 4   A.   And her niece, which we're still friends.
 5   Q.   Her niece, Bailey?
 6   A.   Bailey.
 7   Q.   Did Ms. Michaels ever sign any of Bailey's
 8   paychecks?
 9   A.   I don't -- I don't remember.  I don't want to lie
10   to you.
11          MR. CUTHBERTSON:  All right.  Does anybody
12   need a quick break?
13          MR. POLLOCK:  Yeah.  Let's take a break.
14   We've been going for about an hour.
15          MR. CUTHBERTSON:  Okay.
16          MR. POLLOCK:  That's a good idea.
17          THE REPORTER:  All right.  Going off the
18   record.  The time is 11:10 a.m. Eastern Standard Time.
19   We're off the record.
20      (A recess was taken.)
21          THE REPORTER:  The time is 11:19 a.m. Eastern
22   Standard Time.  We're back on the record.
23   BY MR. CUTHBERTSON:
24   Q.   Mr. Spanos, you testified earlier that the first
25   employee you hired was Trevor; is that correct?
```



```
 1   A.    Correct.
 2   Q.    It was approximately three to six months into the
 3   inception of the business, right?
 4   A.    Something like that.  Yeah.  Do you remember how
 5   you came to met -- meet Trevor?
 6          THE REPORTER:  I'm sorry.  Bear with me just
 7   one moment.
 8          MR. CUTHBERTSON:  Sure.
 9          THE REPORTER:  I'm having an issue.
10          Going off the record.  The time is 11:19 a.m.
11   Eastern Standard Time.  We're off the record.
12       (A recess was taken.)
13          THE REPORTER:  Going on the record.  The time
14   is 11:21 a.m. Eastern Standard Time.  We're back on the
15   record.
16          MR. CUTHBERTSON:  Do I need to repeat my
17   question?
18          THE REPORTER:  No.
19   BY MR. CUTHBERTSON:
20   Q.    Do you recall how you came to meet Trevor?
21   A.    Trevor was referred to me by a dealer I had in
22   Puerto Rico.
23   Q.    Okay.  And did that referral happen in the first
24   year that your business was operating?
25   A.    I believe so.
```



1   Q.   Mr. Spanos, who is Tibby (phonetic)?

2   A.   Tibby was an employee that worked for me for about

3   three, four weeks, maybe, or a month and a half.

4   Q.   When was that?

5   A.   That was when we were at the 1,200 square foot

6   warehouse on 1st Avenue.  And that was approximately

7   2019, I want to say.  Because in 2020, we moved to the

8   big warehouse, so he's never been there.  So it had to

9   be sometime in 2019.

10  Q.   And who's Kristen?

11  A.   It's his wife.

12  Q.   And Kristen worked during the same time period?

13  A.   They worked together at the same time.  They were

14  visiting Fort Lauderdale.  They were passing by with

15  their boat.

16  Q.   And who's Ernst?

17  A.   Ernst is our neighbor.  He lives one -- one boat --

18  the next boat next to us.

19  Q.   And did he ever work for you?

20  A.   He worked for me for a few days on and off, part-

21  time.

22  Q.   Do you remember when?

23  A.   It had to be 2019 and 2020, on and -- either 2019

24  or 2020.  I think he came to the new warehouse, so it

25  had to be 2020.



1   Q.   Did any of those people, Tibby, Kristen, or Ernst,

2   work for you the first year you were in operation?

3   A.   I don't recall.

4   Q.   Did Tibby, Kristen, or Ernst work for you before

5   you hired Trevor?

6   A.   No.  Trevor was the first one.

7   Q.   Isn't it true, Mr. Spanos, that Trevor was hired

8   right before COVID?

9   A.   When was COVID?  It was before COVID.  Yes.  I

10  believe it was before COVID.

11  Q.   So it was not, in fact, the first year you were

12  open; is that correct?

13  A.   It was the first year I was open.

14  Q.   Well, in your testimony, your earlier testimony,

15  you said that he started working in 2018?

16  A.   2018 was the first year.

17  Q.   Okay.  COVID was in 2020 was when COVID started.

18  A.   Okay.

19  Q.   So are you changing your answer?  Did he work --

20  start working in 2019?

21  A.   I may have to change my answer.  My apologies.

22  COVID -- if COVID was 2020, you said?

23  Q.   2020.

24  A.   Travel was there prior to that.

25  Q.   Immediately prior, right?



1    A.    What do you mean immediately?

2    Q.    When did he start working Before COVID happened?

3    A.    I believe Trevor started working in 2018, to the

4    best of my recollection.

5    Q.    Mr. Spanos, your earlier testimony you said you've

6    been married one time; is that correct?

7    A.    No.

8    Q.    You've been married twice?

9    A.    I've been married twice.

10   Q.    And who is your second wife?

11   A.    My first wife?

12   Q.    Oh, your first wife?  My apologies.

13   A.    My first wife was Susan Kim.

14   Q.    Spell the last name?

15   A.    K-I-M.

16   Q.    How long were you married?

17   A.    Nine years.

18   Q.    And you were living where during that marriage?

19   A.    In Mesa, Arizona.

20   Q.    And when did you get divorced?

21   A.    It was 1999 or 2000.  I'm not sure.

22   Q.    And when did you get married?

23   A.    '91, I believe, plus, minus a year.

24   Q.    Does she still live in Arizona?

25   A.    I have no idea where she is now.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                               46

 1 | Q.   All right.  Mr. Spanos, did you have any managers
 2 | at SeaWater Pro?
 3 | A.   Yeah.
 4 | Q.   And during this claim period for this lawsuit, who
 5 | were the managers during that time period?
 6 | A.   Michael Moratta -- Moratta.
 7 | Q.   Anybody else?
 8 | A.   No, that's it.  Can you define manager?  If it's a
 9 | critical question, I would like elaboration.  If not,
10 | then we can move on.
11 | Q.   What do you consider a manager to be, Mr. Spanos?
12 | A.   I'm not sure what you consider a manager.
13 | Q.   Well, we asked you in our discovery request -- let
14 | me find it.
15 |         MR. CUTHBERTSON:  All right.  This is
16 | Plaintiff's 3, SeaWater Pro's responses to Melinda
17 | Michaels' first request for production.
18 |     (Exhibit 3 was marked for identification.)
19 | BY MR. CUTHBERTSON:
20 | Q.   Please turn to Page 3, Mr. Spanos.  Please read
21 | number 11 and state your answer.
22 | A.   "Documents generally describing or relating to
23 | hours worked by SeaWater Pro LLC managers."  Answer,
24 | "None.  This business operated in a 10 by 20 storage
25 | locker.  SeaWater Pro does not have such documentation.



1  | Mr. Spanos was the sole operating manager."  If you are

2  | referring to the early days, that is absolutely true.

3  | If you are asking me if I have a manager now, which you

4  | didn't specify, I do have a manager now.

5  | Q.   And that manager now is Michael Moratta?

6  | A.   Michael Moratta is his name.

7  | Q.   Mr. Spanos, was Bailey ever a manager?

8  | A.   Not really.  Not by your definition anyways.

9  | Q.   Did Bailey hold herself out to be a manager?

10 | A.   Yes.

11 |          MR. CUTHBERTSON:  Is this 4?

12 |          THE REPORTER:  Yes.

13 |          MR. CUTHBERTSON:  This is Plaintiff's 1433,

14 | Exhibit 4, a comment from Bailey Frederes on the Marine

15 | Watermaker Discussion Group.

16 |     (Exhibit 4 was marked for identification.)

17 | BY MR. CUTHBERTSON:

18 | Q.   Can you read Bailey's comment please, Mr. Spanos?

19 | A.   Why would I read Bailey's comments?

20 | Q.   She was your employee, wasn't she?

21 | A.   Yeah.

22 | Q.   Well, is this your --

23 | A.   What does that have to do with anything?

24 |          MR. POLLOCK:  He just want you to read it, so

25 | just read it.  You can -- I'll object if --



```
 1            THE WITNESS:  "I'm Bailey from SeaWater Pro.
 2   I am the super and manager of our shop here in Fort
 3   Lauderdale, Florida.  We would love to help the Water
 4   America community find the best solutions" --
 5   BY MR. CUTHBERTSON:
 6   Q.   Slow down, because she got to take it down.
 7   A.   -- "for the best solution as easy and cost-
 8   effective as possible.  I am here Monday through Friday,
 9   9:00 to 5:00.  Feel free to come in, 3233 Southwest
10   Second Avenue, Fort Lauderdale, and mention you found us
11   from this post for a special discount.  If you have any
12   questions, feel free to message me.  I look forward to
13   hearing from you."
14   Q.   Any other managers, Mr. Spanos?
15            MR. POLLOCK:  Objection.
16            THE WITNESS:  She was not manager.  She
17   thought she was.  I never officially told her that she's
18   a manager.  Did I answer your question?
19   BY MR. CUTHBERTSON:
20   Q.   Yes.
21   A.   Can I put this down?
22   Q.   You may.  What sort of decision making capabilities
23   does Michael Moratta have?
24   A.   Order inventory, send people home if there isn't
25   enough work, lock the shop before he leaves the
```



MICHAEL SPANOS                                              January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                            49

1  premises, turn off the lights and all the equipment.

2  Q.   And getting into the building, is it a key lock, is

3  it a code?  How does he get access?

4  A.   He has a key.

5  Q.   A key.  In every location that SeaWater Pro is

6  operated on, has it been a key entry?

7  A.   Yes.  The one we have now has both key and keypad.

8  Q.   During the claim period, the locations that

9  SeaWater Pro operated, it was key?

10  A.   It was both keyed and keypad.

11  Q.   Key and keypad.  Did Ms. Michaels have access to a

12  key and use the keypad?

13  A.   Not -- not the keypad, and she did not have a key

14  to my -- best of my recollection, not to the new

15  facility.

16  Q.   How about the prior facility?

17  A.   The prior facility, I believe she did.

18  Q.   She had a key?

19  A.   She had a key.

20  Q.   When you started the company, Mr. Spanos, what was

21  Melinda's --

22  A.   May I add something?  We had to change the locks to

23  the new facility to keep Melinda out.  I recall that.

24  Q.   So she had a key?

25  A.   I believe she had a key, but I didn't want to take



1  a chance, so we changed the locks.  That was in 2020,

2  very shortly after we moved in.

3  Q.   All right.  When you started SeaWater Pro and it

4  was just you operating by yourself, what did Ms.

5  Michaels do for the company?

6  A.   When I started SeaWater Pro, I was running it at

7  the same time as the Navy job.  So I was asked answering

8  phone calls while I was working for the Navy.  And that

9  was the reason why I got fired in the end because I was

10 conducting business while I was a contractor.

11 Q.   That didn't answer my question.

12 A.   Your question one more time?

13 Q.   Sure.  When --

14 A.   I was -- I was trying to answer it exactly what

15 happened.

16 Q.   Sure.  So when you started the company --

17 A.   Yes.

18 Q.   -- it was just you operating solely, what did Ms.

19 Michaels do for you in the company?

20 A.   When I first started the company, we did a video

21 together on the dock.

22 Q.   Like, a marketing video?

23 A.   Yeah.  It was a marketing video.  She was -- I was

24 telling her what to do.  I was holding the camera, and

25 she would position the items that you see in the video.



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          51

1   Q.   Okay.

2   A.   She posted for a picture of our one of our

3   equipment.

4   Q.   She posted a picture?

5   A.   She -- she posted for a picture.

6   Q.   Posed.

7   A.   Posed.  I'm sorry.  Yeah, posed for a picture.

8   Q.   And that was for marketing?

9   A.   That was for marketing.

10  Q.   Okay.

11  A.   She would sometimes come with me to help me

12  assemble units.

13  Q.   So when you're assembling a unit, approximately how

14  long does that take?

15  A.   About 20 minutes.

16  Q.   20 minutes.

17  A.   Half an hour.

18  Q.   And how many can you assemble in a day?

19  A.   How many were actually assembled --

20  Q.   Yeah.

21  A.   -- or how many I can assemble?

22  Q.   No.  On average, how many were you assembling --

23  A.   Two.

24  Q.   Two per day?

25  A.   Average, yeah.  Maybe one and a half.



MICHAEL SPANOS                                             January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                            52

1   Q.   And you said she helped you assemble them.  How

2   would she help you?

3   A.   She would help me put the items in the box, close

4   it, and put a shipping label on it.

5   Q.   And those every day?

6   A.   No.

7   Q.   How many days a week?

8   A.   Well, when I was working for the Navy, I was only

9   going in weekends, maybe Saturdays.  One or two days a

10  week.  It was a -- it was a very small business.  It was

11  running out of a 20 by 10 locker, so --

12  Q.   It was the auto locker, wasn't it?  Auto parts,

13  auto repair?

14  A.   I don't remember.  No.  That was before that.  I'm

15  talking before that.  It was like a U-Haul type storage

16  locker.

17  Q.   Okay.

18  A.   10 by 20.

19  Q.   So you said when you first started, you, solo,

20  right?  You were the only employee; just you.  You only

21  went in on the weekends, sometimes on a Saturday to fill

22  orders?

23  A.   Sometimes.  Yeah.

24  Q.   How many orders were you getting a week, would you

25  say, on average?



MICHAEL SPANOS                                   January 22, 2025
MICHAELS V. SEAWATER PRO LLC                              53

1   A.    Four.  Three.

2   Q.    And then how did you increase your orders?

3   A.    The word got out.

4   Q.    What does that mean?

5   A.    Word of mouth.  Friends telling friends.

6   Q.    Okay.  And that was you telling friends?  That

7   was --

8   A.    No.  The customers.

9   Q.    Customers?

10  A.    Yeah.

11  Q.    Did Ms. Michaels tell friends that you guys had?

12  A.    Ms. Michaels doesn't have any friends.

13  Q.    That didn't answer my question.

14  A.    No.

15  Q.    And then -- okay.  So you said that you were

16  getting approximately four orders a week, sometimes

17  three?

18  A.    Yep.

19  Q.    Okay.  When did that jump?  When did you see a big

20  increase in sales?  How long did you operate doing

21  three, four orders a week?

22  A.    About six months.

23  Q.    Six months.  And then what happened after that six

24  months?

25  A.    I outgrew the 20 by 20 and moved to a bigger



1  facility.

2  Q.   When you say you outgrew it, what does that mean?

3  A.   That the inventory -- there wasn't enough room.  It

4  was time to get a bigger place.

5  Q.   How many orders were you processing then per week?

6  A.   About the same.

7  Q.   Three or four?

8  A.   Three or four.

9  Q.   So you were just stockpiling inventory?

10  A.   Basically, yeah.  I would buy parts from Amazon and

11  from a couple of suppliers, bolt them together, and

12  throw them in a box.

13  Q.   And then you moved into that new facility

14  approximately when?

15  A.   I believe it was 2018.  Sometime in 2018.

16  Q.   Late 2018?

17  A.   Somewhere in 2018.  We were there for, like, a year

18  and a half maybe.  And then we moved in 2020 again.

19  Q.   All right.  When you were in that second facility,

20  did you see an increase in orders?

21  A.   Yes.

22  Q.   And what do you attribute that to?

23  A.   Word of mouth advertising.

24  Q.   Did you have any social media advertising?

25  A.   Very little.  We had the Facebook page, and we had



1  a -- YouTube videos.

2  Q.   And who was running that Facebook page?

3  A.   The Facebook page was created by Melinda under her

4  personal Facebook account.

5  Q.   So that said who created it.  Who was running it?

6  A.   She created it, and she ran it.

7  Q.   Okay.  And so that was Facebook.  What about any

8  other marketing?

9  A.   We did advertising on Google.

10  Q.   Google.

11  A.   Google Ads, YouTube, magazines.

12  Q.   Was that all Melinda, too?

13  A.   No.  Melinda, she only worked really on the

14  Facebook page, which was her personal thing.

15  Q.   Did Melinda ever work on the Google Ads?

16  A.   No.

17  Q.   The YouTube?

18  A.   No.

19  Q.   Melinda --

20  A.   Except that video we shot, that 12-minute video.

21  Q.   So just one video on YouTube; that's it?

22  A.   One -- one video on YouTube that we did together

23  under my supervision.

24  Q.   What about any other videos she did on YouTube?

25  Did she do for SeaWater Pro?



MICHAEL SPANOS
MICHAELS V. SEAWATER PRO LLC

January 22, 2025
56

```
 1   A.   No.  I did.  I shot the rest of the videos.
 2   Melinda was around because we were on our boat, if
 3   that's the one you're referring to.  We were out
 4   swimming, and we shot a video.  I was holding the
 5   camera, and Melinda was doing what I was telling her.
 6   Q.   All right.  What about the magazine advertising?
 7   Who was responsible for that?
 8   A.   Me.
 9   Q.   Melinda didn't help at all?
10   A.   Nope.
11   Q.   Who answered the phones?
12   A.   Me.
13   Q.   Did you have a landline to the business?
14   A.   I don't remember, but the business was conducted
15   through my personal cell phone line.  I wanted to keep
16   the same number.
17   Q.   So if somebody Googled SeaWater Pro, that phone
18   number was your cell phone?
19   A.   They would see my cell phone.  Yeah.  602-751-6414.
20   Q.   Is that still currently the number for SeaWater
21   Pro?
22   A.   No.
23   Q.   What's the number now?
24   A.   954-800-8800.
25   Q.   Does that go to your cell phone?
```



1   A.   Does -- it goes to my cell phone still.  To this

2   day, I'm the only one answering the phones.

3   Q.   And what's the phone number that ends in 6414?

4   A.   That was my old personal cell phone.

5   Q.   What's that phone number?

6   A.   What do you mean what's that phone number?  That's

7   not been used anymore.

8   Q.   What's the phone number?

9   A.   602-751-6414.

10   Q.   And that number ended approximately when?

11   A.   I replaced that number, to the best of my

12   recollection, around either 2019 or 2020.

13   Q.   When you replaced that number, you got a whole new

14   phone or you kept your same phone?

15   A.   You mean the device?  The --

16   Q.   Yeah.

17   A.   -- the -- the gadget.  I don't remember.  Most

18   likely.

19   Q.   Who was the carrier for that?

20   A.   The carrier for that, there have been several

21   carriers.  It was AT&T.  No.  Sorry.  Cricket it.  And

22   then I switched to -- where did I go after that?  I

23   think I went to AT&T, and then I went to Google Fi, and

24   back to AT&T.

25   Q.   And this 8800 is with who?



MICHAEL SPANOS                                   January 22, 2025
MICHAELS V. SEAWATER PRO LLC                              58

1   A.   At this time, it's with AT&T.

2   Q.   Do you pay for cell phones for any of your other

3   employees?

4   A.   No.  No, wait a minute.  No.  Only for business

5   lines.

6   Q.   Can you clarify that?

7   A.   Yeah.  I have another phone for support, which

8   is --

9   Q.   That employees use?

10  A.   That one of my guys uses to do technical support.

11  Q.   Did Melinda ever have access to that phone?

12  A.   No.

13  Q.   Was that phone number in use during her claim

14  period?

15  A.   No.

16  Q.   That's recent?

17  A.   That's recent.

18  Q.   Mr. Spanos, did Melinda ever answer your phone

19  ending in 6414?

20  A.   She -- she probably had, but extremely rarely.

21  Q.   Did she ever conduct business on that phone -- the

22  SeaWater phone?

23  A.   No.  I did -- I did all the business.

24  Q.   Did Ms. Michaels conduct any business on her own

25  personal cell phone for SeaWater?



MICHAEL SPANOS                                                  January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                              59

 1  A.    I wouldn't know.

 2  Q.    Did Ms. Michaels ever tell you the work that she

 3  was doing for SeaWater Pro?

 4  A.    Repeat.

 5  Q.    Did Ms. Michaels ever tell you the work that she

 6  was doing for SeaWater Pro?

 7  A.    No.  When she helped me out, I could see it.  She

 8  didn't have to tell me.

 9  Q.    You could see it?

10  A.    Yeah.  Oh, she helped out a few things.

11  Q.    What would she do exactly?

12  A.    She would help with mainly shipping boxes, printing

13  labels, and putting them on boxes.

14  Q.    And the hours that you earlier described, was she

15  working those hours with you?

16  A.    No.  Melinda would show up when she felt like it.

17  Q.    So she didn't come and go with you to the business?

18  A.    Sometimes.

19  Q.    Sometimes, like more than 50 percent?

20  A.    No.  Less than 50 percent.  She wouldn't get out of

21  bed before 11:00.

22  Q.    When you went home at night, would she go home with

23  you?

24  A.    If we were together, yes.

25  Q.    If -- assuming you were together that day at



```
 1  location at SeaWater Pro, would she go home with you
 2  then?
 3  A.   Yes.  We would go out to dinner, we would go out to
 4  lunch together, or we would meet somewhere for lunch, or
 5  we would meet somewhere for dinner.  Melinda and never
 6  cooked.  She cannot cook eggs over easy to save her
 7  life.  So we ate out at least once a day, most --
 8  most -- usually twice a day.
 9  Q.   You mentioned that you attended the Fort Lauderdale
10  International Boat Show and the Miami Boat Show.  Did
11  you attend any other boat shows for SeaWater Pro?
12  A.   No.  Miami, we only did it, believe, just once, and
13  we never did it again.
14  Q.   Did you attend Annapolis?
15  A.   I attended Annapolis.
16  Q.   What year was that?
17  A.   Been to Annapolis for the last three or four years.
18  Q.   And how long is that show?  A week?
19  A.   It's, yeah, five days.
20  Q.   Did Melinda accompany you?
21  A.   Who?
22  Q.   Melinda.
23  A.   I don't remember Melinda coming to Annapolis.
24  Q.   Did Melinda go with you to the Fort Lauderdale Boat
25  Show?
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                            61

1   A.   I believe she did once.  She came; she visited for

2   a few hours.

3   Q.   Okay.  Did she help set up?

4   A.   I don't recall.

5   Q.   Did she help break down?

6   A.   I don't think so.

7   Q.   Do you remember who did?

8   A.   My other employees:  Archie, Trevor, and Glenn.

9   Q.   Do you remember what the hours were at the boat

10  show?

11  A.   10:00 to 6:00.

12  Q.   That was for the public, correct?

13  A.   Those for the public, yeah.

14  Q.   What about for the vendors?

15  A.   I would show up at 11:00 and be out of there by

16  4:00, 5:00.

17  Q.   So you didn't have anybody from SeaWater before

18  11:00 or after 4:00 or 5:00?

19  A.   The guys would be there.  Yeah.

20  Q.   So there were employees there?

21  A.   Yeah.  There were employees there.

22  Q.   And was Melinda there working?

23  A.   Melinda was there.  I don't think she was working.

24  Q.   Mr. Spanos, when you decided to put Ms. Michaels as

25  power of attorney and assigner on the business banking



 1  account, why was that?

 2  A.   Because I was terminally ill at the time, and

 3  Melinda, in case I was incapacitated, could take care of

 4  the -- if there were any things that needed to be done

 5  at the bank.

 6  Q.   But also to pay employees or anything like that,

 7  correct?

 8            MR. POLLOCK:   Form.

 9            THE WITNESS:   Yeah.   That never happened.   So

10  I don't know what she would've done.

11  BY MR. CUTHBERTSON:

12  Q.   Did Ms. Michaels know the business?

13  A.   No.

14  Q.   She did not.

15  A.   No, not very well.

16  Q.   Not very well.   So she knew some?

17  A.   She knew something.   Yeah, of course.   She -- she

18  was my girlfriend.   My present girlfriend also knows the

19  business.

20  Q.   I'm sorry --

21  A.   So does -- so does my sister.   My present

22  girlfriend also knows the business a little bit.

23  Q.   Okay.

24  A.   So did my sister.   She came to visit for a month.

25  Q.   When Melinda was working there, your sister came to



1  visit?

2  A.   Melinda was never working there.

3  Q.   When did your sister --

4  A.   Melinda (sic) was visiting.

5  Q.   Your sister's name is what?

6  A.   My sister name is Sophia.

7  Q.   And she was there when you were with Ms. Michaels?

8  A.   She was there, I believe, when she was -- I'm not

9  sure if she visited me while I was with Melinda or not.

10 But she has visited me.

11 Q.   Did you teach Ms. Michaels the business?

12 A.   I -- I explained.  I answered her questions.

13 Q.   You answered her questions.  So would you say --

14 A.   Yeah.  She had -- she had questions because that

15 was my design, my idea, I developed it from the ground

16 up, so she was -- she would -- anything she would ask

17 me -- she would ask me, I would tell her.

18 Q.   Did Melinda keep notes of things that you would

19 tell her about the business?

20 A.   I don't know.

21          MR. CUTHBERTSON:  Is this 5?

22          THE REPORTER:  Yes.

23          MR. CUTHBERTSON:  This is Plaintiff's Exhibit

24 5.  It is a list of orders from Ms. Michaels' phone and

25 also a protocol for SeaWater Pro on Ms. Michaels' phone.



 1          (Exhibit 5 was marked for identification.)

 2              THE WITNESS:  I have no idea what that is.

 3              MR. POLLOCK:  Wait.  We're going to answer

 4     questions, and just wait until the question is asked.

 5              THE WITNESS:  Okay.

 6              MR. POLLOCK:  And these are Plaintiff's 1597

 7     and 1598.  At the bottom, edited January 8th, 2020,

 8     edited January 7th, 2020, for the second page.  Okay.

 9              THE WITNESS:  This looks like instruction from

10     the manual.

11     BY MR. CUTHBERTSON:

12     Q.   All right.  Mr. Spanos, on the first page at the

13     bottom, it has PLA 1597, and the heading is Orders 4.

14     There's a number of individuals listed.  Do you

15     recognize these orders --

16     A.   No.

17     Q.   -- from customers?

18     A.   No.  These are five years old.

19     Q.   You don't remember these?  Okay.

20     A.   No.

21     Q.   And on the next page, PLA 1598, at the bottom

22     right --

23     A.   Yep.

24     Q.   -- and it says "SeaWater Pro".

25     A.   Yep.



1   Q.   And then there's a list of things such as "read top

2   of flow meter".

3   A.   Yep.

4   Q.   "Install the membrane vertically.  It is best if

5   the output is higher than the input so the air has a way

6   to get out.  Never install a check valve on the suction

7   side of the priming pump.  It will restrict water flow,

8   and the system will not work."

9   A.   Yep.

10  Q.   "Reversing the timer, input, and output renders it

11  useless.  The top is input.  Bottom is output.  Pre-

12  filters need cleaning once a month in the tropics.  If

13  your water smells, replace pre-filters.  Note to remove

14  the filter from the portable unit if mounted permanently

15  on the boat, and note to stand the unit vertical before

16  cleaning or" -- would you say those are accurate

17  instructions for using your product?

18  A.   This is copy exactly out of the manual.

19  Q.   Copy exactly out of the manual.

20  A.   Out of the -- out of the out of the operator's

21  manual.

22  Q.   So when somebody buys a product from you, you give

23  them a user --

24  A.   I give everyone a manual, yes.

25  Q.   -- a user guide?



```
 1              MR. POLLOCK:  Wait for the questions to be
 2    asked, because the transcript will read a muck.
 3              THE WITNESS:  I -- I don't have to think about
 4    this answer because I'm not lying.
 5              MR. POLLOCK:  No.  It's not a question of
 6    that.  You want a clean transcript so that it shows that
 7    you're telling the truth and your truth comes out --
 8              THE WITNESS:  I'll -- I'll --
 9              MR. POLLOCK:  -- in one piece.
10              THE WITNESS:  I'll try my best.  I don't have
11    to think about telling the truth.  That's why I am so
12    prompt.
13              MR. POLLOCK:  Okay.
14              So go ahead.
15    BY MR. CUTHBERTSON:
16    Q.    These directives on this list --
17    A.    Yes.
18    Q.    -- this is something that would come from a user
19    guide that you give to customers when they buy your
20    product?
21    A.    That is correct.  This is a user guide that I
22    typed.
23    Q.    That you typed?
24    A.    I typed.
25    Q.    Okay.
```



```
1   A.   And this is directly out of the user guide

2   verbatim.

3   Q.   Did you teach Ms. Michaels how to do any of these

4   things on this list?

5   A.   No.  That's why we have a manual.  I doubt she

6   knows today what -- what half the shit means here.

7   Q.   All right.  Mr. Spanos, back to the first page.

8   This order is 4, and there's a number of individuals

9   listed here.  Did Ms. Michaels do anything with taking

10  orders from customers?

11  A.   The -- I recall a few times Melinda typing an

12  invoice and getting sent from QuickBooks, but that's

13  mostly done by me.

14  Q.   So do you recall her ever taking an order from a

15  customer?

16  A.   No.

17  Q.   Do you recall Ms. Michaels ever speaking to a

18  customer?

19  A.   Yes.

20  Q.   Do you recall Ms. Michaels entertaining customers?

21  A.   Define entertaining.

22  Q.   Would Ms. Michaels engage in conversations about

23  SeaWater Pro with customers?

24           MR. POLLOCK:  Answer.

25           THE WITNESS:  I'm trying to think if when and
```



 1 | why would Melinda have a conversation with a customer
 2 | about SeaWater Pro.  The general answer to that would
 3 | be, yes, but the customers typically have technical
 4 | questions, and Melinda could not answer technical
 5 | questions.  I was the one that dealt with it.  Melinda
 6 | could have possibly socialized with customers that came
 7 | to our booth while she was visiting.  But anything that
 8 | was technical, I was the only one able to answer these
 9 | questions.
10 | BY MR. CUTHBERTSON:
11 | Q.   So aside from the boat show, aside from your
12 | booth --
13 | A.   Uh-huh.
14 | Q.   -- would Melinda talk to customers at SeaWater
15 | Pro's locations?
16 | A.   Extremely rare.
17 | Q.   And you don't recall you ever witnessed her selling
18 | a product to a customer?
19 | A.   I do not recall.
20 | Q.   Mr. Spanos, did you read all of the posts that
21 | Melinda would do for SeaWater Pro's Facebook page?
22 | A.   No.  I never asked Melinda to do anything online.
23 | I hated being online and talking to people online,
24 | because rumors start, and they're hard to deal with.
25 | And I preferred not to do anything online.



1   Q.   So you didn't know how often she was posting

2   something?

3   A.   No.  My advice to her was to stay away from online

4   crap.

5   Q.   But you had knowledge she was doing that, correct?

6   A.   I know she was doing it.  I couldn't stop her.  I

7   don't know exactly what she was doing.  She would tell

8   me sometimes what's going on, and I said, don't tell me.

9   I don't want to know, because the rumors upset me.  So I

10  didn't want to know.  I didn't want to answer anything.

11  I stayed away, and I asked Melinda to do the same.

12  Q.   So Melinda was running your social media presence

13  on Facebook, correct?

14  A.   I don't know what Melinda was doing on Facebook.

15  That was her personal page where she took the initiative

16  and created a sub-page called SeaWater Pro.

17  Q.   Okay.

18  A.   Which she kept the password.  And then she was

19  posting porn URLs and all kinds of personal information

20  about my health.  I have pages and pages of defamation

21  and slander online by Melinda directed to me.

22  Q.   Okay.

23  A.   So I think Melinda spent 99 percent of the time

24  harming the business than benefiting the business when

25  it comes to online.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                              70

1  Q.   And that was during her --

2  A.   And that -- that turned into a lawsuit.  And that's

3  why she was convicted of online stalking.  She did it

4  all to herself by herself.

5  Q.   During the time that she's claiming in this lawsuit

6  and she was doing marketing on Facebook for SeaWater

7  Pro --

8  A.   It was not with my blessing.

9  Q.   -- did you derive any business from online

10 marketing?

11 A.   I have no idea.

12         MR. CUTHBERTSON:  7?

13         THE REPORTER:  6.

14         MR. CUTHBERTSON:  This is Plaintiff's Exhibit

15 6.  It's PLA 1496.  It is a marketing for portable

16 watermakers for $1,995, SeaWaterPro.com, and it is a

17 photo of the (inaudible).

18     (Exhibit 6 was marked for identification.)

19         THE WITNESS:  That is the picture I told you

20 she --

21         MR. POLLOCK:  Hey, hold on.  Wait for a

22 question.

23         THE WITNESS:  Do you have any questions about

24 this?  I already answered it.

25 BY MR. CUTHBERTSON:



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    71

1    Q.    I do.

2    A.    Go ahead.

3    Q.    Mr. Spanos, did you take this photograph?

4    A.    I did.

5    Q.    And did you take this photograph in order to market

6    SeaWater Pro?

7    A.    Yes.

8    Q.    All right.  Mr. Spanos, when you moved into the new

9    location for SeaWater Pro, did you have a front for foot

10   traffic coming in?

11   A.    What are you referring as the new location?  I've

12   had four locations.

13   Q.    Sure.  During the claim period with Ms. Michaels,

14   when you moved from the 1200 square foot space to the

15   2,000 square foot space, did you have a front, like a

16   storefront?

17   A.    Yes, I did.

18   Q.    For walkable traffic?

19   A.    Yes, I did.

20   Q.    And did you have somebody man that desk?

21   A.    No.  That desk happened to be also the secretarial

22   desk, and that's where Natalie sat and did the payroll,

23   took emails, and did whatever she had to do.  But that

24   happened to be the reception area as well.

25   Q.    Did Ms. Michaels ever work at that spot, the



 1 | secretarial desk?
 2 | A.   No.  Ms. Michaels was visiting and she was
 3 | prohibited to -- from entering that warehouse.  She may
 4 | have visited in the very early days, and then she
 5 | started making enemies and pissing off employees, and
 6 | two employees got restraining orders against her or
 7 | tried to.
 8 | Q.   That was the 2,000 --
 9 | A.   And she was prohibited.  That was in 2020.
10 | Q.   I mean, that was the 2,000 square foot?
11 | A.   No, that was the big one.  This 8,000 square foot.
12 | Q.   That was the 8,000.
13 |      What about the 2,000 square foot space?  Did that
14 | have an area where she would sit and work?
15 | A.   1200 square foot space?
16 | Q.   1200.
17 | A.   That had a very small office in the front, which
18 | was -- half of it was inventory, and there was one
19 | demonstration unit in there.  We didn't really have any
20 | sales out of the store.  They were -- the warehouse,
21 | hidden, off site.  Extremely rarely we -- our walk-in
22 | traffic represented less than 1 percent of the business.
23 | 99 percent was UPS, online.
24 | Q.   How did you determine the metric that less than 1
25 | percent came from foot traffic?



1  A.   Just an estimate.

2  Q.   An estimate.  And what would you estimate comes

3  from marketing?

4  A.   99 percent.

5  Q.   99 percent.  And of that 99 percent, what would you

6  estimate comes from Facebook, Twitter, TikTok,

7  advertising?

8  A.   I don't -- I don't know.

9  Q.   Would you say a large chunk?

10           MR. POLLOCK:  Form.

11           You can answer.

12           THE WITNESS:  I would say, well, yeah, that's

13  the only -- the -- the only source to advertise.  You

14  just named everything.  Yeah.  We pay a lot of money to

15  Google.  We pay Meta.  That -- all that stuff costs

16  money.  There's nothing free.

17  BY MR. CUTHBERTSON:

18  Q.   Do you remember what year Ms. Michaels set up the

19  Facebook page for SeaWater Pro?

20  A.   2018.  Very early.

21  Q.   When did you see the big jump in business in

22  SeaWater Pro?

23  A.   2020.

24  Q.   And that was consistent with COVID?

25  A.   I would say.  Yeah.  When I moved to the big



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          74

```
 1   warehouse.
 2   Q.    Would you say from the time that Ms. Michaels
 3   started the Facebook page and started marketing, you
 4   started doing more business?
 5   A.    No.
 6              MR. POLLOCK:  Form.
 7              THE WITNESS:  No.  The Facebook did not help
 8   at all.  And to this day, it's not really doing much for
 9   us.
10   BY MR. CUTHBERTSON:
11   Q.    So not direct to consumer, so not somebody calling
12   the 800 number from the Facebook ad, but would you say
13   word of mouth helps?
14   A.    Word of mouth?
15   Q.    Yeah.
16   A.    What I -- what I refer to as word of mouth is an
17   existing customer telling his friends.
18        And this picture is 2018.  Why is it here?
19              MR. POLLOCK:  It's right there.  Best they
20   got.
21              THE WITNESS:  This is outside the statute.
22              MR. POLLOCK:  It's okay.
23              THE WITNESS:  Why are we talking about stuff
24   that's not in the limitations?
25              MR. CUTHBERTSON:  This is 8?
```



```
 1              THE REPORTER:  7.

 2              MR. CUTHBERTSON:  This is Plaintiff's Exhibit

 3   7.  It's PLA 1442 and PLA 1443.  These are reviews from

 4   customers of SeaWater Pro.

 5        (Exhibit 7 was marked for identification.)

 6   BY MR. CUTHBERTSON:

 7   Q.   Mr. Spanos, could you please read the first

 8   sentence of the review on PLA 1442?

 9   A.   "We recently purchased and installed a new dual

10   membrane water -- new dual membrane system from Mike and

11   Mindy.  We couldn't be more pleased.  The product is

12   awesome and pumps out 30 to 40 gallons per hour and all

13   under 3,000.  You can't beat the value for the

14   watermaker like this anywhere.  Mack -- Mike will gladly

15   call at any time and help you with any questions you

16   have.  And between the two of them, the service was

17   beyond expectations.  Even they delivered the components

18   to the dinghy dock to make it easy for us to get them

19   back on the boat.  It took me about 12 hours to install

20   it myself with the help of a friend.  For some time,

21   we've been using it almost daily since then.  I would

22   definitely recommend one of their systems if you're in

23   the market for a watermaker."

24   Q.   Thank you, Mr. Spanos.

25        Is this what you would consider word of mouth?
```



1          MR. POLLOCK:  Form.

2          THE WITNESS:  It's a form of advertising.

3   It's positive advertising.  But no, that's not word of

4   mouth.  That is online.  This is Google.

5   BY MR. CUTHBERTSON:

6   Q.   All right.  In this review, Mr. Spanos, it says,

7   "They even delivered the components to the dinghy dock

8   to make it easy for us to get them back to the boat."

9   A.   Yep.

10  Q.   Did Ms. Michaels ever deliver components for

11  SeaWater Pro?

12  A.   She may have been in the car with me.  That's what

13  this tells me.

14  Q.   All right.  Go to the next page, Mr. Spanos.

15       That is PLA 1443.  Can you read that for me?

16  A.   "Can't say enough good things about Mike, Mindy,

17  and his crew at SeaWater Pro Watermakers.  Mike is

18  always available to answer any questions you may have,

19  and he will go above and beyond if you need help.  We

20  installed the 36 gallon per hour unit on our Tayana

21  Vancouver and couldn't be happier.  I've had two

22  Spectras in the past, and I will never go back.  Mike is

23  always tinkering and striving to improve his products

24  through innovation.  A true machinist and engineer.  I

25  almost forgot, Mike and Mindy are boaters, and even



```
 1  delivered our system to us at anchor in Lake Sylvia.
 2  Did I mention, topnotch service."
 3  Q.   So would you also consider that advertising
 4  positive advertising?
 5            MR. POLLOCK:  Objection to form.
 6            THE WITNESS:  Absolutely.  This is Google
 7  reviews.
 8  BY MR. CUTHBERTSON:
 9  Q.   In that very last sentence, "I almost forgot, Mike
10  and Mindy are boaters, and even delivered our system to
11  us at anchor in Lake Sylvia."
12       Do you remember this client, Joe Weathers, Mr.
13  Spanos?
14  A.   No, I do not recall.
15  Q.   Do you remember Ms. Michaels delivering a system at
16  Lake Sylvia?
17  A.   No.  She did not deliver anything.  I was driving
18  the boat.
19  Q.   Do you remember Ms. Michaels being present?
20  A.   I don't remember.  But if -- if something got
21  delivered on a lake via a boat, I would be the one
22  driving.  Mindy could have been with me.  And in this
23  scenario, apparently she was.
24  Q.   Do you have a boater's license, a captain's
25  license?
```



```
 1   A.    Yes.

 2   Q.    When did you get that license?

 3   A.    In 1989.

 4   Q.    That was Coast Guard?

 5   A.    That was the Greek Coast Guard.

 6          MR. CUTHBERTSON:  All right.  I think if you

 7   want to take 20 minutes, eat some lunch, is that good?

 8          MR. POLLOCK:  Sure.

 9          THE REPORTER:  All right.  Going off the

10   record.  Time is 12:14 p.m. Eastern Standard Time.

11   We're off the record.

12       (A recess was taken.)

13          THE REPORTER:  Going on the record.  Time is

14   12:53 p.m. Eastern Standard Time.  We're on the record.

15          MR. CUTHBERTSON:  Welcome back.

16          Earlier, opposing Counsel, Mr. Pollock,

17   objected to the 30(b)(6) representative being Mr.

18   Spanos.  I did find the email on November 7th, 2024, in

19   discussing the 30(b)(6) representative for SeaWater Pro.

20   They should be competent to testify on the following

21   areas:  Melinda Michaels hours worked, pay, rate of pay,

22   work schedule, duties, payment and non-payment of

23   overtime, and date ranges of employment, the defendant's

24   timekeeping practices, pay practices, overtime pay

25   practices, defendant's employment agreements, policies,
```



```
 1   and procedures pertaining to plaintiff's duties, hours

 2   worked, and the payment and non-payment of overtime, and

 3   the facts supporting defendant's answer and affirmative

 4   defenses set forth at DE 21.

 5   BY MR. CUTHBERTSON:

 6   Q.   Mr. Spanos, earlier you testified that in the

 7   larger location that SeaWater Pro worked out of, the

 8   7,000 square foot, you did have a storefront facing for

 9   foot traffic and whatever else, correct?

10   A.   Yes.

11   Q.   Okay.  And you also testified that Ms. Michaels

12   never worked at that desk, correct?

13   A.   She was not allowed to step foot in that place.

14   Q.   She was not allowed to step foot in what place?

15   A.   In the new place.

16   Q.   In the 7,000 square foot --

17   A.   In the 7,000 square foot place.

18   Q.   Okay.

19   A.   I told her personally to please stay the hell away,

20   and then it -- it got really bad until we got -- my

21   employees were forced to get two restraining orders

22   against her, because of online harassment and otherwise.

23   Q.   And you had a storefront in the place prior?

24   A.   We had a storefront in the place prior.  It wasn't

25   exactly a storefront.  It was a -- what looked like a
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    80

1 | warehouse with a door.

2 | Q.   A warehouse with a door?

3 | A.   Yes.

4 | Q.   Okay.  Which warehouse was it that had a front

5 | desk?

6 | A.   The second warehouse, the 7,000 foot one.

7 | Q.   And it had SeaWater Pro behind the front desk,

8 | correct?

9 | A.   Yes.  That's correct.

10 | Q.   So when you would walk in, you would see SeaWater

11 | Pro?

12 | A.   Yes.

13 | Q.   And that's where you testified that the bookkeeper

14 | would sit?

15 | A.   Yes.

16 | Q.   And the bookkeeper would perform all her duties?

17 | A.   Yes.

18 | Q.   Correct?  But it's your testimony that Ms. Michaels

19 | never worked from that seat?

20 | A.   She might -- she -- she was there in the early

21 | days, but she was quickly banned from the place.

22 | Q.   Okay.

23 |          MR. CUTHBERTSON:  I'm going to admit a video.

24 |      (Exhibit 8 was marked for identification.)

25 |          MR. CUTHBERTSON:  It is titled Spanos Arrest



```
 1  from FLPD Body Cam 1080.mp4 --
 2            THE WITNESS:  That was from the early days --
 3            MR. CUTHBERTSON:  -- that was --
 4            THE WITNESS:  -- before Ms. Melinda Michaels
 5  was banned from the building.  Add that to your -- the
 6  sheet.
 7            MR. CUTHBERTSON:  -- that was produced to
 8  defendants.  May the record reflect this body cam
 9  footage from Fort Lauderdale Police Department shows a
10  date of January 12th, 2021 at approximately 5:13 p.m.
11  BY MR. CUTHBERTSON:
12  Q.   And I'm going to begin playing the video at two
13  minutes and 51 seconds.
14      (Video played for the record.)
15  BY MR. CUTHBERTSON:
16  Q.   Mr. Spanos, would you please look at the screen.
17            MR. CUTHBERTSON:  May the record reflect he's
18  looking out the window.
19            THE WITNESS:  I don't need to look at the
20  screen.  I -- I've seen this video.  I was there.
21            THE REPORTER:  I'm sorry.  Can you sit at your
22  mic, please?
23            THE WITNESS:  I know this screen.  I've seen
24  this video.  I was there.
25  BY MR. CUTHBERTSON:
```

MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    82

1   Q.   Mr. Spanos, when the police officer opened the

2   door, who is sitting behind the SeaWater Pro counter?

3   A.   I can't see, but Melinda was there.  Is that what

4   you're trying to tell us?

5        MR. POLLOCK:  Let him ask his questions.

6   BY MR. CUTHBERTSON:

7   Q.   Do you see Melinda sitting behind the desk?

8   A.   I can't see it from here.

9   Q.   Would you like to see it closer?

10  A.   Maybe.

11       MR. CUTHBERTSON:  May I get up, Brian?

12       MR. POLLOCK:  Sure.

13       THE WITNESS:  Melinda is there for the rest of

14  the video.  There is no doubt.  Can we move on?

15  BY MR. CUTHBERTSON:

16  Q.   Pardon me.

17       (Video played for the record.)

18  BY MR. CUTHBERTSON:

19  Q.   I'll stop it there.

20  A.   Why?  Let it play.  That's a good video.  Have you

21  seen the rest of it?

22  Q.   Mr. Spanos, was Ms. Michaels sitting behind that

23  desk?

24  A.   Oh, yeah, it is.  She was there.  I told you

25  before.



```
 1   Q.   Mr. Spanos, did Ms. Michaels greet the police
 2   officer and open the door for SeaWater Pro's business?
 3   A.   I didn't see any -- anybody greeting, but the --
 4   the officer opened the door by himself.
 5   Q.   Mr. Spanos, did you see Ms. Michaels talking to the
 6   police officers from behind that desk?
 7   A.   No, I didn't see it.
 8         MR. CUTHBERTSON:  May the record show Ms.
 9   Michaels was talking to the police officers from behind
10   the desk on the video.
11         MR. POLLOCK:  Is there a question?
12         I move to strike the statement.
13         THE WITNESS:  Hey, can we skip this and go to
14   court?
15         MR. POLLOCK:  No.
16         THE WITNESS:  No?  Okay.  Have to make it -- I
17   will expedite it.  We're going to do this my way.
18   BY MR. CUTHBERTSON:
19   Q.   Mr. Spanos, did you pay Ms. Michaels any wages?
20   A.   I paid Ms. Michaels $92,000.
21   Q.   And what was that for?
22   A.   That was for being my girlfriend.  And like a nice
23   boyfriend, I would -- I was nice to her and I gave her
24   everything she ever wanted.
25   Q.   Can you break down that $92,000 for me?
```



```
1   A.   We have the documents and they've been submitted,

2   I -- I believe with the -- the stack of documents you

3   got there.  There is highlighted every single line of

4   expense that I shared with Ms. Michaels, and they more

5   than exceed the money you're asking.  And these are --

6   that did not include dinners and breakfasts or anything

7   else.  This is just rents and trips to Europe.

8   Q.   All right.

9   A.   Is there -- did I answer your question or was that

10  inconvenience?

11          MR. CUTHBERTSON:  What number are we on?

12          THE REPORTER:  8.  I'm sorry.  Was the video

13  being marked?

14          MR. CUTHBERTSON:  Yes.

15          THE REPORTER:  Okay.  So then this would be 9.

16          MR. CUTHBERTSON:  9.  All right.  Plaintiff's

17  Exhibit 9 is the bank statements that were produced by

18  the defendant to the plaintiff from a joint Wells Fargo

19  account titled Michael Spanos, Melinda F. Michaels, 37

20  Hendricks Isle, Apartment 4, Fort Lauderdale, Florida

21  33301.

22      (Exhibit 9 was marked for identification.)

23  BY MR. CUTHBERTSON:

24  Q.   And what I have done is taken out everything that

25  you highlighted as an expense that you paid to Ms.
```



 1   Michaels.

 2           I don't think it's necessary to go through all

 3   of these pages.

 4   A.   Yeah.  Why'd you give me this then?

 5   Q.   I'm going to highlight some that you highlighted

 6   for purposes of this deposition.  If you could turn to

 7   the second page of that exhibit.  It's SeaWater 0002.

 8        You had highlighted a check on December 10th, Check

 9   Number 184 for $850.  What was that check for?

10   A.   I have no idea.

11   Q.   You highlighted that check as a payment to Ms.

12   Michaels.

13   A.   I can't see anything on this exhibit.

14   Q.   This is what you produced, Mr. Spanos.

15   A.   Okay.  Let's move on.

16   Q.   You don't remember what that check was for?

17   A.   I don't remember.  Maybe we would have seen it in

18   the -- online, when you explode this check.

19   Q.   If you go to the next page, SeaWater 00007, you had

20   highlighted January 7th, Check Number 187 for $880.

21   What was that for, Mr. Spanos?

22   A.   I don't -- there is no explanation here.

23   Q.   If you go to two pages from there, SeaWater 0021,

24   that was February 21st, a transfer to Melinda Michaels

25   for $500.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    86

1      Do you remember what that was for?

2   A.   221.  500.  What is it again?

3   Q.   It is the fourth from the bottom.

4   A.   500, Melinda Michaels.  I have no idea what it was

5   for, but it was to Melinda Michaels.  And then Melinda

6   could have done it herself for all I know.  She -- she

7   was on the account.

8   Q.   On the next page, 0028, that is March 8th, Check

9   Number 192 for $880, you highlighted that.

10      Do you know what that was for?

11  A.   No.  There is no -- there's no explanation on this

12  page.

13  Q.   You produced it, Mr. Spanos.

14  A.   I don't know.

15  Q.   Okay.  So you go to two pages from there, SeaWater

16  0037.  On April 9th there was a Check Number 195 for

17  $880, so same amount as a check that you had written

18  earlier.

19      Do you remember what that amount was for?

20  A.   No.

21  Q.   If you go to the next page, SeaWater 0042.

22  A.   You left out the 410, which is for Melinda Michaels

23  on the same page, 37, for another 500.  410.

24  Q.   Oh.  Mr. Michaels --

25  A.   This was in the middle of the page.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                             87

1   Q.   Mr. Spanos, excuse me, do you remember what that

2   500 was for?

3   A.   No, I don't.

4   Q.   Okay.  Let's go to the next page, SeaWater 0042.

5   That was May 1st.  You highlighted, "Online transfer to

6   SeaWater Pro business for 2,000.".  So it looks like you

7   transferred to your business, but highlighted that as a

8   payment to Ms. Michaels.

9        Do you remember what that was for?

10  A.   My answer is no.

11           MR. POLLOCK:  Objection to the form.

12           You can answer.

13  BY MR. CUTHBERTSON:

14  Q.   Did you find that one?

15  A.   I find it.

16  Q.   Okay.  And then further down, May 1st, Wells Fargo

17  direct fees and payments, Melinda Michaels, 3,052.99.

18       Do you remember what that was for?

19  A.   No, I have no idea.

20  Q.   Okay.

21  A.   It was to Ms. Michaels and Ms. Michaels on this

22  account.  Why don't you ask Ms. Michaels?  Maybe she

23  knows.

24  Q.   This is not Ms. Michaels' deposition, Mr. Spanos.

25  A.   Did you ask Ms. Michaels?



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    88

1   Q.   Please go to SeaWater 0048.  That was May 14th,

2   Check Number 126 for $880.

3   A.   Yep.

4   Q.   Do you remember what that check was for?

5   A.   No, I don't see anything here.

6   Q.   Mr. Spanos, were any of these checks for hours that

7   Ms. Michaels worked?

8   A.   Ms. Michaels had full control of this account.

9   Q.   That didn't answer my question.

10  A.   It could be.

11  Q.   It could be?

12  A.   Yeah.  Why not?

13  Q.   Would you have written these checks?

14  A.   I don't know who wrote these checks.

15  Q.   Are you going to produce copies of these checks?

16  A.   If you want copies, I will try to get them.

17  Q.   That would be very helpful.

18       What about the transfer that I mentioned, the

19  $3,000 transfer, would that have been payment for wages?

20  A.   This is -- I don't know what it's for.

21  Q.   Mr. Spanos, did you ever pay Ms. Michaels anything

22  for the hours she worked for SeaWater Pro?

23  A.   Yes, $92,000.  Rent.  She -- Ms. Michaels was

24  getting money without working really.  These are monies

25  that we shared with Ms. Michaels.  Whether she worked or



```
 1  not, she would have gotten it.

 2      We lived together in apartments.  Everywhere we

 3  lived, I paid for everything.  So whether Ms. Michaels

 4  showed up for work and for how long that she -- clearly,

 5  she didn't keep track of.  I didn't keep track of,

 6  because she was my girlfriend.  Do you keep track of how

 7  many hours your girlfriend spends with you?  But we're

 8  not the one that's --

 9  Q.   Mr. Michaels -- Mr. Spanos.  Excuse me.  My gosh.

10  A.   It's -- what happened?

11          MR. POLLOCK:  He called you Ms. Michaels.

12  BY MR. CUTHBERTSON:

13  Q.   I called you Ms. Michaels.

14  A.   No, it's okay.  I understand.

15  Q.   I was doing the same thing to her yesterday.

16      You've admitted on the record that Ms. Michaels

17  performed some tasks for SeaWater Pro.  You've also

18  claimed that these records that I've produced to you

19  that you highlight as payments made to Ms. Michaels, you

20  don't remember what they were for.

21      So did you ever pay Ms. Michaels for the duties

22  that she did for SeaWater Pro?

23  A.   Yes.

24  Q.   Did you ever pay Ms. Michaels --

25  A.   I paid the rent.
```



MICHAEL SPANOS                                      January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    90

1   Q.   Did you ever pay the hours that she worked for

2   SeaWater Pro?

3   A.   I paid more than the hours she worked for SeaWater

4   Pro by paying rent and paying for her boat, the

5   maintenance on her boat, her insurance.

6   Q.   Did you calculate --

7   A.   Ms. Michael (sic) had no income.  Who do you think

8   paid for Ms. Michaels' expenses?

9   Q.   Did you calculate the hours that Ms. Michaels

10  worked for SeaWater Pro?

11  A.   No.  Neither did she.

12  Q.   So you've never issued a check to Ms. Michaels for

13  hours worked?

14  A.   No.

15  Q.   Okay.

16  A.   I -- I thought I was more than compensating Ms.

17  Michaels for those few hours that she actually did show

18  up for work by paying $95,000 in rents.

19  Q.   But you maintained no records of any hours that Ms.

20  Michaels worked at SeaWater Pro?

21  A.   No.  Ms. Michaels didn't want to maintain records.

22  If she wanted, she could have.

23          MR. POLLOCK:  Counsel, can you repeat your

24  question?

25  BY MR. CUTHBERTSON:



 1  Q.   That you maintained no hours that Ms. Michaels

 2  worked for --

 3  A.   She never there.  When she was there, she could

 4  have kept her own records.

 5  Q.   But it's true that you never made --

 6  A.   She was a visitor.

 7           MR. POLLOCK:  Mike --

 8           THE WITNESS:  She was a visitor.

 9           MR. POLLOCK:  Mike, let him ask his questions,

10  wait a sec, and then go ahead and answer, because you're

11  talking over, and the record's not going to be clear.

12  And for what happened, you want a clear record, okay?

13  BY MR. CUTHBERTSON:

14  Q.   So Mr. Spanos, you did not keep a record of the

15  hours that Ms. Michaels was working for SeaWater Pro?

16  A.   No.  Because Ms. Michael (sic) was not working.

17  Q.   You admitted on the record that Ms. Michaels

18  performed --

19  A.   Ms. Michaels was visiting.

20  Q.   Hold on one second.

21  A.   Take back the record and erase it.  Ms. Michaels

22  was visiting.  She was nothing -- she had nothing better

23  to do.

24  Q.   You are saying now that Ms. Michaels did not

25  perform any duties --



1  A.   That's what I'm saying.

2  Q.   -- for SeaWater Pro?

3  A.   She was -- she was a volunteer at best, and there

4  was no duties.

5  Q.   A volunteer?

6  A.   No duties.  There's no such thing as a duty when it

7  comes to Mindy, okay?  She had no duties.  She was a

8  visitor, maybe helping out, maybe not.  Not at my

9  request.  So there was no need to keep records for

10  somebody who was just visiting.

11  Q.   Okay.

12  A.   If she -- if she felt she was working, why didn't

13  she keep records of her work?

14  Q.   I'd like to go back to --

15       MR. CUTHBERTSON:  I didn't keep a list of the

16  exhibits.  If you can tell me what SeaWater Pro's

17  response is to Melinda Michaels' first request for

18  production.

19       THE REPORTER:  That's 3.

20  BY MR. CUTHBERTSON:

21  Q.   If you can please go back to Exhibit 3.

22  A.   Don't you want to talk about the other charges that

23  have her name, Melinda's name on it?  No, it's not

24  convenient?  The rents and everything else that's here

25  on this?



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    93

 1  Q.   Would you like to see the document?  Would you like

 2  for me to help you?

 3  A.   Help me with what?

 4          MR. POLLOCK:  He wants you to go to a

 5  different document.

 6          THE WITNESS:  Yeah.  Which document is that?

 7          MR. POLLOCK:  Number 3.  Keep going.

 8          THE WITNESS:  You want document number 3?

 9          MR. POLLOCK:  Yes.

10          THE WITNESS:  Document number 3.

11          MR. POLLOCK:  It's going to be a stapled

12  set --

13          THE WITNESS:  Let me see.  One -- that goes to

14  four.

15          MR. POLLOCK:  Let me see.

16          THE WITNESS:  Five.

17          MR. POLLOCK:  Let me do it.  Let me drive.

18  BY MR. CUTHBERTSON:

19  Q.   All right.  If you would please turn to Page 11.

20       All right.  Please read Number 51 and your answer.

21  A.   51, "None.  Melinda Michaels never employed by

22  SeaWater Pro, therefore I did not pay her wages."

23  Q.   Could you read what the question was?

24  A.   Because the question is, "All documents that

25  relate, refer to the elements, determination, and



1  computation of the alleged wages claimed by SeaWater

2  Pro, LLC, have been paid to Melinda Michael (sic) and

3  this each claim of wages paid -- paid is based, balance

4  sheets, financial statements, pay stubs, and checks."

5  And the answer was, "None.  Melinda Michael (sic) was

6  never employed by SeaWater Pro, therefore I did not pay

7  her wages."

8       Which part we disagree on?

9  Q.   Thank you.  So you agree that you did not pay

10  Melinda Michaels any wages?

11            MR. POLLOCK:  Form.

12            THE WITNESS:  In that form of wages, the

13  custom wages and a W-2 Form, no.  Melinda Michaels was

14  paid, compensated, by paying her rent, her car

15  insurance, her gasoline, her food, her visits to the

16  doctor, trips to Greece, trips to -- to Kansas.  All the

17  money that is documented in those charges that you were

18  just -- had me read.

19  BY MR. CUTHBERTSON:

20  Q.   But SeaWater -- sorry.  SeaWater never issued her a

21  paycheck, correct?

22  A.   No.  She was never working for SeaWater.  Everybody

23  who was working for SeaWater Pro is documented and was

24  paid.

25  Q.   And you never issued a check for wages to Ms.



1   Michaels, correct?

2   A.   No.  Absolutely not.

3   Q.   Okay.  And did Ms. Michaels ever complain to you

4   about not getting paid for the hours --

5   A.   Never.  She had a great standard of living.  Why

6   would she complain?

7   Q.   Did she ever complain to any other employee of

8   SeaWater Pro?

9   A.   Not that I know of.  I mean, you want me to guess?

10  Q.   Did you ever issue Ms. Michaels one paycheck from

11  QuickBooks for $600?

12  A.   I don't remember.  Maybe.  You're asking me to

13  remember checks from five years ago.

14  Q.   Isn't it true that Ms. Michaels approached you and

15  was unhappy she wasn't getting a paycheck?

16  A.   No.

17  Q.   And then you went to QuickBooks and issued her a

18  check for $600?

19  A.   Not true.  $600 would be an -- why?  She -- she

20  goes on the account.  She had access to every penny.  If

21  she needed money, she -- she took money as she pleased.

22  Q.   Mr. Spanos, in all of the bank statements that you

23  produced, you don't seem to recall what the payments

24  were made for to Ms. Michaels; isn't that correct?

25  A.   That is correct.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    96

1   Q.   Do you see in all of the documents that you've

2   produced to us where Ms. Michaels was paying any of her

3   own bills out of that joint account?

4   A.   Yes.  The car insurance.

5   Q.   Her car insurance?

6   A.   Yes.

7   Q.   Did Ms. Michaels use her car exclusively?

8   A.   We used it together.  We two -- both our cars.

9   Q.   Did anyone else use Ms. Michaels' car?

10  A.   The guy that built our Bimini Top borrowed the car

11  for two months.

12  Q.   Did you ever let customers of SeaWater Pro use Ms.

13  Michaels' car?

14  A.   Not a customer.  He was an associate.

15  Q.   Did you ever let anyone affiliated with SeaWater

16  Pro used Ms. Michaels' car?

17  A.   I don't remember.  What's so funny?

18  Q.   His ringtone.  You don't recall whether anybody

19  affiliated with SeaWater Pro used Ms. Michaels' car?

20  A.   I'm not sure what you mean by affiliated with

21  SeaWater Pro.  You -- you referring to an employee?

22  Q.   An employee, customer --

23  A.   I don't remember having an employee --

24           THE REPORTER:  I'm sorry.  Can we have one

25  person speaking at a time for a clear record?



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          97

```
 1   BY MR. CUTHBERTSON:

 2   Q.   An employee?  Did an employee of SeaWater --

 3   A.   I do not recall.

 4           MR. POLLOCK:  Wait.  You got to wait.

 5   BY MR. CUTHBERTSON:

 6   Q.   Did an employee of SeaWater Pro, other than Ms.

 7   Michaels or yourself, use Ms. Michaels' vehicle?

 8   A.   I do not recall.

 9   Q.   Did a customer of SeaWater Pro ever use Ms.

10   Michaels' --

11   A.   I do not recall.

12   Q.   Did a potential customer of SeaWater Pro ever use

13   Ms. --

14   A.   I do not recall.

15           THE REPORTER:  I'm sorry.  Can you repeat that

16   question?

17           THE WITNESS:  I do not recall.

18   BY MR. CUTHBERTSON:

19   Q.   Did a -- sure.  Did a potential customer of

20   SeaWater Pro use Ms. Michaels' car?

21           THE REPORTER:  Thank you.

22   BY MR. CUTHBERTSON:

23   Q.   Did your employee Bailey use Ms. Michaels' car?

24   A.   I do not recall.

25   Q.   And you are maintaining that Ms. Michaels paid her
```



1  own car insurance for the exclusive use of her vehicle?

2  A.   I paid her car insurance.

3  Q.   In the records that you've produced, can you point

4  to any other bill that Melinda Michaels has paid

5  personally from that joint account?

6  A.   Oh, you got to go through all the highlights.

7  Where is it?  What happened to the bank statements?

8  Q.   They're going to be at the bottom here.

9  A.   Okay.  Let's --

10 Q.   Oh, why don't we skip to the rents?  Where's the

11 leases?  Did you -- did you go --

12         MR. POLLOCK:  He asked for --

13         THE WITNESS:  And then we can look them up

14 here and find them.  Find all the payments here.

15         MR. POLLOCK:  I think he asked for all the

16 highlight ones.  So you want to go through them?

17         THE WITNESS:  You want me to go through 100

18 pages or should we just pull out the lease that --

19 BY MR. CUTHBERTSON:

20 Q.   This is a deposition.  Isn't it true, Mr. Spanos,

21 that the only thing that you have produced in this case

22 is these bank statements that you show her paying any

23 personal expenses?

24 A.   Personal expenses.  Personal expenses were paid by

25 me on my credit card.  So when we went shopping, I used



 1  my credit card, she was there.  When we went to have

 2  dinner, I used my credit card, she was sitting next to

 3  me.  Melinda had to pay for nothing.  We are going to

 4  look at her statements and find out what Melinda

 5  actually paid for during those years.

 6  Q.   So you're --

 7  A.   When we go to Court.  And let's find out what she

 8  actually paid.  And then let's find out with deposits,

 9  where did the money come from that Ms. Melinda spent?

10  Q.   You are claiming that in the records you produce --

11  A.   Yeah.

12  Q.   -- you show transactions of Ms. Michaels paying her

13  personal expenses?

14  A.   I didn't claim that.

15  Q.   You --

16  A.   I -- I -- I'm talking about leases here.  That I

17  have -- we have -- we have here -- here.  Would you like

18  your insurance, would you like to do the rent payments,

19  trips to Greece?  What would you like?  Allstate

20  Insurance?  Page 00091 dated December 3rd, $124.  Would

21  you like some more?

22  Q.   What page was that, Mr. Spanos?

23  A.   That was 91.

24  Q.   Page 91.  Okay.  And what transaction?

25  A.   Page 87.



```
 1   Q.   Hold on one second, Mr. Spanos.

 2   A.    It's the one that I highlighted on the bottom,

 3   fourth -- third from the bottom, dated December 3rd,

 4   Allstate Insurance --

 5          THE WITNESS:  Is that -- is that yours, Ms.

 6   Michaels?

 7   BY MR. CUTHBERTSON:

 8   Q.   Allstate Insurance Company --

 9          MR. POLLOCK:  She's not going to answer.

10   BY MR. CUTHBERTSON:

11   Q.   -- Allstate Insurance company for $124.07?

12   A.   Yes.  Turn the page now.

13   Q.   Hold on one second, Mr. Spanos.  This is what you

14   are saying was a personal expense of Ms. Michaels, her

15   car?

16   A.   Yes.  That is one that is clearly documented.

17   Q.   And you're saying that she used her car solely?

18          MR. POLLOCK:  Objection to form.

19          THE WITNESS:  She used her car.

20   BY MR. CUTHBERTSON:

21   Q.   Are you claiming that no one in SeaWater Pro used

22   her vehicle?

23   A.   I don't recall anybody using her vehicle.  I used

24   her vehicle sometimes, she used my vehicle sometimes.

25   Q.   All right.
```



 1              MR. CUTHBERTSON:  Have we already --

 2              THE WITNESS:  Did you use my car?

 3              MR. CUTHBERTSON:  Have we already introduced

 4   the Michael Spanos responses to Melinda Michaels' first

 5   set of interrogatories?

 6              MR. POLLOCK:  No.

 7              THE WITNESS:  Let's go to Page 87.

 8   BY MR. CUTHBERTSON:

 9   Q.   Please.

10              MR. POLLOCK:  Mike, Mike, you'll have your

11   day.

12              THE WITNESS:  This is extortion.

13              MR. CUTHBERTSON:   This is Number 10?

14       (Exhibit 10 was marked for identification.)

15              MR. POLLOCK:  Yes.

16   BY MR. CUTHBERTSON:

17   Q.   All right.  Plaintiff's Exhibit 10 is SeaWater Pro,

18   LLC's responses to Melinda Michaels' -- oh, excuse me.

19   This is the wrong document.  It is Michael Spanos'

20   Responses to Melinda Michaels' First Set of

21   Interrogatories.  I'm sorry.

22       All right.  Mr. Spanos, please turn to Page 11, and

23   please read Request Number 13, and your answer?

24   A.   "State in detail all facts supporting Michael

25   Spanos' contention that Melinda Michaels received



1   payments for all wages that are due, identify all

2   documents that support those facts, identify all

3   witnesses that have knowledge regarding these facts, and

4   provide a detailed summary of the knowledge you believe

5   each witness has regarding those facts.

6           "Answer:  The money generated by Mr. Spanos

7   was deposited in a joint account he held with the

8   plaintiff.  As a joint account holder, Plaintiff owned

9   half of the money in that account, and she used it as

10   such to pay all of her personal expenses for specific

11   amounts.  Please refer to the bank statements produced

12   in response to the Plaintiff's first Request for

13   Production to SeaWater Pro, Michael Spanos.  The witness

14   to this are Plaintiff and -- are Plaintiff and Mr.

15   Spanos.  Their contact information and expected

16   knowledge is in a SeaWater Pro answer to Interrogatory

17   Number 2."

18   Q.   Thank you, Mr. Spanos.  In your answer, you refer

19   to the bank statements produced in response to

20   Plaintiff's First Request for Production to SeaWater and

21   Michael Spanos.  Those are the bank statements with

22   which I introduced into the record, and you have

23   identified that they show her paying all her personal

24   expenses in Interrogatory Number 13.  So far, you've

25   identified a car insurance payment.

1     Are there any other personal expenses shown on

2     those bank statements?

3     A.   Yes.  Both.

4          MR. POLLOCK:  Hang on a sec.  Objection to the

5     form.  That mischaracterizes Mr. Spanos' testimony,

6     which he went in -- at length about the different

7     expenses that are reflected on that.

8          You can go ahead and answer.

9          THE WITNESS:  The expenses that I'm referring

10    to are restaurant bills, which we can see if we can get

11    the receipts, rents, boat slip expenses, trips expenses

12    that Ms. Michaels claimed to be business related, which

13    they're not, they're vacations, to the sum of over

14    $90,000.

15    BY MR. CUTHBERTSON:

16    Q.   Mr. Spanos, in your interrogatory answer, you

17    phrased it "She used it as such to pay all of her

18    personal expenses."

19    A.   Yeah.

20    Q.   She being Melinda Michaels?

21    A.   Yes.

22    Q.   "She used that account to pay her own personal

23    expenses."  But the expenses that you've highlighted are

24    for checks that you cannot identify and car insurance

25    payments.  Are there any other expenses in those bank



1  records that you can point out today that show Melinda

2  Michaels --

3  A.   Yes.  Because they're -- you're missing pages.  If

4  you go from Page 87 to Page 90, and so forth.

5  Q.   Okay.

6  A.   These are not all the bank statements or they're

7  not in order.  So --

8  Q.   I included everything you highlighted, Mr. Spanos.

9  A.   You -- you -- well, let's go over it.  Would you

10  like to go over it?

11  Q.   I think we left out on Page 91.

12  A.   Okay.  Let's go -- let's start with Page 1.  Why go

13  to 91?

14  Q.   We've already been through Page 1.  Let's start --

15  A.   No, I haven't gone through Page 1.  You asked me a

16  question.  Do you want the answer?

17  Q.   I think you -- I think you skipped from 1, and

18  then, Mr. Spanos --

19  A.   You skipped to --

20  Q.   -- 1 to 91.  There --

21  A.   It goes from Page 2 to Page 7, Page 15, Page 21,

22  Page 28, 33.  What are the rest of the pages?

23  Q.   So I only included the pages that you highlighted

24  expenses that she paid herself as you claim.

25  A.   Okay.  Let's go over it.  Amazon Marketplace, it's



 1  not even highlighted.  Publix Supermarket, it's not even
 2  highlighted.  Amazon, not highlighted, Amazon.  Sam's
 3  Club, Speedway Gasoline, Croissan'Time, not even
 4  highlighted.  Dental insurance, not sure who that is,
 5  but it could be either one.  Amazon Marketplace,
 6  December 12th, Amazon, Amazon, AT&T bill payment,
 7  Amazon.
 8  Q.   Mr. Spanos --
 9  A.   Pollo Tropical.
10  Q.   Can you say without a doubt all of these Amazon
11  expenses were personal expenses?
12  A.   I don't -- I -- I'm not 100 percent.  Those --
13          THE REPORTER:  Can you repeat your question?
14  BY MR. CUTHBERTSON:
15  Q.   Can you say without a doubt that all of these
16  Amazon expenses were Ms. Michaels' personal expenses?
17  A.   I can't say.  I don't have enough here, but I am
18  pointing out expenses that could be Mrs. Michaels'
19  orders that she placed on Amazon using my account and my
20  credit card.
21  Q.   From any of the --
22  A.   And the restaurants that I just pointed out, which
23  are not even included in the $92,000.
24  Q.   So would you like to go back and amend your
25  response to include other highlighted items that you



1  have produced?

2  A.   Absolutely.  I can go back and re-highlight half

3  these documents and probably double the amount of

4  $92,000.  Would you like me to do that?

5  Q.   I would like for you to produce what you claim are

6  personal expenses paid from your own account.

7  A.   No problem.  We'll -- we'll sit down and --

8       THE REPORTER:  I need to have one person

9  speaking at a time for a clear record.

10      THE WITNESS:  Yep.

11      THE REPORTER:  Counsel, repeat?

12  BY MR. CUTHBERTSON:

13  Q.   I would like for you to produce all expenses in

14  your joint account you claim Ms. Michaels paid for her

15  own personal expenses as you indicate in your

16  interrogatory response --

17  A.   That's going to take about three months to produce;

18  are you okay with that?

19      THE REPORTER:  Repeat your question?

20  BY MR. CUTHBERTSON:

21  Q.   I would like for you to produce, as you stated in

22  Interrogatory Number 13 --

23  A.   Yep.

24  Q.   -- all personal expenses paid by Melinda Michaels

25  from your joint checking.



1  A.   Yes.  Here's how I can do that.  It will take

2  almost three months and probably one person full time to

3  go through each and every line, compare it to the Amazon

4  account, and then we're going to bring it in.  And Ms.

5  Michaels' will have to either admit that it's hers or

6  not.  I would request also that you pay some of these

7  expenses to go through these thousands of transactions

8  to produce.

9  Q.   For the purposes of the deposition today, Mr.

10 Spanos, would you agree that you never wrote Ms.

11 Michaels a check for wages owed?

12        MR. POLLOCK:  Form.

13        THE WITNESS:  Ms. Michaels never officially

14 got employed by SeaWater Pro, and therefore she was

15 never paid.  Are we done reading expenses?  Because I

16 have a ton more here on Page 15.

17        MR. CUTHBERTSON:  I think I'm finished with

18 the deposition.  Do you have anything, Brian?

19        MR. POLLOCK:  Yeah.

20                  CROSS-EXAMINATION

21 BY MR. POLLOCK:

22 Q.   Mike, I just got a couple follow-ups.  Just to be

23 clear, at any given time, did Ms. Michaels work more

24 than a couple minutes an hour for SeaWater?

25 A.   No.



1  Q.  Okay.  And for whatever Ms. Michaels was doing

2  online, to be clear, when you talked about this with her

3  lawyer, you told him that you did not want her to do any

4  kind of online marketing, especially on Facebook; is

5  that right?

6  A.  I specifically requested to stay off the internet.

7  Q.  Okay.  And if she was doing any kind of Facebook or

8  other activities on the internet, whether it be

9  researching for your business as she claimed yesterday,

10  was she doing that against your wishes?

11  A.  She was doing that against any request of mine.

12  Q.  Okay.  Was she also doing it without you knowing

13  about it?

14  A.  She did it without me knowing.

15  Q.  Okay.  And when you told her that you don't want to

16  know about her doing anything online, is that because

17  you told her, don't do it, don't do it for my company?

18  And you know, this is not anything that I am authorizing

19  or want to hear about?

20  A.  I don't want to hear --

21  Q.  Go ahead?

22  A.  I don't want to hear about it.  I don't want you

23  getting on the internet.  Please stay out.  That was the

24  main idea behind me and the internet.  To this day, I am

25  not -- you will not find one post from me anywhere on



1   the internet.  I encourage you to look.

2   Q.   And --

3   A.   I have nothing to do with social media.

4   Q.   And when you talk about the bank statements and the

5   checks that we were looking at from which you couldn't

6   determine who they were made out to, can you request

7   that information from the bank to see an image of the

8   check to determine who it was payable to and what it --

9   and then who signed it?

10  A.   We can request that and we can find out all the

11  Amazon transactions.

12  Q.   And that was my next question.  For the Amazon

13  transactions that were paid by the joint Wells Fargo

14  account, can you look at the Amazon order history and

15  determine whether those were items that were purchased

16  for the SeaWater Pro business or for personal for you

17  and Ms. Michaels when you were living together?

18  A.   It would be very difficult but possible.

19  Q.   Okay.

20  A.   That's why I request Ms. Michaels to help us

21  financially to do and these numbers for her to help her

22  case.

23  Q.   And very difficult because of the time and labor it

24  would require in order to go through an order history of

25  nearly four years -- excuse me, a five-year order



MICHAEL SPANOS                                          January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                        110

1   history going back to 2019; is that right?

2   A.   That is correct.

3   Q.   And did you use the same Amazon account for the

4   time relevant to this lawsuit for both your business and

5   personal?

6   A.   We use the same account to this day.

7   Q.   Okay.  And with respect to Ms. Michaels, you

8   indicated that you didn't write a check to her and --

9   for wages.  Is that because she was never an employee of

10  your company?

11  A.   She was never an employee of the company.

12  Q.   Okay.  And if she -- let me see something else.

13  Did you and Ms. Michaels use her car for personal use?

14  A.   We both used her car and we both used my cars.

15  Q.   Okay.  Besides and just using them, were they used

16  solely for business, or solely for personal, or a

17  mixture of both?

18  A.   A mixture of both.

19  Q.   Okay.

20  A.   Mostly personal.  My truck was used for business.

21  Q.   And what kind of car does Ms. Michaels have?

22  A.   Michaels had -- Ms. Michaels has a Toyota Prius C,

23  which is the smallest Toyota.  Not big enough to be used

24  for any of the stuff we were transporting.

25  Q.   And in looking online, would you be able to tell



 1  who initiated a transfer from the joint bank account you

 2  shared with Ms. Michaels to her account, just by looking

 3  at anything online?

 4  A.   I have -- I -- I may not be able to do that because

 5  she's authorized on this account as well as I am.  So I

 6  have no way of knowing who did those transfers, whether

 7  it was me or Melinda.  The bank has no way to

 8  distinguish who initiated these transactions.

 9  Q.   Is there anything else?  Oh, the other thing.

10      You testified that Ms. Michaels would not work the

11  hours that you would work; she would work when she felt

12  like it.  In providing that answer, were you indicating

13  that Ms. Michaels was working more than you or less than

14  you in the course of any given day?

15  A.   Ms. Michael (sic) was not working.

16  Q.   And so when you're talking about that, were you

17  talking about Ms. Michaels accompanying you to the

18  office or --

19  A.   Yes.  Just like any girlfriend.

20  Q.   And so while Ms. Michaels was at one of the

21  warehouses, if she weren't hanging out with you at the

22  warehouse, did she have other responsibilities or other

23  places that she needed to be during the course of any

24  given day?

25  A.   She had her schedule with LA Fitness.



MICHAEL SPANOS                                        January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                      112

1   Q.   Okay.  So other than taking -- other than teaching

2   possibly two courses up until COVID in the morning,

3   Tuesdays and Thursdays, and possibly Thursday afternoon,

4   the rest of the time, Ms. Michaels was free?

5   A.   The rest of the time, Ms. Michaels was free.

6            MR. POLLOCK:  That's all I got.

7                    REDIRECT EXAMINATION

8   BY MR. CUTHBERTSON:

9   Q.   Just a couple follow-ups.  You just testified that

10  Ms. Michaels drove a Prius and that you both used it,

11  correct?

12  A.   Correct.

13  Q.   Did Ms. Michaels have any other form of

14  transportation?

15  A.   We had several cars.

16  Q.   Several cars?

17  A.   Yeah.

18  Q.   What about a bike?

19  A.   We had two electric bikes.

20  Q.   Did Ms. Michaels ever take the electric bike to

21  SeaWater Pro?

22  A.   Very rarely.

23  Q.   Is it a tandem bike where two people ride or is

24  it --

25  A.   No.  Single electric.



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                  113

1   Q.   And you testified earlier that Ms. Michaels had a

2   key, correct, to SeaWater?

3   A.   Yeah.  I believe she did.  I believe; I'm not sure.

4   Q.   Did Ms. Michaels ever go into SeaWater before you

5   did?

6   A.   Never.

7   Q.   During the day?

8   A.   Never.

9   Q.   Did she stay after you left?

10  A.   Never.

11  Q.   You testified that Ms. Michaels occasionally would

12  sign paychecks.  Are you going to produce copies of

13  those paychecks?

14  A.   We can try it.  This account is closed.  I don't

15  know if --

16           MR. POLLOCK:  If they've been requested.

17           THE WITNESS:  Yeah.  I --

18           MR. CUTHBERTSON:  They haven't.

19           THE WITNESS:  This account has been closed, so

20  it's really hard to go online and click on it and expand

21  the -- the check.  But we may be able to get them from

22  the bank.

23           MR. CUTHBERTSON:  All right.  That's all I've

24  got.

25           MR. POLLOCK:  We'll read.



MICHAEL SPANOS                                       January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    114

1              THE REPORTER:  All right.

2              Counsel Cuthbertson, will you be ordering a

3    copy or E-Tran today?

4              MR. CUTHBERTSON:  We'll let you know.

5              THE REPORTER:  Say that one more time?

6              MR. CUTHBERTSON:  We'll let you know.

7              MR. POLLOCK:  And likewise.

8              THE REPORTER:  All right.

9              And I will go ahead and call us off the

10   record.  The time is 1:39 p.m. Eastern Standard Time.

11   We're off the record.

12        (Deposition concluded at 1:39 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6         I, the undersigned authority, certify that

7    MICHAEL SPANOS personally appeared before me and was

8    duly sworn on this 22nd day of January, 2025.

9

10   WITNESS my hand and official seal this 9th day of June,

11   2025.

12

13

14   _____

15   Chelsie Enciso, Digital Reporter

16   Notary Commission Florida No.:  HH 238730

17   Commission Expires:  March 10, 2026

18

19

20

21

22

23

24

25



MICHAEL SPANOS                                         January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                       116

```
 1                           CERTIFICATE

 2

 3          I, CHELSIE ENCISO, a Digital Reporter and

 4   Notary Public within and for the State of Florida do

 5   hereby certify:

 6

 7          That the foregoing witness whose examination

 8   is hereinbefore set forth was duly sworn and that said

 9   testimony was accurately captured with annotations by me

10   during the proceeding.

11

12          I further certify that I am not related to any

13   of the parties to this action by blood or marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16

17          IN WITNESS THEREOF, I have hereunto set my

18   hand this 9th day of June, 2025.

19

20

21   _____

22   CHELSIE ENCISO, CER

23   Notary Commission Florida/HH 238730

24   Commission Expires:  March 10, 2026

25
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    117

1              CERTIFICATE OF TRANSCRIPTIONIST

2

3          I, SANDRA REDAVID, located in the state of

4    Florida do hereby certify:

5

6          That the foregoing is a complete and accurate

7    transcript of the digital audio recording of the

8    testimony and proceedings captured in the above-entitled

9    matter, all to the best of my skills and ability.

10

11         I further certify that I am not related to any

12   of the parties to this action by blood or marriage and

13   that I am in no way interested in the outcome of this

14   matter.

15

16         IN WITNESS THEREOF, I have hereunto set my

17   hand this 9th of June, 2025.

18

19

20   _____

21        SANDRA REDAVID, TRANSCRIPTIONIST

22

23

24

25



MICHAEL SPANOS                                            January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                          118

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. J12037199

 4    Case Caption:  MELINDA MICHAELS v. SEAWATER PRO LLC

 5

 6              DECLARATION UNDER PENALTY OF PERJURY

 7

 8              I declare under penalty of perjury that I have

 9    read the entire transcript of my deposition taken in the

10    above-captioned matter or the same has been read to me,

11    and the same is true and accurate, save and except for

12    changes and/or corrections, if any, as indicated by me

13    on the DEPOSITION ERRATA SHEET hereof, with the

14    understanding that I offer these changes as if still

15    under oath.

16

17      Signed on the _____ day of _____, _____.

18

19

20              _____

21                    MICHAEL SPANOS

22

23

24

25
```



MICHAEL SPANOS                                      January 22, 2025
MICHAELS V. SEAWATER PRO LLC                                    119

```
1   DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25          MICHAEL SPANOS
```



MICHAEL SPANOS                                    January 22, 2025
MICHAELS V. SEAWATER PRO LLC                              120

1    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25          MICHAEL SPANOS

