IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,

    Complainant,

v.

ELLIOT ARI KOZOLCHYK,

    Respondent.

_____/

Supreme Court Case No. SC-

The Florida Bar File No. 2023-50,298(17J)

## **FORMAL COMPLAINT FOR RECIPROCAL DISCIPLINE**

The Florida Bar, complainant, files this Complaint against Elliot Ari Kozolchyk, respondent, under the Rules Regulating The Florida Bar and alleges:

1.    Respondent is, and at all times mentioned in the complaint was, a member of The Florida Bar, admitted on December 18, 2009, and is subject to the jurisdiction of the Supreme Court of Florida.

2.    In addition to membership with The Florida Bar, Respondent is also admitted to the bar for The United States District Court for the Southern District of Florida, subject to its jurisdiction.

3.    Respondent is the sole practitioner at his law firm, Koz Law, P.A.

4.    Respondent's practice is almost exclusively representing plaintiffs bringing claims against employers for unpaid wages and overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.

The FLSA allows plaintiffs to recover reasonable attorney's fees and costs, *see id*. § 216(b), but when an FLSA case is settled, the entire settlement agreement, including attorney's fees and costs, is subject to court approval.

5.    Judicial review of attorney's fees are mandated by the FLSA "to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement."

6.    This is a Complaint for reciprocal discipline action.  On July 17, 2019, then-Chief Judge Moore, submitted a Letter of Referral[1] (hereafter "Letter") to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance Committee (the "Committee"), to investigate the respondent's misconduct in multiple cases filed in the U.S. District Court for the Southern District of Florida and to conduct disciplinary proceedings.

7.    The Letter summarizes instances of respondent's misconduct in court, court filings, and court related events.  The most common pattern of misconduct described in the Letter is that respondent "continued litigating cases after the defendant has offered or sent [respondent's] client the full value of their claim," but "[respondent] then continue[d] to generate

---

[1] The Letter of Referral is attached as The Florida Bar's "Composite Exhibit 1."

unnecessary work ... so that he can later request [increased] attorney's fees for the additional time spent."

8.     Following a hearing before the Committee[2], a Proposed Report and Recommendation was issued on August 15, 2022, which included findings of fact, conclusions, and proposed discipline.   The Committee submitted a Final Report and Recommendation[3]  (hereafter "Final Report" ) to the Court on August 17, 2022.

9.     An Order to Show Cause was issued to respondent on August 30, 2022, giving him an opportunity to respond to the Final Report and Recommendation.  Respondent filed a Statement[4] accepting the Committee's recommendations.

10.     Pursuant to Rule 6(c)(2)(B)(v) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys, Local Rules of the United States District Court for the Southern District of Florida, the Honorable Cecilia Altonaga, Chief United States District Judge submitted this matter to the Court for its consideration at a regularly scheduled Judges' Meeting held on October 6, 2022. Upon review of the Final Report and

---

[2] The Transcript from the June 28, 2022, hearing is attached as The Florida Bar's "Composite Exhibit 2."
[3] The Final Report is attached as The Florida Bar's "Composite Exhibit 3."
[4] Respondent's statement is attached as "The Florida Bar's "Composite Exhibit 4."

3

Recommendation, respondent's response, and attachments, by unanimous vote of all District Judges and Senior District Judges eligible to vote, the Court approved and adopted the Committee's Final Report and Recommendation in its entirety.

11.    The Final Report found respondent in violation of five Rules governing The Florida Bar:

A. Rule 4-3.2 (Expediting Litigation).  The Report listed "five instances when Mr. Kozolchyk 'continued litigating cases after the defendant has offered or sent his client the full value of their claim,' and 'Mr. Kozolchyk then continues to generate unnecessary work ... so that he can later request [additional] attorney's fees for the additional time spent.'"

B. Rule 4-4.4 (Failure to Respect Rights of Third Persons). The Final Report identified three instances when respondent engaged in "disrespectful conduct toward third persons involved in the litigation."

    i. First, in *Mendez v. Model Row, Inc.,* No. 17-CV-81104-Rosenberg/Hopkins, the respondent made the defendant cry in open court.  Respondent's client was awarded a monetary Final Judgment.  The defendant could not afford

4

to make a lump sum payment and offered to make monthly payments until the Judgement was satisfied.  Respondent refused to accept a payment plan from the defendant unless he made payments by credit card and imposed a 3% transaction fee, increasing the judgment.

ii.  Next, *in Hernandez-Sabillon v. Naturally Delicious, Inc.,* No. 15-CV-80812- Rosenberg/Brannon, during a deposition, respondent attempted to make his own audio recording of a deposition over opposing counsel's objection. The disagreement resulted in both attorneys calling the judge's chambers.  During the call, respondent and opposing counsel were loud, heated, and disruptive. They were ordered to cease such conduct, but respondent continued his misconduct.  Respondent was sanctioned for his misconduct related to the deposition as well as misconduct in pleadings and other discovery violations. He was required to serve at a local soup kitchen.

iii.  Then, in *Salvador v. Brico, LLC,* No. 17-CV-61508- Rosenberg/Seltzer, respondent and opposing counsel were "leveling" personal attacks against one another in

court filings.  Judge Rosenberg told them to cease filing

the attacks.   Despite Judge Rosenberg's warning,

respondent continued his misconduct.

C. Rule 4-3.1  (Meritorious Claims and Contentions).  The Final

Report found two instances of respondent presenting frivolous

arguments to the Court to avoid judicial review of his fees in

respective settlement agreements.

    i. First, in *Shuman v. Treatment Partners of America*, No.

18-81609- Middlebrooks/Brannon, respondent denied a

settlement had been reached in an effort to avoid judicial

review of his fees.  The Court described respondent's

argument that same was not subject to review as

"nonsensical and a violation of respondent's duty of

candor towards the Court," as well as "self-serving."

    ii. Then, in *Salvador*, respondent again claimed there was

not a true settlement based on the fact the opposing party

expressed its intention to appeal any fee award.  Judge

Brannon concluded respondent's position "was without

support . . . and vexatious."

6

D. Rule 4-3.3 (Candor Toward the Tribunal).  The Final Report identifies two instances in which respondent made misrepresentations to the Court.   However, while the Final Report addressed both, only one was found to be actionable.

   i. The Final Report first addressed the *Olguin* case.  After reviewing that case and respondent's explanation of the circumstances,  it was determined respondent did not make a misrepresentation.  Regardless of that finding, the Final Report stated , "although the Court did not explicitly find [respondent's] statements to be untrue, the Court's 'skepticism of those statements is striking,' and '[a]t the very least, it shows that [respondent] is comporting himself in a manner that has led to multiple judges to distrust his honesty and candor toward the court.'"

   ii. The instance when respondent was found to have made an actionable misrepresentation to the Court is in *Shuman,* when respondent tried to avoid judicial review of a settlement.  In *Shuman*, respondent's claim that "no settlement had been reached" was a "misrepresentation of

7

fact," and "a self-serving and false account of the facts and circumstances of the case" to avoid judicial review.

E. Rule 4-4.1(c)(e) (Truthfulness In Statements To Others).
Respondent was found to have made misrepresentations to a third person.  In *Shuman*, respondent falsely "represented to opposing counsel that Judge Dimitrouleas allowed dismissals without prejudice without judicial review." Actually, [r]espondent "was relying on a standard order Judge Dimitrouleaous issues in FLSA cases, but he blatantly misrepresented the contents of that order."  The Final Report found respondent's "misleading explanation of Judge Dimitrouleas's order equivalent to an affirmative false statement because it caused his opposing counsel to attempt to dismiss an FLSA case without judicial review, in contravention of the law in this Circuit."  The Final Report further found that '[i]t strains credulity to argue respondent merely misunderstood the clear directions in Judge Dimitrouleas's order, and it appears that these maneuvers were aimed at evading judicial scrutiny of the settlement agreement and his attorney's fees.'"

F. It is noteworthy that while the Committee did not charge respondent with Rule 4-8.4(d) (Misconduct), the Final Report did conclude, "[u]nquestionably, [respondent's] misconduct and bad-faith litigation tactics interfered with the Court's administration of justice and wasted the time and resources of the Court, his opposing counsel, the defendants his clients sued, his clients, and even [respondent] himself."

12.     On October 28, 2022, an Order[5] was entered on the Final Report adopting it in its entirety.

13.     For the above referenced behavior and rule violations, the Order imposed the following discipline:

A. Respondent was required to take two CLE courses within 60 days of entry of the Order as follows: (l) Episodes 1 through 4 of the "Your Honor Series," hosted by Paul Lipton, and (2) at least 2 hours on federal court practice; and provide an affidavit to the Committee attesting to timely completion of the CLE.

B. For a period of 12 months from entry of the Order, respondent was required to self-report to the Committee within 72 business

---

[5] The October 28, 2022, Order is attached as The Florida Bar's "Composite Exhibit 5."

9

hours of the entry of any order or court filing by opposing

counsel alleging, describing, or relating to any problematic or

unprofessional conduct by respondent.

C. Within 30 days from entry of the Order, respondent was required

to prepare and deliver letters of apology to Judges Moore,

Middlebrooks, Dimitrouleas, Rosenberg, Seitz, Moreno,

Goodman, Strauss; and retired Magistrate Judge Seltzer; and

provide a copy of each letter to the [Ad Hoc] Committee[6].

D. Enroll within 60 days from entry of the order by the Court in

counseling for anger management for a minimum of 25 hours,

with the course to be approved in advance by the Committee.

14.    A Sub-Committee was tasked with monitoring respondent's

compliance with the Order and reporting to the Court regarding same.

15.    On February 13, 2023, respondent disclosed to the sub-

committee that he failed to timely report that he was sanctioned (to pay

opposing counsel's attorney's fees) in *Keefe v. Britt's Bow Wow Boutique*,

*Inc*., Case No. 22-cv-62138 for discovery related misconduct.  There was

also an allegation that respondent lacked candor to the Court in that same

---

[6] The apology letters are attached as "Composite Exhibit 6."

10

case for filing a Certificate of Compliance when he was not in compliance with the rules.[7]

16.    On March 1, 2023, the Sub-Committee submitted its first status report[8] finding respondent was compliant.  The report included the February 13, 2023, disclosure.  Respondent made no further disclosures until August 30, 2023, and September 5, 2023.

17.    Following the March 1, 2023, report, the Committee became aware of other instances where respondent had not complied with the Order.

18.    The Committee required respondent to appear for a hearing held on November 9, 2023,[9]  to address respondent's additional violations of the October 28, 2022, Order.  After receiving the Notice of Hearing, respondent submitted at least eight more disclosures of his subsequent misconduct in violation of the Order.

---

[7] Respondent filed Interrogatories that were not signed nor under oath, and as such were not in compliance.

[8] The Committee's Report is attached as The Florida Bar's "Composite Exhibit 7."

[9] The hearing date is later referenced to have taken place on November 20, 2023.  Regardless, the hearing transcript is attached as The Florida Bar's "Composite Exhibit 8."  During the hearing, respondent admitted he failed to self-report several instances of subsequent misconduct .  See page 7 (admissions) and also pp. 10-17, re: *Martinez v. Durcon Construction, LLC*, 23-cv-60722, Rule 11 Motion for Sanctions against Respondent.

19.    Between the notice of hearing and the actual hearing, respondent admitted that he did not report a client's case[10] that was dismissed because he failed to prosecute the matter.

20.    During the hearing, the Committee found that respondent failed numerous times to properly and timely self-report subsequent misconduct in violation of the Order.  The Committee determined those findings required an "extension of the Committee's monitoring of his professional activities."

21.    Also, during the hearing, the Committee "overwhelmingly" concluded respondent's number of open cases (44), his opinion of how many cases his office could realistically handle, and his problematic office management procedures contributed to respondent's missed deadlines, created avoidable conflict with opposing counsel, and contributed to his failure to (properly and timely) self-report to the Committee.

22.    On December 15, 2023, the Committee issued a Proposed Supplemental Report and Recommendation giving respondent 14 days to respond to same.  Respondent filed a Response,[11] (hereafter "Second Statement").  A hearing was held, following which, the Committee submitted

---

[10] *Reddish v. Epoca Corp*., Case No. 17-21206-CIV-Williams, 2023 WL 5831459 (S.D. Fla., Sept. 7, 2023).

[11] Respondent's Response is attached as The Florida Bar's "Composite Exhibit 9."

a Final Supplemental Report and Recommendation (hereafter "Final Supplemental Report")[12] on January 25, 2024.

23.    The Final Supplemental Report recommended the following:

A.   [Respondent] should be publicly reprimanded for his repeated failure to comply with the Court's October 28, 2022, Order. Significantly, this finding correlates to a finding that respondent violated Rule 4-3.4(c) of the Rules Regulating the Florida Bar.

B.   For a period of 24 months, *nunc pro tune* to October 29, 2023, [respondent] must self-report to the Committee within 3 business days of the entry of any order describing or relating to any problematic or unprofessional conduct by respondent.   A monthly report should be provided to the Committee to ensure that no disclosures have been missed and if so, and explanation should be provided concerning why the deadlines was missed. At the request of the Committee, [respondent] shall appear before the Committee to answer questions regarding his compliance with this section. At the end of 12 months, the

---

[12] A copy of the Final Supplemental Report is attached as The Florida Bar's "Composite Exhibit 10."

Committee may recommend that the reporting requirements be modified, be discontinued, or be extended.

C. Within 45 days [respondent] shall, at his cost, register and take part in The Florida Bar's Diversion/Discipline Consultation Service ("DDCS") which conducts administrative management reviews of law office processes and procedures as directed by a grievance committee. Once retained, DDCS should communicate with the Committee so DDCS can fully understand the concerns of the Committee. The DDCS report shall be submitted to the Committee upon completion, and the Committee may make such other recommendations to the Court as it may determine to be necessary and beneficial to [respondent's] practice in the Southern District.

24. An Order to Show Cause was issued on January 25, 2024, directing respondent to Show Cause why the Final Supplemental Report and Recommendation should not be adopted by the Court.

25. On February 12, 2024, respondent filed a response accepting the Committee's findings and recommendations.

26. On May 16, 2024, after a review of the Final Supplemental Report, by unanimous vote of all District Judges and Senior Judges eligible

14

to vote in attendance at the meeting, the Court approved and adopted the Committee's Final Supplemental Report in full.

27.     On June 4, 2024, an Order was entered adopting the Final Supplemental Report in full.[13]  That Order noted the "Court's inherent power to regulate membership in its bar for the protection of the public interest," and that a "federal court has the power to control admission to its bar and to discipline attorneys who appear before it."

28.     On July 9, 2024, another Order[14] was entered requiring the respondent to appear before Chief Judge Altonaga On August 20, 2024, at 8:30 AM to receive respondent's public reprimand.

29.     By operation of Rule 3-4.6, Rules Regulating The Florida Bar, the Final Report and Recommendation, the Final Supplemental Report and Recommendation, and the Orders adopting those Reports constitute conclusive proof of the misconduct in this disciplinary proceeding.

WHEREFORE, The Florida Bar respectfully requests that respondent be appropriately disciplined in accordance with the Rules Regulating The Florida Bar.

---

[13] The June 24, 2024, Order is attached as The Florida Bar's "Exhibit 11."
[14] The July 9, 2024, Order is attached as The Florida Bar's "Composite Exhibit 12."

15

Sharla Manglitz, Bar Counsel
The Florida Bar
Ft. Lauderdale Branch Office
Lake Shore Plaza II
1300 Concord Terrace Ste. 130
Sunrise, FL 33323
(954) 835-0233
Florida Bar No.65421
smanglitz@floridabar.org
rcorzo@floridabar.org

Patricia Ann Toro Savitz, Staff Counsel
The Florida Bar
651 E. Jefferson Street
Tallahassee, Florida 32399-2300
(850) 561-5839
Florida Bar No. 559547
psavitz@floridabar.org

## CERTIFICATE OF SERVICE

I certify that this document has been filed via the Florida Courts E-Filing Portal with The Honorable John A. Tomasino, Clerk of the Supreme Court of Florida with a copy provided via the portal to David Bill Rothman, Counsel for Respondent, at dbr@rothmanlawyers.com; and that a copy has been furnished by United States Mail via certified mail No. 7020 1810 0000 0813 5369 return receipt requested to David Bill Rothman, whose record bar address is 200 S. Biscayne Blvd., Ste. 2770, Miami, FL 33131-5300 and to Sharla Manglitz, Bar Counsel, via email at smanglitz@floridabar.org, on this 26th day of November, 2024.

Patricia Ann Toro Savitz, Staff Counsel

## <u>NOTICE OF TRIAL COUNSEL AND DESIGNATION OF PRIMARY EMAIL ADDRESS</u>

The trial counsel in this matter is Sharla Manglitz, Bar Counsel, whose address, telephone number and primary email address are The Florida Bar, Ft. Lauderdale Branch Office, Lake Shore Plaza II 1300 Concord Terrace Ste. 130 Sunrise FL 33323, (954) 835-0233 and smanglitz@floridabar.org. Respondent need not address pleadings, correspondence, etc. in this matter to anyone other than trial counsel and to Staff Counsel, The Florida Bar, 651 E Jefferson Street, Tallahassee, Florida 32399-2300, psavitz@floridabar.org.

## <u>NOTICE OF MANDATORY ELECTRONIC FILING</u>

All parties must file all pleadings, motions, and notices in this matter electronically, with a copy to the referee, through the Florida Courts E-Filing Portal, www.myflcourtaccess.com, under Rule Regulating The Florida Bar 3-7.6(h)(5)(A) and (B).

## <u>MANDATORY ANSWER NOTICE</u>

RULE REGULATING THE FLORIDA BAR 3-7.6(h)(2) PROVIDES THAT A RESPONDENT MUST ANSWER A COMPLAINT.

July 17, 2019

Chief Judge K. Michael Moore
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 13-1
Miami, Florida 33128

Dear Chief Judge Moore:

We write you asking that you consider referral of attorney Elliot Kozolchyk of Koz Law, P.A. to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee") for investigation and disciplinary proceedings. Based on Mr. Kozolchyk's conduct in several cases before us, we believe that he has violated several Rules of Professional Conduct, Chapter 4 of the Rules Regulating the Florida Bar, as set forth below. Moreover, a review of his cases throughout the Southern District of Florida shows that the misconduct exhibited before us is not unique, but is a hallmark of Mr. Kozolchyk's legal practice.

Mr. Kozolchyk is the sole practitioner at his law firm, Koz Law, P.A., a labor and employment law firm that specializes in claims for unpaid wages and overtime pay.[1] His legal practice seems to consist primarily of bringing cases on behalf of plaintiffs under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* The FLSA allows for the recovery of reasonable attorney's fees and costs by plaintiffs. *See id.* § 216(b). However, when a case brought under the FLSA is resolved by settlement agreement, the entire settlement agreement, including the recovery of attorney's fees and costs, is subject to court approval. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 (11th Cir. 1982). The Eleventh Circuit has stated that judicial review of attorney's fees, in particular, is mandated by the FLSA "to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement." *Silva v. Manuel,* 307 Fed. Appx. 349, 351 (11th Cir. 2009).

Our central concern regarding Mr. Kozolchyk's conduct is that his litigation strategies seem driven more by his desire to collect attorney's fees than by concern for his clients. To that end, we have seen him make misrepresentations to the Court in violation of Rule 4-3.3, delay litigation so as to increase his own fees in violation of Rule 4-3.2, and make material misrepresentations to opposing counsel in violation of Rule 4.4-1. Based on this conduct—described in greater detail below—we think it appropriate for the Court to refer him to the Committee for disciplinary proceedings.

---

[1] *See* Firm Background, Koz Law, https://www.paychecklawyers.com/firm-background (last visited June 25, 2019).

THE FLORIDA BAR'S
EXHIBIT
1

I.

On May 22, 2019, Judge Middlebrooks held calendar call in *Shuman v. Treatment Partners of America*, Case No. 18-81609-Middlebrooks/Brannon, in which Mr. Kozolchyk represented plaintiff Felicia Shuman ("Shuman"). Shuman claimed that, pursuant to the FLSA, defendants Treatment Partners of America LLC and Scott Frankel owed her $522.00 in unpaid minimum wages, $122.00 in unpaid overtime wages, and $644.00 in liquidated damages, amounting to a total of $1,288.00 in damages. Approximately two weeks after the Complaint was filed, in December 2018, Plaintiff received a payroll check for $1,075.12 from defendant Treatment Partners of America. At the calendar call, the defense counsel asserted that the check had actually been sent to Shuman before her lawsuit was even filed.

Despite the payment to Shuman for all of the wages she claimed she was owed, the case remained open and unresolved. Three months after Shuman received her payroll check, Mr. Kozolchyk filed a motion in limine, ostensibly to prepare for trial. The parties were not, however, litigating Shuman's entitlement to liquidated damages or the precise terms of a general release; the only dispute remaining between the parties at the calendar call was whether they had reached a settlement agreement for Shuman's remaining claims for attorney's fees and costs. The parties had agreed that the defendants would pay Mr. Kozolchyk $2,500.00 for Shuman's claims for fees and costs in exchange for the dismissal of the case without prejudice. While the defendants believed that this exchange constituted a settlement agreement subject to judicial review, Mr. Kozolchyk represented to the Court that the agreement did not constitute a settlement agreement. Mr. Kozolchyk insisted that the exchange of fees for dismissal did not constitute a settlement agreement because the dismissal of Shuman's claims was without prejudice.

As the Court stated on the record at the calendar call, Mr. Kozolchyk's argument—that the exchange of money for dismissal did not constitute a settlement agreement—was both disingenuous and a means for the parties to evade judicial review of the settlement agreement. Mr. Kozolchyk argued that the money paid to Shuman immediately after the Complaint was filed and the $2,500.00 paid to Mr. Kozolchyk to dismiss the lawsuit were completely unrelated to one another. He further argued that, because the dismissal was without prejudice, Shuman relinquished none of her legal rights; thus, the agreement fell outside the ambit of the Eleventh Circuit's mandate that district courts must review compromises under the FLSA for fairness. These arguments are nonsensical and a violation of Mr. Kozolchyk's duty of candor towards the Court. The exchange that took place between the parties—in which the defendants paid Mr. Kozolchyk $2,500.00 for the dismissal of Shuman's claims—is the very definition of a settlement agreement—in which one party pays the other to resolve a lawsuit without further litigation. In emails between Mr. Kozolchyk and defense counsel, Mr. Kozolchyk had even written that

2

"Plaintiff accepts the [payment]."[2]  For Mr. Kozolchyk to argue repeatedly before the Court that such an exchange did not constitute a settlement agreement was disingenuous and self-serving.

Moreover, Mr. Kozolchyk has violated his duty of truthfulness to third parties in order to convince his opposing counsel that a dismissal without prejudice did not require judicial review. Defense counsel informed the Court that Mr. Kozolchyk had represented to him that United States District Judge William P. Dimitrouleas allows dismissals without prejudice without judicial review. Mr. Kozolchyk clarified that Judge Dimitrouleas issues a standard order in cases brought under the FLSA, which discusses the circumstances in which Judge Dimitrouleas allows parties to dismiss such a case without prejudice.  Judge Dimitrouleas's order reads:

> [A]ny voluntary dismissal or stipulation of dismissal will require the parties to submit a settlement agreement for judicial review and approval.  Further, the Court finds that in order to effectuate the Eleventh Circuit's requirements dictated by *Lynn's Food, even dismissals without prejudice require the Court to review any settlement agreement that has been reached by the parties. . . .*
> The Court recognizes that there may be situations in which the plaintiff chooses to voluntarily dismiss the case, even if there has been *no settlement or compromise.*
>> (1) In that event, the court will require the notice of voluntary dismissal to affirmatively state that (a) no settlement agreement has been reached, *and* (b) the plaintiff has voluntarily chosen to abandon the FLSA claim at this time.
>> (2) The Court will construe such a dismissal to be <u>without</u> prejudice, regardless of the language used in the notice.  Plaintiff will be able to re-file or otherwise pursue the claim in the future, subject to the statute of limitations.[3]

Judge Dimitrouleas's order explicitly requires parties to file any settlement agreement for the court's review, even where the parties seek to dismiss the action without prejudice.  The order allows for dismissal without prejudice *only* where there has been no settlement or compromise. *Shuman,* however, did not present such a situation—the exchange of money for the dismissal of the remaining claims is precisely the type of negotiated agreement that, pursuant to Judge Dimitrouleas's order, would be subject to the court's review and approval.  Mr. Kozolchyk used Judge Dimitrouleas's order to do exactly what the order disallows: to label a settlement agreement as a "stipulation of dismissal without prejudice" in order to avoid the Court's review of the settlement agreement.  In the process, he also appears to have misrepresented the contents of Judge Dimitrouleas's standard FLSA order to his opposing counsel in order to secure opposing counsel's agreement to file a stipulation of dismissal.  While a lawyer does not have a duty to inform opposing counsel of all relevant facts, Mr. Kozolchyk's misleading explanation of Judge

---

[2] Case No. 18-81609-DMM, DE 29, Exhibit A.
[3] *Koenitzer v. ATCI Comms., Inc.*, Case No. 18-61257-CIV-Dimitourleas/Snow (S.D. Fla. June 7, 2018) (emphasis added) (citations omitted).

Dimitrouleas's order is equivalent to an affirmative false statement because it caused his opposing counsel to attempt to dismiss an FLSA case without judicial review, in contravention of the law in this Circuit.

II.

Judge Rosenberg's experiences with Mr. Kozolchyk mirror Judge Middlebrooks' experiences—it is typical for a defendant to offer as quickly as possible to pay the entire damages demand of Mr. Kozolchyk's client, but the case does not resolve or settle until Mr. Kozolchyk has generated a significant amount of fees and costs. A recent example is *Soto v. Audiology Distribution LLC*, No. 19-CV-80339-ROSENBERG/REINHART. In *Soto*, the defendant quickly delivered settlement checks to Mr. Kozolchyk for the full amount the plaintiff sought. The parties agreed to settlement terms as the terms applied to Mr. Kozolchyk's client. Rather than deliver the settlement checks to his client, however, Mr. Kozolchyk took the position that there was no settlement agreement between the parties because the defendant refused to agree that it would not seek sanctions against Mr. Kozolchyk *personally*. Because the parties could not resolve the possibility of sanctions against Mr. Kozolchyk personally (due to his delay in settling the case and his overall conduct), Mr. Kozolchyk refused to concede that there was a settlement agreement as to *his client*, which put the case into a state of limbo where the defendant was uncertain how to proceed and where the settlement checks remained in Mr. Kozolchyk's office. Judge Rosenberg is still, at present, attempting to bring *Soto* to a conclusion.

Another example is *Mendez v. Model Row, Inc.*, No. 17-CV-81104-ROSENBERG/HOPKINS. *Mendez* represented the fourth time that Mr. Kozolchyk sued the defendant.[4] Just as in the three preceding cases, the defendant in *Mendez* offered to settle the case. The parties reached a settlement agreement (at least in principle) because the plaintiff attempted to make an offer of judgment and the defendant attempted to accept the offer. Nonetheless, the parties were unable to bring the case to a conclusion, so Judge Rosenberg required the parties to appear in person at a hearing. At the hearing, the parties informed Judge Rosenberg that they were in agreement and that the terms of the settlement agreement could be read into the record, but the defendant informed Judge Rosenberg that because he had been sued by Mr. Kozolchyk on three prior occasions, he no longer had the funds to make payment. Thus, the plaintiff agreed that the defendant could make monthly payments in the future to satisfy its debt. Mr. Kozolchyk, however, did not agree to accept future monthly payments towards his own fees and costs. Faced with that situation, the defendant informed Judge Rosenberg that he had no other way to end the case other than to pay Mr. Kozolchyk's fees with a credit card. Upon learning that the defendant intended to pay with a credit card, Mr. Kozolchyk declared that his fee demand would increase by 3 percent.

---

[4] *Martinez v. Model Row, Inc.*, No. 16-CV-81636; *Herrera v. Model Row, Inc.*, No. 17-CV-80241; *Lopez v. Model Row, Inc.*, No. 17-CV-80677.

At this point, the defendant began to weep in open court but, stating he had no other alternative, he agreed that Mr. Kozolchyk's fees could be increased by three percent.

Mr. Kozolchyk's behavior is worthy of consideration in other regards as well. Mr. Kozolchyk's behavior and communications towards opposing counsel are consistently problematic. In *Hernandez-Sabillon v. Naturally Delicious, Inc.*, No. 15-CV-80812-ROSENBERG/BRANNON, Mr. Kozolchyk attempted to make his own audio recording of a deposition over opposing counsel's objection. The argument that ensued resulted in both attorneys calling Judge Brannon's chambers on separate lines. Because the phone calls were on separate lines, each attorney's phone call was answered by a separate law clerk. The audio level of the attorneys on the phone was so loud, and so heated, that each law clerk could hear the opposing attorney yelling on the phone to the other law clerk. These phone calls, together with Mr. Kozolchyk's general behavior in discovery, resulted in Judge Brannon sanctioning Mr. Kozolchyk by requiring him to serve at a local soup kitchen.[5]

In *Salvador v. Brico, LLC*, No. 17-CV-61508-ROSENBERG/SELZER, Mr. Kozolchyk and opposing counsel repeatedly attacked each other in court filings, often via the attachment of e-mails of their correspondence. The fighting between counsel ultimately resulted in Judge Rosenberg censuring both counsel and ordering them to cease their personal attacks. Despite Judge Rosenberg's censure, Mr. Kozolchyk continued to attack opposing counsel in his court filings. Ultimately, the parties declared that a settlement had been reached at a settlement conference before Judge Brannon. After the conference, however, Mr. Kozolchyk took the position that there was no settlement agreement because defendant expressed its intention to appeal any fee award to Mr. Kozolchyk. Judge Rosenberg therefore ordered Mr. Kozolchyk to appear before Judge Brannon a second time. Judge Brannon concluded that Mr. Kozolchyk's position (that defendant waived its right to appeal fees) was without support and Judge Brannon also described Mr. Kozolchyk's behavior as vexatious.

III.

Our experiences with Mr. Kozolchyk do not seem to be unique or uncommon. To the contrary, there are several other cases in which the same or similar behavior is noted and rebuked. In *Nelson v. Kobi Karp Architecture & Interior Design, Inc.*, Case No. 17-23600-CIV-Seitz/McAliley, 2018 WL 3059980 (S.D. Fla. May 7, 2019), Judge Seitz denied a motion for attorney's fees "[b]ecause Plaintiff's counsel, Elliot Kozolchyk, unreasonably and unnecessarily dragged this case out in order to increase his fees." *Id.* at *1. Less than a month after initiating the case, Mr. Kozolchyk accepted checks on the plaintiff's behalf for the full amount of claimed unpaid wages and liquidated damages. *Id.* Mr. Kozolchyk refused, however, to accept an offer to settle the claims for attorney's fees and costs for $2,000.00 and continued to litigate the case. *Id.*

---

[5] Opposing counsel was required to do community service as well.

Mr. Kozolchyk eventually moved for $9,065.00 in attorney's fees. *Id.* In denying that request, the court found that "Plaintiff's counsel's sole intent, after receiving the checks with the October 24, 2017 letter from defense counsel, was to run up his bill." *Id.* at *3.

Magistrate Judge Seltzer made a similar finding in a Report and Recommendation in *Batista v. South Florida Women's Health Association, Inc.*, Case No. 18-61075-CIV-Moreno/Seltzer, which was adopted by Judge Moreno. *Batista*, DE 37 & DE 40. The defendant in *Batista* had mailed a paycheck to the plaintiff, which she never received. *Batista*, DE 37 at 2. The plaintiff brought suit for those wages, whereupon the defendant emailed Mr. Kozolchyk informing him that the defendant had sent the plaintiff a check and would be willing to send her a new check for the amount of wages that she was owed. *Id.* at 2–3. However, Mr. Kozolchyk refused to settle the case without payment of his attorney's fees. As Judge Seltzer wrote, as of twelve days after the complaint was filed, "Plaintiff's counsel was aware that, at most, a mistake had occurred, which could easily be rectified. From that date forward, both Plaintiff's counsel and his client knew that Defendants were willing to issue a new check; the only obstacle to resolution throughout was the fee demand of Plaintiff's counsel." *Id.* at 5. Judge Seltzer recommended that the plaintiff's request for $10,675 of attorney's fees be denied because "[t]his was a prototypical 'nuisance suit' for which an award of fees would be unreasonable and unjust." *Id.* at 1.

*Nelson* and *Batista* shared several features that contributed to Judge Seitz and Judge Seltzer's opinions that Mr. Kozolchyk was interested primarily in his attorney's fees. Both claims were for relatively small amounts—the plaintiff in *Nelson* claimed $259.24 in total damages and the plaintiff in *Batista* claimed $551.00 in total damages—and in both cases, Mr. Kozolchyk made no effort to resolve the dispute before filing a lawsuit. *Nelson*, 2018 WL 3059980 at *1; *Batista*, DE 37 at 2. In both cases, the defendants immediately communicated their desire to resolve the matter quickly and offered to pay Mr. Kozolchyk's clients for all the wages owed them. *Nelson*, 2018 WL 3059980 at *1; *Batista*, DE 37 at 3–4. And in both cases, Mr. Kozolchyk demanded around $3,000.00 in attorney's fees to settle the matter and refused to settle for less. *Nelson*, 2018 WL 3059980 at *1; *Batista*, DE 37 at 4. In *Nelson*, Judge Seitz explained why Mr. Kozolchyk's $3,000.00 demand was unreasonable:

> [A]t [the time the offer was made], Plaintiff's counsel had billed all of 3.6 hours, which, at counsel's billing rate of $350.00 an hour, totaled $1,260.00 in fees. Even including the $523.00 in costs incurred to that point, such a settlement offer was unreasonable and would have been a windfall for Plaintiff's counsel.

*Nelson*, 2018 WL 3059980, at *3.

Magistrate Judge Goodman recently found that these facts were echoed again in *Olguin v. Florida's Ultimate Heavy Hauling*, Case No. 17-61756-CIV-Cooke/Goodman, in which Judge

Goodman wrote a Report and Recommendation ("Report") recommending that the district judge deny Mr. Kozolchyk's client any attorney's fees.[6]  There, part of the plaintiff's claim was for unpaid minimum wages for his last week of work with defendant.  Because the plaintiff had stopped working for defendants mid-week, defendants had cancelled his automatic payroll deposit and prepared a check for the wages owed him.  The plaintiff never retrieved that paycheck, and neither the plaintiff nor Mr. Kozolchyk inquired into those wages before filing the lawsuit.  Ultimately, Judge Goodman found that "Plaintiff's counsel, Elliot Kozolchyk, appeared to be far-more interested in generating attorney's fees for himself than in resolving a modest claim for his client's benefit.  His actions strongly suggest a strategy of avoiding an early resolution in order to generate more fees." *Olguin*, DE 104 at 5.

*Olguin* also showcases two instances in which Mr. Kozolchyk appears to have made misrepresentations to the Court.  The first instance concerns the defendants' attempt to tender to Mr. Kozolchyk a check for more than the total amount of unpaid minimum wages claimed by Mr. Kozolchyk's client. *Id.* at 10–11.  The defendants averred that Mr. Kozolchyk declined to accept the tender without explanation.  Mr. Kozolchyk argued that he never refused the tender, but that the tender was made by an unexpected delivery to Mr. Kozolchyk's office at a time when neither Mr. Kozolchyk nor anyone employed by him was present in the office; though there was a receptionist available when the delivery was made, the receptionist does not work for Mr. Kozolchyk and is not authorized to sign anything on Mr. Kozolchyk's behalf.  According to Mr. Kozolchyk, because the receptionist would not sign for the package that contained the tender, the courier refused to deliver the package.  Judge Goodman wrote that he "[was] not at all convinced by Kozolchyk's after-the-fact explanation that the receptionist was not authorized to accept a package for him." *Id.* at 32.

Second, Judge Goodman's Report details a hearing he held on the defendants' motion to bar solicitation of other plaintiffs.  After the initiation of the lawsuit, another of defendants' former employees, Glenn Pryor ("Pryor"), received a phone call from a male attorney who attempted to solicit Pryor to join the lawsuit.  Pryor testified that he recognized Mr. Kozolchyk's voice as that of the person who had solicited him to join the lawsuit, but Mr. Kozolchyk denied any knowledge of or involvement in the solicitous phone call.  Although Judge Goodman did not make a finding or rule on the motion to bar solicitation, the Report indicates that he is skeptical of Mr. Kozolchyk's denial.  Judge Goodman noted that Mr. Kozolchyk was the only male attorney involved in the case and that Mr. Kozolchyk "has a distinctive way of speaking, . . . [which] may well be atypical enough for someone like Pryor to recognize it ten months after his conversation with the person soliciting his legal business." *Id.* at 18.  Judge Goodman also observed that at the time the solicitous phone call was made, Pryor was not affiliated in any way with the lawsuit, meaning that

---

[6] Judge Goodman's Report and Recommendation has not yet been ruled on by the presiding district judge.  The plaintiff submitted objections to Judge Goodman's Report on June 19, 2019. (*Olguin*, DE 105).

only a person with insider knowledge of defendants' former employees could have obtained Pryor's name and phone number. Judge Goodman was "hard-pressed to accept Kozolchyk's theory that some *other* FLSA attorney made a cold call to Pryor by scanning the public dockets on CM/ECF and learning of the lawsuit," noting instead that Mr. Kozolchyk's client might have known Pryor's cell phone number. *Id.* at 19–20.

In addition to the above orders illustrating Mr. Kozolchyk's conduct, magistrate judges in the District have reported to us similar experiences: Magistrate Judge Lurana S. Snow now recuses in all cases where Mr. Kozolchyk is counsel.

## IV.

The episodes described above—both those we have personally experienced and those described in court orders by other judges in the District—reveal a pattern of behavior by Mr. Kozolchyk that we think violates several Rules of Professional Conduct. We believe that Mr. Kozolchyk's behavior shows that he litigates in the interest of his own fees rather than his client's best interest, which in turn leads to various acts of misconduct in an effort to obtain the greatest fee award possible.

First, Mr. Kozolchyk has repeatedly violated Rule 4-2.3 by delaying litigation in an effort to obtain increased attorney's fees. Rule 4-3.2 provides that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." Fla. State Bar Rule 4-3.2. The Comment explains that "[r]ealizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client." *Id.* (emphasis added). In numerous instances described above, Mr. Kozolchyk has continued litigating cases after the defendant has offered or sent his client the full value of their claim. Despite the fact that his clients' claims have principally been settled, Mr. Kozolchyk then continues to generate unnecessary work for those cases so that he can later request attorney's fees for the additional time spent. In *Shuman*, for example, Mr. Kozolchyk's client was sent a payroll check for her claimed wages two weeks after the case was initiated; three months later, Mr. Kozolchyk filed an *unopposed* motion in limine. *Shuman*, DE 19. When Mr. Kozolchyk later defended the amount of attorney's fees he was paid pursuant to the parties' settlement, he frequently cited the motion in limine as evidence that he was entitled to the fees collected for work performed—regardless that the motion in limine was unnecessary because his client had already received her wages and the defendant agreed to the relief requested in the motion.

Second, Mr. Kozolchyk has violated Rule 4-3.3 and Rule 4-4.1 by making material misrepresentations to the Court and to his opposing counsel in an effort to avoid judicial scrutiny of settlement agreements. Rule 4-3.3 provides that lawyers have a duty of candor toward the tribunal. Fla. State Bar Rule 4-3.3. It requires that lawyers, as officers of the court, "avoid conduct

8

that undermines the integrity of the adjudicative process. *Id.*, Comment. In *Shuman*, however, Mr. Kozolchyk presented the Court a self-serving and false account of the facts and circumstances of the case. In that case, Mr. Kozolchyk repeatedly represented to the Court that the parties had not reached a settlement agreement that would require the Court's scrutiny. Such claim was false. It defied logic to label the exchange of money for the dismissal of a lawsuit as anything but a settlement agreement. And while "[a] lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force," Mr. Kozolchyk's misrepresentations in *Shuman* were purely for his own benefit. His client had received payment for her claim months before he negotiated the settlement agreement at issue, and the disputed term was the amount of attorney's fees. His client's recovery was never at issue, and the false statements he made to the Court were purely self-serving.

Moreover, Mr. Kozolchyk violated Rule 4-4.1 by misrepresenting the contents of Judge Dimitrouleas's standard FLSA order to his opposing counsel in order to secure a joint stipulation without dismissal, which Mr. Kozolchyk represented would not require judicial review. Rule 4-4.1 prohibits lawyers from knowingly making false statements of material fact or law to non-clients. Fla. State Bar Rule 4-4.1. The Comment explains that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements." *Id.*, Comment. In describing Judge Dimitrouleas's order to his opposing counsel, Mr. Kozolchyk omitted the order's explicit directive that dismissals without prejudice *were* subject to judicial review. It strains credulity to argue that Mr. Kozolchyk merely misunderstood the clear directions in Judge Dimitrouleas's order, and it appears that these maneuvers were aimed at evading judicial scrutiny of the settlement agreement and his attorney's fees. Mr. Kozolchyk's client was not benefitted in any way from these tactics, but Mr. Kozolchyk was—after his opposing counsel filed a motion to enforce settlement agreement, Mr. Kozolchyk allegedly demanded an additional $1,000.00 for attorney's fees.

The idea that Mr. Kozolchyk is willing to make misrepresentations to serve his self-interest is bolstered by the circumstances described by Judge Goodman in *Olguin*. In his Report, Judge Goodman notes his skepticism of several statements made by Mr. Kozolchyk in the course of the litigation. While Judge Goodman's Report does not explicitly find Mr. Kozolchyk's statements to be untrue, the Report's skepticism of those statements is striking. At the very least, it shows that Mr. Kozolchyk is comporting himself in a manner that has led multiple judges to distrust his honesty and candor toward the court.

For all these reasons, we ask you to refer Mr. Kozolchyk to the Committee for investigation, disciplinary action, and possible referral to the Florida Bar. We think that Mr. Kozolchyk's tactics are of great concern and deserve additional scrutiny.

Sincerely,

Judge Donald M. Middlebrooks

Judge Robin L. Rosenberg

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-MC-21879


IN RE:

ELLIOT KOZOLCHYK
Florida Bar #74791



Transcript of the testimony of Elliot
Kozolchyk before the Ad Hoc Committee on
Attorney Admissions, Peer Review and Attorney
Grievance (the "Committee") by Zoom Video
Conference commencing at 4:08 p.m. on Tuesday,
June 28, 2022, reported by MARIA ISABEL SALUM,
Registered Professional Reporter and Notary
Public in and for the State of Florida.



THE FLORIDA BAR'S
EXHIBIT
2

Maria I. Salum, P.A.                    305 746-3079

Page 2

1                        APPEARANCES
2
3          Committee Members:
4          William C. Hearon, Chair
           Michael Olin
5          Da'Morus Cohen
           Christopher Wahl
6          Richard Baron
           Ryan Zagare
7          Devang Desai
           Garth Yearick
8          Dylan Fay
           Anita Viciana
9          Bertila Fernandez
           Alison Smith
10         Andrew Figueroa
           Val Rodriguez
11         Valencia Gallon-Stubbs
           Bernardo Lopez
12         Bruce Lehr
           Celeste Higgins
13         Tiffani Lee
           Kimberly Gilmour (Recused from
14         consideration on this matter.)
15
16
17         WITNESS:
18
           Elliot Kozolchyk
19
20         ALSO PRESENT:
21
           Phoebe Dauz
22
23
24
25

Maria I. Salum, P.A.                    305 746-3079

Page 3

1      MR. HEARON:  This is Bill Hearon.

2  First thing we're going to do is swear

3  you in.  Our court reporter, Maribel,

4  will swear you in and then the committee

5  members will be given an opportunity to

6  question you after you are given an

7  opportunity to make an opening statement

8  if you so choose to do so.  If you don't

9  want to make a statement, that's entirely

10  up to you.  If you'd like to make one,

11  we're happy to listen to it and then the

12  questioning will begin when you are done.

13  And we have an order for the questioning

14  to be conducted, so that hopefully we

15  only have one person speaking to you at a

16  time.

17      If at any point, you don't catch the

18  question because of the audio, please ask

19  us to repeat it.  We want to make sure

20  that you hear the question carefully

21  before you have an opportunity to answer.

22  Okay.

23      MR. KOZOLCHYK:  Okay.

24      MR. HEARON:  Obviously, if you need

25  to take a break for any reason, let us

Maria I. Salum, P.A.                     305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 4

1    know.
2         You had indicated to me that you
3    might want to bring someone along for
4    moral support.  Is there anyone in the
5    room with you?
6         MR. KOZOLCHYK:  Yes.
7         MR. HEARON:  Who might that person
8    be?
9         MR. KOZOLCHYK:  Her name is Phoebe
10   Dauz.
11        MR. HEARON:  Can you spell the last
12   name?
13        MR. KOZOLCHYK:  D-A-U-Z.
14        MR. HEARON:  Is she an employee of
15   your firm?
16        MR. KOZOLCHYK:  Yes.
17        MR. HEARON:  Maribel, if you would
18   like to swear the witness.
19        THE REPORTER:  Can you raise your
20   right hand, please?
21        Do you solemnly swear or affirm that
22   the testimony you're about to give will
23   be the truth, the whole truth and nothing
24   but the truth?
25        MR. KOZOLCHYK:  Yes.

Maria I. Salum, P.A.                    305 746-3079

Page 5

1        THE REPORTER:  Thank you.

2        MR. HEARON:  You have the floor, Mr.

3    Kozolchyk, if you would like to make a

4    statement.

5        MR. KOZOLCHYK:  Yes, I would.

6        First I would like to thank the

7    entire committee for taking the time to

8    be here and ask me questions.  I

9    particularly want to thank Mr. Cohen, Mr.

10   Wahl and Mr. Olin for yesterday taking

11   the time to ask me questions and get to

12   know me better.

13       Not a day has gone by during the

14   last three years that I have not thought

15   about this letter.  I understand how

16   important and serious it is and that my

17   entire career and the ability to

18   financially support my two stepchildren,

19   Phoebe and Jeremy are at stake.

20       The time period during the events

21   described in the letter of referral was

22   an overwhelming, stressful and difficult

23   time for me.  Since 2015, my fiancee was

24   battling cancer and receiving radiation

25   treatment.  At the same time, I had an

Maria I. Salum, P.A.                    305 746-3079

Page 6

1    active caseload of 30 to 50 cases in
2    federal court at any given time.  The
3    stress of my personal life and my
4    professional life was overwhelming.
5    Ultimately within the span of four months
6    in 2019, I lost my fiancee, five days
7    before our wedding, I receive this letter
8    of referral.  I was sanctioned $30,000 in
9    Olguin, and I was handling the very
10   difficult case of Soto Aldana.  These
11   events are all described in detail in my
12   response letter.
13       The pandemic gave me much needed
14   time to digest the letter's content and
15   to reflect on my conduct, including what
16   I could have done differently and what I
17   could do better.  Through intensive
18   self-reflection and regular counseling
19   with my attorney, David Rothman, I am not
20   the same person I was three to seven
21   years ago during the time that the events
22   described in the letter were unfolding.
23       Half the cases identified in the
24   letter of referral involve claims for
25   lost paychecks with low value.  I no

Maria I. Salum, P.A.                    305 746-3079

Page 7

1    longer bring these claims in federal
2    court.  On average, I decline about four
3    cases per month where prospective
4    clients' sole claims were that they were
5    not paid their last paychecks from their
6    employers.  I have come to realize that
7    bringing these cases in federal court
8    hurts my credibility, which hurts me
9    professionally and hurts my other clients
10   whose claims are larger and depend on me
11   to represent them effectively.
12       Now when I am contacted by people
13   with low claims, I recommend they pursue
14   the matter in small claims court or
15   contact Florida Legal Aid or the
16   Department of Labor.
17       Some of the other cases identified
18   in the letter of referral deal with my
19   interactions with opposing counsels.
20   Cases involving unpaid wages are often
21   contentious.  I no longer respond in-kind
22   when I feel that I have been attacked by
23   opposing counsel.  I strive to take the
24   high road, avoid the emotion and focus
25   dispassionately on the issues relevant to

Maria I. Salum, P.A.                    305 746-3079

Page 8

1      the court's determination of each case.

2          I am not perfect.  But who I am

3      today is much better than the person I

4      was at that time.  I am more patient.  I

5      am less reactive.  I try hard to remain

6      calm even when confronted with difficult

7      situations and difficult opposing

8      counsels.  I try to take the high road

9      and not react in-kind.

10         I am very proud of the work I do.

11     In February, March and April of this

12     year, I won three consecutive trials in

13     federal court.  In one of those cases, I

14     represented eight people and the final

15     judgment was approximately $268,000.

16         It is extremely important to my

17     family, my clients and me that I maintain

18     the ability to practice in federal court.

19     My practice is devoted almost exclusively

20     to the Federal Statute Fair Labor

21     Standards Act.  I cannot maintain my

22     practice if I cannot practice in federal

23     court.

24         I have grown.  I am still growing

25     and I continue to grow.  Thank you again

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                              8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 9

1    for your time.

2         MR. HEARON:  Thank you.

3         Michael Olin, questions?

4         MR. OLIN:  No.  We spoke with Elliot

5    yesterday and had a very wholesome

6    conversation with the subcommittee, so I

7    would like to let anybody else that would

8    like to speak, including my

9    co-subcommittee members if they wish, to

10   go ahead and ask additional questions.

11        MR. HEARON:  Da'Morus Cohen?

12        MR. COHEN:  Sure.  I will ask a few

13   questions.

14        Mr. Kozolchyk, it's nice to see you

15   again and I appreciate you taking the

16   time to meet with us yesterday

17   informally.

18        I just want to ask a few questions

19   related to your practice in the Southern

20   District, just so the committee has an

21   understanding of how expansive your

22   practice is and the importance of the

23   Southern District to your practice.

24        So currently, how many cases do you

25   have active in the Southern District?

Maria I. Salum, P.A.                    305 746-3079

Page 10

1        MR. KOZOLCHYK:  I believe I have

2    approximately 20 currently.  I have seven

3    more that I need to file.  I'm going to

4    look it up right now to give an exact

5    number as to how many are currently open.

6        MR. COHEN:  An estimate is fine.

7        Do you have an estimate of how many

8    cases you need to file?

9        MR. KOZOLCHYK:  It could be -- could

10   be 30 cases.  I'm getting new cases on a

11   regular basis.

12       MR. COHEN:  Understood.  What

13   percentage of your caseload is in the

14   Southern District of Florida?

15       MR. KOZOLCHYK:  I have one case in

16   the Middle District currently.

17       MR. COHEN:  So you have

18   approximately 20 plus cases active in the

19   Southern District and one case active in

20   the Middle District?

21       MR. KOZOLCHYK:  And then I have a

22   small number of cases in the state court.

23       MR. COHEN:  Understood.

24       All of your current cases -- strike

25   that.

Maria I. Salum, P.A.                  305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

1      You noted that you had changed your

2   policies and procedures relating to how

3   you file cases and what cases you take.

4   Are all of your current cases in the

5   Southern District, do they comport with

6   your policy and procedure of not taking

7   last check cases or a minimal threshold?

8      MR. KOZOLCHYK:  Yes.  I don't

9   believe I have any active cases currently

10   that have that kind of fact pattern.

11      MR. COHEN:  Understood.

12      The events in the letter date back

13   from 2019, however, I want to know in the

14   last 12 to 18 months, have you had any

15   similar issues that are consistent with

16   the claims made by the judge in the

17   referral letter?

18      MR. KOZOLCHYK:  The events occurred

19   between 2015 and 2019.

20      In the last 18 months, I had an

21   issue with opposing counsel in a case

22   where there was some conflict at a

23   deposition, but I maintained my composure

24   at all times.  I did not attack opposing

25   counsel even one time, nor did I speak

Maria I. Salum, P.A.                    305 746-3079

Page 12

1    over opposing counsel or interrupt him,

2    and I kept a calm and professional

3    demeanor.  I believe the court with

4    regard to me took issue with the fact

5    that my objections were lengthy, and I

6    accept that, and I will be much more

7    succinct next time.

8        MR. COHEN:  So it's your testimony

9    today that in the last 12 to 18 months,

10   you only had one similar issue when

11   compared to the claims made by the judge

12   in the response letter -- or the referral

13   letter, excuse me?

14       MR. KOZOLCHYK:  Yes.  There was that

15   other minor case we discussed.  There was

16   a reference in the paperless order.

17   Just --

18       MR. COHEN:  And when you say the

19   minor case, you're talking about the

20   motion for sanctions case that we

21   discussed where you filed the motion for

22   sanctions against your defense counsel?

23       MR. KOZOLCHYK:  Right, right.  In

24   both instances that I just referenced,

25   I'm the one that sought sanctions against

Maria I. Salum, P.A.                    305 746-3079

Page 13

```
1      the other side.  And I rarely file
2      motions for sanctions.  I don't believe I
3      have filed a motion for sanctions in the
4      last three years, except those two cases,
5      to the best of my recollection.  It's not
6      something that I do regularly.  But the
7      conflict before the court was initiated
8      by me because of what I saw was going on.
9           MR. COHEN:  Understood.
10          I think that's all I have in
11     relation to your current caseload and any
12     other similar issues that you've had in
13     the last 12 to 18 months.
14          The last couple of questions I will
15     ask is you mentioned you had two
16     stepchildren, correct?
17          MR. KOZOLCHYK:  Yes.
18          MR. COHEN:  And what are their names
19     and ages?
20          MR. KOZOLCHYK:  Jeremy is 18 and
21     Phoebe is 20.
22          MR. COHEN:  And Phoebe also works at
23     your firm, correct?
24          MR. KOZOLCHYK:  Correct.  She's the
25     firm manager.
```

Maria I. Salum, P.A.                    305 746-3079

Page 14

```
 1        MR. COHEN:  Okay, perfect.  And I
 2   think that's all I have.  I'll let Chris
 3   jump in to see if he has any questions.
 4        MR. HEARON:  Mr. Wahl?
 5        MR. WAHL:  Thank you.
 6        Mr. Kozolchyk, I have just one
 7   question right now.  You mentioned that
 8   you basically have a threshold criterion
 9   for what sort of cases you're going to
10   take in terms of how much money the
11   plaintiff is owed or allegedly owed.  Why
12   are you no longer taking those cases?
13   Can you please just give us the reason
14   why there are certain cases you are not
15   going to be filing any more?
16        MR. KOZOLCHYK:  When -- a lot of
17   clients contact me for unpaid wages and
18   in particular their employer has not paid
19   them their last paycheck.  That could be
20   a week or two of work or it can be a few
21   days.  And I empathize with my clients
22   because of how uneven the bargaining
23   power is between the employer and the
24   employee, where the employee can often
25   feel powerless with regard to collecting
```

Maria I. Salum, P.A.                    305 746-3079

Page 15

1    their last paycheck if the employer

2    doesn't want to pay.  But I don't bring

3    those cases any more because it hurts my

4    credibility, when ultimately I can't take

5    it pro bono and when my fees exceed the

6    small value of the claim, it's easy to

7    interpret that as the whole case being

8    about my attorney's fees, and that hurts

9    my credibility, which then hurts my other

10   clients with much larger claims because

11   my credibility is being hurt in front of

12   the court.  It's not -- it's a disservice

13   to me and my other clients and to me

14   professionally to continue to bring those

15   kind of cases.  It's also been

16   unproductive for me professionally.  I

17   think it's in large part why I'm here

18   today and so I've opted not to take those

19   cases and I regularly reject those cases.

20   I decline them.

21       MR. WAHL:  Thanks for sharing that.

22   I completely respect your decision and

23   you making the right judgment call to

24   stay out of trouble and maybe drawing a

25   bright line rule.

Maria I. Salum, P.A.                    305 746-3079

Page 16

1          I'm just curious if congress created

2     a statute that allows for these cases to

3     be brought and congress has created a

4     situation where an employee can get 600

5     bucks and an attorney can get $6,000

6     based on the way a case is litigated, why

7     does that harm your credibility if you're

8     just following the statute?  Have people

9     come towards you and said you shouldn't

10    be filing these cases?  I mean, I'm just

11    concerned that there are people with

12    claims out there and they may not get

13    their day in court because -- I'm just

14    wondering where these credibility

15    concerns come from and alternatively, is

16    the federal court the best forum to be

17    bringing those cases or is there a

18    perhaps more efficient forum?  You said

19    small claims court.  Were you helping

20    these people before and now they're not

21    being helped or are they still being

22    helped in a different way?

23         MR. KOZOLCHYK:  They can bring the

24    cases themselves in small claims court.

25    I refer them there or I say you can also

Maria I. Salum, P.A.                    305 746-3079

Page 17

```
 1    contact Legal Aid or the Department of
 2    Labor.  It's not practical for me to
 3    personally pursue those cases in small
 4    claims court while simultaneously trying
 5    to litigate the cases in my federal
 6    practice, plus the defendants always have
 7    the option, if it's the Federal Statute
 8    of Fair Labor Standards Act, to remove
 9    the case to federal court anyway.
10          MR. WAHL:  That's all I have.
11          MR. HEARON:  Mr. Baron?
12          MR. BARON:  Thank you, Mr. Chairman.
13          Mr. Kozolchyk, did I pronounce that
14    right, sir?
15          MR. KOZOLCHYK:  Yes.  If you prefer,
16    you can call me Elliot, too.
17          MR. BARON:  Mr. Kozolchyk, during
18    that period of your reflection, were you
19    getting any counseling from a
20    professional?
21          MR. KOZOLCHYK:  Not from a
22    professional.  Lots of counseling from
23    Mr. Rothman.  I am very open to getting
24    counseling.
25          MR. BARON:  How come you haven't so
```

Maria I. Salum, P.A.                    305 746-3079

Page 18

1   far?  It sounds like you were in a really

2   tough place where counseling could have

3   been extraordinarily helpful.  I'm

4   wondering why you didn't undertake that

5   endeavor.

6        MR. KOZOLCHYK:  When you say

7   "counseling," do you mean like

8   personally, like a therapist or

9   professionally like professional

10   counseling?

11        MR. BARON:  Like a therapist.

12        MR. KOZOLCHYK:  I mean, I know

13   Mr. Rothman and I discussed counseling.

14   I was under the impression that he

15   mentioned in some professional capacity

16   related to a Florida legal organization,

17   so I didn't consider that personal

18   counseling though I'm not sure if it

19   would be considered personal counseling.

20   So assuming that that's distinct, actual

21   therapist, I have not -- I really haven't

22   thought a lot about a personal therapist.

23   I am certainly open to that, too.  I can

24   tell you it's been very difficult these

25   several years.  I haven't given that a

Maria I. Salum, P.A.                    305 746-3079

Page 19

1   lot of thought.

2        MR. BARON:  Have you ever heard of

3   FLA, Florida Lawyers Assistance program?

4        MR. KOZOLCHYK:  That was the

5   organization that I was trying to

6   reference.  Mr. Rothman and I did discuss

7   that.  If that is personal counseling,

8   yeah.  Mr. Rothman and I have discussed

9   that.  It hasn't been pursued yet, but

10  I'm very open to doing that.

11       MR. BARON:  You said you have about

12  20 FLSA cases in the Federal Southern

13  District now, more or less,

14  approximately?

15       MR. KOZOLCHYK:  Currently active.  I

16  have more that need to be filed.

17       MR. BARON:  But currently you have

18  20 active?  I'm not trying to pin you

19  down to a number.  I'm just trying to get

20  a concept.

21       You have about 20 cases; is that

22  right?

23       MR. KOZOLCHYK:  Right.

24       MR. BARON:  Can you tell me what the

25  average wage claim is in those cases?

Maria I. Salum, P.A.                    305 746-3079

Page 20

1          MR. KOZOLCHYK:  Oh, I mean, it can

2     vary from -- I haven't run an actual

3     mathematical average.  I have some cases

4     that could be five, six, seven, 8,000.  I

5     have this case that I went to trial in

6     February, I represented eight people.

7          MR. BARON:  How many?

8          MR. KOZOLCHYK:  Eight people.  And

9     the final judgment was for 268,000.

10         MR. BARON:  So that was a multiple

11    plaintiff case?

12         MR. KOZOLCHYK:  Yes.  One gentleman

13    is receiving $92,000 on that.  Another

14    gentleman I think is receiving in the

15    70s.

16         MR. BARON:  And that is because in

17    the judgment they get trebled the amount

18    of their lost wages, correct?

19         MR. KOZOLCHYK:  They get double --

20    if the Court awards liquidated damages,

21    then they're entitled to double damages.

22         MR. BARON:  Where do you get your

23    clients from?

24         MR. KOZOLCHYK:  Internet.  Mostly

25    Internet, but I also -- I get referrals

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 21

```
 1    from other happy clients.  I get

 2    referrals from other attorneys.  I've

 3    gotten referrals from opposing counsels.

 4         MR. BARON:  Would you say most of

 5    your clients come from advertising on the

 6    Internet?

 7         MR. KOZOLCHYK:  The majority, yes.

 8         MR. BARON:  What does your ad say?

 9         MR. KOZOLCHYK:  I'm not hands-on on

10    the marketing, so I don't write it myself

11    and I don't look at it that much, to be

12    honest with you, but I believe it's --

13    and it says various things, depending on

14    what ad is posted.  I think there's

15    something like "help recover the lost

16    wages.  Help recover your overtime,"

17    things like that.

18         MR. BARON:  Do you have someone that

19    does your marketing for you?

20         MR. KOZOLCHYK:  I did.  And I'm in a

21    state of transition now.

22         MR. BARON:  What does that mean?

23         MR. KOZOLCHYK:  I had a long time

24    person doing marketing and he has moved

25    into other spaces and doesn't do this
```

Maria I. Salum, P.A.                    305 746-3079

Page 22

1    marketing very much anymore.  He's kept

2    me on because I've been such a long time

3    client of his, but it was -- we have a

4    very good relationship, but I need to

5    move on to a different marketer.

6        MR. BARON:  Will you continue

7    marketing your ability to help people

8    recover their lost claim wages, correct?

9        MR. KOZOLCHYK:  Yes.

10       MR. BARON:  If I were to Google

11   "lost claims," does your name pop up, is

12   that the way it works, "lost wages"?

13       MR. KOZOLCHYK:  My name could pop up

14   along with several other attorneys.

15       MR. BARON:  Is that something you

16   pay for to get your name to pop up early?

17       MR. KOZOLCHYK:  Yes.

18       MR. BARON:  Thank you very much, Mr.

19   Chairman.  I have nothing further.

20       MR. HEARON:  Thank you, Mr. Baron.

21       Ryan?

22       MR. ZAGARE:  No, I don't have

23   anything.

24       MR. HEARON:  Davang?

25       MR. DESAI:  Thank you, Mr. Chair.

Maria I. Salum, P.A.                      305 746-3079

Page 23

1       Good afternoon, Mr. Kozolchyk.  How

2    are you?

3        MR. KOZOLCHYK:  Good.  How are you?

4        MR. DESAI:  Good, sir.  Condolences

5    on behalf of the committee for your loss.

6        As it relates to your response, you

7    indicated in your last paragraph that it

8    was in 2020, when you traveled to

9    Tallahassee to attend a Practicing With

10   Professionalism CLE.  Do you recall that?

11       MR. KOZOLCHYK:  Yes.

12       MR. DESAI:  You've been licensed to

13   practice since 2009; is that correct?

14       MR. KOZOLCHYK:  Yes.

15       MR. DESAI:  Given some of the issues

16   that you have experienced with the

17   judiciary and your lack of candor and

18   professionalism with your colleagues at

19   the bar, as indicated in the court's

20   referral, why is it that it has taken you

21   since your graduation until 2020 to

22   attend some type of practicing or

23   professionalism course, and if you've

24   attended others, what have you attended

25   and when?

Maria I. Salum, P.A.                    305 746-3079

1      MR. KOZOLCHYK:  I believe there may

2  have been a mandatory Practicing With

3  Professionalism or some professional CLE

4  early on in my career.

5      Regarding what you said in your

6  question about my lack of candor to the

7  court and to opposing counsels, I address

8  those issues explicitly in my response

9  letter, and if you want me to go in more

10  detail about those items, I can.  I

11  respectfully don't believe that I was not

12  candid with the court.  I would never not

13  be candid with the court, and those

14  specific allegations, if you'd like to

15  address them, I'm very prepared to do so

16  as my letter does.

17      MR. DESAI:  I appreciate that, and

18  we received a copy of your response, we

19  understand your positions, so thank you.

20      Those are all my questions.

21      MR. HEARON:  Okay.  Garth?

22      MR. YEARICK:  Thank you,

23  Mr. Chairman.

24      Mr. Kozolchyk, pleasure to see you.

25      I have some questions.  Can you hear

Maria I. Salum, P.A.                    305 746-3079

1    me okay?

2         MR. KOZOLCHYK:  Yes, I can.

3         MR. YEARICK:  You understand one of

4    the concerns that was raised in the

5    referral letter was that it appeared to

6    be that you were doing this litigation

7    and participating in this litigation for

8    your own benefit above that of your

9    clients.  Is that a fair summary of some

10   of the assertions made?

11        MR. KOZOLCHYK:  In the letter of

12   referral, yes.

13        MR. YEARICK:  Do you believe that

14   that was true?

15        MR. KOZOLCHYK:  I don't believe that

16   was true.

17        MR. YEARICK:  And sir, one of the

18   things that you said throughout today and

19   throughout your response is that you've

20   decided not to take certain cases that

21   you would otherwise take because of the

22   amount; is that right?

23        MR. KOZOLCHYK:  Yes.

24        MR. YEARICK:  And the amount -- and

25   my understanding is you referred to it,

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

1    and I think some other folks have

2    referred to it, as last paycheck cases,

3    right?

4         MR. KOZOLCHYK:  Yes.

5         MR. YEARICK:  Is there an amount

6    that you associate with the last paycheck

7    case and that's the reason you don't take

8    it?

9         MR. KOZOLCHYK:  They are typically

10   under a thousand dollars.  That's not to

11   say I would file a case for a thousand

12   one dollars.  I'm not making that

13   assertion.  I haven't really put a

14   specific dollar amount, what's the bright

15   line rule for when I would reject a case.

16   But certainly under a thousand dollars is

17   clear as day.  I'm not particularly

18   comfortable even in the thousands.  I

19   haven't really put an exact number on

20   what the line is, but I think all of my

21   cases in federal court right now are over

22   $5,000 or close to it, and many are --

23   I'm sorry, many are much, much higher

24   than that.

25        MR. YEARICK:  I understand that.

Maria I. Salum, P.A.                    305 746-3079

Page 27

```
1    And I'm wondering -- the reason why I'm
2    asking the question is, I'm trying to
3    determine why you drew the line where you
4    did?
5         MR. KOZOLCHYK:  Where I drew the
6    line currently?
7         MR. YEARICK:  Yes.
8         MR. KOZOLCHYK:  I mean, I don't have
9    a bright line right now, but I'm not
10   comfortable bringing the smaller cases
11   because the attorney's fees it takes to
12   bring those cases immediately exceeds the
13   value of the recovery, and if a defendant
14   takes a position they're going to pay the
15   client but not pay me, it puts me in a
16   position -- it puts me in a difficult
17   position that can appear to the judge
18   that I'm just litigating for my
19   attorney's fees.
20        MR. YEARICK:  And that's why you
21   think it affects your credibility in
22   front of the court?
23        MR. KOZOLCHYK:  Yes.
24        MR. YEARICK:  Now, has it been
25   expressed to you by judges and orders or
```

Maria I. Salum, P.A.                    305 746-3079

```
 1      otherwise that one thing that you could

 2      do to potentially participate in those

 3      cases is increase efficiencies or not

 4      charge as much for certain tasks that you

 5      have done over and over in these cases?

 6           MR. KOZOLCHYK:  I'm sorry, could you

 7      repeat that question, please?

 8           MR. YEARICK:  Is one of the

 9      things -- if you wanted to still keep

10      participating in cases that were under

11      say $10,000 or even around that amount,

12      couldn't you increase efficiencies in

13      your practice by creating forms or

14      otherwise that would allow you to maybe

15      not bill as much for a particular task

16      that you've done over and over in other

17      cases?

18           MR. KOZOLCHYK:  I mean, I do have

19      forms.  If you're referring to

20      complaints, I have a form for complaints.

21      But often I think there is still a

22      complexity in a complaint that I don't

23      always fully realize.  Different cases

24      have different issues that I have to put

25      in certain legal theories and then if
```

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 29

1    there's multiple plaintiffs and multiple

2    defendants and tying the defendants

3    together, you can have two complaints

4    that look similar, but have some nuance

5    distinction as to certain legal theories

6    and that all has to be sifted through.

7    Particularly when, you know, the case

8    that I went to trial in February with

9    eight plaintiffs, that case started with

10   12 people and it actually went up to 13

11   at one point.  Getting a complaint like

12   that together was very complicated.  I'm

13   as efficient as I can be and I do use

14   forms and templates.

15        MR. YEARICK:  Has it ever occurred,

16   particularly the last three or four

17   years, where judges have brought concerns

18   on ruling on your attorney's fees, that

19   perhaps you could have been more

20   efficient or not charged as much and not

21   add it to the value of the case with your

22   fees?

23        MR. KOZOLCHYK:  Some of my fee

24   motions have been discounted due to that.

25        MR. YEARICK:  And is it your

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 30

1    testimony that you understand that to be

2    a credibility issue with the court or is

3    the court just concerned that these cases

4    are being protracted by attorney's fees?

5         MR. KOZOLCHYK:   I feel like there's

6    a lot of issues being put there in one

7    question.  When I take a case to trial or

8    when we settle a case and I have to then

9    file a motion for attorney's fees, the

10   other side always attacks line by line

11   every item, those are litigated and

12   ultimately the judge decides.  It's not

13   uncommon for a judge to discount

14   attorney's fees 10, 20, 30 percent and

15   that's not just for me, but that's for

16   other practitioners.  Rarely does an

17   attorney ever get a hundred percent of

18   attorney's fees they seek.

19        Although I can point to a case that

20   I litigated where that was the case and

21   the other side was protracting the

22   attorney's litigation tremendously.  But

23   the norm is that oftentimes the

24   attorney's fees are discounted 10, 20 or

25   30 percent.  I acknowledge some of those

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 31

1    decisions include with regard to me that

2    some things could have been done more

3    efficiently, I having been there and

4    actually done the work.  It is my opinion

5    that there's a misunderstanding as to a

6    form complaint.  The other side often

7    says, "Oh, it's a form complaint, it

8    should take you a few minutes."  It

9    doesn't take me a few minutes to do a

10   complaint, particularly when certain

11   cases have more issues than others, more

12   parties than others and tying it all

13   together, it can take me 40, 50, 60

14   minutes sometimes to prepare a complaint.

15   So I understand sometimes the courts

16   don't award me a hundred percent if I

17   bill an hour or 50 minutes to prepare a

18   complaint.  Even if it took me that

19   amount of time, I understand the courts

20   don't always grant 100 percent of that

21   fee.  But I find that to be very common.

22   It's rare to see a court grant a hundred

23   percent of attorney's fees, in my

24   experience, and from what I've seen from

25   other practitioners.

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 32

1      I'm trying to answer your questions

2   as directly as I can.

3      MR. YEARICK:  I guess I'll ask it in

4   a different way.  When you're settling

5   cases, including cases for larger amounts

6   that you discussed, do you weigh the

7   benefit your client gets from the case as

8   opposed to the amount of fees that you

9   may have to write off to make that

10  settlement or how do you balance those

11  interests in your mind?

12     MR. KOZOLCHYK:  Well, if we can't

13  reach an agreement on a global amount, I

14  will settle my client's claim and let the

15  court determine attorney's fees.  In

16  fact, many of the cases in this letter of

17  referral, I have made settlement offers

18  that allow the court to determine my

19  attorney's fees, particularly the Soto

20  Aldana case, every single one of my

21  offers said, "Let the court determine

22  attorney's fees.  I agree to confer with

23  you in good faith to try and resolve the

24  attorney's fee.  If you can't agree to

25  it, we can let the court determine it."

Maria I. Salum, P.A.                    305 746-3079

Page 33

1  So I don't -- I try very hard not to

2  allow my attorney's fees to be the

3  stumbling block in the cases, and the way

4  I do that is by including the option to

5  let the court determine the attorney's

6  fees.

7      MR. YEARICK:  And do you have a copy

8  of your personal statement in front of

9  you?

10      MR. KOZOLCHYK:  Yes.

11      MR. YEARICK:  I wanted to direct

12  your attention, a couple of questions

13  about a paragraph on page 13.  And this

14  is discussing Judge Brannon's R&R

15  relating to the settlement motion that

16  you made and you stated here that "Judge

17  Brannon's R&R did not conclude that my

18  argument that the defendants waived their

19  right to appeal liquidated damages, fees

20  and costs was," quote "without support."

21      You see that?

22      MR. KOZOLCHYK:  Yes.

23      MR. YEARICK:  And the "without

24  support" you're quoting there is from

25  Judge Rosenberg's and Judge Middlebrooks'

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)          8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 34

1    referral letter, right?

2        MR. KOZOLCHYK:  Yes.

3        MR. YEARICK:  And so, you disagree

4    with that statement in the referral

5    letter?

6        MR. KOZOLCHYK:  I quote literally

7    what Judge Brannon's R&R said explicitly

8    after that.

9        MR. YEARICK:  Right.  And what you

10   quote is that "R&R concluded," quote,

11   "plaintiff's counsel's interpretation

12   that a full settlement was reached, which

13   cannot be appealed, is inaccurate;" is

14   that correct?

15       MR. KOZOLCHYK:  Yes.  And I accept

16   that I was wrong in that issue.  I did

17   legal research and I cited the legal

18   research I did in my filing.  The court

19   disagreed and I accept that.

20       MR. YEARICK:  Do you see -- are you

21   distinguishing between the judge's

22   referral letter saying it was without

23   support and Judge Brannon saying it was

24   inaccurate?  Do you see those two

25   different things?

Maria I. Salum, P.A.                    305 746-3079

1        MR. KOZOLCHYK:  Yes.

2        MR. YEARICK:  And why?

3        MR. KOZOLCHYK:  Because I did legal

4    research and I found authority that I

5    believed did support my position, so I

6    don't believe it was without support.  I

7    cited authority in my filing, but I

8    accept that I was wrong on that issue.  I

9    accept the judge's conclusion contrary to

10   what I advocated for, and I'm not

11   challenging that.  I'm not continuing to

12   assert I was right notwithstanding the

13   judge's conclusion to the contrary.  I

14   accept the judge's conclusion.

15       MR. YEARICK:  You're still

16   correlating with the language of Judge

17   Rosenberg and Judge Middlebrooks'

18   referral letter, right, you're saying

19   that they said it was without support and

20   you disagree with that, right?

21       MR. KOZOLCHYK:  I do, because I did

22   legal research and I cited to what I

23   believe supported that.

24       MR. YEARICK:  The very next sentence

25   of what Judge Brannon said and the court

Maria I. Salum, P.A.                    305 746-3079

1    that you blocked above that is, "This was

2    not a term of the partial settlement

3    agreement reached."

4         You see that?

5         MR. KOZOLCHYK:  Right.

6         MR. YEARICK:  So Judge Brannon's

7    report and recommendation was saying it

8    was without support because that wasn't

9    part of the partial settlement agreement

10   reached, right?

11        MR. KOZOLCHYK:  I believed the way

12   the terms of the settlement were -- if I

13   could take a step back and give some

14   context to this, if I may.

15        MR. YEARICK:  Uh-huh.

16        MR. KOZOLCHYK:  First, this case,

17   the Salvador case was litigated for a

18   very long time.  It was litigated past

19   summary judgment before it finally

20   settled.  We won on summary judgment on

21   an issue that Judge Rosenberg said was

22   not even a close call.  Then we reached a

23   settlement.  The terms of the settlement

24   included that issue of liquidated damages

25   would still have to be litigated in front

Maria I. Salum, P.A.                    305 746-3079

1    of the court, so it wouldn't be settled

2    and my attorney's fees and costs would

3    still have to be litigated in front of

4    the court.  It wouldn't be settled.  And

5    plaintiff accepted that.  And I

6    recommended that the plaintiff accept

7    that.  So these were the only terms that

8    the defense would agree to settle the

9    case, and we took it so we could finally

10   get the case settled.

11        After the settlement was reached,

12   one of the things the defendant tried to

13   do was compel confidentiality, which the

14   court prohibits and it was never agreed

15   to as a term of the settlement.  I moved

16   to enforce settlement, to ensure the case

17   would get settled and I further advocated

18   that there was not a right to appeal on

19   attorney's fees because the parties

20   specifically agreed to let the court

21   determine it and I wanted to put this

22   case to an end.  I didn't want the

23   litigation to keep going even on to

24   appeal.  I didn't want litigations on

25   appeal.  I wanted this case over.  So I

Maria I. Salum, P.A.                    305 746-3079

Page 38

1    did legal research and I found what I

2    believed supported that position that

3    where you consent to the court

4    determining it, you don't have the

5    ability to appeal.  And that was

6    favorable to my side because we wanted

7    the litigation over with.  We wanted the

8    litigation over with a long time ago.  So

9    I included that legal research in my

10   filing to support the position that they

11   didn't have the right to appeal.

12         The judge disagreed with that.  I

13   accept that the judge -- I accept the

14   judge's finding that that was wrong and

15   I'm not challenging that, but I didn't

16   just make that assertion without doing

17   legal research.

18         MR. YEARICK:  What I'm focused on

19   and what I'm trying to understand is that

20   even in your response letter, you said

21   you are challenging the referral letter,

22   and you're saying Judge Brannon did not

23   say that it was met without support, and

24   you put that in quotes, but then when I

25   go back to the referral letter and I go

Maria I. Salum, P.A.                    305 746-3079

Page 39

1      back to the letter, the R&R, Judge
2      Brannon's R&R, he's saying it was without
3      support because it was not part of the
4      settlement agreement that was reached.
5      Isn't he?
6           MR. KOZOLCHYK:   I don't -- did he
7      specifically -- he agrees it's not part
8      of the settlement that's reached.   I
9      thought it was from the legal research I
10     did.   I'm wrong with my legal research.
11     I'm not challenging.
12          MR. YEARICK:   I'm not trying to go
13     back and revisit history of what was
14     argued in front of Judge Brannon.   What
15     I'm trying to do is understand why you're
16     still correlating with the language used
17     by Judge Rosenberg and Judge Middlebrooks
18     saying it was or was without support.
19     You're saying "I did the research."
20     Judge Brannon's language said that was
21     not a part of the settlement -- partial
22     settlement agreement reached.   Are you
23     still sitting here today saying, "No,
24     Judge Middlebrooks and Judge Rosenberg
25     were wrong, he didn't say it was without

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

1    support, just because he didn't use those

2    exact two words"?  I just don't

3    understand your argument.

4         MR. KOZOLCHYK:  I believed that the

5    terms of the settlement waived the right

6    to appeal based on the legal research I

7    did, so I believed that argument was with

8    support.  My intention behind making that

9    argument was to put the case to an end,

10   to stop potential future litigation.

11        MR. YEARICK:  But what is being

12   talked about in this paragraph is your

13   response, and I'm sorry to keep focusing

14   in so much on this.  It's "Judge

15   Brannon's R&R did not conclude that my

16   argument..." it's not talking about what

17   you argued back then.  It's what Judge

18   Brannon put in his R&R, which we can read

19   in the paragraph above in your statement.

20   What's your basis for saying that Judge

21   Rosenberg and Judge Middlebrooks were

22   wrong when they said "without support"?

23        MR. KOZOLCHYK:  That I did legal

24   research.  I'm not trying to go in

25   circles here.  I'm trying --

Maria I. Salum, P.A.                    305 746-3079

Page 41

1          MR. YEARICK:  No, I think I

2     understand your point.

3          MR. KOZOLCHYK:  Just to be clear, I

4     acknowledge I'm wrong.  I accept -- I'm

5     not challenging the decision at all and

6     in good faith and for good reasons I made

7     the argument and I believed in the

8     argument.  And ultimately the judge

9     granted my motion to enforce settlement

10    in part and he said in the report and

11    recommendation, "Plaintiff's description

12    of the terms of the settlement agreement

13    in paragraph four of the motion is

14    correct," and then he added additional

15    terms and I agreed everything I sought to

16    enforce was not granted a hundred

17    percent, and I accept I was wrong and

18    that my legal research was not correct,

19    but I would not file and ask for a relief

20    for something without support, and I

21    believe the legal research I found

22    supported that, and I accept the judge's

23    decision in the contrary.

24         MR. YEARICK:  And sir, I want to go

25    back to something we started off with.

Maria I. Salum, P.A.                    305 746-3079

Page 42

1    It's your position here today that since
2    2019, when this letter was sent to you
3    and you received it, you tried to change
4    your ways, right?
5         MR. KOZOLCHYK:  Very much, and I'm
6    not perfect and every day I'm growing and
7    getting better.
8         MR. YEARICK:  And other than -- I
9    think in your testimony before, you were
10   referring to Judge Strauss's order in the
11   Road Runner Moving and Storage case where
12   he basically said that there was a
13   dispute, deposition disputes that
14   resulted in some heated discussions and
15   that at the end of the day, you were
16   warned that if it continued in that
17   case -- and this is in 2021, right -- if
18   you continued and your opposing counsel
19   continued in that kind of conduct that it
20   would be referred to this committee,
21   wouldn't it?
22        MR. KOZOLCHYK:  Yes, and if I may
23   speak a little bit more about that
24   because it may be a little unclear.
25        At no point in that exchange at the

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 43

```
 1    deposition did I raise my voice.  At no
 2    point did I interrupt opposing counsel.
 3    I did not interrupt him.  I did not talk
 4    over him.  I never attacked him.  You
 5    will not find in the order -- if you look
 6    at the substance of Judge Strauss's order
 7    as it pertains to my conduct, because
 8    opposing counsel's conduct is different
 9    than mine.  In my conduct, the sole issue
10    was that my objections were longer than
11    they should have been, and I accept that
12    and I will be more succinct in the
13    future.  But I personally in that
14    exchange was not yelling.  I personally
15    was not talking over the other side.  I
16    was not attacking opposing counsel.
17    Every time he interrupted me, I stopped
18    and waited for him to finish before I
19    continued.  I maintained my composure and
20    my volume at an appropriate level at all
21    times.  And I had this letter of referral
22    in the back of my mind the entire time.
23    It was in the back of my mind the entire
24    time because I wanted to grow from this
25    experience and I didn't want this event
```

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 44

1    to cause me problems, so as for my
2    behavior there, I could say firmly -- and
3    we have audio recordings, by the way of
4    much of this, and I can provide you with
5    those audio recordings if you would like
6    to hear what transpired at those events.
7    I have the audio recordings.
8         The conduct that was specific to me,
9    the actual substantive conduct was that
10   my objections, which were calm and
11   professional and substantive went on
12   longer than they should and I completely
13   accept that I'm going to work to be more
14   succinct in my objections.  I'm not
15   trying to blame opposing counsel who's
16   not here today.  They would have been
17   shorter had he allowed me to make them
18   fully without interrupting me.  I accept
19   the judge's criticism that they were too
20   long and I will work to be more succinct
21   in the future in my objections.
22        MR. YEARICK:  Do you recognize that
23   Judge Strauss's order said, quote, "The
24   back and forth squabble between Mr.
25   Kozolchyk and Mr. Amit then ensued,

Maria I. Salum, P.A.                    305 746-3079

Page 45

1    including silly arguments about who had

2    argued with whom"?  Does that sound about

3    right?

4        MR. KOZOLCHYK:  He said those

5    things.  I have the audio recordings of

6    what actually happened at the deposition.

7    I'm not saying he's wrong or anything.

8    I'm saying the actual substantive conduct

9    that I engaged in that was at issue was

10   that my objections went longer than they

11   should have.  And if you listen to the

12   audio recordings, I stayed in the exact

13   same tone I'm talking to you right now

14   the entire time while he was yelling at

15   me and yelling profanities at me.  I went

16   out of my way to make sure I was not

17   going to talk over him.  I was not going

18   to engage him.  And every time he

19   interrupted me, I stopped.  And I had

20   this hearing going on in the back of my

21   mind the entire time.  I was not going to

22   allow myself to do what opposing counsel

23   was doing.  I was not going to

24   reciprocate.  I actually find that event

25   as an example because I didn't engage

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 46

1    opposing counsel.  I did not engage

2    opposing counsel, to be very, very clear.

3    I was not engaging him in an argument.  I

4    stayed calm the entire time.  Ultimately

5    that became an issue in front of the

6    court because I am the one that moved for

7    sanctions against the other side.  He

8    yelled -- he was, among other things, he

9    was yelling profanities at me during the

10   deposition.

11        And I've litigated against this

12   opposing counsel in many other cases, but

13   I'm the one that sought sanctions against

14   the other side in that case.

15        MR. YEARICK:  I don't have any

16   further questions.

17        MR. KOZOLCHYK:  Thank you.

18        MR. HEARON:  Thank you.

19        Dylan?

20        MR. FAY:  Thank you.

21        Mr. Kozolchyk, thank you for being

22   here.  I have just a couple of questions.

23        My first question is, what is your

24   hourly rate?

25        MR. KOZOLCHYK:  It's been -- the

Maria I. Salum, P.A.                    305 746-3079

Page 47

1   courts have awarded primarily 375.  There

2   was one or two occasions when I've been

3   awarded 400.  I'm seeking a rate of 450

4   right now that has not been awarded by

5   the court.

6       MR. FAY:  If you say that you did

7   take a case that was a last paycheck case

8   today, a case where, say, $400, how long

9   do you think it would take you to put a

10  complaint together?

11      MR. KOZOLCHYK:  I don't take those

12  kind of cases anymore.

13      MR. FAY:  I know you don't take

14  them, but imagine that you were able to

15  take one, as I think CJ says, the statute

16  does say you can bring these cases, so if

17  you did have one of these cases like you

18  did in the past, how long do you think it

19  would take you to put the complaint

20  together?

21      MR. KOZOLCHYK:  Well, at first, I

22  would have to do the interview and, you

23  know, the interview depending on how

24  complex the case is.  Even a seemingly

25  straightforward case can present issues

Maria I. Salum, P.A.                    305 746-3079

Page 48

```
 1    such as finding out -- sometimes it can
 2    be very difficult to find the defendant,
 3    the name of the entity.  Sometimes the
 4    individuals are difficult to locate and
 5    identify.  Sometimes there's multiple
 6    individuals, multiple defendants, the
 7    interrelation between these defendants,
 8    the day ranges my clients worked, the
 9    hours worked, the schedule, what his
10    method of payment was, so many different
11    kinds of payments, you know, hourly,
12    commission, bonus.  Some defendants paid
13    some clients and it's like random, the
14    methodology that they employed, and to
15    try to decipher and interpret their
16    method they chose to pay and to put it --
17    make it fit into the FLSA could be a
18    challenging task.  Sometimes the
19    exemptions where a plaintiff may not be
20    entitled to minimum wage overtime.
21    Sometimes there's issues of coverage
22    where an employer may not be subject to
23    the statute and there could be other
24    issues as well beyond that.  So even if
25    someone is owed a last paycheck, there
```

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 49

1       could be other issues and sometimes
2       clients are owed last paychecks, but it
3       turns out they're owed $30,000 in
4       overtime, that even the client didn't
5       even know about, and the reason of "how
6       could that be" is because if they're not
7       exempt from overtime and the employer
8       thought they were exempt -- and the
9       employer thought they were exempt, and
10      the employee even thought they were
11      exempt, through the interview, it comes
12      out actually they're not exempt and this
13      entire time they are owed much more money
14      than they realized, that could happen,
15      too.  And I have no idea of knowing that
16      until I do the interview.  So it's
17      very -- if someone comes to my office and
18      they are owed a hundred bucks or 200
19      bucks, whatever it is, but you have to
20      cover all the issues to see what else is
21      out there and to know who to sue
22      correctly and how to put the legal
23      theories together to establish coverage
24      and make sure they are not exempt, that
25      we're naming the right parties, that they

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 50

1    don't have any other claims out there,

2    that even a seemingly simple -- what we

3    thought was a simple straightforward case

4    actually requires a lot of analysis.  So

5    the interview itself can often take two

6    hours.

7        And then drafting the complaint.  I

8    mean, if it's a real simple complaint, it

9    might not take me more than 20 or 30

10   minutes, but it sure can take longer if a

11   bunch of issues creep into it.

12       I've got a case right now where I

13   have the, what is essentially a home

14   health aide, but he's not working at

15   home, he's working at an assisted living

16   facility, and there's a question of

17   trying to get him covered under the

18   statute, and who his real employer is, is

19   he jointly employed by the facility and

20   by the patient's family members at the

21   same time.  It's a whole host of issues

22   that one may not realize.

23       MR. FAY:  I guess what I'm hearing

24   is even for the simplest of cases, it

25   could take five or ten hours before the

Maria I. Salum, P.A.                    305 746-3079

1    defendant is on notice and a complaint

2    has been filed and everything is sent to

3    the court?

4         MR. KOZOLCHYK:  I'm not saying every

5    case is like that.  The most -- a very

6    small, without any issues, if I'm able to

7    get all the information I need right

8    away, it could potentially take just a

9    few hours between an initial interview

10   and getting the case filed, if everything

11   goes right and there's no additional

12   issues, but other cases of a small amount

13   of money can be much, much more.

14        MR. FAY:  The reason I ask this

15   question is because I think, like a few

16   of the other commenters, are struck by

17   your commitment to not take on certain

18   low value cases, I'm wondering about that

19   because I think that the point that the

20   judges are making about fees, I'm

21   wondering if you see it more as what your

22   fees are in relation to the claim or what

23   your fees are in relation to the work

24   that you did, because if your fees are

25   $4,000, because you took ten hours to do

Maria I. Salum, P.A.                    305 746-3079

Page 52

```
 1    the case, it's one thing, but if your
 2    fees are $4,000 because you took a small
 3    paycheck case and did more investigation
 4    than was necessary, or refused to settle
 5    right away or didn't take the phone calls
 6    of the defendants so that you can keep
 7    preparing a motion in limine or any other
 8    motion that comes into the course of
 9    things, that's different than if it just
10    took you five or ten hours to file the
11    case and that's what it took because you
12    had to do the interview.  So I'm
13    wondering, if you're not taking these
14    cases, is it because you're worried about
15    the disparity between the value of the
16    case and your fees or because you don't
17    think that you can do the case in an
18    efficient enough time that your fees
19    would be reasonable, which would be the
20    standard?
21         MR. KOZOLCHYK:  The definition of
22    reasonable I have come to learn can vary
23    if the case is very small.  Reasonable is
24    not just an hour for hour multiplied by
25    your hourly rate for time needed to do
```

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 53

1    the case.  There's a few cases in here

2    where there's a proportionality analysis

3    where the amount of fees is not

4    proportionate to the recovery.  And so,

5    if a client is owed $800 and they had a

6    very unusually complex fact pattern that

7    led to that and they had other issues,

8    even if it took me a substantial amount

9    of time, it's unlikely that a judge is

10    going to find that reasonable, because

11    the value of the claim is particularly

12    small.

13        In my experience, I have come to

14    realize and learn in judges' opinions

15    that the smaller the case is, the more

16    the thought is, "Well what is the

17    proportionate fee for that," and I may

18    not get credit for the actual work

19    required to go through that, and so I

20    don't believe it's a measure of

21    inefficiency, but I don't believe I can

22    -- I don't believe I can take these

23    smaller cases and put in the time I need

24    to and be paid a reasonable fee for that

25    without it appearing as though I'm

Electronically signed by Maria Salum (001-186-132-3519)         8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 54

```
 1        litigating just for my attorney's fees.
 2        And sometimes defendants just tender the
 3        small check and don't want to pay the
 4        attorney's fees and that puts me in a
 5        difficult position.  Now I'm litigating a
 6        case where my client has already gotten
 7        paid, but I have not gotten paid, and I
 8        can't afford to take these cases pro
 9        bono.  So there's a whole host of
10        problems and issues in these smaller
11        cases, and the judges can perceive it as
12        me just litigating for my attorney's
13        fees, which hurts my credibility and
14        which hurts my other cases of greater
15        value.  And so, I have made the decision
16        that it's better off for everyone
17        involved if I simply direct those
18        particular people to -- they can bring
19        the claim in small claims court
20        themselves, they can contact Legal Aid or
21        they can contact the Department of Labor,
22        and they are also free to speak to a
23        different attorney if they desire to do
24        so.
25             MR. FAY:  I appreciate that
```

Page 55

1    explanation.  I just have one more
2    question.  I think you mentioned in your
3    response and in your statement today that
4    during the time that most of this conduct
5    discussed in the referral letter
6    happened, it was a very stressful and
7    overwhelming time for you in conjunction
8    with a lot of things happening in your
9    life.  So I see that that was
10   overwhelming and made it difficult for
11   you to manage your caseload in a
12   professional manner.
13       But do you have an idea of -- in the
14   event that things become overwhelming
15   again in your personal life or your
16   professional life, what is the number of
17   cases that you think you can manage in a
18   professional and courteous and ethical
19   manner without it becoming overwhelming
20   from a stress perspective?
21       MR. KOZOLCHYK:  I haven't put a
22   number on that.  I'm sorry, I haven't put
23   a number on that.
24       MR. FAY:  That's okay.  It's maybe
25   something to think about when you're

Maria I. Salum, P.A.                    305 746-3079

Page 56

```
 1    managing your caseload going forward, is
 2    determining what is the point in which
 3    this is going to cause more stress than
 4    is easy to handle.
 5         MR. KOZOLCHYK:  I will tell you
 6    something, as part of this experience and
 7    an intense self-reflection and personal
 8    growth and counseling with my attorney,
 9    Mr. Rothman, I can tell you that I'm
10    better equipped now with dealing with
11    these situations that I dealt with
12    before.  I'm in a better position now
13    to -- if I get a difficult opposing
14    counsel or a difficult situation, if I
15    feel like I'm personally attacked, to not
16    reciprocate in-kind and to focus on the
17    issues and to not elevate the temperature
18    in the room.  So I'm in a better position
19    now to deal with those situations than I
20    was before.
21         MR. FAY:  That's all my questions.
22    Thank you.
23         MR. HEARON:  Anita?
24         MS. VICIANA:  Hi, Elliot.  Can you
25    confirm the date which you sent your
```

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

1   response?

2        MR. KOZOLCHYK:  To the letter of

3   referral response?

4        MS. VICIANA:  Yes.

5        MR. KOZOLCHYK:  I can certainly get

6   you that date.  I'm going to look it up

7   right now.  I think it was June 11, 2021,

8   but I need to confirm that.  It was June

9   11, 2021, when the letter was submitted.

10        MS. VICIANA:  Thank you.

11        Phoebe, I will call her your

12   stepdaughter, has she ever gone by any

13   other name?

14        MR. KOZOLCHYK:  Her legal first name

15   is Justice and her middle name is Phoebe,

16   so Justice Phoebe Dauz, but she goes by

17   Phoebe.

18        MS. VICIANA:  Does she ever use any

19   other last name?

20        MR. KOZOLCHYK:  May I ask her?

21        MS. VICIANA:  Sure.  I don't have

22   any issues, but I'm going to defer to the

23   chair with that.

24        MR. HEARON:  That's fine.

25        MR. KOZOLCHYK:  Okay, one moment.

Maria I. Salum, P.A.              305 746-3079

Page 58

1          In her emails, she puts Phoebe

2    Kozolchyk.

3          MS. VICIANA:  She doesn't legally

4    have that name?

5          MR. KOZOLCHYK:  Correct.

6          MS. VICIANA:  Out of curiosity, why

7    does she go by your same last name?

8          MR. KOZOLCHYK:  She's considered

9    changing her name to that and we're

10   family.

11         MS. VICIANA:  I don't have any other

12   questions.

13         Thank you.

14         MR. HEARON:  Val, because you

15   indicated you were going to be leaving by

16   5:30, if you have any questions.

17         MR. RODRIGUEZ:  I appreciate the

18   opportunity.

19         I kind of have had -- Elliot, what

20   would you do differently -- what do you

21   think you can do differently

22   realistically going forward?

23         MR. KOZOLCHYK:  Every day I'm

24   working to not react the way I did before

25   to difficult, stressful and

Maria I. Salum, P.A.                    305 746-3079

Page 59

1    confrontational litigation and I am much
2    better now than I was before.  I am not
3    perfect.  I am not perfect.  I want to go
4    back to the Dahdouh case that Mr. Yearick
5    discussed.  That was a whole other
6    conflict, but I did not -- I did not yell
7    or speak over or address in an
8    unprofessional way the other side.  That
9    conflict occurred and I believe the judge
10   was angry at both sides and so I received
11   the order and it was not particularly
12   favorable to me either.  But my conduct
13   there, it was not a re-repetition of
14   everything that has been going on before
15   2019 for me, and I was very careful about
16   the way I acted at that time and not
17   elevate my voice, not interrupt the other
18   side, not to engage or yell at the other
19   side.  It was very, very stressful for me
20   because I was being yelled at with
21   profanities and being attacked personally
22   and I did not reciprocate in-kind.  It
23   wasn't perfect and the judge's order
24   reflects it was not perfect, and in
25   particular, the actual substance of my

Maria I. Salum, P.A.                    305 746-3079

Page 60

1    conduct of that event was that the

2    objections took longer than they should.

3    And I agree that I could be long-winded

4    sometimes.  And each time opposing

5    counsel interrupted me, because I wasn't

6    going to engage him, I stopped speaking

7    and when he finished speaking, I

8    continued with my objection.  And I

9    should have been more succinct, and I

10   accept that.  And I will be more succinct

11   in the future.

12        I tried very hard not to lose my

13   cool.  I am not a hundred percent and I'm

14   not perfect.  I've grown a lot since 2019

15   and what happened before 2019.  So as far

16   as what I can do moving forward is to

17   continue on this track and this journey

18   that I began in 2019 to not reciprocate

19   in-kind when there's conflict, to keep my

20   head focused on the issues relevant in

21   the litigation for me in any particular

22   case, take out the emotion and not react

23   in-kind.  That's what I strive to do and

24   each day, I'm getting better and better.

25        MR. RODRIGUEZ:  Thank you.  That's

Maria I. Salum, P.A.                    305 746-3079

Page 61

1    all I have.

2         MR. HEARON:  Bily?

3         MS. FERNANDEZ:  I don't have any

4    questions.

5         MR. HEARON:  Alison?

6         MS. SMITH:  Yes, thank you so much.

7         Mr. Kozolchyk, I apologize I'm not

8    on the video this evening.  I'm having

9    difficulty with my WiFi.  I did have some

10   questions for you.

11        Before I ask my questions, I wanted

12   to extend condolences for the losses that

13   you've experienced.  I know those things

14   are difficult and the practice of law in

15   and of itself is difficult, and also

16   sitting here before all of us is probably

17   not the most fun experience and probably

18   a little intimidating, but it's

19   important, so I appreciate you appearing

20   and communicating with us and

21   accommodating the questions that we have.

22        That being said, I wanted to ask

23   you, you were asked a question earlier

24   about managing the difficulties, the

25   stressors that you've encountered in your

Maria I. Salum, P.A.                    305 746-3079

Page 62

1    life, and I wanted to follow up on that

2    question and ask you, what do you do

3    currently outside of speaking to

4    Mr. Rothman -- I know you mentioned him

5    quite a few times and it sounds like he's

6    a great mentor to you and in giving you

7    some advice regarding your practice --

8    but what do you do in a very pragmatic

9    sense in terms of dealing with the

10   stressors of everyday life, so that

11   doesn't seep into your practice and how

12   you conduct your business?

13        MR. KOZOLCHYK:  Like do I exercise

14   or something?

15        MS. SMITH:  Anything that you do.  I

16   know we talked about therapy, which I'm a

17   big advocate for.  Mental health and

18   attorneys is something that is very

19   serious and it should be pursued

20   meaningfully.  But outside of that, since

21   you already said you haven't retained any

22   sort of psychiatrist or psychologist or

23   therapist or clinical social worker,

24   anybody, what else do you do?  Is there

25   anything that you do that helps you with

Maria I. Salum, P.A.                     305 746-3079

Page 63

1    the stressors?  Because I know you have

2    stressors, we all do and we all deal with

3    them in different ways.  So outside of

4    just saying, "Well, I take the high road,

5    and I try not to engage and I focus on

6    the issues," What do you do in a

7    pragmatic sense to deal with the issues

8    that you are facing every day, the

9    caseload, the clients who are sometimes

10   difficult, the courts?

11        MR. KOZOLCHYK:  First of all, I'm

12   very open to therapy and I'm not opposed

13   to that at all, and Mr. Rothman and I

14   have discussed that.  I have a close

15   friend I talk to and I hash out a lot of

16   issues and I confide in, that I've known

17   for a very very long time.

18        MS. SMITH:  We're hearing somebody's

19   conversation in the background.  I wanted

20   to make sure that the record was clear.

21        MR. HEARON:  It was Mr. Olin.

22   Please mute your microphone.

23        MS. SMITH:  Okay.

24        MR. KOZOLCHYK:  And honestly -- can

25   you hear me?

Maria I. Salum, P.A.                    305 746-3079

Page 64

1      MR. HEARON:  Yes, Elliot, go ahead.

2      MR. KOZOLCHYK:  And I confide in

3   Phoebe, too, and I'm trying to get in a

4   routine to exercise and to eat healthy.

5   So just to distill that again succinctly.

6      MS. SMITH:  So are you involved in

7   any organizations, any voluntary bar

8   associations, like the Dade Bar

9   Association, or anything that's more

10  targeted towards your area of practice?

11  All of those things I find very helpful

12  in terms of learning more about your

13  practice, understanding the right way to

14  litigate, et cetera.  Are you involved in

15  anything like that, or no?

16     MR. KOZOLCHYK:  I am not.  I am

17  certainly open to being part of that, but

18  I am not currently.

19     MS. SMITH:  So you practice solo,

20  not in concert with any other colleagues

21  really?

22     MR. KOZOLCHYK:  Correct.  I'm a solo

23  practitioner.

24     MS. SMITH:  Okay.  I want to ask you

25  a question, a purely simple one, a

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 65

1   straightforward one.  There's lots of

2   banter going back and forth earlier as to

3   what the judge said in the order and what

4   you said in the reply, et cetera, et

5   cetera.  Rather than doing that, I just

6   wanted to know from your perspective,

7   because I know you disagreed with one of

8   the committee members who said you were

9   less than candid with the court and

10  opposing counsel, and you disagreed with

11  that respectfully.  What would you say

12  that you did wrong that led you to be

13  here speaking to us now?  What do you

14  think you did?

15       MR. KOZOLCHYK:  Several things.

16  Several things.

17       MS. SMITH:  Okay.

18       MR. KOZOLCHYK:  First I took small

19  cases that -- I took small cases and it

20  led to a lot of conflict, and I didn't

21  handle that conflict well.  And so -- and

22  then other cases that were not small

23  cases, but they were contentious with --

24  they were contentious litigation with

25  opposing counsels, I didn't handle those

Maria I. Salum, P.A.                    305 746-3079

Page 66

1    well either and -- so I work very hard to

2    not reciprocate in-kind and to try to

3    take the high road, and not enhance the

4    temperature in the room, and to craft my

5    emails as substantively and

6    dispassionately and clinically as

7    possible focused on the issues.  So I was

8    much more emotional in my litigation

9    before.  And I took cases -- the smaller

10   cases led themselves to that kind of

11   emotional conflict to begin with, because

12   they're smaller and there's attorney's

13   fees involved, so these were two things

14   that fed off each other in a negative

15   way.

16        MS. SMITH:  Do you feel that your

17   conduct warranted you being referred to

18   this committee?  Do you think that was an

19   appropriate response to your conduct?

20        MR. KOZOLCHYK:  I've been engaged in

21   intense self-reflection since 2019 on

22   everything that has happened here.  This

23   letter has been extremely painful for me.

24   That question certainly causes a lot of

25   reflection.

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 67

1        MS. SMITH:  What do you think when
2    you reflect?
3        MR. KOZOLCHYK:  I can understand why
4    I was referred to the committee and I try
5    every day to ensure that doesn't happen
6    again and that these issues don't
7    continue to follow me.
8        MS. SMITH:  Okay.  I wanted to ask
9    you also.  Doesn't mean that the
10   committee is going to follow what you
11   have to say here in response to my
12   question or even give it a serious
13   consideration, but it would be useful for
14   me to know what you think would be a
15   fitting response by the committee to this
16   referral.  What do you think should
17   happen?
18       MR. KOZOLCHYK:  It is my
19   understanding that the committee has a
20   lot of options available that it could
21   recommend.
22       I need to -- my ability to practice
23   in the Southern District of Florida is
24   extremely, extremely important to me and
25   to my stepchildren and to my entire

Maria I. Salum, P.A.                    305 746-3079

Page 68

1    career and my entire practice.  I will do

2    therapy.  I will take classes.  I will

3    get a mentor.

4         I understand that the committee has

5    a lot of options.  I hope and I pray that

6    I can still continue to practice in the

7    Southern District, and I know this is

8    very serious, and so I would ask that the

9    committee consider the alternatives that

10   allow me to practice in the Southern

11   District of Florida.

12        MS. SMITH:  Just a quick question

13   because I know probably others have some

14   questions, and I'm wrapping up, and this

15   is only because of my ignorance, I don't

16   know, I have never handled an FLSA claim,

17   so I'm not sure.  When you say you have

18   to practice in the Southern District,

19   those are not claims that you can file in

20   state court?  And, again, I don't know,

21   so pardon my ignorance.

22        MR. KOZOLCHYK:  No problem.  I'm

23   glad you asked that question so I could

24   answer it.  I want it to be understood

25   and known.

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 69

1          This is a federal statute, so even

2     if I file in state court, they can always

3     remove it to federal court.  It can be

4     forced into federal court whether I

5     choose to file there or not.

6          MS. SMITH:  Understood.  Those are

7     all my questions.  I appreciate your

8     participation.  Thank you.

9          MR. KOZOLCHYK:  Thank you.

10         MR. HEARON:  Andrew?

11         MR. FIGUEROA:  I have no questions,

12    Bill.

13         MR. HEARON:  Valencia?

14         MS. GALLON-STUBBS:  Yes.  Just a

15    follow-up and I do appreciate your time

16    and I'm sorry for the logistics with my

17    camera right now.

18         What type of alternative would you

19    recommend for yourself?  You heard the

20    question about what would you recommend

21    for this committee as it relates to the

22    purpose for which we're here based on

23    your actions, behavior, et cetera.  So do

24    you have any recommendations for

25    yourself?  I would just like to hear

Maria I. Salum, P.A.                    305 746-3079

Page 70

1    them.

2         MR. KOZOLCHYK:  I've already engaged

3    in tremendous personal growth to make

4    sure that this doesn't happen again.  But

5    I think if I need to have a mentor, if I

6    need to take classes, if I need to get

7    therapy, I can certainly do those things,

8    maybe probation, to give me the

9    opportunity to continue practicing while

10   on probation to show the committee that

11   this will not happen again.

12        MS. GALLON-STUBBS:  I appreciate

13   your frankness.

14        Are you willing to a particular time

15   frame?  Is this something that you're

16   willing to commit, a time frame?

17        MR. KOZOLCHYK:  In terms of

18   probation?

19        MS. GALLON-STUBBS:  Whether it's

20   probation, whether it's mentorship,

21   whether it's some type of mental health

22   classes, courses, et cetera.

23        MR. KOZOLCHYK:  I would commit to

24   whatever the committee required sincerely

25   and in good faith.

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                              8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 71

1          MS. GALLON-STUBBS:  Thank you.  I

2    have no further questions.  I appreciate

3    it.

4          MR. HEARON:  Thank you.

5          Bernardo?

6          MR. LOPEZ:  Thank you, Mr. Chairman.

7    Mr. Kozolchyk, I join the other ones in

8    telling you I'm sorry for your loss and I

9    applaud you for being the father to your

10   fiancee's children.

11         I also note we've been going for an

12   hour and a half.  Did you want to get a

13   drink of water or anything?

14         MR. KOZOLCHYK:  I'm on my second

15   water right now.

16         MR. LOPEZ:  I have two questions

17   that I just want to clarify on the record

18   and I note that you have your personal

19   statement in front of you.

20         MR. KOZOLCHYK:  Yes.

21         MR. LOPEZ:  If I can direct you to

22   page four, and there's a portion right in

23   the middle of the page that's kind of

24   highlighted, it's bolded in, and I will

25   just read that to you, where you say

Maria I. Salum, P.A.                    305 746-3079

Page 72

1    "Second, I thought in retrospect,

2    erroneously, that avoiding the task of

3    reviewing and finalizing a written

4    agreement would avoid further delay and

5    avoid incurring additional unnecessary

6    attorney's fees."

7        And I just want to clarify.  Are you

8    saying that you -- because I think

9    there's a little bit of conflict in your

10   statements.

11       Are you saying that you did

12   intentionally avoid having that

13   settlement reviewed by the court, but

14   only for the reason to avoid further

15   litigation, or I think you made the

16   statement in another part that you never

17   intended to avoid any kind of review by

18   the court, so I'm wondering if you can

19   clarify that.

20       MR. KOZOLCHYK:  Sure.

21       The actual quote, unquote agreement

22   that this case -- this particular case,

23   the Shuman case was disposed with was

24   basically a phone call that said an

25   agreement, "If you pay me $2,500, we can

Maria I. Salum, P.A.                    305 746-3079

Page 73

1    just have the case dismissed without

2    prejudice."  I notified the court on

3    three different filings that I was

4    receiving the money.  It was never kept

5    as a secret that I was receiving these

6    fees and costs.

7         I deliberately, in reaching that

8    agreement with the other side, I was

9    trying to avoid a settlement agreement

10   and a formal settlement, because it would

11   take more time -- because it would take

12   more time and because it would require my

13   client to agree to a lot of other

14   non-monetary terms.  They were not

15   offering more money to my client.  I

16   specifically asked the other side, "Are

17   you agreeing to pay my client anything in

18   return for entering into a settlement

19   agreement?"  And they declined to pay my

20   client any additional money, so it was to

21   save time in having to draft it, because

22   I was already receiving less money than

23   the time I put in the case.  This case

24   was already a loss for me for all the

25   time and cost I invested in it.  I was

Maria I. Salum, P.A.                    305 746-3079

Page 74

```
 1    trying to dispose of it as cheaply in
 2    terms of time as I could, but without
 3    ever hiding the fact that I was getting
 4    paid from the judge.
 5         MR. LOPEZ:  I think that answered my
 6    question.
 7         If I can have you go to page 28 of
 8    your statement.  This is where you're
 9    talking about Judge Dimitrouleas's order
10    in the FLSA cases.  There's a portion
11    here towards the bottom of the page
12    that's indented, looks like a block
13    quote, where does that quote come from?
14    Is that from a transcript?  Is that form
15    an email that you sent to opposing
16    counsel or is that just the best
17    recollection of what you said to opposing
18    counsel?
19         MR. KOZOLCHYK:  That is an actual
20    transcript of an excerpt -- that's an
21    excerpt from the actual transcript of the
22    hearing that gives rise to portions of
23    this letter of referral.  This is
24    literally what I represented to Judge
25    Middlebrooks at the hearing verbally.
```

Maria I. Salum, P.A.                    305 746-3079

1    MR. LOPEZ:  Okay.  So this is in

2    open court and you're talking to Judge

3    Middlebrooks and this is what you said?

4    MR. KOZOLCHYK:  Yes.

5    MR. LOPEZ:  I just wanted to clear

6    that.  I wasn't sure.

7    Also, I'm a criminal practitioner so

8    I'm completely ignorant in most civil

9    matters, especially FSLA cases.  So maybe

10   if I just ask you a few questions and

11   educate me on those kind of cases.  The

12   statute does provide for attorney's fees;

13   is that correct?

14   MR. KOZOLCHYK:  And costs, yes, to

15   prevailing plaintiffs.

16   MR. LOPEZ:  Would it be fair to say

17   that the statute provides for attorney's

18   fees and costs to kind of incentivize

19   attorneys to take those cases?

20   MR. KOZOLCHYK:  I mean, this is the

21   policy rationale of congress.  A lot of

22   times clients can't afford an attorney,

23   that's for sure, and then if you hire an

24   attorney and you litigate the case, a lot

25   of the times the attorney's fees are

Maria I. Salum, P.A.                    305 746-3079

1    going to overcome the entire value of the

2    plaintiff if the defendant chooses to

3    litigate it all the way to trial.  It's

4    not uncommon in this area of law that

5    fees exceed the full value of the claim,

6    particularly if a defendant wants to

7    litigate it to trial.

8         It will be impractical for an

9    attorney to take the case without the --

10        MR. LOPEZ:  Right, no, no.  It's a

11   way of getting attorneys to come in and

12   help these people who have maxed out on

13   small wages; is that correct?

14        MR. KOZOLCHYK:  I wouldn't say just

15   small wages, any kind of wages.

16        MR. LOPEZ:  Also, it probably serves

17   as an incentive for the defendants to

18   come to a similar agreement earlier

19   because they can either pay -- like in

20   these last paycheck cases, they can pay

21   somebody the $900 or $500 that they owe

22   or if they want to continue in that and

23   come to some kind of settlement, they

24   know that the lawyer fees are racking up,

25   they are obstinate about it; would that

Maria I. Salum, P.A.                    305 746-3079

Page 77

1    be fair?

2         MR. KOZOLCHYK:  Yes.  And I will

3    just expand on that.  There's four

4    different sources of liability here.

5    There's the underlying wage claim,

6    there's liquidated damages that double

7    the underlying wage claim, there's the

8    attorney's fees and costs to the

9    plaintiff entitlement to that, and

10   there's the defendant's attorney's fees

11   and costs that they need to pay to

12   continue to defend the litigation.

13        MR. LOPEZ:  Based on your experience

14   in doing these kind of cases, would it be

15   fair to say that the plaintiffs in these

16   kind of cases are mostly middle to low

17   income people?

18        MR. KOZOLCHYK:  Yes.

19        MR. LOPEZ:  And if they weren't

20   there with an attorney, they would be

21   facing an employer who does have an

22   attorney?

23        MR. KOZOLCHYK:  Typically, yes, and

24   typically well funded with a lot of

25   resources.

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                                8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 78

```
 1          MR. LOPEZ:  Because I guess I'm a
 2     little bit concerned about your statement
 3     saying that you have given those up.  I
 4     understand why you're saying that.  I
 5     really do.
 6          But I think the issues that the
 7     judges had with you in these cases was
 8     not that you were bringing them or that
 9     the fees might exceed what you're asking
10     for for the plaintiffs, because I think
11     congress kind of understood that, but I
12     think what the judges were saying in
13     these cases are that you were inflating
14     your fees by dragging the litigation on.
15     And I understand that sometimes the
16     judges in the district court do discount
17     fees.  I know that happens in criminal
18     cases which attorneys will often give
19     their bills to the judges, and very
20     rarely do they get paid a hundred percent
21     of what they're asking for.  And I think
22     the attorneys know that.  There's a
23     little game that gets played and they
24     know that they have to ask certain judges
25     for more, and they know that they have to
```

Maria I. Salum, P.A.                    305 746-3079

1    file certain motions with the judges
2    ahead of time if they want to get paid
3    for those kind of things, so I know that
4    happens.  But I think you might be
5    misunderstanding what the court is saying
6    and what the committee is saying in
7    bringing this suit to your attention in
8    those kind of small cases.  It's not that
9    the fees might exceed what you're asking
10   for, and it's way below what the
11   diversity requirement is in district
12   court.  It might get some of the judges
13   frustrated.  But the magistrate judges
14   that handle these cases, they are some of
15   the more level headed and understanding
16   judges that I've ever been in front of,
17   so I think they would understand that you
18   are bringing this and you are doing a
19   service to these people and if it takes
20   you five hours to do this case -- and it
21   takes you five hours to do the case, then
22   you should get paid appropriately, no
23   matter what the response is or what
24   you're asking for.
25          I think the judges just had an issue

Maria I. Salum, P.A.                     305 746-3079

1  with you kind of inflating your hours,

2  and I'm hoping you understand that.

3      MR. KOZOLCHYK:  If I may address

4  that.

5      Taking you to the example of one of

6  these cases, the Batista case, they

7  offered -- I believe they offered -- I

8  don't want to make a misrepresentation

9  here.  Off the top of my head, I believe

10  they offered $1,500 to resolve my claim.

11  I believe that number is correct.  I

12  don't think it was 2,000.  I think it was

13  1,500, off the top of my head.  I had --

14  I had -- during the initial settlement

15  discussions, I offered 2,750 in

16  attorney's fees, plus costs.  I offered

17  to let the court determine attorney's

18  fees and costs, and I offered $2,000 of

19  attorney's fees.  This was a live phone

20  conversation with the defendant.  The

21  first time we had a phone conversation

22  about settlement, I made those offers.

23  They could have let the court determine

24  attorney's fees.  They could have

25  accepted my initial offer of 2,750 plus

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 81

1    costs or they could have accepted $2,000.
2    Even if they didn't like 2,000 or 2,750,
3    I included the offer, "Let the court
4    determine the attorney's fees."  The
5    defendant said in response to let the
6    court determine attorney's fees, he told
7    me over the phone, "I would rather pay an
8    attorney $10,000 than let the court
9    determine attorney's fees."  That's
10   verbatim what he said.  He doesn't deny
11   saying that either.  He doesn't deny
12   saying that either.
13        Ultimately, I ended up taking the
14   case on appeal when my fees were denied,
15   and the 11th Circuit and their decision
16   said that I did not accept defendant's
17   offer for attorney's fees, which I think
18   it was approximately -- I think it was
19   approximately $1,500.  When the case was
20   remanded, I withdrew my motion for
21   attorney's fees.
22        In that case, in Batista, I withdrew
23   my motion for attorney's fees and I
24   stopped seeking attorney's fees in that
25   case.  I brought that case up to

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 82

1   illustrate in what you said that that is

2   a case where I offered up front.  In my

3   opinion, it was pretty modest numbers for

4   attorney's fees, and I included the offer

5   that the court determine attorney's fees,

6   and I still ended up in a place I don't

7   want to find myself again professionally.

8        Similarly in a Soto Aldana case,

9   from the outset, from the very, very

10  beginning, I included an offer to let the

11  court -- my sum and offer was to pay my

12  client's claim, agree to confirm good

13  faith as to our attorney's fees.  "If we

14  can't resolve the issue of attorney's

15  fees and costs, I consent to let the

16  court determine attorney's fees."  And

17  that is on page seven.  And that was

18  offered multiple times, time and time.

19  It was offered on April 17, May 3rd, May

20  6th, May 17 and May 21st, and despite

21  from the beginning of the case, agreeing

22  to let the court determine attorney's

23  fees, I find myself in a position I did

24  not want to be in.

25        So in my experience, it is not so

Maria I. Salum, P.A.                    305 746-3079

Page 83

1    simple as to just simply try to offer to

2    let the court determine attorney's fees,

3    because even if you do that, it can be

4    taken the wrong way.

5        So I have filed -- I have litigated

6    over 700 cases.  Half of the eight cases

7    in this letter dealt with these much

8    smaller claims.  These much smaller

9    claims in my experience drastically lead

10   to my credibility being compromised and

11   the appearance that it is just about my

12   attorney's fees, and so -- even when I

13   make an offer at the outset to let the

14   court determine attorney's fees.

15       I don't think it's as simple as

16   just -- I'm not -- I have found that

17   these cases to be very problematic for me

18   professionally and I'm much better off

19   not taking them.

20       MR. LOPEZ:  I have no further

21   questions, Mr. Chairman.

22       MR. HEARON:  Thank you.

23       Mr. Kozolchyk, you have four more

24   people on the list to question you.  Do

25   you need to take a break?

Maria I. Salum, P.A.                    305 746-3079

Page 84

1    MR. KOZOLCHYK:  I thank you very
2 much.  I'm actually doing really well.
3 But if anyone else needs to take a break,
4 no problem.
5    MR. HEARON:  Bruce, you're up.
6    MR. LEHR:  Thank you.
7    Good afternoon, Mr. Kozolchyk.  You
8 said on a couple of occasions that if
9 this was filed in state court that it
10 would run a good chance of it being
11 removed to federal court.  Why would a
12 defendant want to move to a more
13 expensive, more time consuming, more
14 complicated forum by removing from county
15 court to go to the district court?
16    MR. KOZOLCHYK:  Just so you're
17 aware, I have filed a few cases in state
18 court, several in state court and several
19 have been removed to federal court.
20    You're asking me to speculate on
21 what was in the mind of the defendants in
22 doing that.  I'm happy to do that, but I
23 want to be clear I can't necessarily know
24 what's going on in their head in making
25 that decision.  But I can certainly

Maria I. Salum, P.A.                    305 746-3079

Page 85

1    estimate and speculate why they might

2    want to do that.

3         MR. LEHR:  Go ahead.

4         MR. KOZOLCHYK:  Number one, if --

5    some attorneys, they do a volume of

6    defense work and they specialize in

7    defending cases in federal court and

8    their systems are aligned with the

9    federal practice, and so as a matter of

10   procedure, they will remove every one of

11   these state FLSA cases to federal court

12   as a matter of practice.  A second reason

13   is that a federal judge may be more

14   familiar and equipped to adjudicate the

15   obscure FSLA legal issues as an exemption

16   in a more predictable way.  I'm trying to

17   think if there might be a third reason.

18   Maybe the misimpression -- and I'm really

19   speculating here, I don't actually know.

20   Maybe the misimpression that the

21   plaintiff's attorney filing in the state

22   court is not prepared to litigate the

23   case in federal court.

24        MR. LEHR:  Okay, I understand.  You

25   are a sole practitioner, correct?

Maria I. Salum, P.A.                    305 746-3079

Page 86

1          MR. KOZOLCHYK:   Yes.

2          MR. LEHR:   So you basically get to

3     eat what you kill?

4          MR. KOZOLCHYK:   Right, yeah.

5          MR. LEHR:   Explain to me why would

6     20 open cases, you would have, I think

7     you said 50 unfiled cases, when it takes

8     you an hour to three hours to file?  Why

9     would you want to carry a backlog like

10    that?

11         MR. KOZOLCHYK:   I don't have an

12    exact number on my backlog and I think I

13    gave a range of 30 to 50, but it's the

14    best estimate.  I don't have the number

15    offhand.  It's not that I want to carry a

16    backlog.  These cases are -- can be time

17    consuming and taxing.  I had four trials

18    so far this year in federal court.  This

19    has been very busy.  This experience with

20    the committee has been very taxing.  It's

21    not something that I would want to do.

22         MR. LEHR:   Do you send out demand

23    letters?

24         MR. KOZOLCHYK:   It's not required

25    under the Fair Labor Standards Act.  The

Maria I. Salum, P.A.                    305 746-3079

1   Florida Minimum Wage Act requires it.

2   When I bring a claim under the Florida

3   Minimum Wage Act, I do send a pre-suit

4   demand letter.

5        MR. LEHR:  Because you're required

6   to.  But with the federal claim, the ones

7   that you are now turning away, you would

8   not send a demand letter to see what

9   happens and maybe help out that client?

10        MR. KOZOLCHYK:  Let me explain why.

11   When I have a client -- if a client comes

12   to me for a last paycheck, I have to do a

13   complete interview to cover all the other

14   issues.  Now when I'm speaking with them

15   over the phone, I see if there's any

16   other potential claim, so I cover the

17   extent of it, there's other monies owed.

18   If there's any kind of additional monies

19   owed.  Let's say they're not owed any

20   other monies, it's solely a last paycheck

21   and nothing else.  For me to send a

22   demand letter, I still need to gather a

23   tremendous amount of information.  I need

24   to know exactly who the defendant is, and

25   sometimes there are multiple

Maria I. Salum, P.A.                    305 746-3079

1     corporations, and the statute allows it

2     to sue individuals provided the

3     individuals fit within certain

4     requirements of the statute that open up

5     those individuals to individual

6     liability, so I have to do an interview

7     not only on each defendant corporation

8     and their interrelationships, but also as

9     to any individuals that may fall within

10    the scope of individual liability under

11    the statute.  And I still have to analyze

12    exemptions and coverage under the statute

13    and if they are misclassified as an

14    independent contractor, whether we have a

15    viable route to argue that they are

16    actually an employee, because I'm an

17    independent contractor, they are not

18    available under the statute.  And so,

19    it's not just simply sending them out.

20    When I send that demand letter out, I

21    need to know where I stand on every one

22    of these issues.

23         And so, the time I put into a case

24    is not practical.  It's not just as

25    simple, "Oh, you're owed a hundred bucks,

Maria I. Salum, P.A.                    305 746-3079

Page 89

1    let me send a demand letter."  What if my

2    client did the math wrong?  Because

3    that's another thing.  I have to

4    independently calculate each one of these

5    claims, and the calculation is a function

6    of their date, ranges of employment,

7    their hours worked and, of course, I

8    can't just say, "How many hours have you

9    worked this week," 65 or whatever it is,

10   I need to know the factual foundation

11   behind those hours and I have to know the

12   schedule, when did they come in to work,

13   when did they leave work.  Sometimes I

14   have clients with schedules that on one

15   week they're working certain days and

16   then it varies every single week, and

17   coming up with some kind of

18   representative schedule that might

19   reflect their actual hours worked, unpaid

20   time versus partially paid time.  So I

21   have to actually do the interview to

22   calculate my client's claim, too, because

23   I can't just rely on, "Oh, my client says

24   he is owed a hundred dollars," and just

25   accept that.  I need to know how we get

Maria I. Salum, P.A.                    305 746-3079

1    to the hundred dollars and oftentimes my

2    clients do not calculate their claims

3    accurately and in accordance with the

4    law.

5        The interview is a very important

6    step in the process and it requires a lot

7    of work from me to iron out every one of

8    these details, and so it's not just

9    simply someone calling me for a hundred

10   bucks and I will just send out a demand

11   letter for a hundred dollars.  There's a

12   whole lot more to it than that.

13       MR. LEHR:  One last question,

14   believe it or not, you have described a

15   relatively recent case where you and

16   opposing counsel were not getting along,

17   him attacking you and you were very proud

18   that you were able to maintain your

19   composure and not raise your voice and

20   not interrupt him, and you told the

21   committee this is because this committee

22   has been in the back of your mind.

23       Let's say this resolves in a manner

24   that you can go on practicing these cases

25   in the Southern District, what happens

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 91

1    when the next confrontation happens and

2    you don't have the committee hanging over

3    your head, then what?

4         MR. KOZOLCHYK:  Mr. Lehr, I can

5    assure you, I will have this committee

6    hanging over my head for the rest of my

7    practice because I fear, if I'm permitted

8    to practice, continue practicing in the

9    Southern District of Florida, I fear what

10   might happen if I am referred again.

11        MR. LEHR:  Thank you very much.

12        MR. HEARON:  I asked Mr. Kozolchyk

13   if he was okay.  Maribel, I failed to ask

14   you if you were okay.  Do you need to

15   take a break?

16        THE REPORTER:  No, I'm fine.  We can

17   continue.  Thank you.

18        MR. HEARON:  Celeste?

19        MS. HIGGINS:  Thank you, Mr. Chair.

20        Mr. Kozolchyk, I'm a sole

21   practitioner.  I'm a criminal defense

22   attorney.  I have my own practice.  So I

23   can understand what it feels like to have

24   the weight of all the cases on only your

25   shoulders, so I relate to that.  I am

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 92

```
 1      somewhat less concerned, even though I'm
 2      a former federal public defender, I'm not
 3      sort of concerned with your decision not
 4      to take on smaller cases.  Economically I
 5      understand that.
 6           My concern is something along the
 7      line of what Bruce just asked you, which
 8      is the behavior during deposition and
 9      during exchanges with opposing counsel.
10      And I accept your statements that you are
11      always going to remember this experience.
12      I'm wondering if you ever, before this
13      happened and before the tragic events
14      that were happening in 2019, had you ever
15      been in a situation where you were
16      reprimanded for your conduct in a
17      deposition, where you were sanctioned for
18      your behavior where something like this
19      happened before?
20           MR. KOZOLCHYK:  Not in deposition.
21      The Hernandez-Sabillon case, which is in
22      the letter of referral, which dates back
23      to 2015 or 2014, specifically pertains to
24      conduct at a deposition.  I had a very
25      contentious relationship with the
```

Maria I. Salum, P.A.                    305 746-3079

Page 93

```
1        opposing counsel and I sought to record
2        what was going to transpire at the
3        deposition via audio.  I was not aware at
4        the time -- again, this was in 2014 or
5        2015.  I opened my firm in 2012.  I was
6        not aware at the time that it would be
7        improper to record the audio of the
8        deposition.  And opposing counsel
9        literally grabbed the microphone and
10       ripped it out of my laptop, and what
11       ensued thereafter was a heated verbal
12       argument where I attempted to regain my
13       property.
14            MS. HIGGINS:  Is that the one
15       reported on by the Daily Business Review?
16       That one?
17            MR. KOZOLCHYK:  Oh, I don't know if
18       it was reported.  I have no knowledge of
19       that --
20            MS. HIGGINS:  Okay.
21            MR. KOZOLCHYK:  -- if it was
22       reported by the Daily Business Review.
23            MS. HIGGINS:  So that sounds like
24       you're suggesting that was sort of out of
25       the ordinary.  We have all experienced
```

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 94

1    situations where we encounter bullying in

2    litigation, in depositions.  Would you

3    say that that's a successful or effective

4    way of trying to get your position heard

5    when you're in a depo or a hearing to

6    just sort of raise your voice?

7        MR. KOZOLCHYK:  Okay.  So the event

8    in the Hernandez-Sabillon case in 2014 or

9    2015, no, I don't believe yelling and

10   raising my voice is an effective way of

11   getting my point across, and I certainly

12   didn't do that in the Dahdouh case.  No.

13   And I try -- that's one of the things

14   I've been working on is to not respond,

15   to be more dispassionate and less

16   emotional and not seek to increase the

17   temperature in the room.

18       MS. HIGGINS:  Prior to these events

19   happening and this committee being on

20   your mind, is that something that would

21   happen then kind of more frequently?

22       MR. KOZOLCHYK:  I don't think -- and

23   these events -- I've litigated over 700

24   cases.  There are eight cases in this

25   letter.

Maria I. Salum, P.A.                    305 746-3079

Page 95

1    MS. HIGGINS:  I heard you say that.
2    I'm talking about your general practice
3    and the way you behaved.
4       MR. KOZOLCHYK:  When I'm yelling in
5    a deposition?
6       MS. HIGGINS:  Or, you know, behaving
7    in that aggressive manner.  And I don't
8    mean aggressively pursuing your case, I
9    mean, being personally aggressive.
10      MR. KOZOLCHYK:  I was aggressive
11   before.  I try not to be aggressive
12   anymore.
13      MS. HIGGINS:  Okay.  The people that
14   you go up against, is it usually the same
15   group of defense attorneys?  Do you
16   regularly see them?
17      MR. KOZOLCHYK:  There are some that
18   I regularly see and I regularly see new
19   faces all the time.
20      MS. HIGGINS:  Okay.  I have no
21   further questions.  Thank you.
22      MR. KOZOLCHYK:  If I can just
23   expand, Ms. Higgins.  I try very hard and
24   every day I'm growing more to not have
25   that aggressive confrontation and not

Maria I. Salum, P.A.                    305 746-3079

Page 96

1    reciprocate in-kind.  I'm embarrassed by
2    the events at the deposition and to be
3    frankly also at the Dahdouh deposition,
4    even though I tried extremely hard to not
5    engage in that.  And I believe every day
6    I'm getting better and I'm not -- I'm
7    trying to avoid those kind of situations
8    in the future and de-escalate when
9    possible.
10         MS. HIGGINS:  Thank you.
11         MR. HEARON:  Tiffani?
12         MS. LEE:  I don't have any
13   questions.
14         MR. HEARON:  Mr. Kozolchyk, first of
15   all, thank you for agreeing to appear and
16   I appreciate that I denied a couple of
17   requests to delay the hearing.  I'm sure
18   when we are finished today, you will be
19   happy that you got it behind you and
20   didn't postpone it for a later date.
21         I did want to note for the record
22   that one of our committee members,
23   Kimberly Gilmour, indicated to us that
24   she has had cases with you in the past,
25   so she has recused herself from any of

Maria I. Salum, P.A.                    305 746-3079

1   the decision-making process related to

2   your case, and I wanted you to be aware

3   of that.

4      A couple of things.  Talk to me, if

5   you will, about what your understanding

6   is of when the court has to approve

7   settlements.

8      MR. KOZOLCHYK:  When the parties

9   enter into a settlement agreement, it

10  must be approved by the court in order

11  for the claims to be dismissed with

12  prejudice, although some judges have

13  taken the position that even a dismissal

14  without prejudice requires a court

15  approval, in a settlement of every case.

16  If there's a settlement agreement, some

17  judges take a position that it must

18  always be reviewed.  If it's a dismissal

19  without prejudice, some judges take the

20  position that because the claims can be

21  re-brought, there's no settlement that

22  needs to be reviewed.

23     MR. HEARON:  So is your

24  understanding that the linchpin of that

25  analysis is whether there's a written

Maria I. Salum, P.A.       305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)   8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 98

1    settlement agreement?

2         MR. KOZOLCHYK:  No, no.  Even a

3    verbal settlement.  It can be a verbal·

4    settlement, too.  And I accept that I was

5    wrong in my analysis in Shuman that the

6    event that transpired could be considered

7    a settlement, and I accept that I'm wrong

8    on that.

9         I can tell you the reasons why I

10   believed it was not a settlement at the

11   time, but I accept that I was wrong, and

12   I was -- I definitely did not try to hide

13   the fact that I was getting paid

14   attorney's fees and costs.  I made that

15   known to the court in three separate

16   filings and it was brought up very early

17   on at the hearing as well.

18        MR. HEARON:  Since 2019, have you

19   had any settlements of any cases that

20   have not been taken to the court for

21   approval?

22        MR. KOZOLCHYK:  Some -- this is

23   very, very uncommon, what I'm about to

24   describe.  It's not the norm at all.

25        Some defendants and their --

Maria I. Salum, P.A.                    305 746-3079

1      MR. HEARON:  Let's start with a yes

2   or no to my question.

3          Have you had cases since 2019, since

4   all of this arose, where you have reached

5   a settlement where you have not sought

6   court approval?

7          MR. KOZOLCHYK:  Yes.

8          MR. HEARON:  On how many occasions?

9          MR. KOZOLCHYK:  I can only think of

10  one.  I can only think of one.

11         MR. HEARON:  Can you tell me the

12  circumstances of that case?  First of

13  all, with regard to that case, were you

14  paid a fee?

15         MR. KOZOLCHYK:  Yes.

16         MR. HEARON:  Was there a written

17  settlement agreement?

18         MR. KOZOLCHYK:  Yes.

19         MR. HEARON:  And court approval was

20  not sought?

21         MR. KOZOLCHYK:  Yes.  I'm eager to

22  give you the context to that situation.

23         MR. HEARON:  First give us the case

24  name.

25         MR. KOZOLCHYK:  Sure.  One second.

Maria I. Salum, P.A.                    305 746-3079

Page 100

1      MR. HEARON:  If you have a case
2   number, that would be --
3      MR. KOZOLCHYK:  I'm going to get it
4   for you right now.  I'm going to try to
5   remember it.  It's loading right now.  I
6   will give you the case number as soon as
7   it comes up.  Case number 22 -- 22-20409.
8      MR. HEARON:  Okay.  Your
9   explanation.
10     MR. KOZOLCHYK:  Again, that's the
11  case of Arias versus Commodore Systems,
12  Inc., et al.  Let me just pull up the
13  case, so I can give you the chronology.
14     MR. HEARON:  Who is the Judge?
15     MR. KOZOLCHYK:  Judge King.
16     In that case, we had every intention
17  of seeking the court's approval of the
18  settlement.  We filed a notice of
19  settlement on June 9th, notifying the
20  court that the parties had reached a
21  settlement.  The very next day, June
22  10th, the court entered a final order of
23  dismissal saying the case was dismissed
24  with prejudice and retaining jurisdiction
25  to enforce the terms of the settlement.

Maria I. Salum, P.A.                    305 746-3079

Page 101

1    Again, we filed a notice of settlement on
2    June 9, 2022.  The very next day the
3    court entered an order of dismissal
4    dismissing the case with prejudice and
5    retained jurisdiction to enforce the
6    terms of the settlement.
7        MR. HEARON:  What was your fee in
8    that case?
9        MR. KOZOLCHYK:  $28,000.  And so --
10        MR. HEARON:  How much was your
11    client's recovery in the case?
12        MR. KOZOLCHYK:  The client's
13    recovery is 32,000.  I also got
14    reimbursed my costs, which were 500 some
15    dollars in costs.
16        I'd like to give you a little more
17    context, if I may.
18        The defense attorney decided that
19    given the dismissal with prejudice and
20    the court retaining jurisdiction to
21    enforce the settlement, that it will be
22    better for confidentiality to not file it
23    on the docket.  And so, I didn't have any
24    objection to that.  But we did not hide
25    the fact that there was a settlement.  It

Maria I. Salum, P.A.                    305 746-3079

Page 102

1    was to promote -- it was a benefit to the

2    defendant to promote confidentiality with

3    the agreement.

4        I also want to expand on that case

5    some more.  That client is extremely

6    grateful to me because I -- he ended up

7    getting incarcerated around this time and

8    I drove to Miami, like -- I believe it

9    was three times -- two or three times I

10   drove to Miami to deal with the facility

11   he was incarcerated in to get him bailed

12   out, because he had no one else.  He had

13   no one else but me, and he's extremely

14   thankful to me.  The only other person he

15   had was his sister in a different state.

16   And I got him bailed out, and he was

17   extremely grateful for that.

18       MR. HEARON:  The question that was

19   asked by Mr. Faye earlier that I want to

20   follow up on and this all has to do with

21   this notion of not taking the smaller

22   cases.

23       Very early in your testimony you

24   said that you can't take cases pro bono.

25   Do you remember saying that?

Maria I. Salum, P.A.                      305 746-3079

Page 103

1          MR. KOZOLCHYK:  Yes.

2          MR. HEARON:  Can you tell me, have

3     you ever taken any of these cases pro

4     bono?

5          MR. KOZOLCHYK:  If I don't win at

6     trial, they certainly convert into that

7     situation.

8          MR. HEARON:  I don't think that's

9     the way the bar defines pro bono.  Pro

10    bono is defined by you taking the case

11    with the understanding you will not seek

12    a fee.

13         MR. KOZOLCHYK:  I understand that.

14         MR. HEARON:  Let's try my question

15    again.

16         MR. KOZOLCHYK:  Just to be clear,

17    I'm not reporting those events as pro

18    bono work to the Florida Bar.

19         MR. HEARON:  I'm not suggesting that

20    you did, notwithstanding your comment.

21    I'm just asking if you had ever taken any

22    cases voluntarily as pro bono in the

23    past.

24         MR. KOZOLCHYK:  None that I can

25    recall off the top of my head.  Having

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 104

```
1    done the number of cases that I have
2    done, there may have been a very small
3    handful that I don't recall.
4        MR. HEARON:  When Mr. Faye asked you
5    the question of how long it took for you
6    to evaluate a case and prepare the case
7    for filing in a situation where it was a
8    last paycheck case, you gave a very long
9    answer about this extensive analysis that
10   you do when people come to you, which
11   left me with the thought that boy, it
12   must be pretty hard for you to make a
13   decision on what cases to not take, which
14   are last paycheck cases, because you went
15   through this list of things that you ask
16   people.  Do you do that on every case
17   where somebody comes in and says, "I
18   didn't get my last paycheck"?  Do you
19   spend what sounds like an hour or more
20   going through this checklist before you
21   now decide not to take the case?
22       MR. KOZOLCHYK:  No, no.  That's not
23   how it happens.  If someone is on a last
24   paycheck, I will ask him questions to see
25   if they are owed any more money.  The
```

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 105

1    first thing I try to do is assess and

2    value the claim.  Now, assessing -- to

3    complete an entire interview, assessing

4    the value of a claim requires that I do a

5    full calculation of their claim, you

6    know, independent of whatever

7    preconception they had of what they are

8    owed.  But during the initial screening

9    to decide if we're going to move forward

10   with the full blown interview, I am just

11   assessing what is the claim to be owed.

12   If it's the last paycheck, I'll ask him

13   questions to see if they may be owed more

14   money that they are not aware of, like an

15   unpaid overtime situation.  Somebody

16   could have worked at a place for three

17   years and be owed a last paycheck and it

18   turns out they're owed $50,000 of unpaid

19   overtime that they had no idea about.

20        MR. HEARON:  Let's forget about all

21   those extreme cases.

22        I come in and say, "I'm owed the

23   last paycheck," tell me how many minutes

24   you have to spend with me, assuming that

25   my answers to all of your inquiries is

Maria I. Salum, P.A.                    305 746-3079

Page 106

1    no.  I'm owed my last paycheck and only

2    my last paycheck, how long does that

3    initial interview take?

4         MR. KOZOLCHYK:  The question

5    assessing whether it's only the last

6    paycheck doesn't take very long.

7         MR. HEARON:  Give me a time.  I'm

8    trying to assess -- you told us

9    repeatedly you don't take these cases

10   anymore.  I'm trying to actually

11   visualize what that looks like in the

12   normal course of your business.

13        MR. KOZOLCHYK:  It looks like a five

14   to 30 minute phone conversation where I'm

15   just -- I'm not doing the interview.  I'm

16   assessing what their claim is.  It's a

17   preliminary assessment.

18        MR. HEARON:  All right.  So after

19   five minutes or 30 minutes, you will say

20   to me, "Bill, I'm not taking any of these

21   cases anymore, because it appears that

22   you're only owed your last paycheck of

23   $500"?  Is that what happens?

24        MR. KOZOLCHYK:  I tell them I no

25   longer take these kind of cases, and I

Electronically signed by Maria Salum (001-186-132-3519)        8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 107

1    give them other options.  They can take

2    it to small claims court themselves,

3    contact Florida Legal Aid, seek another

4    attorney or contact the Department of

5    Labor.

6         MR. HEARON:  Okay.  And you are the

7    person who conducts this initial

8    interview?

9         MR. KOZOLCHYK:  Not always.

10         MR. HEARON:  If you're not doing it,

11    who is?

12         MR. KOZOLCHYK:  It could be Phoebe.

13    I have a part-time assistant who also

14    works as a subcontractor.

15         MR. HEARON:  Is that a person

16    trained as a lawyer?

17         MR. KOZOLCHYK:  No, no, no, no.

18         MR. HEARON:  So initial -- the

19    initial inquiries may not even go to you,

20    they may go to Phoebe or this other third

21    party, they may conduct the initial

22    inquiry?  Is it possible that after the

23    initial inquiry, they don't even get to

24    you?

25         MR. KOZOLCHYK:  Their criteria is

Maria I. Salum, P.A.                    305 746-3079

Page 108

1    not the same as mine on whether to

2    escalate to me.

3         MR. HEARON:  Mr. Kozolchyk, let's

4    try with my question.

5         I call in, Phoebe or this other

6    person talks to me, is it possible that

7    they will interview me and then they will

8    not pass along my name to you?

9         MR. KOZOLCHYK:  Yes.

10        May I expand on that answer, please?

11        MR. HEARON:  Wait a second.  I just

12   want to understand the process first and

13   then you can expand on it.

14        So they do the initial inquiry and

15   after the initial inquiry, they can

16   decide that it's not worthy of being

17   passed on to you and so you never deal

18   with it?

19        MR. KOZOLCHYK:  Yes.

20        MR. HEARON:  If they think it's

21   something that merits your attention, is

22   that because they think there may be a

23   claim there more than the last paycheck?

24        MR. KOZOLCHYK:  No.

25        MR. HEARON:  Okay.  You can go ahead

Maria I. Salum, P.A.                305 746-3079

Page 109

1      and explain it.

2          MR. KOZOLCHYK:  We get calls from

3      people who are not owed wages.  We get

4      calls -- I've gotten a call for someone

5      looking for a divorce attorney.

6      Sometimes -- quite often, people are

7      terminated and it could be for a

8      completely unjust and false reason, but

9      not a reason that is legally actionable.

10         MR. HEARON:  I'm really only

11     focusing on the last paycheck cases that

12     you say you don't take anymore.

13         MR. KOZOLCHYK:  Most of those cases

14     go to me to assess further, because if

15     they are owed some money, there is a

16     significant probability that they are

17     owed more money, so I evaluate that.

18         MR. HEARON:  So every -- let's not

19     say every.  But almost every case that's

20     a last paycheck case, even if it's

21     screened by somebody, it will eventually

22     get to you and then you will conduct your

23     phone conversation that lasts between

24     five and 30 minutes, yes?

25         MR. KOZOLCHYK:  Or scheduled for an

Maria I. Salum, P.A.                305 746-3079

Page 110

1    appointment, usually that's the case, one

2    or the other.

3              MR. HEARON:  So it's possible that

4    these folks may actually come in to your

5    office and you will have a lengthy

6    discussion and after all of your inquiry,

7    it's still a last paycheck case?

8              MR. KOZOLCHYK:  Yes.

9              MR. HEARON:  And then you shuffle

10   them off to somebody else?  That's a bad

11   expression.  I apologize for that.  You

12   refer them to other sources of legal

13   assistance?

14             MR. KOZOLCHYK:  Yes.  I want to make

15   sure that they don't -- they are not

16   missing out on a more substantial claim

17   than I will be able to help them with.

18   If someone has a case that I could help

19   them with, I don't want to turn them

20   away.

21             MR. HEARON:  I'm already passed

22   that.  You have already determined that

23   they don't have a more serious claim and

24   then you refer them to someone else to

25   handle their last paycheck.

Maria I. Salum, P.A.                          305 746-3079

Page 111

1        MR. KOZOLCHYK:  Yes, that's correct

2   and I get about approximately four calls

3   a month to that effect.

4        MR. HEARON:  Okay.

5        MR. KOZOLCHYK:  Where I decline -- I

6   decline about four cases a month.

7        MR. HEARON:  And you never take

8   these cases out on a pro bono basis?

9        MR. KOZOLCHYK:  I would not be able

10  to put in the kind of time.  Because

11  again, there's two parts to this.

12       There's the assessment of the only

13  thing there, it's an unpaid check case,

14  but then if I was going to then proceed

15  and move forward with the case, I will

16  need to still to do an extensive, a far

17  more extensive interview, to identify the

18  defendant, to identify the relationship,

19  including the individuals, to ensure the

20  coverage under the statute, to ensure

21  there are no applicable exemptions and

22  there's no employee, independent

23  contractor issue.  I still would need to

24  calculate their claim myself and some

25  fact patterns are very difficult to

Maria I. Salum, P.A.                    305 746-3079

Page 112

1    calculate.  Getting to that next level,

2    okay, I'm going to take your case, even

3    though I have identified it as the last

4    paycheck, it still requires a far more in

5    depth interview that I could not afford

6    to do and certainly not afford to do it

7    on average four times a month.  That's

8    like 48 cases a year.

9         MR. HEARON:  All right.  But if the

10   committee wanted to recommend that you do

11   a certain number of pro bono cases on

12   last paycheck cases, would you be able to

13   do that?

14        MR. KOZOLCHYK:  Certainly.

15        MR. HEARON:  How many do you think

16   your practice would be able to handle

17   without it being a burden on your

18   practice?

19        MR. KOZOLCHYK:  May I ask for

20   clarification?

21        MR. HEARON:  Sure.

22        MR. KOZOLCHYK:  Are you suggesting I

23   file these cases in federal court?

24   Because that's where my practice, my

25   system, everything is built.  That's

Maria I. Salum, P.A.                   305 746-3079

Page 113

1      why -- my practice is built on the

2      practice of federal court.  And even if I

3      was doing this on a pro bono basis, I

4      don't think the judges would appreciate

5      me bringing small dollar amounts in their

6      court, which is one of the reasons why I

7      have admitted to not bringing these

8      cases, so I don't bring them in federal

9      court.

10         MR. HEARON:  I don't think -- I

11     think Mr. Lopez was trying to make that

12     point in his questioning.  I don't know

13     that the judges were upset that you

14     brought last paycheck cases.  It appears

15     that the referral is based upon a belief

16     that you were overcharging or delaying

17     the conclusion of these cases in order to

18     increase your fees.  I don't think -- I

19     mean, again, as Mr. Lopez pointed out,

20     this is a federal statute and it is

21     designed to give the voiceless a voice in

22     trying to collect money from their

23     employers that they may rightfully be

24     entitled to.  And I don't think that

25     there's any belief and I don't think

Maria I. Salum, P.A.                    305 746-3079

Page 114

1    anybody in the committee is trying to say

2    that these cases should not be brought.

3    And I don't think that the referral says

4    that the cases shouldn't be brought.  The

5    only question I asked you is if the

6    committee made a recommendation that you

7    should handle some of these last paycheck

8    cases on a pro bono basis, A, whether you

9    would be willing to do it and B, how many

10   would your practice do without it

11   becoming unduly burdensome?

12        MR. KOZOLCHYK:  To answer your first

13   question, I will certainly do it and be

14   able to do it, if that's what the

15   committee required on a pro bono basis.

16   This may not be the proper forum to ask

17   this question, but if I did it on a pro

18   bono basis, would the costs be

19   reimbursable through a pro bono --

20   through some pro bono program or would I

21   be out of pocket these costs?

22        MR. HEARON:  Let's assume for

23   purposes of the discussion that the cost

24   would be recoverable, being that you

25   weren't doing it on a totally pro bono

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 115

1    basis, but you were donating your legal

2    time as opposed to paying the costs.

3    Assuming that the court awarded the

4    costs.

5         MR. KOZOLCHYK:  I could certainly do

6    that.  How many, I hazard to guess.  I

7    don't know what the number would be.  I

8    would aim to please the committee.

9         MR. HEARON:  Okay.  You realize, of

10   course, that ultimately we only make a

11   recommendation to the court.  We do not

12   have the power to impose anything on you.

13   It's entirely up to the judiciary to do

14   it.  I'm just trying to get a feel for

15   what you can do and not do.

16        I have only a couple of other

17   things.  Number one, at the very early

18   part of your testimony you referred to a

19   relatively new paperless order.  Do you

20   remember that reference?

21        MR. KOZOLCHYK:  Yes.

22        MR. HEARON:  Can you provide me with

23   a copy of that paperless order that you

24   referred to?  Not now.  You can do it

25   tomorrow, because I have a couple of

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                              8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 116

1    other things also.  I also would like you

2    to provide us with copies of the cases

3    that you say you tried, not copies, but

4    the case numbers of the four cases that

5    you tried in 2022, and you offered to

6    provide a recording, I forget if it was a

7    hearing or a deposition.  I would also

8    ask that you provide that as well.

9         Is that okay with you?

10         MR. KOZOLCHYK:  Yes.  And the cases

11   I tried in 2022, I tried four.  I won

12   three.  I did lose one.

13         MR. HEARON:  Okay.  I just wanted to

14   know the case numbers.  Okay.

15         MR. KOZOLCHYK:  Sure.

16         MR. HEARON:  I have no further

17   questions unless any members of the

18   committee have any follow-up, we are

19   through, Mr. Kozolchyk, and thank you

20   very much for coming in.

21         MR. KOZOLCHYK:  Thank you very much

22   for the time of the committee.  It's very

23   important to me and my family that I

24   maintain the ability to practice.  Thank

25   you so much for the consideration.  I'm

Maria I. Salum, P.A.                    305 746-3079

Page 117

1    really open to many, many options that

2    the committee may come up with and I

3    would do pro bono work on the last

4    paychecks if that's what the committee

5    wanted me to do.

6         MR. HEARON:  Okay.  You may sign off

7    and, Ms. Court Reporter, you may also

8    sign off.  Thank you.

9         (Thereupon, the proceedings was

10   concluded at 6:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    8bc6df7e-a6d6-43b9-ad39-8ff900219303

Page 118

CERTIFICATE OF REPORTER

STATE OF FLORIDA        :
                        : SS.
COUNTY OF MIAMI-DADE :

          I, MARIA ISABEL SALUM, Registered
Professional Reporter, do hereby certify that
I reported in shorthand the proceedings in the
above-styled cause before the Ad Hoc
Committee, at the time and place as set forth;
that the foregoing pages, numbered from 1 to
118, inclusive, constitute a true and correct
record.

          I further certify that I am not an
attorney or counsel of any of the parties, nor
related to any of the parties, nor financially
interested in the action.

          WITNESS my hand and Official Seal in the
City of Miami, County of Miami-Dade, this 13th
day of July, 2022.


_____
MARIA ISABEL SALUM


Maria I. Salum, P.A.                    305 746-3079

WILLIAM C. HEARON, P.A.
ATTORNEY AT LAW
SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
SUITE 3000
MIAMI, FLORIDA 33131

PHONE: (305) 579-9813
FAX: (305) 358-4707

August 17, 2022

*Via Email Only*

The Honorable Cecilia M. Altonaga
Chief Judge, United States District Court SDFL
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue, Room 13-3
Miami, Florida 33128

> In Re: Elliot Ari Kozolchyk (Fla. Bar #74791)
> Case No. 20-MC-21879
> Final Report and Recommendation

Dear Judge Altonaga:

Attached please find the Final Report and Recommendation of the Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance (the "Committee") regarding the referral of Elliot Ari Kozolchyk to the Committee.

By copy of this letter to Mr. Kozolchyk, he is directed to Rule 6 © (2) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys with respect to the Committee's findings and Final Report and Recommendation.

Should Your Honor have any questions regarding the foregoing or the attached or should you need the Committee to be of further service with regard to this matter, please do not hesitate to contact me.

Sincerely,

William C. Hearon, *Chair*
*Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance*

WCH/mm
Enclosure
cc: Clerk's Office
    Elliot Ari Kozolchyk, Esq.

THE FLORIDA BAR'S
EXHIBIT
3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-MC-21879**

IN RE:

**ELLIOT ARI KOZOLCHYK**
**Florida Bar # 74791**

_____/

## FINAL REPORT AND RECOMMENDATION

**THE AD HOC COMMITTEE ON ATTORNEY ADMISSIONS, PEER REVIEW, AND ATTORNEY GRIEVANCE FOR THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA[1]**

THIS MATTER was referred to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee") by then-Chief Judge K. Michael Moore at the request of Judge Donald M. Middlebrooks and Judge Robin L. Rosenberg by letter dated July 17, 2019 (the "Letter of Referral"), to investigate the conduct of Elliot Ari Kozolchyk, Esq. in multiple cases filed in the U.S. District Court for the Southern District of Florida and to conduct disciplinary proceedings. On May 10, 2022, Chief Judge Cecilia M. Altonaga granted the Committee's second request for an extension of time until September 7, 2022, to consider the matter and submit its final report and recommendation to the Court.

An Investigative Committee was appointed to investigate this matter pursuant to Rule 6(c)(2) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys.

---

[1] Mr. Kozolchyk was served on August 15, 2022 with the Committee's Proposed Report and Recommendation, and in the forwarding email informed of his rights under Rule 6 of The Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys in the Southern District. On August 16, 2022 Mr. Kozolchyk submitted his Response to the Proposed Report and Recommendation. The Committee considered the matters raised by Mr. Kozolchyk's Response, and they are addressed in the Recommendation section, *infra*.

The Investigative Committee also met with Mr. Kozolchyk for an informal discussion, which took place on June 27, 2022. Mr. Kozolchyk had previously submitted a written Personal Statement of Elliot Kozolchyk in Response to Letter of Referral to Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance (the "Statement") and, during a video-conference hearing held on June 28, 2022, gave testimony in the form of a statement and responses to questions posed by Committee members.[2] Mr. Kozolchyk has been represented by an attorney during portions, but not the entirety, of these proceedings. He appeared before the Committee without counsel.

## REPORT

## I. MR. KOZOLCHYK'S BACKGROUND AND PRACTICE

Mr. Kozolchyk is the sole practitioner at his law firm, Koz Law, P.A. He was admitted to the Florida Bar in 2009 and worked at two small firms before opening his solo practice in 2012.

Mr. Kozolchyk's practice is dedicated almost exclusively to representing plaintiffs bringing claims against employers for unpaid wages and overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* The FLSA allows plaintiffs to recover reasonable attorney's fees and costs, *see id.* § 216(b), but when an FLSA case is settled, the entire settlement agreement, including attorney's fees and costs, is subject to court approval. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982). As the Letter of Referral notes, "[t]he Eleventh Circuit has stated that judicial review of attorney's fees, in particular, is mandated by the FLSA 'to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement.'" (Ltr. of Referral 1 (quoting *Silva v. Manuel*, 307 F. App'x 349, 351 (11th Cir. 2009))). At the time of the June 28,

---

[2] References to Mr. Kozolchyk's testimony shall be cited as "Transcript at _____."

2022 hearing conducted in this disciplinary matter, Mr. Kozolchyk estimated that he currently had about 20 cases pending in this District.

During the time that some of the misconduct that is the subject of these proceedings took place, Mr. Kozolchyk was going through some very difficult personal circumstances, what he describes as "the worst period of [his] life": on April 2, 2019, his fiancée and firm manager, who had for years been battling cancer, passed away unexpectedly five days before their planned wedding. (Stmt. 7). During this period, when he had an active case load of about 30 to 50 federal cases at any given time, he also received the Letter of Referral and was sanctioned $30,000.00 in the *Olguin* case, discussed below. Mr. Kozolchyk testified that "[t]he stress of [his] personal life and [his] professional life was overwhelming." (Transcript at pp. 5-6). He continues to financially support the young-adult biological children of his deceased fiancée as if they were his own children, and they are all financially dependent on his firm for their living expenses.

## II. MR. KOZOLCHYK'S MISCONDUCT

The Letter of Referral identifies and analyzes various incidents of misconduct by Mr. Kozolchyk in cases in this District. Below, the Committee summarizes those incidents and the statements Mr. Kozolchyk has provided with respect to those incidents.

### A. Realizing Financial Benefit From Improper Delay In Litigation

The Letter of Referral identifies five instances when it appeared Mr. Kozolchyk "continued litigating cases after the defendant has offered or sent his client the full value of their claim," and "Mr. Kozolchyk then continues to generate unnecessary work . . . so that he can later request attorney's fees for the additional time spent." (Ltr. of Referral 8). Under Rule 4-3.2 of the Florida Rules of Professional Conduct, "A lawyer shall make reasonable efforts to expedite litigation

consistent with the interests of the client." The Comment to this Rule explains that "[r]ealizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client."

*Shuman v. Treatment Partners of America*, **Case No. 18-81609-Middlebrooks/Brannon.** Two weeks after the case was initiated, the defendant sent the plaintiff a check for the wages she claimed, but the case dragged on because the parties disputed Mr. Kozolchyk's attorney's fees. (Ltr. of Referral 2). Moreover, by the time of calendar call, part of the fees Mr. Kozolchyk sought were for preparing a motion in limine that was entirely unnecessary because (1) the plaintiff had already received her wages and (2) the defendant agreed to the relief sought in the motion. (*Id.*). In his Statement, Mr. Kozolchyk "acknowledge[s] that [he] should have tried to settle the case sooner." (Stmt. 2).

*Soto v. Audiology Distribution LLC*, **No. 19-CV-80339-Rosenberg/Reinhart.** Soon after the case was filed, the defendant delivered settlement checks for the full amount the plaintiff sought, and the parties agreed to settlement terms. (Ltr. of Referral 4). Nevertheless, according to the Letter of Referral, "Mr. Kozolchyk took the position that there was no settlement agreement between the parties because the defendant refused to agree that it would not seek sanctions against Mr. Kozolchyk *personally*." (*Id.*). In his Statement, Mr. Kozolchyk denies that he took this position (Stmt. 9), but otherwise, after recounting in the detail the difficult settlement negotiations that took place (*id.* at 7–9), Mr. Kozolchyk "acknowledge[s] that [he] could have done things differently" and that he "could have been more flexible in [his] settlement offers" (*id.* at 9). He explains that he has learned lessons from this case and that he "will incorporate these lessons into [his] conduct moving forward and try to avoid events like this from repeating in the future." (*Id.* at 9–10).

*Nelson v. Kobi Karp Architecture & Interior Design, Inc.*, **Case No. 17-23600-CIV-Seitz/McAliley.** At the beginning of the case, Mr. Kozolchyk accepted checks for the full amount of his client's claimed damages but refused to settle because he thought he deserved a greater amount in attorney's fees than the defendant was willing to pay. (Ltr. of Referral 5). When Mr. Kozolchyk eventually moved for thousands of dollars more in attorney's fees than the defendant had offered to pay, Judge Seitz denied his motion, finding that Mr. Kozolchyk's sole intent in litigating the case after receiving his client's checks "was to run up his bill." (*Id.* at 5–6). In his Statement, Mr. Kozolchyk explains in detail why he took that position but also acknowledges that the position was "wrong" and "that a 'proportionate' fee may require a reasonable fee to be less than the time required to complete a case." (Stmt. 16). He also states that, due to the financial difficulties that cases of low monetary value create for him, he no longer brings claims "of value similar to *Nelson* in federal court." (*Id.*).

*Batista v. South Florida Women's Health Association, Inc.*, **Case No. 18-61075-CIV-Moreno/Seltzer.** After the complaint was filed, it came to light that the employer had already mailed the plaintiff a check for the lost wages she sought but that, for whatever reason, she never received the check. (Ltr. of Referral 6). The employer offered to send her a new check, but Mr. Kozolchyk refused to settle without payment of his attorney's fees. (*Id.*). As the Letter of Referral explains, "Judge Seltzer recommended that the plaintiff's request for $10,675 of attorney's fees be denied because '[t]his was a prototypical 'nuisance suit' for which an award of fees would be unreasonable and unjust.'" (*Id.*). In his Statement, Mr. Kozolchyk asserts that the plaintiff's initial failure to be paid by the employer was not merely a mistake, as the employer had claimed, but rather a result of the employer's "explicit refusal" to pay, which necessitated Mr. Kozolchyk's

assistance. (Stmt. 17). Nevertheless, just as he states with respect to the *Nelson* case, Mr. Kozolchyk says he "no longer bring[s] cases of this value in federal court." (*Id.*).

***Olguin v. Florida's Ultimate Heavy Hauling*, Case No. 17-61756-CIV-Cooke/Goodman.** In this case, the plaintiff claimed his employer owed him lost wages, but the reality was that the plaintiff had simply failed to retrieve from his employer the paycheck that accounted for those lost wages, "and neither the plaintiff nor Mr. Kozolchyk inquired into those wages before filing the lawsuit." (Ltr. of Referral 6–7). Ultimately, Judge Goodman issued a Report and Recommendation recommending that the district judge deny the attorney's fees Mr. Kozolchyk sought, finding that Mr. Kozolchyk "appeared to be far-more interested in generating attorney's fees for himself than in resolving a modest claim for his client's benefit," and that "[h]is actions strongly suggest a strategy of avoiding an early resolution in order to generate more fees." (*Id.*). In his Statement, Mr. Kozolchyk explains in greater detail the circumstances that led to the plaintiff not getting paid his lost wages, including the fact that the payment was originally made by direct deposit but then reversed. (Stmt. 19). He also points out that the employer normally paid the plaintiff by direct deposit and that the employer had never advised the plaintiff that the check with some of the wages at issue was available for him to collect. (*Id.*).

## B. Failure to Respect Rights of Third Persons

The Letter of Referral identifies three instances when Mr. Kozolchyk engaged in disrespectful conduct toward third persons involved in the litigation. Rule 4-4.4, entitled "Respect for Rights of Third Persons," provides: "In representing a client, a lawyer may not use means that have no substantial purpose other than to embarrass, delay, or burden a third person."

*Mendez v. Model Row, Inc.*, **No. 17-CV-81104-Rosenberg/Hopkins.** In this case, the parties reached a settlement in principle but could not finalize it, and so Judge Rosenberg held a hearing. (Ltr. of Referral 4). At the hearing, when the parties were ready to have the terms of the settlement read into the record, the defendant informed the Court that he didn't have the funds to make the payment. (*Id.*). The plaintiff agreed that he could make monthly payments, but Mr. Kozolchyk refused to accept monthly payments. (*Id.*). The defendant advised that he would therefore have to make the payments by credit card, at which point Mr. Kozolchyk stated that his fee demand would increase by three percent. (*Id.*). Upon hearing that, the defendant began to weep in open court but agreed because he had no other alternative. (*Id.* at 4–5). In his Statement, Mr. Kozolchyk states that he declined to accept monthly payments from the defendant because he had bad experiences with monthly payments in past cases with the defendant, and Mr. Kozolchyk notes that he routinely agrees to monthly payments when he has no reason to believe the defendant will default. (Stmt. 11). Mr. Kozolchyk also states that he imposed the additional three percent because his firm does not have the ability to accept credit card payments and the payment service he would use for that mode of payment charges three percent. (*Id.*). Nevertheless, Mr. Kozolchyk states that, "if [he] had to do it over again, [he] would not have charged the extra 3%."

*Hernandez-Sabillon        v.        Naturally        Delicious,        Inc.,        No.        15-CV-80812-Rosenberg/Brannon.* In this case, Mr. Kozolchyk attempted to make his own audio recording of a deposition over opposing counsel's objection. (Ltr. of Referral 5). The ensuing argument resulted in both attorneys placing separate phone calls to Judge Brannon's chambers that escalated into loud, heated, and unprofessional interactions. (*Id.*). Judge Brannon sanctioned Mr. Kozolchyk for this conduct in addition to his general behavior in discovery by requiring him to serve at a local soup kitchen. (*Id.*). In his Statement, Mr. Kozolchyk writes that he was not aware at the time that

recording the deposition was improper, that he is embarrassed by the incident, and that "it will never happen again." (Stmt. 11–12).

***Salvador v. Brico, LLC,*** **No. 17-CV-61508-Rosenberg/Seltzer.** Judge Rosenberg had to order Mr. Kozolchyk and his opposing counsel to cease their personal attacks, which they had been leveling against each other in court filings. (Ltr. of Referral 5). Despite Judge Rosenberg's censure, Mr. Kozolchyk continued to attack opposing counsel in his court filings. (*Id.*). In his Statement, Mr. Kozolchyk apologizes, acknowledges that his attacks on opposing counsel were unprofessional, and asserts that the way he drafts communications and filings today is different than it was back when he was litigating this case. (Stmt. 12). Mr. Kozolchyk states: "Today, I try to keep my filings and communications dispassionate, factual, and singularly focused on the relevant issues. When I am attacked by opposing counsel, I focus on the facts and do not reciprocate or engage." (*Id.*).

## C. Frivolous Argument

The Letter of Referral identifies two instances when Mr. Kozolchyk presented a frivolous argument to the Court. Under Rule 4-3.1, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous."

The first instance was in ***Shuman*** (citation *supra*). By the time of calendar call, the plaintiff had already been paid all wages she claimed she was owed, and the only remaining issue was whether the parties had reached a settlement agreement for the plaintiff's attorney's fees and costs. (Ltr. of Referral 2). The parties agreed that defendants would pay Mr. Kozolchyk $2,500.00 in exchange for dismissal of the case without prejudice. (*Id.*). Defendants believed this constituted a

settlement agreement, which would be subject to judicial review under the FLSA, but Mr. Kozolchyk argued to the Court that the agreement was not a settlement agreement because the dismissal would have been without prejudice. (*Id.*). The Court found Mr. Kozolchyk's argument disingenuous and an attempt to evade judicial review. (*Id.*). The Letter of Referral also finds that the argument was "nonsensical and a violation of Mr. Kozolchyk's duty of candor towards the Court," as well as "self-serving." (*Id.*). In his Statement, Mr. Kozolchyk explains the cases upon which he relied to support his theory "that FLSA cases that are dismissed without prejudice are not subject to judicial review." (Stmt. 4–6). Nevertheless, Mr. Kozolchyk acknowledges that he was "wrong" and that he "ha[s] since changed [his] approach because of this case." (*Id.* at 6). Specifically, he will "cast a broad net over what circumstances constitute a settlement subject to judicial review, and request from the courts guidance on whether they will exercise judicial review over FLSA cases that are being dismissed without prejudice." (*Id.*).

The second instance of frivolous argument was in ***Salvador*** (citation *supra*). The Letter of Referral states that, after a settlement agreement had been reached, "Mr. Kozolchyk took the position that there was no settlement agreement because defendant expressed its intention to appeal any fee award to Mr. Kozolchyk." (Ltr. of Referral 5). In his Statement, however, Mr. Kozolchyk writes that was not his position and that his "position was that there <u>was</u> a settlement and that it did not include confidentiality or a right to appeal the Court's determination of liquidated damages, attorney's fees, and costs." (Stmt. 12–13). In addition, the Letter of Referral states, "Judge Brannon concluded that Mr. Kozolchyk's position . . . was without support and Judge Brannon also described Mr. Kozolchyk's behavior as vexatious." (Ltr. of Referral 5). In his Statement, Mr. Kozolchyk asserts that Judge Brannon did not find that his position was "without support" but rather that his interpretation was "inaccurate." (Stmt. 13). Mr. Kozolchyk also asserts that Judge

Brannon did not describe his behavior as vexatious but rather "warned [Kozolchyk] that any further litigation on the terms of the settlement agreement would border on vexatious" (*id.* (quoting Judge Brannon's R&R; emphasis supplied by Mr. Kozolchyk)).

### D. Breach of Duty of Candor to the Tribunal

Under Rule 4-3.3, a lawyer owes a duty of candor to the tribunal. The Letter of Referral identifies two instances in ***Olguin*** (citation *supra*) in which "Mr. Kozolchyk appears to have made misrepresentations to the Court." (Ltr. of Referral 7). In his Statement, Mr. Kozolchyk explains the circumstances of those instances in extensive detail and explains why he did not make misrepresentations to the Court. (Stmt. 19–27). Nevertheless, the Letter of Referral remarks that, although the Court did not explicitly find Mr. Kozolchyk's statements to be untrue, the Court's "skepticism of those statements is striking," and "[a]t the very least, it shows that Mr. Kozolchyk is comporting himself in a manner that has led multiple judges to distrust his honesty and candor toward the court." (Ltr. of Referral 9).

As for ***Shuman*** (citation *supra*), the Letter of Referral finds that Mr. Kozolchyk's position that no settlement had been reached was not only a frivolous legal argument but also a misrepresentation of fact: "Mr. Kozolchyk presented the Court a self-serving and false account of the facts and circumstances of the case." (Ltr. of Referral 9). The Letter of Referral finds false Mr. Kozolchyk's representation "that the parties had not reached a settlement agreement that would require the Court's scrutiny" because "[i]t defied logic to label the exchange of money for the dismissal of a lawsuit as anything but a settlement agreement." (*Id.*). And it finds his misrepresentation self-serving because his client had already been paid her claimed damages and thus all that was at issue was Mr. Kozolchyk's fees. (*Id.*). In his Statement, Mr. Kozolchyk explains that the view he took of Judge Dimitrouleas's order was based on a misunderstanding of the law,

and Mr. Kozolchyk acknowledges that he was wrong and insists that he was "***not trying to evade Court approval.***" (Stmt. 5–6 (emphasis in original)).

### E. False Statements to Third Persons

Under Rule 4-4.1, "In the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." In ***Shuman*** (citation *supra*), during the negotiation of the settlement agreement, Mr. Kozolchyk represented to opposing counsel that Judge Dimitrouleas allowed dismissals without prejudice without judicial review. (Ltr. of Referral 3). It turns out that Mr. Kozolchyk was relying on a standard order Judge Dimitrouleas issues in FLSA cases but was blatantly misrepresenting the contents of that order. (*Id.* at 3–4). As stated in the Letter of Referral, "[w]hile a lawyer does not have a duty to inform opposing counsel of all relevant facts, Mr. Kozolchyk's misleading explanation of Judge Dimitrouleas's order is equivalent to an affirmative false statement because it caused his opposing counsel to attempt to dismiss an FLSA case without judicial review, in contravention of the law in this Circuit." (*Id.*). The Letter of Referral further finds that "[i]t strains credulity to argue that Mr. Kozolchyk merely misunderstood the clear directions in Judge Dimitrouleas's order, and it appears that these maneuvers were aimed at evading judicial scrutiny of the settlement agreement and his attorney's fees." (*Id.* at 9). In his Statement, Mr. Kozolchyk explains that the view he took of Judge Dimitrouleas's order was based on a misunderstanding of the law, and Mr. Kozolchyk acknowledges that he was wrong and insists that he was "***not trying to evade Court approval.***" (Stmt. 5–6 (emphasis in original)).

Page **11** of **14**

## III. CONCLUSION

The Letter of Referral's conclusion that Mr. Kozolchyk "litigates in the interest of his own fees rather than his client's best interest, which in turn leads to various acts of misconduct in an effort to obtain the greatest fee award possible" (Ltr. of Referral 8) is well-founded with respect to the incidents described above. There is little doubt that, on almost all of the occasions described above, Mr. Kozolchyk violated the above-mentioned Rules of Professional Conduct, with the exception of the suspected misrepresentation to the Court in *Olguin* which, upon closer inspection, appears not to have been a misrepresentation. Unquestionably, Mr. Kozolchyk's misconduct and bad-faith litigation tactics interfered with the Court's administration of justice and wasted the time and resources of the Court, his opposing counsel, the defendants his clients sued, his clients, and even Mr. Kozolchyk himself.

Nevertheless, although the Court has not yet disciplined Mr. Kozolchyk, the disciplinary process seems to have had significant remedial effects on Mr. Kozolchyk's attitude and behavior. Mr. Kozolchyk's Statement and the testimony he gave during his hearing before the Committee show that he accepts responsibility for his actions, that he is sincerely remorseful for the harm he has caused, and that he has been genuinely committed to improving his conduct. According to Mr. Kozolchyk, he has done much self-reflection and has also received counseling from the attorney who helped him at various points during these disciplinary proceedings. It is also notable that Mr. Kozolchyk's practice of law appears to be far less contentious than it used to be. (*See, e.g.* Transcript at pp. 5-9).

The Committee has taken note of the self-improvement Mr. Kozolchyk has demonstrated and believes that, with the right support system, Mr. Kozolchyk can become the better attorney he has said he wants to be. That said, the Committee also acknowledges that the Letter of Referral

appears to have been the impetus for Mr. Kozolchyk's change and that, without the pressure exerted by the disciplinary process, there is an evident risk Mr. Kozolchyk may revert back to his old ways.

Accordingly, the Committee makes the following recommendation of discipline, which is designed to assist Mr. Kozolchyk in his rehabilitation and empower him to become a more professional, ethical, and productive attorney.

## **RECOMMENDATION**

The Committee recommends that Mr. Kozolchyk be ordered to comply with the following requirements:[3]

1.      Take two CLE courses within 60 days of entry of the order by the Court as follows: (1) Episodes 1 through 4 of the "Your Honor Series," hosted by Paul Lipton, and (2) at least 2 hours on federal court practice; and provide an affidavit to the Committee attesting to timely completion of the CLE.

2.      For a period of 12 months from entry of the order by the Court, self-report to the Committee within 72 business hours[4] of the entry of any order or court filing by opposing counsel[5] alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk.

---

[3] It should be noted that a minority of the Committee members suggested other, more significant remedial measures. Those additional measures were not accepted by the majority, but some or all of those suggested measures may become appropriate if Mr. Kozolchyk fails to comply with the above recommendations or suffers a re-lapse in his behavior.

[4] In the Proposed R&R the Committee had suggested 48 business hours and in his Response Mr. Kozolchyk suggested 72 business hours. The Committee accepted his suggestion.

[5] In his Response, Mr. Kozolchyk suggested removing the phrase "or court filing by opposing counsel." The Committee considered his suggestion, but rejected it. Mr. Kozolchyk is concerned that his "cases are often contentious and [that he has] no control over what opposing counsel write in their filings." The purpose of the remedial measures outlined above is to monitor Mr. Kozolchyk's behavior in his cases and to avoid the situation where his behavior rises to the level of the Court entering orders as detailed in Section II. One such filing by an opposing

3.      Prepare and deliver within 30 days from entry of the order by the Court letters of apology to the following members of the Court: Judges Moore, Middlebrooks, Dimitrouleas, Rosenberg, Seitz, Moreno, Seltzer, Goodman, and Strauss; and provide a copy of each letter to the Committee.

4.      Enroll within 60 days from entry of the order by the Court in counseling for anger management for a minimum of 25 hours, with the course to be approved in advance by the Committee.

Dated August 17, 2022                           Respectfully submitted,

                                                _____
                                                William C. Hearon, Esq.
                                                Chair

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of August, 2022, a true and correct copy of the foregoing was served via e-mail to Elliot Ari Kozolchyk, Esq. at ekoz@kozlawfirm.com.

                                                _____
                                                William C. Hearon, Esq.

---

counsel may be insignificant, but more numerous filings by opposing counsel may indicate to the Committee and the Court that Mr. Kozolchyk's previous *modus operandi* of contentiousness has returned.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN RE:
ELLIOT KOZOLCHYK

_____/

### PERSONAL STATEMENT OF ELLIOT KOZOLCHYK
### IN RESPONSE TO LETTER OF REFERRAL TO AD HOC COMMITTEE ON
### ATTORNEY ADMISSIONS, PEER REVIEW AND ATTORNEY GRIEVANCE

Please accept this submission in response to the July 17, 2019, letter of referral ("Letter of Referral") to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee"). In the nearly two years since I was referred to the Committee, hardly a day has gone by when I do not think and worry about the referral and the allegations by two federal judges and what I did that got me into trouble. As a relatively young, solo practitioner (at the time of the referral I had been an attorney for nine years), I was overwhelmed with fear that my practice and my livelihood were at stake. The silver lining was that, over the last two years, I was forced to look inside and figure out how I got here, and how, if I am allowed to continue practicing in Federal Court, I can be the lawyer I need to be.

## INTRODUCTION

First things first. I accept responsibility for the problems I caused. I sincerely apologize for what I did and what I did not do that led to the referral. Through introspection and regular counseling from my attorney, over the last twenty-four months, I have gained a great deal of insight that I promise to apply going forward.

I entered law school immediately after college and graduated in 2009. I started my first job as an attorney in December 2009 working with a solo practitioner in the areas of Wage & Hour and Social Security Disability. In the second half of 2011, I left that firm and worked at another firm practicing Wage & Hour law before starting my firm in 2012.

My firm focuses on helping employees recover their unpaid wages. Over the years, I have handled more than 700 cases involving claims for unpaid wages and estimate that I have helped more than 1,000 people obtain the wages that they are owed.

I live with and take care of two teens ages 17 and 19 that are the biological children of my deceased fiancé. My firm is our sole source of income, and we are financially dependent on it to live. I play piano and compose music. Here are excerpts from my piece, "Hurting Right Hand": https://www.dropbox.com/sh/jju9z6lbbt2elch/AAAjO3NGje21SlJyp-2i5itRa?dl=0.

## ADDRESSING EACH OF THE MATTERS REFERENCED IN THE REFERRAL

Below I provide relevant details in each of the eight (8) cases mentioned in the Letter of Referral that will hopefully help you, the Committee, put my conduct in context, and provide insight into my thought process at the time of my actions.

1



THE FLORIDA BAR'S
EXHIBIT
4

1.  *Shuman v. Treatment Partners of America LLC et al.*, Case No. 18-cv-81609

Plaintiff Felicia Shuman ("Shuman") worked for the defendants as a behavioral health technician and was not paid for the last two weeks of her employment. On November 25, 2018, I filed Shuman's Complaint. On December 6, 2018, Scott Frankel ("Frankel") was served. On December 13, 2018, after Frankel was served, Defendants tendered a check directly to Shuman and not to me.[1] At calendar call, Defendants' counsel incorrectly asserted that "the plaintiff received a payroll check from the employer for $1075.12 on November 9th, 2018" and that "she was paid in the normal course by her company through a payroll check."[2] Defendants did not tender payment until after Shuman's Complaint was filed and Frankel was served. Payment on December 13—41 days after her last day of employment on November 2, 2018—was not payment in the normal course of Shuman's employment.

On March 19, 2019, I initiated efforts to try to settle the case. Before my March 19 email, Defendants' counsel had not tried to settle the case. While the onus to settle a case is the responsibility of both parties and does not lie solely with the plaintiff, *I acknowledge that I should have tried to settle the case sooner.* Fortunately, my delay did not prejudice anyone since I was not actively generating attorney's fees in the case other than filing a motion in limine in accordance with the applicable deadline.

My March 19, 2019, settlement offer agreed to confer in good faith to resolve Shuman's reasonable attorney's fees and costs pursuant to 29 U.S.C. §216(b), and agreed to let the Court determine reasonable fees and costs:



---

[1] "Plaintiff received and accepted payment of alleged unpaid wages by payroll check on or about December 13, 2018." Defendants' Motion to Enforce and Approve FLSA Settlement, ECF No. 29, p. 1. The amount Defendants tendered was $1,075.12—$212.88 less than the value of Plaintiff's claim.
[2] *Shuman Transcript* at 3:6-8, 3:11-12.

2



Defendants' counsel's response opposed Shuman's entitlement to fees and costs, demanded that the case be dismissed with prejudice immediately, and asserted various incorrect statements of facts regarding the timing of payment and representations to Shuman regarding payment.



Thus, this was not a situation where I was demanding unreasonable fees or otherwise preventing the case from resolving. I readily consented to letting the Court determine Shuman's reasonable

3

fees and costs. The initial issue was Defendants declining to agree to pay any fees and costs and, instead, demanding that Shuman's claims be dismissed.

The Eleventh Circuit has held that it does not "authoriz[e] the denial of attorney's fees, requested by an employee, solely because an employer tendered the full amount of back pay owing to an employee, prior to the time a jury has returned its verdict, or the trial court has entered judgment on the merits of the claim." *Dionne v. Floormasters Enters., Inc.*, 667 F.3d 1199, 1206 n. 6 (11th Cir.2012). Accordingly, Defendants' counsel's position on March 21, 2019, that Defendants were not responsible for paying attorney's fees and costs because it previously tendered Shuman a check was incorrect.

I filed Shuman's motion in limine pursuant to the applicable deadlines in the case because the case had not settled and Shuman's claims were not moot. The Eleventh Circuit has held that tendering a check for the value of the claim does not moot the claim if not accompanied by an offer of judgment. *Wolff v. Royal Am. Mgmt., Inc.*, 545 F. App'x 791, 794 (11th Cir. 2013).

In May 2019, the parties agreed to resolve Shuman's fees and costs for $2,500. This amount represented a substantial compromise to the fees and costs I had actually incurred, but I agreed to it to avoid further litigation. The parties agreed that Shuman's claims would be dismissed without prejudice, there would be no written agreement, and Shuman would not receive any additional compensation beyond what she received previously on December 13, 2018. The lack of a written agreement was for two reasons: First, because Shuman was not receiving any additional compensation beyond what she already received six months earlier in December 2018, there was no benefit or consideration for her to agree and contractually obligate herself to any nonmonetary terms. *Second, I thought—in retrospect, erroneously—that avoiding the task of reviewing and finalizing a written agreement would avoid further delay and avoid incurring additional unnecessary attorney's fees.* Thus, the decision to not have a written settlement agreement was because of the absence of consideration to Shuman and to save time and expense.

Because Shuman's claims were being dismissed without prejudice, I believed the dismissal was not subject to the Court's review and approval under *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982). I relied on the following authority, which holds that FLSA claims that are dismissed without prejudice are not subject to judicial review under *Lynn's Food Stores, Inc.*:

- *Kerr v. Powerplay Arcade, Inc.*, No. 6:07–CV–1441–ORL–19KRS, 2007 WL 3307091, at *1 (M.D. Fla. Nov. 6, 2007) (concluding that where "case is being dismissed without prejudice, there will be no final adjudication on the merits" and no settlement or resolution of FLSA claims for the court to review for fairness).
- *Perez-Nunez v. North Broward Hosp. Dist.*, 609 F.Supp.2d 1319, 1320-1321 (2009) ("If the dismissal sought by the Parties were without prejudice, the Court would agree that approval would not be necessary, since Plaintiff would not be foreclosing her ability to vindicate any FLSA claim she may have by refiling at a later time.") (citing *Kerr*).
- ("[N]either the alleged fraud by Defendant nor the alleged fraud by Scott deprived the Plaintiff of his day in court on his FLSA claim, since the claim was dismissed without prejudice, which did not foreclose Plaintiff's ability to vindicate any remaining FLSA claim he may have had"... "[T]here is no public policy requiring court scrutiny of the

4

circumstances surrounding dismissal without prejudice of a FLSA case.") (citing *Perez-Nunez* and *Kerr*).

- *Appleby v. Hickman Const., Inc.*, 2013 WL 1197758 at *1 (2013) ("Where the parties stipulate to dismissal without prejudice, the plaintiff is not foreclosed from refiling any FLSA claim at a later time, and thus, such a stipulated dismissal remains self executing without contravening the FLSA. See *Perez-Nunez v. N. Broward Hosp. Dist.*, 609 F.Supp.2d 1319, 1320–21 (S.D.Fla.2009). But, the FLSA's requirements regarding the compromise of an FLSA claim in the context of a suit brought by an employee dictate that where the parties seek dismissal of an FLSA claim with prejudice, the court must be satisfied that any compromise of FLSA rights is fair and reasonable.")

- *Lopez v. Hayes Robertson Group, Inc.*, 2015 WL 9462968 at *2 (2015)("If dismissal of an FLSA claim is sought with prejudice, then the dismissal would "preclude plaintiff from re-filing her FLSA claim, [and] it cannot be granted without [the] Court's approval.") (quoting *Perez-Nunez* and citing *Bleecher* and *Kerr*).

More recent authority, *Defaite v. Phoenix Complete Auto Care Inc. et al.*, Case No. 19-62518-Smith, ECF No. 21 (S.D. Fla. Jan. 28, 2020), holds the same:

> This is an FLSA case. See ECF No. 1. Because the case is being dismissed without prejudice, there is no final adjudication on the merits, and no settlement or resolution of FLSA claims for the Court to review for fairness. *See Perez-Nunez v. N. Broward Hosp. Dist.*, 609 F. Supp. 2d 1319, 1321 (S.D. Fla. 2009); *Kerr v. Powerplay Arcade, Inc.*, No. 6:07-CV-1441-ORL19KR, 2007 WL 3307091, at *1 (M.D. Fla. Nov. 6, 2007).

I also believed in good faith that the May 2019 resolution of this case was not a settlement because: (1) Shuman's claims were being dismissed without prejudice, (2) Defendants previously tendered unconditionally a check to Shuman six months earlier on December 13, 2018, without any agreement to settle, (3) Shuman was not receiving any additional compensation in May 2019, and (4) there was no written agreement. Additionally, because I believed there was no settlement, I thought the circumstances fit the kind of situation described in the second paragraph below from a standard order Judge Dimitrouleas enters in FLSA cases:

> [A]ny voluntary dismissal or stipulation of dismissal will require the parties to submit a settlement agreement for judicial review and approval. Further, the Court finds that in order to effectuate the Eleventh Circuit's requirement dictated by *Lynn's Food*, even dismissals without prejudice require the Court to review any settlement agreement that has been reached by the parties. *See Lynn's Food*, 679 F.2d at 1352 ("Congress made the FLSA's provisions mandatory; thus, the provisions are not subject to negotiation or bargaining between employers and employees.").

> **The Court recognizes that there may be situations in which the plaintiff chooses to voluntarily dismiss the case, even if there has been no settlement or compromise.**

5

> (1) In that event, the court will require the notice of
> voluntary dismissal to affirmatively state that (a) no
> settlement agreement has been reached, *and* (b) the
> plaintiff has voluntarily chosen to abandon the FLSA
> claims at this time.
>
> (2) The Court will construe such a dismissal to be <u>without</u>
> prejudice, regardless of the language used in the notice.
> Plaintiff will be able to re-file or otherwise pursue the
> claim in the future, subject to the statute of limitations.

*Smith v. Intercoastal Air, LLC et al*, Case 17-cv-61510-Dimitrouleas, ECF No. 4, p. 2 (emphasis added).

Because I thought that the circumstances under which this case was being dismissed did not constitute a settlement, I believed that the second paragraph above applied. *I was wrong and acknowledge that the circumstances under which this case was resolved could be considered a settlement. I was not trying to evade Court approval—I believed that the way this case was being resolved did not meet the definition of a settlement.*

At no point did I deny or conceal from the Court the facts and circumstances regarding the resolution of this case. In three separate filings before calendar call, I informed the Court that I would be receiving payment for fees and costs and that Shuman's claims would be dismissed without prejudice.[3] At no point did I hide from the Court the amount of fees and costs that I was receiving. Nor do I believe that the $2,500 for fees and costs was unreasonable or would not be approved by the Court under *Lynn's Food Stores, Inc.*

*I have since changed my approach because of this case.* In *Defaite v. Phoenix Complete Auto Care Inc. et al.*, Case No. 19-62518-Smith, the plaintiff reached an agreement with the defendants where the plaintiff would dismiss the case in exchange for the defendants reemploying him. To avoid any possibility that the Court might construe this disposition as a settlement, or my conduct as attempting to avoid judicial review, I explained the circumstances in Plaintiff's Unopposed Motion to Dismiss [ECF No. 20]. The Court granted the motion and held that there was no settlement and that the dismissal was not subject to judicial review: "Because the case is being dismissed without prejudice, there is no final adjudication on the merits, and no settlement or resolution of FLSA claims for the Court to review for fairness." *Id.* at ECF No. 21.

Like courts' holdings in *Defaite, Perez-Nunez, Lopez, Bleecher*, and *Appleby*, I believed in *Shuman* that, because the case was being dismissed without prejudice, there was no final adjudication on the merits and no settlement or resolution of FLSA claims for the Court to review for fairness.

*The lesson I learned from this experience, as shown in Defaite, is to err on the side of caution, cast a broad net over what circumstances constitute a settlement subject to judicial review, and request from the courts guidance on whether they will exercise judicial review over FLSA cases that are being dismissed without prejudice.*

---

[3] *See* Notice [ECF No. 27], Response to Order [ECF No. 31], and Stipulation of Dismissal without Prejudice [ECF No. 34].

6

2.   *Soto Aldana v. Audiology Distribution LLC*, Case No. 19-cv-80339

This case took place during the worst period of my life. I filed Plaintiff's Complaint on March 11, 2019, and Defendant was served on March 14, 2019. On April 2, 2019, my fiancé and firm manager passed away unexpectedly five days before our planned wedding. One day later, on April 3, Defendant's counsel requested a 15-day extension of time to respond to Plaintiff's Complaint. I responded that same day informing her of my fiancé's passing and agreeing to the 15-day extension.

On April 17, 2019, Defendant's counsel communicated Defendant's first settlement offer: Defendant agreed to pay the full value of Plaintiff's claim ($4,532.81) plus $1,000.00 total to resolve both Plaintiff's counsel's fees and costs. Defendant's settlement offer was unreasonable because on that date, my total fees were $2,360.00 and costs were $441.00.

That same day, I communicated Plaintiff's first settlement offer:

1. Defendant will pay Plaintiff $4,532.81.
2. Additionally, Defendant will pay Plaintiff's reasonable fees and costs.
3. Once we have an enforceable settlement, I will confer with you in good faith to resolve Plaintiff's fees and costs without the Court's intervention. If we are unable to resolve Plaintiff's fees and costs amicably, I'll seek the Court's determination of Plaintiff's reasonable fees and costs.
4. Dismissal with prejudice conditioned on the Court's retention of jurisdiction to enforce this settlement and award Plaintiff's reasonable attorney's fees and costs.
5. In the event that enforcement of this settlement is sought, the prevailing party shall be entitled to reasonable attorney's fees and costs.

Regarding attorney's fees and costs, this offer followed the language of FLSA's statute, 29 U.S.C. § 216(b): "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

This offer was my attempt to get the case settled immediately without any disagreements between the parties or their counsel regarding attorney's fees and costs standing in the way of a settlement. This offer allowed the parties to resolve Plaintiff's underlying claim immediately, confer on attorney's fees and costs to try to resolve them amicably and without court intervention, and if the parties could not resolve Plaintiff's fees and costs without court intervention, consent to the Court determining Plaintiff's reasonable fees and costs rather than hold up the entire settlement. The offer did not obligate Defendant to pay any more than what was required by the statute. I made this offer five (5) separate times: on April 17, May 3, May 6, May 17 and May 21. Each time, Defendant did not accept the offer and continued litigating the case.

On April 19, while my original April 17 settlement offer was still open, Defendant moved to dismiss Plaintiff's Complaint for not filing a statement of claim pursuant to a court order that required it to be filed by April 12, 2019.[4] I missed the deadline because my fiancé passed away.

---

[4] The statement of claim was previously filed as an exhibit to Plaintiff's Complaint.

Defendant's counsel knew at the time she filed the motion to dismiss that my fiancé passed away. Defendant's counsel did not confer with me about the oversight before filing the motion. Defendant's counsel had an open offer from me at the time to settle for the value of Plaintiff's claim plus reasonable fees and costs to be determined through conferral or by the Court. Defendant's counsel caused more attorney's fees to be incurred by moving to dismiss Plaintiff's case to try to avoid paying any attorney's fees and costs rather than agree to pay reasonable fees and costs.

On May 1, 2019, Defendant's counsel communicated Defendant's second settlement offer: Defendant agreed to pay the full value of Plaintiff's claim ($4,532.81) plus $2,000.00 total to resolve both Plaintiff's counsel's fees and costs. On that date, my total fees were $7,680.00 and costs were $441.00.

On May 22, 2019, Defendant's counsel sent a draft settlement agreement without stating whether Defendant agreed to Plaintiff's May 21 settlement offer. That first draft agreed to pay the full value of Plaintiff's claim ($4,532.81). Additionally, the initial draft had the following language regarding fees and costs, which was acceptable to both Plaintiff and me:

> ADL agrees to pay Plaintiff's reasonable attorney's fees and costs incurred in this action. Counsel for the Parties agree to confer in good faith to reach an agreement on the amount of Plaintiff's reasonable attorney's fees and costs without the need for Court intervention. If counsel for the Parties are unable to reach an amicable agreement on the amount of Plaintiff's reasonable attorney's fees and costs, the Parties agree to move for a determination of reasonable attorney's fees and cost by the Court.

First draft of settlement agreement.

This language regarding fees and costs mirrored the language in Plaintiff's settlement offers. That same day, I emailed back Plaintiff's revisions to the overall settlement agreement.

On June 14, 2019, Defendant's counsel emailed a revised settlement agreement. This third version completely removed any reference to Defendant agreeing to pay Plaintiff's reasonable fees and costs. Instead, Defendant's revised settlement agreement provided that the Court would determine and award attorney's fees and costs to either party:

> The Parties have agreed to settle Plaintiff's claim for unpaid overtime wages, excluding any entitlement to an award to attorney's fees or costs. Liability for and any amount of attorney's fees and costs remain before the Court, including any right to appeal the Court's order on any such motion(s).

Third draft of settlement agreement.

Both my client and I did not believe it was reasonable to agree to a settlement term that left ambiguous whether Defendant would pay Plaintiff's fees and costs and that allowed Defendant to

8

seek attorney's fees and costs against Plaintiff or me. Plaintiff and I had always sought to settle the case with payment of Plaintiff's reasonable fees and costs as mandated by the FLSA, 29 U.S.C. § 216(b).

The Letter of Referral at p. 4 describes the events above as follows:

> The parties agreed to settlement terms as the terms applied to Mr. Kozolchyk's client. Rather than deliver the settlement checks to his client, however, Mr. Kozolchyk took the position that there was no settlement agreement between the parties because the defendant refused to agree that it would not seek sanctions against Mr. Kozolchyk *personally.*

I did not take the position that "there was no settlement agreement between the parties because the defendant refused to agree that it would not seek sanctions against Mr. Kozolchyk *personally.*"

Defendant's first draft of the settlement agreement provided for payment of Plaintiff's reasonable fees and costs—either as agreed to by the parties or as determined by the Court. This was acceptable to both Plaintiff and me. After I returned the second draft with Plaintiff's revisions, Defendant's revised third draft of the settlement completely rewrote that provision to challenge Plaintiff's entitlement to fees and costs and left open that either side may seek attorney's fees and costs against the other. Both my client and I did not believe it was reasonable to agree to a settlement term that allowed Defendant to seek attorney's fees and costs against Plaintiff or me.

Upon receipt of Defendant's revisions to the settlement agreement, in order to prevent the settlement from falling apart and the litigation from protracting further, I sought the Court's intervention in two ways: (1) I filed Notice of Filing Emails and Defendant's Newly-Revised Settlement Agreement [ECF No. 34] where I explained to the Court what happened, and (2) I filed Plaintiff's Motion for Telephonic Status Conference [ECF No. 35]. On June 19, 2019, Magistrate Judge Bruce E. Reinhart conducted the telephonic status conference. During the status conference, Defendant's counsel and I agreed that the settlement agreement would be silent as to attorney's fees and costs. While I did not believe it was reasonable to have the settlement agreement silent as to Plaintiff's attorney's fees and costs, and that is not the way FLSA settlement agreements are normally written, I did not want the case to be protracted any further and this was the only way that Defendant would agree to settle and not continue litigating the case.

This case was very painful for me—both at the time these events were unfolding, and today as I have had to relive them to write this section. This case could have settled April 17 when the parties each exchanged their first settlement offers if Defendant accepted Plaintiff's offer, which included agreeing to confer on Plaintiff's reasonable fees and costs and letting the Court determine reasonable fees and costs if the parties could not agree without the Court's intervention. *But I acknowledge that I could have done things differently. I could have been more flexible in my settlement offers. Although not requested, I could have provided my billing records when Defendant's counsel expressed Defendant's willingness to settle Plaintiff's underlying claim. I could have negotiated my attorney's fees and costs before the parties agreed to a settlement. These are lessons I have learned from this case recently as a consequence of my intense*

*reflection while writing this response. I will incorporate these lessons into my conduct moving forward and try to avoid events like this from repeating in the future.*

### 3. *Mendez v. Model Row Inc. et al.*, Case No. 17-cv-81104

Defendants, Model Row Inc. and Robert Born (collectively "Model Row"), operate a landscaping business. Plaintiff Gonzalo Guillermo Mendez ("Mendez") worked for Model Row as a landscaper and was not paid overtime wages as required by the FLSA. Overtime violations are prolific among landscaping companies. *See, e.g.*, South Florida Landscaping Company to Pay $110,602 in Back Wages To 85 Employees After U.S. Department of Labor Finds Overtime Violations, U.S. Dept. of Labor, https:/www.dol.gov/newsroom/releases/whd/whd20200817 (last visited Jun 1, 2021).

I represented four employees of Model Row because they all retained me for similar claims relating to Model Row's failure to pay proper overtime wages. The lawsuits were separate because each plaintiff came to me at different times. It is not uncommon for an employer to follow the same improper pay practices for multiple employees thereby causing multiple employees to have similar claims.

On October 1, 2017, I filed Mendez's Complaint for unpaid overtime wages and liquidated damages totaling $14,679.88. On February 18, 2018, Model Row served an offer of judgment under Fed. R. Civ. P. 68. On March 5, 2018, on behalf of Mendez, I accepted Model Row's offer of judgment.

The terms of Model Row's offer of judgment were as follows:

1. Defendants to pay to Plaintiff $7,339.94, less proper and applicable deductions and withholdings, representing alleged unpaid overtime wages, per DE 10.
2. Defendants to pay to Plaintiff $7,339.94, representing alleged liquidated damages, per DE 10.
3. Defendants to pay to Plaintiff's counsel $2,142.00, representing payment in full of costs and attorneys' fees through January 14, 2018, per DE 10.
4. Defendants to pay to Plaintiff's counsel additional and reasonable costs, expenses and attorneys' fees, as agreed to by the parties or, in the event the parties cannot agree, as determined by the Court.
5. Acceptance of this offer is conditioned upon the parties execution of a mutually acceptable settlement agreement and releases, as well as the Court's approval of the settlement agreement.
6. Acceptance of this offer is conditioned upon all parties bearing their own costs, expenses and attorneys' fees, except as specifically stated herein.
7. Acceptance of this offer is conditioned upon dismissal with prejudice of this action.

ECF No. 17-1.

After the offer of judgment was accepted, Model Row surprised Mendez with a twenty-four (24) month payment plan of $500 per month. A payment plan was never mentioned in the offer of judgment nor otherwise bargained for or discussed before Mendez accepted Model Row's offer of

judgment. Mendez, therefore, directed me to oppose Model Row's new requirement that Mendez wait two (2) years to be fully paid.

When the Court later required the parties to attend a status conference, Mendez capitulated under the pressure of the courtroom and accepted Model Row's new requirement that Mendez wait two years to be fully paid solely to end continued litigation. Mendez's decision would ultimately prove to be a bad one: Months later, Mendez succumbed to cancer and passed away. Model Row promptly ceased making payments thereby leaving Mendez's widow in a terrible position.

I declined to accept monthly payments for my fees and costs in this case because in prior settlements with these same Defendants, I did accept monthly payments and those were bad experiences: Defendants missed monthly payments several times and their counsel was uncooperative during my subsequent conferrals, which were necessitated by Defendants missing payments. Based on those prior bad experiences, I declined to agree to a payment plan for my fees and costs in this case. When I have no reason to believe that a defendant will default on payment, I routinely agree to receive payment of my fees and costs on a monthly basis.

Regarding the extra three percent because of a credit card, my firm does not have the ability to accept credit card payments. The only way I could accept credit cards as a payment is to request a favor from a colleague at a separate law firm to run the transaction through his firm's payment processor. My colleague charges me three percent to do this.[5] I would have preferred Model Row pay without using a credit card, but that was the only way Model Row would agree to pay me other than a lengthy payment plan.

Rather than decline Model Row's requirement that the form of payment be through a credit card, I instead advised Model Row that it would require me to incur an additional three percent cost that they would need to pay. I explained this to Defendants and they understood it. Defendants still decided to proceed with a credit card payment rather than pay through some other means. I would have accepted some other form of payment without that additional three percent charge that credit card payments require me to incur.

When I advised Model Row that I could not accept credit card payments without an additional three percent charge, Model Row began weeping. At the time I believed Model Row's reaction was intended to gain sympathy from the Court. But, as I write this, upon reflection, I cannot say my initial reaction was correct. Although my sympathies were with Mendez, his widow, and the multiple employees Model Row failed to pay their proper wages, if I had to do it over again, I would not have charged the extra 3%.

4. *Hernandez-Sabillon v. Naturally Delicious, Inc.*, Case No. 15-cv-80812

I attempted to independently record the audio for the deposition. I believed it was prudent to do so based on Defendants' counsel's previous conduct in the case. *I was unaware at the time that doing so was improper.* I did not conceal the fact that I was independently recording the audio of the deposition. The event that immediately preceded me calling Judge Brannon's chambers was that

---

[5] Not that it is exactly the same situation, but under recently amended Florida Bar Rule 4-1.5(h), lawyers are permitted to pass through to their clients the cost of a credit card charge.

Defendants' counsel physically grabbed my cable connecting my microphone to my laptop, and violently yanked my cable out of my laptop's socket, which risked damaging both my cable and my laptop. Defendants' counsel then rolled up my cable around my microphone and refused to return the microphone, which was my property, back to me. Judge Brannon sanctioned both sides. *Recalling this incident embarrasses me. Simply stated, it will never happen again.*

5. *Salvador v. Brico, LLC et al., Case No. 17-cv-61508*[6]

*I acknowledge that I attacked defendants' counsel in this case. Clearly, that was unprofessional. I am sorry. The way I draft my communications and filings today is different from the way I did in 2017 and 2018 when this case was litigated. Today, I try to keep my filings and communications dispassionate, factual, and singularly focused on the relevant issues. When I am attacked by opposing counsel, I focus on the facts and do not reciprocate or engage. This change is the direct result of the Letter of Referral, intense self-reflection, and counseling from my attorney, David Rothman. I am not perfect and this is an ongoing process, but where I am today is very different from where I was at that time.*

At the time, I wrongfully justified my conduct as an appropriate reaction to the regular attacks by defendants' counsel. Even a basic motion for enlargement of time that I filed at one point in the case was met with an excoriating response from defendants' counsel. Now, through a different lens, looking back at my tit-for-tat response to defendant's counsel I realize my reaction only made matters worse. *I no longer react in kind; I strive always to take the high road.*

The plaintiff worked as a car appraiser for a car buying business and filed suit for $12,284.29 in unpaid overtime wages and liquidated damages. The defendants' primary defense was that the plaintiff was exempt from overtime as an outside salesperson. The defendants tenaciously litigated that defense all the way to summary judgment where the Court ruled in the plaintiff's favor and against the defendants. After losing on summary judgment, the defendants moved to stay the case and certify the Court's decision on summary judgment for interlocutory appeal, which the Court denied. At a subsequent status conference, the Court described the inapplicability of the exemption as not a "close call."

The parties then attended a settlement conference with Judge Brannon where the case settled and the terms were stated on the record. After the settlement conference, while the parties were exchanging drafts of the written settlement agreement, the defendants attempted to force the plaintiff to agree to settlement terms that were not previously agreed to at the settlement conference: The defendants required a confidentiality provision even though the Court's Order [ECF No. 4] made clear that "confidentiality provisions are, at best, strongly disfavored in the settlement of FLSA claims." Defendants' counsel also took the position that the defendants did not actually agree to "pay" the liquidated damages, costs, or attorney's fees, and that they intended to reserve their right to appeal the Court's determination of liquidated damages, attorney's fees, and costs.

I respectfully disagree that I took "the position that there was no settlement agreement because defendant expressed its intention to appeal any fee award to Mr. Kozolchyk." Letter of Referral at

---

[6] The same attorney representing the defendants in this case represented the defendants in the *Model Row* case.

p. 5. My position was that there <u>was</u> a settlement and that it did not include confidentiality or a right to appeal the Court's determination of liquidated damages, attorney's fees, and costs. I sought to enforce the parties' settlement by filing the plaintiff's Motion to Enforce Settlement [ECF No. 99].

Judge Brannon's subsequent Report and Recommendation [ECF No. 106] ("R&R") recommended that Defendants' Motion for Status Conference [ECF No. 98] be denied and the plaintiff's Motion to Enforce Settlement [ECF No. 99] be granted, in part, and denied, in part. The R&R reads in part:

> Plaintiff filed the instant Motion, seeking entry of an order enforcing the terms of the parties' settlement agreement as stated on the record at the conclusion of the settlement conference. **Plaintiff's description of the terms of the settlement agreement in paragraph 4 of his Motion is correct.** However, in addition to those terms listed by Plaintiff, the parties agreed to the following basic terms: mutual general release, neutral reference, no rehire, and that the Court retain jurisdiction to enforce the terms of the settlement. DE 104 at 9-10. **Plaintiff is also correct that the parties did not agree to include a confidentiality provision in the settlement agreement.** However, Plaintiff's counsel's interpretation that a full settlement was reached which cannot be appealed is inaccurate. That was not a term of the partial settlement agreement reached. The issues of **liquidated damages and attorney's fees and costs** remain before the District Court, with a right to appeal.

R&R at pp. 1-2 (emphasis added).

Based on my legal research, which I included on pages 3 and 4 of the plaintiff's Motion to Enforce Settlement [ECF No. 99], I believed and argued that the defendants' consent to the Court determining liquidated damages, attorney's fees, and costs without reserving their right to appeal that determination waived their right to appeal that determination. I accept the Court's decision to the contrary. My argument regarding the appeal was intended to stop the defendants from prolonging the case further by preventing them from continuing to litigate the plaintiff's claims (liquidated damages, fees, and costs) on appeal.

Judge Brannon's R&R did not conclude that my argument that the defendants waived their right to appeal liquidated damages, fees, and costs was "without support." Letter of Referral at p. 5. The R&R concluded, "Plaintiff's counsel's interpretation that a full settlement was reached which cannot be appealed is inaccurate." *Id.* at 2. I accept that.

Judge Brannon did not describe my behavior as vexatious. The R&R reads, "[T]he Court warned Plaintiff's counsel that any further litigation on the terms of the settlement agreement <u>would</u> border on vexatious." *Id.* at 2 (emphasis added). There was no further litigation on the terms of the settlement agreement. Judge Brannon was speculating about future litigation that never happened and was not currently before him. The primary cause for Plaintiff's Motion to Enforce Settlement

13

[ECF No. 99] was the defendants' attempting to compel confidentiality, a term which the parties never agreed to as part of the settlement and which contravened the Court's Order [ECF No. 4]. The Court ruled in the plaintiff's favor on that issue and against the defendants so that would not seem to be vexatious litigation on behalf of the plaintiff.

*I apologize for my interactions with the defendants' counsel. I no longer engage opposing counsels when they attack me personally and professionally in communications and filings. I keep my communications dispassionate, factual, and focused on the relevant issues.* This case was not prolonged due to my attorney's fees. The defendants litigated this case to summary judgment based on a defense that the Court denied on summary judgment and described as not a "close call." After the parties agreed to a settlement, I did not take the position that there was no settlement. In contrast, when the parties disagreed on certain terms, I moved to <u>enforce</u> the settlement which the Court granted in part.

6. ***Nelson v. Kobi Karp Architecture & Interior Design, Inc. et al.,*
   *Case No. 17-cv-23600***

This case, and several others mentioned in the Letter of Referral, pertain to unpaid last paychecks. I regularly receive calls from people whose employers refuse to pay their final paychecks.[7] In virtually every FLSA case I file, I attach as an exhibit to the first filing in the case (the Complaint), a Statement of Claim ("SOC"). The SOC itemizes the claim with relevant information, including date ranges, hours worked, rates of pay, and a calculation of the exact amount of wages owed. Some courts require that the plaintiff file a SOC in a subsequent filing in the case, but I voluntarily include the SOC at the very outset of the case. I do this so that the defendants know upfront the claim value and can take immediate action to settle the case if they desire to do so. In cases involving last paychecks, I also regularly include in my settlement offers the option to let courts determine my reasonable attorney's fees. I believed that early disclosure of the claim value combined with agreeing to let the court resolve any disagreements concerning reasonable fees and costs removed any obstacle to early resolution and any reason for protracted litigation.

Plaintiff Gabriella Emily Nelson ("Nelson") worked as a receptionist for Defendants, an interior design business. On March 16-17, 2017, Nelson worked her last two days, which Defendants refused to pay. Two months later, on May 17, 2017, Nelson was still asking Defendants for her last paycheck:

---

[7] I no longer bring cases of this value in federal court. While I continue to believe that employers should not be permitted to refuse to pay their employees their last paycheck, I have come to realize that filing these smaller FLSA claims in Federal Court, where more substantial criminal and civil cases are typically litigated, may be viewed as a burden on scarce judicial resources. In addition, although I know that small FLSA cases matter to the individual employees, I now understand how the disparity between these claims and the resulting attorney's fees can impact my credibility with the courts which can translate into difficulties for my current and future clients.

---

Begin forwarded message:

> **From:** gnels001@gmail.com
> **Date:** May 17, 2017 at 3:28:45 PM EDT
> **To:** jshedd@kobikarp.com
> **Subject:** Last Paycheck
>
> Hi Jon,
> As requested March 16 and March 17 are my last days of work
>
> Thank you
> Emily

---

May 17, 2017, email from Nelson to Defendants requesting her last paycheck after a telephone call.

On October 1, 2017, 4.5 months after Nelson worked her last two days of work, she still had not been paid. I then filed suit for $232 in unpaid minimum wages and liquidated damages. After the lawsuit was filed, Defendants tendered checks to Nelson and offered $1,500 and then $2,000 for attorney's fees and costs. These amounts would not have fully compensated me for the time required in the case including time finalizing the settlement and obtaining court approval.

I offered $3,000 to settle my fees based on my time at the rate of $350 per hour. In addition to the work and time already expended, settling and ending the case still required (1) drafting or reviewing, revising, conferring with Defendants' counsel on, and finalizing the parties' settlement agreement, (2) conferring with Nelson on the terms of the settlement agreement and explaining to Nelson the terms of the settlement agreement, (3) coordinating Nelson's execution and return of the settlement agreement, (4) drafting or reviewing, revising, conferring with Defendant's counsel, and finalizing the parties' joint motion to approve settlement, and (5) possibly repeating the process if the Court did not approve the parties' settlement agreement in its initial form. Defendants rejected the offer and the case did not settle until the settlement conference with the parties agreeing to let the Court determine fees and costs.

In *Munoz v. Kobi Karp Arch. & Interior*, 09-21273-CIV, 2010 WL 2243795, at *1 (S.D. Fla. May 13, 2010), report and recommendation adopted *sub nom. Munoz v. Kobi Karp Architecture & Interior Design*, Inc., 09-21273-CIV, 2010 WL 2243798 (S.D. Fla. June 4, 2010), the same defendants as in *Nelson* once more failed to pay an employee's wages. In that case, the plaintiff's counsel offered to settle plaintiff's fees for $3,500—$500 more than the $3,000 I offered to settle in *Nelson*. In that case, the plaintiff's counsel's $3,500 offer was made when his total fees incurred totaled $1,325—$2,175 less than the fees he offered to bring the case to its conclusion. In *Munoz*, Defendants made similar arguments about the plaintiff's counsel "driving up" attorney's fees, which the Court rejected:

> First, it is worth noting that Plaintiff's Counsel's billing records reflect that when the May 14, 2009, letter was sent to KKA from

15

Plaintiff's Counsel, a total of 3.00 hours had been spent on the case by Attorney Robert S. Norell and a total of 2.80 hours had been spent on the matter by Jon M. Kreger (DE # 27–2).[2] Therefore, at the time Plaintiff's Counsel forwarded the letter requesting $3500.00 in attorney's fees to the Defendants, the Plaintiff's attorney's fees totaled $1325.00, representing $975.00 for Attorney Norell (3 hours x $325.00/hr.) and $350.00 for Jon M. Kreger (2.80 hours x $125.00/hr.) Hence, Counsel for the Plaintiff initially requested that the Defendants settle the attorney's fee portion of the Plaintiff's claim for $2175.00 more than the actual amount of attorney's fees that had been incurred at that point. As such, at first blush, the Defendants' argument that Plaintiff's Counsel merely "drove up" the attorney's fees instead of quickly settling this matter holds some appeal. However, upon closer review of the correspondence between the Parties and the Plaintiff's Counsel's time records, it appears that the Plaintiff's demand for $3500.00 for attorney's fees may have represented the total amount of fees that Plaintiff's Counsel anticipated would be incurred by the time the entire matter was concluded.

*Munoz v. Kobi Karp Arch. & Interior*, 09-21273-CIV, 2010 WL 2243795, at *3 (S.D. Fla. May 13, 2010), report and recommendation adopted *sub nom. Munoz v. Kobi Karp Architecture & Interior Design, Inc.*, 09-21273-CIV, 2010 WL 2243798 (S.D. Fla. June 4, 2010).

As in *Munoz*, my initial offer of $3,000 to settle attorney's fees ($500 less than the $3,500 demanded in *Munoz*) included conservatively the total amount I anticipated would be incurred by the time the entire matter was concluded. In *Munoz*, the court awarded $4,540.00 in fees and costs.

In addition to *Nelson* and *Munoz*, Defendants have been sued for FLSA unpaid wage violations in *Gutierrez v. Kobi Karp Architecture & Interior Design, Inc*, Case No. 17-cv-24637 (settled with $1,000 in fees and costs) and *Cruz v. Kobi Karp Architecture & Interior Design Inc. et al*, Case No. 09-cv-61852 (settled with $4,000 in fees and costs). I was not the plaintiff's attorney for any of these cases except *Nelson*.

As stated *supra*, I no longer bring claims of value similar to *Nelson* in federal court. I have learned that what courts consider a "proportionate" fee is not solely a function of the time required in a case multiplied by the hourly rate. If a claim is below a certain value, some courts interpret a "proportionate" fee to mean a fee for substantially less time than the time actually required to be incurred in a case. *I understand and acknowledge that under that view, I should have accepted Defendants' offer to resolve my fees for $2,000. I believed at the time that the offer was not reasonable because it would not compensate me for all the time necessary to complete the case. I acknowledge that my belief is wrong and that a "proportionate" fee may require a reasonable fee to be less than the time required to complete a case.*

7.     *Batista v. South Florida Woman's Health Associates, Inc. et al.,*
        **Case No. 18-cv-61075**

Like *Nelson*, and for the same reasons, I no longer bring cases of this value in federal court. As discussed more fully below and supported by the sworn Affidavit of Mitzy Batista [ECF No. 38-1], this case involved Defendants' explicit refusal to pay Batista's last paycheck and was not merely a "mistake" as Defendants claimed.

Defendants South Florida Woman's Health Associates, Inc. and Edward D. Eckert (collectively "SFWHA") provide medical services. ECF No. 1, p. 1, ¶ 4. Batista worked as a medical assistant on January 17, 2018. ECF No. 38-1, p. 1, ¶¶ 3-4. SFWHA refused to pay Batista's last paycheck. The facts alleged in the sworn Affidavit of Mitzy Batista [ECF No. 38-1] do not support the conclusion that, "as of twelve days after the complaint was filed, 'Plaintiff's counsel was aware that, at most, a mistake had occurred, which could easily be rectified.'"

On or about February 5, 2018, Defendant Eckert terminated Batista's employment because she missed a day of work. *Id.* at 1, ¶ 7. Batista missed a day of work because her nephew had a medical emergency involving a collapsed lung and Batista had to rush to the hospital to be with him. *Id.*

SFWHA failed to pay Batista's last paycheck via direct deposit. *Id.* at 2, ¶ 10. On or about Tuesday, February 6, 2018, Batista called SFWHA's office, spoke to the receptionist, and asked for her last paycheck. *Id.* at 2, ¶ 8. The receptionist transferred Batista to the SFWHA employee responsible for processing payroll. *Id.* Batista then asked for her last paycheck from the SFWHA employee responsible for processing payroll. *Id.* The SFWHA employee responsible for processing payroll put Batista on hold, and then returned to the telephone and said that Batista would be paid via direct deposit. *Id.*

On or about Friday, February 9, 2018, Batista called SFWHA's office again and spoke to the receptionist. *Id.* at ¶ 9. Batista again asked the receptionist when she would receive her last paycheck. *Id.* **SFWHA's receptionist said that Defendant Eckert was not going to pay her.** *Id.* Batista never received payment for her last paycheck via direct deposit or through any other means. *Id.* at 2, ¶ 10.

On May 13, 2018, Batista sued SFWHA for their failure to pay minimum wages in violation of the FLSA. ECF No.1. Batista claimed $275.50 in unpaid minimum wages plus an equal amount as liquidated damages for a total claim of $551.00. ECF No. 1-3.

On May 25, 2018, Defendant Eckert emailed me denying the allegations in Batista's Complaint. ECF No. 36-2. Defendant Eckert admitted that Batista had called asking for her last paycheck before her lawsuit was filed. *Id.* Defendant Eckert admitted that Batista had not been paid her last paycheck but characterized the non-payment as Batista "not cash[ing] the check." *Id.* Defendant Eckert's email did not make any offer to settle Batista's claims, nor communicate any desire to resolve Batista's claims amicably. *Id.* The email merely offered to send Batista's last paycheck. *Id.*

On June 13, 2018, attorney Ross S. Eckert emailed me on behalf of SFWHA communicating Defendant Eckert's admission that, "there was a miscommunication with the payment." ECF No.

36-3, p. 1. Attorney Eckert, on behalf of Defendant Eckert, admitted that Batista was never paid her last paycheck, but claimed Batista refused her paycheck: "Dr. Eckert says the check payment was offered, but it was not accepted." *Id.* Attorney Eckert claimed that the case can "be easily resolved," but acknowledged only Batista's claim for $551.00. *Id.* Attorney Eckert did not acknowledge Batista's claim for attorney's fees or costs, nor make any settlement offer to resolve any of Batista's claims. *Id.*

Later, on June 13, 2018, Defendant Eckert emailed me offering to settle Batista's claims for the amount she is claiming plus costs, but refusing to pay Batista's attorney's fees: "She should in all fairness pay your fees out of her settlement." ECF No. 35-1, pp. 20-21.

On July 9, 2018, Eckert and I discussed settlement via a telephone call. This was the first telephone call the parties had regarding settlement. Defendants agreed to pay Batista's claim, but refused to pay any fees. I offered to resolve my fees for $2,750, which Eckert rejected, and I then lowered the offer to $2,000, which Eckert also rejected. Again, these offers were not solely to compensate for time incurred through the moment in the litigation when the offer was communicated but instead "the total amount of fees that Plaintiff's Counsel anticipated would be incurred by the time the entire matter was concluded." *Munoz* at *3. I did not believe fees of $2,750 or $2,000 were unreasonable when considering the time required to handle an FLSA case from start to finish.

During that same July 9, 2018, phone call, I also agreed to let the Court determine my reasonable fees. Eckert did not accept any settlement offer. I did not think that those offers were excessive. My additional offer to let the Court determine reasonable fees should have removed any possible disagreement over fees, but Defendants would not agree to pay fees. During the call, Eckert said, "I would rather pay a defense attorney $10,000 than allow a court to determine fees and costs."

I respectfully deny that I "demanded around $3,000 in attorney's fees to settle the matter and refused to settle for less." Letter of Referral at p. 6. My initial offer for fees in Batista was $2,750 and then I reduced the offer to $2,000. The Letter of Referral's citation to ECF No. 37 at 4 supports this: "the fee demand had been reduced from $3,200[2] to $2,000 n. 2: Plaintiff's counsel represents that his fee demand to settle the matter was not $3,200, but $2,750 (DE 28 at 5 n.3)." I also offered to let the Court determine reasonable fees.

On July 11, 2018, Defendant Eckert emailed the following settlement offer: SFWHA agreed to pay Batista's claim for wages ($551), costs ($523), and attorney's fees of $1,100. ECF No. 18-1, p. 4. I did not believe the $1,100 offer for fees was reasonable because it did not compensate all the time required to be incurred in the case.

In response, I emailed a settlement counteroffer that included the same monetary terms communicated on July 9, 2018: i.e., (1) payment of Batista's unpaid minimum wages and liquidated damages totaling $551, (2) payment of Batista's costs totaling $523, and (3) payment of reasonable attorney's fees as determined by the Court. ECF No. 18-1, p. 3. Later, on July 11, 2018, Defendant Eckert accepted the settlement offer in writing via email.

My only offers to resolve fees in this case were $2,750, $2,000, and to let the Court determine reasonable fees. I did not believe these offers were unreasonable given the time necessary to conclude FLSA cases including finalizing settlements and obtaining court approval. Defendants'

18

claim that their failure to pay Batista was an accident is controverted by the sworn Affidavit of Mitzy Batista [ECF No. 38-1]. Once again, based on what occurred in this case and other similarly sized cases, I am no longer bringing claims of this value in federal court.

### 8. *Olguin v. Florida's Ultimate Heavy Hauling LLC et al.*, Case No. 17-cv-61756

Plaintiff Ricardo Jorge Olguin ("Olguin") was employed as a driver and laborer. Defendants Florida's Ultimate Heavy Hauling LLC d/b/a Florida's Ultimate Heavy Hauling & Rigging, Michael Cammarata ("MC"), and Amie Cammarata ("AC") operate a business which transports heavy equipment.

According to the sworn Affidavit of Ricardo Jorge Olguin [ECF No. 31-1] ("O. Aff."), the facts pertaining to Olguin's unpaid last paycheck are as follows: On or about August 24, 2017, Olguin returned Defendants' truck to their facility in Pompano Beach, Florida. Defendants MC and AC were present at the facility at that time. O. Aff. at p. 1, ¶ 3. Olguin dropped off Defendants' cell phone, fuel card, and headset. *Id.* Olguin voluntarily resigned from his employment with Defendants MC and AC at that time. *Id.* When Olguin resigned, MC told Olguin, "You're a piece of s***!" Olguin did not respond and left the facility in his personal car. *Id.*

During Olguin's employment, Defendants normally paid Olguin via direct deposit. *Id.* at p. 1, ¶ 5. On August 25, 2017, Olguin's bank account had a direct deposit payment reversed for the payroll period of about August 19, 2017 through August 25, 2017. *Id.*

After Defendants reversed the direct deposit, and before Olguin's lawsuit was filed, Defendants never paid Olguin any check or other compensation for the last payroll period of Olguin's employment; i.e., from about August 19, 2017 through about August 25, 2017. *Id.* at p. 2, ¶ 6. Defendants never communicated with Olguin, either directly or indirectly, that any check or other compensation was ready or available for the last payroll period of Olguin's employment. *Id.* at p. 2, ¶ 8. Defendants never communicated with Olguin, either directly or indirectly, that Olguin should go pick up any check or other compensation for the last payroll period of Olguin's employment. *Id.* at p. 2, ¶ 9. Defendants simply reversed the direct deposit payment for Olguin's last payroll period of employment and took no other action to compensate Olguin for that period before Olguin's lawsuit was filed. *Id.* at p. 2, ¶ 10.

On September 5, 2017, I filed suit for $11,235.08 allocated as $290.00 in unpaid minimum wages, $5,327.54 in unpaid overtime wages, and $5,617.54 in liquidated damages.

On September 26, 2017, Defendants' counsel initiated communication with me. That first communication did not discuss the merits of Olguin's claims, nor attempt to settle or reach an amicable resolution. Instead, Defendants' counsel's first communication was a "litigation hold" letter that ended with: "[P]lease confirm in writing that you have forwarded a copy of this letter to Olguin so I am not compelled to forward this letter to him directly." I was taken aback by the clearly inappropriate warning.

On October 11, 2017, <u>one day</u> after Defendants filed their answer to Olguin's Complaint, Defendants' counsel filed Defendants' Motion to Bar Direct Solicitation of Potential Plaintiffs [ECF No. 10] ("Motion to Bar") seeking sanctions against me and my disbarment. Two hours

19

before Defendants' Motion to Bar was filed, Defendants' counsel sent a "Declaration of Glenn
Pryor" alleging that someone identifying himself as an attorney had solicited one of Defendants'
former employees from a blocked phone number.[8] Defendants' counsel and I then discussed
Defendants' allegations during a phone call. I unequivocally denied making the alleged phone call
or being involved in any way with the alleged communication. Defendants' counsel demanded that
I produce my phone records. I declined. Less than two hours after the phone conversation,
Defendants' counsel filed Defendants' Motion to Bar. During the May 24, 2018, evidentiary
hearing, Defendants' counsel admitted that he "may have" had the motion already drafted before
the telephone call with me even happened.[9]

Among other relief, Defendants' motion requested an evidentiary hearing, sanctions including an
award of Defendants' attorney's fees and costs, and that I be disciplined pursuant to S.D. Fla. L.R.
Rules Governing Discipline of Attorneys, which includes (1) disbarment, (2) suspension, (3)
reprimand, (4) monetary sanctions, (5) removal from this Court's roster of attorneys eligible for
practice before this Court, or (6) any other sanction the Court may deem appropriate.

During subsequent communications, Defendants' counsel rebuffed my requests for additional
information: he claimed that he did not have the screenshot of Glenn Pryor's cell phone call log
showing the alleged phone call, could not obtain the screenshot of Glenn Pryor's cell phone call
log showing the alleged phone call, refused to produce the telephone records of Glenn Pryor
showing the alleged telephone call, and claimed he did not have Glenn Pryor's telephone number.[10]

On October 26, 2017, Defendants sent a courier to my office. Defendants' counsel made no
appointment, advance arrangements, nor gave prior notice that Defendants were making any sort
of delivery. Neither I, nor anyone employed by my law firm, was in the office at the time of
Defendants' surprise delivery. The receptionist in my office building is not an employee or
subcontractor of my law firm.[11] The receptionist can receive deliveries but is not authorized to sign
anything on behalf of me. The courier refused to deliver the package because the receptionist
would not sign a document. Neither the receptionist nor I refused any delivery. Later that day,
Defendants' counsel sent a letter claiming that I "refused" Defendants' paychecks to Olguin. At
no point before, during, or immediately after the surprise delivery did Defendants communicate
any desire or intention to settle Olguin's claims.[12]

---

[8] During the subsequent evidentiary hearing held on May 24, 2018, before Magistrate Judge Goodman, Mr. Pryor
contradicted his prior declaration and testified that the alleged caller did not say he was a lawyer, but instead the caller
"had to be a lawyer" by "the way he was talking." ECF No. 86-3, ECF No. 86-3, *Hearing Transcript* at 19:20-20:2.
[9] ECF No. 86-3, *Hearing Transcript* at 63:13-64:25. Defendants' counsel testified under oath that he would have
drafted the motion before the telephone call because he "heard about me" from "[t]he majority of the defense bar in
South Florida." *Id.* at 64:7-10. Defendants' counsel testified <u>under oath</u> that he could not remember a single name of
any attorney he allegedly talked to. *Id.* at 64:13-20.
[10] ECF No. 17-2.
[11] The receptionist is employed by another law firm in the office building.
[12] Defendants' counsel repeated his misrepresentation that I "refused" Defendants' paychecks to Olguin in (1)
Defendants' Response to Plaintiff's Statement of Claim [ECF No. 21, p. 2, ¶ 3], (2) Defendants' Answer to Plaintiff's
Original Complaint [ECF No. 25-1, p. 5, ¶ 21], (3) Defendant's Response to Plaintiff's Motion to Strike Defendant's
Affirmative Defenses [ECF No. 38, p. 1, ¶ 1], (4) Defendants' Response to Plaintiff's Motion for Leave to file Motion
for Summary Judgment on Defendants' Fourth Affirmative Defenses [ECF No. 55, p. 2, ¶ 1], (5) Defendants'
Response to Plaintiff's Motion for Entry of Order Approving Settlement Agreement, for Leave to File Motion for
Attorney's Fees and Bill of Costs [ECF No. 70, p. 11, ¶ 10], and (6) Defendants' Response to Plaintiff's Motion for

Throughout this case, Defendants rejected Olguin's multiple settlement offers to pay his claim for unpaid minimum wages and allow the Court to determine Olguin's reasonable fees and costs. Before June 12, 2018, Defendants' only settlement offers required Olguin to agree to recover no fees or costs or required Olguin to agree to allow Defendants to recover their fees and costs. This case settled on June 12, 2018, the deadline for filing the parties' joint pretrial stipulation. Defendants refused to pay any attorney's fees during the entire lawsuit. Before that date, Defendants rejected multiple settlement offers by Olguin to allow the Court to determine Olguin's reasonable fees and costs.

On March 12, 2018, at 1:14 p.m., I emailed Defendants' counsel offering to settle for $783.00, which represented Olguin's claim for unpaid minimum wages without any compensation for Olguin's overtime claim, plus attorney's fees and costs to be determined by the Court. Defendants did not respond. Instead, at 8:20 p.m., Defendants filed their Motion for Summary Judgment [ECF No. 30].

Absent from this chronology so far is mention of any effort by Defendants to settle this case. That is because none existed. No Fed. R. Civ. P. 68 offers of judgment were ever made either. Thus, from the beginning of the case all the way through Defendants' Motion for Summary Judgment [ECF No. 30], Defendants gave Olguin no option that would allow him to resolve his claims.

On May 18, 2018, I tried again to settle this case:



Entry of Order Approving Settlement Agreement, for Leave to File Motion for Attorney's Fees and Bill of Costs [ECF No. 72, p. 5, ¶ 10].

Defendants responded refusing to allow the Court to determine Plaintiff's reasonable attorney's fees, even with Defendants reserving all rights to argue that Plaintiff is not entitled to recover any attorney's fees and costs. Defendants would only agree to settle if Plaintiff agreed to waive his right to recover attorney's fees.

On May 24, 2018, Magistrate Judge Goodman held an evidentiary hearing on Defendants' Motion to Bar in which Pryor, Defendants' counsel, and I testified. In the courtroom, but before the hearing began, Defendants' counsel reviewed documents with Pryor to help "prepare him" to give testimony at the hearing.[13] These documents had not been produced to me at any time before the hearing. At the hearing, Defendants' counsel refused my requests to see the documents, produce the documents, or disclose what were the documents. Only after Judge Goodman ordered Defendants' counsel to produce the documents to me did Defendants' counsel comply:

> THE COURT: So let's not play games, sir. If opposing counsel asks you to look at the documents and you know you are going to use them either to introduce them or show the witness the documents to refresh his recollection, then show them to the opposing lawyer upon request. So we are now going to have to take a few minutes for plaintiff's counsel to review the documents which maybe, who knows, maybe you should have sent over weeks ago in response to his request or maybe earlier this morning. We are all going to wait for as long as it takes for Mr. Kozolchyk to review those documents.

ECF No. 86-3, *Hearing Transcript* at 9:19-10:4.

Defendants' counsel's billing records later revealed that he met with Pryor on May 23, 2018—the day before the hearing—to prepare him:

| 05/23/18 | K. Kolb | 4.40 | Prepare for hearing tomorrow. Meet with G Pryor to prepare him for hearing. |
|---|---|---|---|

Defendants' billing records, DE 89-7, p. 32.

During the hearing, Pryor testified that he was able to recognize my voice from the brief communication between counsel that occurred before the hearing began.[14] Pryor testified that my voice matched the voice he heard during the single alleged phone call that took place on September 19, 2017.[15] The alleged call at issue occurred more than eight months earlier and lasted 1 minute and 46 seconds.[16] Pryor testified that, at the time of the phone call, Pryor was working as a truck

---

[13] Defendants' counsel represented to the Court at the hearing that the documents he was reviewing with Pryor were to help "prepare him" for his testimony at the hearing. ECF No. 86-3, *Hearing Transcript* at 7:18-8:1.
[14] ECF No. 86-3, *Hearing Transcript* at 25:19-24.
[15] Pryor's undated and digitally-signed declaration (ECF No. 10-1) submitted in support of Defendants' Motion to Bar claims the phone call occurred on September 14, 2017—not September 19, 2017, as Pryor testified to at the evidentiary hearing.
[16] ECF No. 86-3, *Hearing Transcript* at 26:24-27:3.

driver and was out of drive time for the day,[17] aggravated,[18] tired,[19] about to go to sleep,[20] and did not want to be bothered.[21]

I testified under oath unequivocally that I never spoke to Pryor before,[22] never had any prior phone conversation with Pryor,[23] and did not know Pryor.[24] I produced the phone records for my law firm,[25] the phone records for my cell phone,[26] and the phone records for both cell phones of my office manager and fiancé.[27] Neither I, nor my office manager and fiancé, own any other phones. All the phone records showed no phone call near the date and time that Pryor alleged that a phone call took place.[28]

In a later report and recommendation, Magistrate Judge Goodman raised a theory that no one had argued at any point during the evidentiary hearing or the whole litigation:

> The phone records from Kozolchyk's office did not show a telephone call to Pryor at 11:22 a.m., the time reflected on Pryor's phone records for incoming calls. [ECF No. 52, p. 17:17-24]. Pryor testified that he was in Vance, Alabama when the telephone call at issue was received. The Undersigned takes judicial notice that Vance, Alabama is in the central time zone, which means that it is one hour earlier there than in South Florida, where Kozolchyk's office is located. Therefore, a phone call from South Florida (if that is where it was made) that Pryor received in Alabama at 11:22 a.m. would have been made from South Florida at 12:22 p.m. (because of the time zone difference). **The phone records submitted by Kozolchyk did not include calls after 12:00 p.m., however.**

ECF No. 104, p. 20 (emphasis added).

Notably, the phone records I submitted <u>did</u> include calls after 12:00 p.m. and showed that there was no call from my office, cell phone, nor the cell phones of my office manager and fiancé at either 11:22 a.m. or 12:22 p.m.:

---

[17] *Id.* at 18:2-10.
[18] *Id.* at 19:3-4, 19:8.
[19] *Id.* at 16:11, 19:3, 19:9.
[20] *Id.* at 16:4-5, 18:2-14.
[21] *Id.* at 19:5.
[22] *Id.* at 36:25-37:3.
[23] Id.
[24] *Id.* at 32:12-17.
[25] ECF No. 45-1.
[26] ECF No. 45-2.
[27] ECF No. 45-3.
[28] Pryor testified that the phone call occurred on September 19, 2017, at 11:22 a.m., and lasted 1 minute and 46 seconds. ECF No. 86-3, *Hearing Transcript* at 26:24-27:3. My law firm phone records show no calls on September 19, 2017, from 11:11 a.m. through 11:53 a.m. My cell phone records show no calls on September 19, 2017, until 11:54 a.m. My office manager and fiancé's cell phones show no calls whatsoever on September 19, 2017.



My office phone records showing no calls on September 19, 2017, around 12:22 p.m., ECF No. 45-1 at p. 2.

| Koz Law Call Group | Out | Sep 19 2017 | 11:54 AM | ░░░9984 | 102 | $0.00 | 00:00:00 |
| Koz Law Call Group | In | Sep 19 2017 | 11:54 AM | ░░░9984 | 1-786-924-9929 | $0.00 | 00:00:07 |
| LJ | Out | Sep 19 2017 | 11:10 AM | ░░░9978 | 786-227-4619 | $0.00 | 00:01:12 |
| LJ | Out | Sep 19 2017 | 10:28 AM | ░░░9978 | 305-785-5577 | $0.00 | 00:01:23 |
| LJ | In | Sep 19 2017 | 10:21 AM | ░░░0568 | 1-954-283-9978 | $0.00 | 00:02:08 |

My office phone records showing no calls on September 19, 2017, around 11:22 a.m., ECF No. 45-1 at p. 4.

| Sep 18 | 8:01 PM |
| Sep 19 | 11:54 AM |
| Sep 19 | 11:59 AM |
| Sep 19 | 12:01 PM |
| Sep 19 | 12:14 PM |
| Sep 19 | 12:54 PM |

My cell phone records showing no calls on September 19, 2017, around 11:22 a.m. and 12:22 p.m., ECF No. 45-2.

| Sep 08 | 01:24 pm | | AU | 01.00 |
| | 04:17 pm | | AU | 01.00 |
| Sep 17 | 08:52 pm | | NW/AU | 01.00 |
| Sep 21 | 07:23 pm | | AU | 01.00 |
| Sep 22 | 04:23 pm | | AU | 01.00 |

| Sep 15 | 03:27 pm | | AU | 01:00 |
| | 04:52 pm | | AU | 01:00 |
| | 05:00 pm | | AU | 01:00 |
| | 05:37 pm | | AU | 01:00 |
| Sep 16 | 05:06 pm | | NW/AU | 02:00 |
| | 05:08 pm | | NW/AU | 03:00 |
| | 05:53 pm | | NW/AU | 01:00 |
| Sep 20 | 03:21 pm | | AU | 02:00 |
| | 04:17 pm | | AU | 01:00 |
| | 05:02 pm | | AU | 01:00 |
| Sep 21 | 07:24 pm | | AU | 01:00 |
| | 07:26 pm | | AU | 01:00 |

My office manager and fiancé's cell phone records showing no calls on September 19, 2017, around 11:22 a.m. and 12:22 p.m., ECF No. 45-3.

Additionally, as Magistrate Judge Goodman noted in a report and recommendation:

> The hearing revealed that defense counsel's paralegal had obtained a report containing the following information about Plaintiff's counsel: his social security number, his date of birth, the phone carrier that provides service to him, the names of several individuals with his same last name who may be relatives, the name of his office manager/paralegal and her social security number and date of birth. [ECF Nos. 44-1; 52, pp. 68-69]. Defense counsel said that he did not know whether his paralegal accessed the information in the report in accordance with applicable law. [ECF No. 52, p. 70].

Report and Recommendations on Plaintiff's Motion to Approve Settlement Agreement [ECF No. 81, p. 4].

On May 25, 2018, the Court entered its Post-Evidentiary Hearing Administrative Order [DE 43], which directed the parties to "make an earnest effort to resolve Defendants' [Motion to Bar] and the entire case."[29] Filed at ECF No. 86-7 are the emails exchanged between counsel in furtherance of that directive. Importantly, Defendants refused to settle unless Plaintiff either agreed to waive any right to fees or agreed to allow Defendants to seek their fees. These discussions also show Defendants repeatedly attempting to avoid the Court's approval of the settlement, which is required for Plaintiff's right to recover fees and costs in any settlement.

On June 2, 2018, I began conferring with Defendants' counsel on Plaintiff's Motion *In Limine*. On June 12, 2018, I sent Defendants a proposed joint pretrial stipulation in compliance with the Court's deadline.[30]

---

[29] *Id.* at pp. 1-2.
[30] The Court required the parties to file their joint pretrial stipulation no later than June 12, 2018. *See* Order Setting Civil Trial Date and Pretrial Deadlines [ECF No. 13].

On June 12, 2018, apparently after realizing that this case was proceeding to trial, Defendants' counsel called me and, for the first time, agreed to settle Plaintiff's claims without requiring (1) Plaintiff to waive his right to recover attorney's fees, (2) Plaintiff to agree to Defendants recovering their attorney's fees, or (3) Plaintiff to agree to forego the Court's approval of the settlement, which is required for Plaintiff's right to recover fees and costs. As agreed during the phone call, the settlement was memorialized via emails between counsel filed at ECF No. 86-8.

My subsequent efforts to confer with Defendants' counsel on a formal written settlement agreement spanned 22 emails and were unsuccessful.[31] In those emails, Defendants' counsel took several differing and contradictory positions including that: (1) there was no settlement and, therefore, no Court approval was necessary because Plaintiff's minimum wage claim was being paid in full,[32] (2) Defendants were entitled to seek their attorney's fees against Plaintiff as a term of the settlement,[33] and (3) there was no settlement because the settlement terms do not contain every material term.

On July 3, 2018, Plaintiff moved for the Court's approval of the email exchange between counsel at ECF No. 86-8 as an enforceable settlement.[34] Defendants opposed Plaintiff's motion[35] and argued against the Court's approval of the parties' settlement: "*Wolff v Royal American Management* notwithstanding, there would not seem to be anything to approve as a practical matter and nothing for the Court to oversee regarding a 'settlement' as Defendants unconditionally tendered the full amount of Plaintiff's alleged minimum wages and liquidated damages on June 12, 2018."[36]

On September 6, 2018, Judge Goodman entered his Report and Recommendations on Plaintiff's Motion to Approve Settlement Agreement [ECF No. 81] recommending that Plaintiff's motion for approval of the parties' settlement be granted.

On September 28, 2018, the Court entered its Order Adopting Report and Recommendation [DE 82], which adopted Judge Goodman's report and recommendation, granted Plaintiff's motion to approve settlement, and approved the parties' settlement agreement in accordance with *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982).

---

[31] Those emails were previously filed at ECF No. 67-1 to Plaintiff's Motion for Entry of Order Approving Settlement agreement, for Leave to File Motion for Attorney's Fees and Bill of Costs, and Incorporated Memorandum of Law [ECF No. 67].

[32] *See* ECF No. 61, p. 1, ¶ 1. This was a transparent effort by Defendants' counsel to try to deprive the Court of jurisdiction to award Plaintiff's attorney's fees and costs.

[33] Plaintiff has never agreed that Defendants are entitled to any attorney's fees, and Plaintiff has never agreed to pay Defendants' fees as a term of the settlement. When asked what basis Defendants were relying on to support their belief that they were entitled to recover their attorney's fees post-settlement, Defendants' counsel cited *Goss v Killian Oaks House of Learning*, 248 F.Supp.2d 1162, 1168 (S.D. Fla. 2003). *See* DE 67-1, email from Defendants' counsel sent Monday, July 2, 2018 at 3:56 pm. Plaintiff strongly disagrees that Defendants are entitled to recover their attorney's fees, and further disagrees that *Goss* supports Defendants' position.

[34] Plaintiff's Motion for Entry of Order Approving Settlement agreement, for Leave to File Motion for Attorney's Fees and Bill of Costs, and Incorporated Memorandum of Law [ECF No. 67].

[35] "Defendants respectfully request that the Court deny Plaintiff's Motion for the reasons argued above..." ECF No. 72, p. 7.

[36] ECF No. 72, p. 5, ¶ 8.

The *Olguin* case was difficult because Defendants' counsel defined the litigation early when he sought sanctions and my disbarment one day after Defendants' answer was filed based on allegations that were highly defamatory and completely false. I produced phone records for my office, my cell phone, and my office manager and fiancé's cell phones—all of which show that no such call from me took place. I testified under oath at the evidentiary hearing and denied unequivocally that I had anything to do with any alleged call to Pryor.[37]

## ADDRESSING REFERRAL LETTER SECTION IV (PATTERN OF BEHAVIOR)

I acknowledge it is accurate that "[i]n numerous instances described above, Mr. Kozolchyk has continued litigating cases after the defendant has offered or sent his client the full value of their claim." Letter of Referral at p. 8. But those instances were when the defendants would not agree to pay reasonable fees or agree to let the courts determine reasonable fees. The Eleventh Circuit does not "authoriz[e] the denial of attorney's fees, requested by an employee, solely because an employer tendered the full amount of back pay owing to an employee, prior to the time a jury has returned its verdict, or the trial court has entered judgment on the merits of the claim." *Dionne v. Floormasters Enters., Inc.*, 667 F.3d 1199, 1206 n. 6 (11th Cir.2012). *Half the cases identified involve claims for last paychecks with low values. I no longer bring these claims in federal court. Additionally, I am more flexible when negotiating settlements. If defendants express a willingness to pay the plaintiffs' claims but will not agree to pay my attorney's fees and will also not agree to let the court determine reasonable fees, I will voluntarily provide my billing records.*

I admit that I continue to fight for payment of my clients' claims, costs and my fees. I often have reduced my fees to close cases. But I cannot continue to represent clients with valid claims against employers under the FLSA unless I get paid for my services. Respectfully, I do not "generate unnecessary work" in cases to "later request attorney's fees for the additional time spent."[38] Plaintiffs in FLSA cases are not entitled to recover attorney's fees unless and until they become the prevailing party. Where a defendant tenders a check, but refuses to pay any fees, or will not agree to pay reasonable fees, and will not agree to let the court determine reasonable fees, I am forced to continue litigating the case to ensure the plaintiffs prevail on their claims. The Eleventh Circuit decision *Dionne* makes clear that defendants cannot simply tender a check and not be responsible for paying plaintiffs' reasonable fees. If defendants could end cases by merely agreeing to pay the plaintiffs' claims without also agreeing to pay the plaintiffs' attorney's fees, there would be no attorneys willing to represent plaintiffs in FLSA cases.

I disagree with the conclusion that I made material misrepresentations to the Court or opposing counsel to avoid judicial scrutiny of any settlement agreement.

---

[37] In the Referral Letter, at p. 8, it is noted that "Magistrate Judge Lurana S. Snow now recuses in all cases where Mr. Kozolchyk is counsel." My understanding is that she does so because her former career law clerk's husband shares the adjacent office space as my law firm.

[38] In *Shuman*, I accepted and was paid $2,500 inclusive of my costs. I had much more time and costs in the case than what I accepted. I filed the motion in limine because I was obligated to comply with the Court's deadlines. Additionally, because Defendants at the time had refused to pay my fees, I was required to establish Plaintiff as the prevailing party. In that case, I initiated settlement discussions—not Defendants. My initial communication offered to confer on attorney's fees to try to resolve them amicably and without the Court's intervention and agreed to let the Court determine reasonable fees if we could reach agreement. Defendants' counsel responded demanding the case be dismissed with prejudice without payment of any fees or costs.

In *Shuman*, again, the fees and costs Defendants agreed to pay, and I accepted, totaled $2,500. This amount represented far less than the time and costs I incurred in the case. At no point did I deny or conceal from the Court the facts and circumstances regarding the resolution of this case. In three separate filings before calendar call, I informed the Court that I would be receiving payment for fees and costs and that Shuman's claims would be dismissed without prejudice.[39] At no point did I hide from the Court the amount of fees and costs that I was receiving. Nor do I believe that the $2,500 for fees and costs was unreasonable or would not be approved by the Court under *Lynn's Food Stores, Inc.*

As discussed *supra*, I believed in good faith that the May 2019 resolution of the *Shuman* case was not a settlement. Because Shuman's claims were being dismissed without prejudice, I also believed the dismissal was not subject to the Court's review and approval under *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982) in reliance upon *Perez-Nunez, Lopez, Bleecher*, and *Appleby, supra. See also Defaite v. Phoenix Complete Auto Care Inc. et al*, Case No. 19-62518-Smith, ECF No. 21. I acknowledge that I was wrong and that the circumstances under which this case was resolved could be considered a settlement. However, I was not trying to evade Court approval. The fact that I was receiving a nominal amount for fees and costs was never hidden from the Court.

I did not misrepresent Judge Dimitrouleas's standard FLSA order to opposing counsel. I explained that there are numerous cases holding that dismissal without prejudice is not subject to judicial review under *Lynn's Food Stores, Inc.*, and that Judge Dimitrouleas's standard FLSA order discusses situations involving dismissals without prejudice where there are no settlements. Defendants' counsel specifically said at calendar call that they did their own research and agreed with my analysis: "We went back, we analyzed *Lynn Foods*, we agreed with that analysis." When discussing Judge Dimitroulas's standard FLSA order at the calendar call, the representations I made to the Court were as follows:

> He has a standing order that comes out that talks about situations where there is dismissal without prejudice. It's a standard order he enters in FLSA cases.... Well, I'm going off of my memory right now, so I certainly don't have a verbatim recollection of it. I'm tremendously paraphrasing here, but basically something to the extent that, the Court recognizes situations where a case may be dismissed without a settlement or without prejudice, something to that effect. But please don't hold me to it, because I don't recollect it.

Judge Dimitrouleas's standard FLSA order does discuss situations where a plaintiff chooses to voluntarily dismiss the case without prejudice and where there has been no settlement or compromise. For the reasons mentioned above, I believed *Shuman* represented that kind of situation. I acknowledge that I was wrong and that the circumstances under which this case was resolved could be considered a settlement. But I did not misrepresent to the Court during calendar call Judge Dimitrouleas's standard FLSA order. I made clear that I was paraphrasing and going

---

[39] *See* Notice [ECF No. 27], Response to Order [ECF No. 31], and Stipulation of Dismissal without Prejudice [ECF No. 34].

off my memory, but that the Court recognizes situations where "a case may be dismissed without a settlement or without prejudice, something to that effect." The part I was referring to was this:

> The Court recognizes that there may be situations in which the plaintiff chooses to voluntarily dismiss the case, even if there has been no settlement or compromise.
>> (1) In that event, the court will require the notice of voluntary dismissal to affirmatively state that (a) no settlement agreement has been reached, *and* (b) the plaintiff has voluntarily chosen to abandon the FLSA claims at this time.
>> (2) The Court will construe such a dismissal to be <u>without</u> prejudice, regardless of the language used in the notice. Plaintiff will be able to re-file or otherwise pursue the claim in the future, subject to the statute of limitations.

*Smith v. Intercoastal Air, LLC et al*, Case 17-cv-61510-Dimitrouleas, ECF No. 4, p. 2 (emphasis added).

Judge Dimitrouleas's order does direct that "dismissals without prejudice require the Court to review any <u>settlement agreement</u> that has been reached by the parties." For the reasons discussed above, I believed there was no settlement agreement and, therefore, *Shuman* fit into the second category described in the order—dismissals without prejudice where there are no settlements. I have never knowingly or deliberately made misrepresentations to any court, nor would I ever do that.

## CONCLUSION

Within the span of four months from April 2019 through July 2019, I lost my fiancé, I was sanctioned more than $30,000 in *Olguin*, I endured the defendant's counsel's conduct in *Soto Aldana*, and I received the Letter of Referral. That was the worst period in my life. These past two years while the Letter of Referral has remained pending have been extraordinarily difficult for my family and me.

In February 2020, I traveled to Tallahassee and attended a Florida CLE on practicing with professionalism. I have undergone counseling with my attorney, David Rothman. I have engaged in intensive self-reflection to learn from my past mistakes and to avoid repeating them in the future. I am not perfect and this is an ongoing process, but where I am today is very different from where I was at that time. When I am attacked by an opposing counsel, I do not react in kind and I strive always to take the high road. Today, I keep my filings and communications dispassionate, factual, and singularly focused on the relevant issues.

Respectfully submitted,

Elliot Kozolchyk

29

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**ADMINISTRATIVE ORDER 2022-94**
**CASE NO. 20-MC-21879**

IN RE:  **ELLIOT ARI KOZOLCHYK**
       **FLORIDA BAR # 74791**

_____/

FILED BY_____CW_____D.C.

*Oct 28, 2022*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIA

## ORDER ON FINAL REPORT AND RECOMMENDATION

On July 17, 2019, then-Chief Judge Moore, at the request of Judges Donald M. Middlebrooks and Robin L. Rosenberg, submitted a letter of referral [ECF No. 1] to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance to investigate the conduct of attorney Elliot Ari Kozolchyk.  Following that referral and a hearing before the Committee, the Committee issued a Proposed Report and Recommendation [ECF No. 7] on August 15, 2022, giving Mr. Kozolchyk 14 days to respond in accordance with Rule 6(c)(2)(B)(ii) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys.  Mr. Kozolchyk filed a Response to Report and Recommendation [ECF No. 8], on August 16, 2022; and the Committee submitted a Final Report and Recommendation [ECF No. 9] to the Court on August 17, 2022.

An Order to Show Cause [ECF No. 10] was issued on August 30, 2022, giving Mr. Kozolchyk an opportunity to respond to the Final Report and Recommendation.  Mr. Kozolchyk filed his response [ECF No. 11], indicating his acceptance of the Committee's recommendations.

Pursuant to Rule 6(c)(2)(B)(v) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys, Local Rules of the United States District Court for the Southern District of Florida, the Undersigned submitted this matter to the Court for its



THE FLORIDA BAR'S
EXHIBIT
5

Case 0:24-cv-60984-PAB   Document 101-4   Entered on FLSD Docket 01/09/2026   Page 191 of
362
Case 1:20-mc-21879   Document 12   Entered on FLSD Docket 10/28/2022   Page 2 of 3

consideration at a regularly scheduled Judges' Meeting held on October 6, 2022. Upon review of the Final Report and Recommendation, response, and attachments, by unanimous vote of all District Judges and Senior District Judges eligible to vote, the Court approved and adopted the Committee's Final Report and Recommendation in full.

Given this background, in accordance with Rule 6(c)(2)(B)(v) and the Court's inherent power to regulate membership in its bar for the protection of the public interest, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it."),

**IT IS ORDERED** that the Committee's Final Report and Recommendation is **ADOPTED**, and the matter is **CLOSED**.

**IT IS FURTHER ORDERED**, consistent with the Final Report and Recommendation, as follows:

1. Mr. Kozolchyk is required to take two CLE courses within 60 days of entry of this Order as follows: (1) Episodes 1 through 4 of the "Your Honor Series," hosted by Paul Lipton, and (2) at least 2 hours on federal court practice; and provide an affidavit to the Committee attesting to timely completion of the CLE.

2. For a period of 12 months from entry of this Order, Mr. Kozolchyk must self-report to the Committee within 72 business hours of the entry of any order or court filing by opposing counsel alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk.

3. Within 30 days from entry of this Order, Mr. Kozolchyk shall prepare and deliver letters of apology to Judges Moore, Middlebrooks, Dimitrouleas, Rosenberg, Seitz, Moreno,

2

Goodman, Strauss; and retired Magistrate Judge Seltzer; and provide a copy of each letter to the Committee.

4. Within 60 days from entry of this Order, Mr. Kozolchyk shall enroll in counseling for anger management for a minimum of 25 hours, with the course to be approved in advance by the Committee.

**DONE AND ORDERED** in Miami, Florida, this 28th day of October, 2022.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

c:     All Miami Eleventh Circuit Court of Appeals Judges
       All Southern District of Florida District Judges
       All Southern District of Florida Bankruptcy Judges
       All Southern District of Florida Magistrate Judges
       United States Attorney
       Circuit Executive
       Federal Public Defender
       Clerks of Court – District, Bankruptcy and 11th Circuit
       Florida Bar and National Lawyer Regulatory Data Bank
       Library
       William C. Hearon, Chair, Ad Hoc Committee on Attorney Admissions, Peer Review,
              and Attorney Grievance
       Elliot Ari Kozolchyk

3

November 28, 2022

Via Email: dimitrouleas@flsd.uscourts.gov

Judge William P. Dimitrouleas
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Courtroom 205B, Chambers 205F
Fort Lauderdale, Florida 33301

Dear Judge Dimitrouleas:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:     (786) 924-9929
Fax:     (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

THE FLORIDA BAR'S
EXHIBIT
6

November 28, 2022

Via Email: goodman@flsd.uscourts.gov

Judge Jonathan Goodman
James Lawrence King Federal Justice Building
99 N.E. Fourth Street
Room 1168
Miami, Florida 33132

Dear Judge Goodman:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for
the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will
continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: middlebrooks@flsd.uscourts.gov

Judge Donald M. Middlebrooks
Paul G. Rogers Federal Building and U.S. Courthouse
701 Clematis Street
Room 257
West Palm Beach, Florida 33401

Dear Judge Middlebrooks:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: moore@flsd.uscourts.gov

Judge K. Michael Moore
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 13-1
Miami, Florida 33128

Dear Judge Moore:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:     (786) 924-9929
Fax:     (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: moreno@flsd.uscourts.gov

Judge Federico A. Moreno
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 12-2
Miami, Florida 33128

Dear Judge Moreno:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: rosenberg@flsd.uscourts.gov

Judge Robin L. Rosenberg
Paul G. Rogers Federal Building and Courthouse
701 Clematis Street
Courtroom 2
West Palm Beach, Florida 33401

Dear Judge Rosenberg:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: seitz@flsd.uscourts.gov

Judge Patricia A. Seitz
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
Room 11-4
Miami, Florida 33128

Dear Judge Seitz:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

> Respectfully submitted,
>
> Koz Law, P.A.
> 800 East Cypress Creek Road, Suite 421
> Fort Lauderdale, FL 33334
> Tel:    (786) 924-9929
> Fax:    (786) 358-6071
> Email: ekoz@kozlawfirm.com
>
> Elliot Kozolchyk, Esq.
> Bar No.: 74791

November 28, 2022

Via Email: seltzer@flsd.uscourts.gov

Judge Barry S. Seltzer
U.S. Federal Building and Courthouse
299 E Broward Blvd
Fort Lauderdale, FL 33301

Dear Judge Seltzer:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in the cases referenced in the July 17, 2019 letter of referral. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ekoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

November 28, 2022

Via Email: strauss@flsd.uscourts.gov

Judge Jared M. Strauss
U.S. Federal Building and Courthouse
299 East Broward Boulevard
Chambers 109
Fort Lauderdale, Florida 33301

Dear Judge Strauss:

This is my letter of apology pursuant to Administrative Order 2022-94. I am sincerely sorry for the events that occurred in *Dahdouh et al v. Road Runner Moving and Storage Inc et al*, Case No. 20-61936. I will continue working to ensure those events do not happen again.

Respectfully submitted,

Koz Law, P.A.
800 East Cypress Creek Road, Suite 421
Fort Lauderdale, FL 33334
Tel:    (786) 924-9929
Fax:    (786) 358-6071
Email: ckoz@kozlawfirm.com

Elliot Kozolchyk, Esq.
Bar No.: 74791

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-MC-21879

IN RE:

ELLIOT ARI KOZOLCHYK
Florida Bar # 74791

_____/

THE AD HOC COMMITTEE ON ATTORNEY ADMISSIONS, PEER REVIEW, AND
ATTORNEY GRIEVANCE FOR THE UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF FLORIDA

<u>COMMITTEE REPORT ON ELLIOT ARI KOZOLCHYK'S COMPLIANCE
WITH OCTOBER 28, 2022 ORDER ON FINAL REPORT AND RECOMMENDATION</u>

On October 28, 2022 the Court entered its Order on Final Report and Recommendation

concerning Mr. Elliot Ari Kozolchyk. The Order approved and adopted in full the Final Report

and Recommendation ("Final R&R") submitted to the Court by the Ad Hoc Committee on

Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee"). The Final R&R

detailed the following obligations imposed upon Mr. Kozolchyk, and the Committee reports to

the Court regarding Mr. Kozolchyk's compliance therewith, based upon an affidavit from Mr.

Kozolchyk and/or evidence of completion provided to the Committee by Mr. Kozolchyk.

- Requirement to complete two specific CLE courses (one containing four
  episodes) within 60 days of the Court Order and to provide an affidavit to the
  Committee attesting to same. TIMELY COMPLETED.

- Delivering letters of apology to certain members of the Court within 30 days of
  the Court Order. TIMELY COMPLETED.

THE FLORIDA BAR'S
EXHIBIT

7

- Within 60 days of the Court Order enrolling in counseling for anger management for a minimum of 25 hours; the courses to be approved in advance by the Committee. TIMELY ENROLLED AND ALSO COMPLETED.

- For a period of 12 months from the date of the Order, a continuing requirement to self-report to the Committee within 72 hours of the entry of any court order or court filing by opposing counsel alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk. MR. KOZOLCHYK APPEARS TO BE IN COMPLIANCE, WITH HIS MOST RECENT DISCLOSURE TO THE COMMITTEE ON FEBRUARY 13, 2023.

Respectfully submitted,

William C. Hearon, Esq.
Chair

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of March 2023, a true and correct copy of the foregoing was served via e-mail to Elliot Ari Kozolchyk, Esq. at ekoz@kozlawfirm.com.

William C. Hearon, Esq.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-MC-21879


IN RE:

ELLIOT ARI KOZOLCHYK
Florida Bar #74791



        Transcript of the testimony of Elliot
Kozolchyk before the Ad Hoc Committee on
Attorney Admissions, Peer Review and Attorney
Grievance (the "Committee") by Zoom Video
Conference commencing at 3:00 p.m. on
Thursday, November 9, 2023, reported by MARIA
ISABEL SALUM, Registered Professional Reporter
and Notary Public in and for the State of
Florida.



THE FLORIDA BAR'S
EXHIBIT
8

Maria I. Salum, P.A.                          305 746-3079

Page 2

1                       APPEARANCES

2

3       COMMITTEE MEMBERS:
4       William C. Hearon, Chair
        Da'Morus Cohen
5       Garth Yearick
        Seth Miles
6       Bridget Berry
        Jennifer Wahba
7       Alison Smith
        Steve Davis
8       Bertila Fernandez
        Andrew Figueroa
9       Celeste Higgins
        Margot Moss
10      Tiffani Lee
        Devang Desai
11      Valencia Gallon-Stubbs
        Bernardo Lopez
12      Allison Kahn
        Richard Baron
13

14

        WITNESS:
15

16      Elliot Kozolchyk

17

18

19

20

21

22

23

24

25              THE REPORTER:  Can you raise your

Maria I. Salum, P.A.                    305 746-3079

Page 3

1    right hand, please?

2         Do you solemnly swear or affirm that

3    the testimony you're about to give will

4    be the truth, the whole truth and nothing

5    but the truth?

6         MR. KOZOLCHYK:  Yes.

7         MR. HEARON:  Mr. Kozolchyk, welcome

8    back before the committee.  We're going

9    to ask you a series of questions.  If at

10   any point in time you want to take a

11   break, let us know.  You are under oath.

12   And the committee members will go in an

13   order that was prearranged and Mr. Cohen

14   will go first because he was on your

15   subcommittee.  The other two subcommittee

16   members are not here today so I will turn

17   it over to him.

18        If you have any questions or need to

19   stop at any point during the process,

20   just let me know.

21        MR. KOZOLCHYK:  Thank you.

22        MR. COHEN:  Good afternoon, Mr.

23   Kozolchyk.  How are you doing?

24        MR. KOZOLCHYK:  Could be better.

25   How are you doing?

Maria I. Salum, P.A.                    305 746-3079

Page 4

1        MR. COHEN:  I'm doing well.  It's

2    good to see you again.  I'm not going to

3    have a lot of questions for you.  I'm

4    pretty familiar with the facts.

5        I received all of the emails that

6    you have sent to Mr. Hearon regarding

7    compliance with the October 28, 2022

8    order on final report and recommendation.

9    The questions I'm going to ask you are

10   going to relate to kind of two different

11   topics.  One would be what your thoughts

12   are or what you believe your obligations

13   are under the order and whether you have

14   complied with the order, and then I guess

15   an ancillary topic within the second

16   topic would be, to the extent that you

17   have not complied with the order, have

18   you disclosed the noncompliance and why

19   you haven't complied.  So that's really

20   what I want to focus on with my

21   questions.  And so, I will go ahead and

22   jump in if you're ready.

23        MR. KOZOLCHYK:  Can you break that

24   down?  That's a multi-part question.

25        MR. COHEN:  I'm going to ask you

Maria I. Salum, P.A.                    305 746-3079

Page 5

```
 1    questions.  I want to make sure you
 2    understand where I'm kind of leaning --
 3    where we are going, so you understand
 4    what I am going to ask about.
 5         So do you have a copy of the October
 6    28th, 2022 order in front of you right
 7    now?
 8         MR. KOZOLCHYK:  Not at this moment,
 9    but I can try to get it.
10         MR. COHEN:  I'm assuming you have
11    read the order, correct?
12         MR. KOZOLCHYK:  Yes.
13         MR. COHEN:  And you understand what
14    your obligations are under the order?
15         MR. KOZOLCHYK:  Yes.
16         MR. COHEN:  Okay.  So I'm going to
17    focus on the reporting requirement.
18    There's language in the order that says,
19    "For a period of 12 months from entry of
20    this order, Mr. Kozolchyk must self
21    report to the committee within 72
22    business hours of the entry of any order
23    or court filing by opposing counsel
24    alleging, describing or relating to any
25    problematic or unprofessional conduct by
```

Maria I. Salum, P.A.                    305 746-3079

Page 6

1    Mr. Kozolchyk."

2         Are you familiar with that language?

3         MR. KOZOLCHYK:  Yes.

4         MR. COHEN:  And what do you think

5    that language requires of you?

6         MR. KOZOLCHYK:  It's very broad so

7    anything -- any kind of criticism, I

8    should report.

9         MR. COHEN:  When you say

10   "criticism," what do you mean?

11        MR. KOZOLCHYK:  Any critique on me

12   put in a filing, I should report.

13        MR. COHEN:  And you should report it

14   within what period of time?

15        MR. KOZOLCHYK:  72 hours.

16        MR. COHEN:  In your opinion, do you

17   believe you have complied with the order

18   during the 12 month period starting on

19   October 28th, 2022 through, I guess that

20   would be the 27th or 29th of 2023?

21        MR. KOZOLCHYK:  I believe I have

22   tried to report.  I know -- I have

23   actually counted the times I reported,

24   and I believe the number of times I've

25   reported is ten times.  I've tried to

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 7

1    report everything.

2         I know Mr. Hearon brought to my

3    attention one item that fell through the

4    cracks that was not reported.  I know

5    some other items that didn't occur to me

6    at the time, but I then reported late,

7    but I certainly did not try to not report

8    something.

9         MR. COHEN:  My question was really

10   yes or no, have you complied with the

11   order as it relates to the reporting

12   obligation?

13        MR. KOZOLCHYK:  Not 100 percent, so

14   I guess it's no.

15        MR. COHEN:  You state that you

16   understand the obligations and so, you

17   say it's very broad.  And you say any

18   critique of you should be reported.

19        I guess, what type of critiques fall

20   under any problematic or unprofessional

21   conduct by Mr. Kozolchyk?

22        MR. KOZOLCHYK:  Well, the word

23   "problematic," I interpreted to mean

24   almost anything, so any criticism of any

25   kind, I should report.

Maria I. Salum, P.A.                    305 746-3079

Page 8

1      MR. COHEN:  Understood.

2      So you said you issued or you

3  furnished ten compliance reporting to the

4  committee in the past 12 months?

5      MR. KOZOLCHYK:  Based on my count.

6  I counted it before this meeting.

7      MR. COHEN:  And you stated that you

8  know you haven't fully complied with the

9  order.

10     So have you gone back through your

11  cases to see how many instances of

12  problematic or unprofessional conduct you

13  failed to report?

14     MR. KOZOLCHYK:  Well, I know I sent

15  an email to Mr. Hearon a week or two ago

16  where I reported three items that were

17  untimely.  That was my effort in good

18  faith to try to think of anything that I

19  might have missed before.  I did not

20  willfully miss anything, but it was my

21  understanding from speaking to Mr. Hearon

22  that I have missed things, so I thought

23  very hard and I reviewed as best as I

24  could and I found three instances that

25  could be interpreted as me missing

Maria I. Salum, P.A.                    305 746-3079

Page 9

1    something, and so I reported those, and
2    then to my understanding, there was still
3    a fourth item that I missed, which is the
4    Reddish case, so I definitely didn't do
5    that on purpose.
6         MR. COHEN:  It's your testimony that
7    you failed to report four times?
8         MR. KOZOLCHYK:  It is my
9    understanding -- well, the three items I
10   reported -- on two of those, there's an
11   argument to be made that they would not
12   be within the scope.
13        Again, the scope is very broad and
14   in my humble opinion, not very -- it's
15   kind of vague.  But I don't mean that to
16   criticize the order.  I'm trying to
17   comply with the order.  I think there's
18   an argument to be made that two of those
19   three items that I reported a week or two
20   ago to Mr. Hearon may be outside the
21   scope of that, but in abundance of
22   caution, I reported them.
23        One of them, I could certainly --
24   the third I could certainly see would be
25   within the scope and so I definitely

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 10

1    should have reported that, and when I

2    reviewed everything, I saw that and I

3    reported it.  But yes, it was untimely

4    along with those other two things.  The

5    one that Mr. Hearon brought to my

6    attention earlier today, I absolutely --

7    it absolutely did not even occur to me

8    until he e-mailed me about it.

9         MR. COHEN:  For the two that you

10   state are outside the scope of

11   problematic and unprofessional conduct,

12   can you explain why for each instance?

13        MR. KOZOLCHYK:  I'm saying an

14   argument could be made.  I'm not being

15   black and white.  I think it's gray.  And

16   so, I reported it in an abundance of

17   caution.  I'm certainly not here to nit

18   pick or argue whether it is or it's not.

19   I'm here to comply as best as I can.  So

20   if you want me to review the three that I

21   reported to Mr. Hearon a week or two ago

22   and explain the context of those, I'm

23   happy to do that.  Is that what you want

24   me to do?

25        MR. COHEN:  For sake of time, I

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 11

1    won't have you do that.

2         My next question would be:  When did

3    it occur to you to make the report to

4    Mr. Hearon of those three instances that

5    you reported to him last week?  Was it

6    last week that it came to your -- that

7    you thought you should report it or was

8    it at the time of the, you know, each of

9    the instances?

10        MR. KOZOLCHYK:  I'm trying to think.

11        I had some communications with Mr.

12   Hearon that suggested that something was

13   missed and I didn't know what it was.  So

14   it was after that -- I think it was when

15   I got notice of this hearing.  I got an

16   email about a notice of a hearing -- this

17   hearing and so I started thinking, "Okay,

18   did I miss something?  Did I miss

19   something?"  So I started thinking.  I

20   started thinking.  And so between that

21   time and when I sent the email is when I

22   thought of those three items.

23        MR. COHEN:  Any reason why, I guess

24   it didn't occur to you at the time

25   whether the motions were filed or there

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 12

1    were court orders that you didn't report

2    to the committee?

3         MR. KOZOLCHYK:  Yeah, that goes into

4    the context that I was offering.  If you

5    want me to get into those three items,

6    and I can be brief.

7         Just as an aside, I'm not trying to

8    justify anything.  I'm merely speaking

9    the truth as to the reason why they were

10   not reported.  Not that they're good

11   reasons.  It's just the truth.  I'm not

12   trying to defend anything.

13        MR. COHEN:  Okay.

14        MR. KOZOLCHYK:  So the three things

15   I reported, one of them was -- the last

16   one in the email was the motion to

17   dismiss where they said, "Plaintiff was

18   trying to mislead the court."  So that

19   one didn't register because technically

20   they were referring to the plaintiff, not

21   me, so the plaintiff was trying to

22   mislead the court.  But then upon further

23   reflection, let me cast as broad a net as

24   possible, because I don't want to be

25   accused of not complying with the order,

Maria I. Salum, P.A.                    305 746-3079

Page 13

```
 1        in terms of willfully not complying with
 2        the order, so I was like, you know, "This
 3        can be interpreted as against me, let me
 4        go ahead and include that in there."  So
 5        that's with regard to that instance.
 6             But just to give further context on
 7        that instance, the irony is that the
 8        defendant's attorney was citing --
 9        mis-citing a case and if you look at the
10        case, his arguments were really
11        misleading the court, not my arguments,
12        but again -- so my thinking at the time
13        was, that's referencing the plaintiff,
14        it's not referencing me specifically, so
15        I thought it fell outside the scope.  But
16        then I got this notice of hearing and I'm
17        like, shoot, let me think of every
18        possible thing that could conceivably be
19        within the scope, and I thought, well,
20        that could conceivably be within the
21        scope, let me report that.
22             Another item was in the Santiago
23        case.  There are two reasons why I
24        thought -- why I did not think to report
25        it at the time.  And again, I'm not
```

Maria I. Salum, P.A.                    305 746-3079

Page 14

1   suggesting these are good reasons.  I'm
2   not trying to defend anything.  I'm just
3   simply telling the truth as to why at
4   that time I did not report it.
5        Number one, I thought they were --
6   the way he worded it was kind of in the
7   abstract, if you look at the language he
8   used.  And so, I thought the way he
9   worded it kind of insinuates without
10  actually saying it.  I thought they were
11  abstract insinuations rather than
12  explicit attacks on me.  And so I thought
13  that would put it outside the scope.
14       And the second reason, because I
15  didn't think -- opposing counsel is a
16  former committee member of this
17  committee.  I didn't think he would
18  really -- I was a little in disbelief and
19  skeptical that he really would put these
20  attacks at me and require me, trigger
21  something from me to have to report to
22  the committee.  I was a little bit
23  incredulous that he would really be doing
24  that deliberately to cause me to have to
25  report this.  And since he worded it in

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 15

1    such an abstract way, I thought maybe it

2    was outside the scope.

3         As further context, those abstract

4    things he was saying, those insinuations

5    were disproven because he ended up losing

6    summary judgment and the case had merit,

7    and we then settled after that.  So I

8    felt his insinuations were completely

9    meritless.  I felt he worded it

10   sufficiently in the abstract, that it did

11   not trigger the scope, to be within the

12   scope.  I thought -- I was a little bit

13   in disbelief that surely as a former

14   member of this committee, he's not really

15   attacking me where I now need to report

16   it.  He wouldn't do something like that.

17        But then as I got the notice of this

18   hearing, I thought really hard, "Is there

19   anything else?"  So that came to mind

20   again.  And I'm like, "Let me cast as

21   broad a net as possible, and let me

22   include that."

23        The third item was the motion for

24   sanctions in the Martinez case.  And

25   again, I'm not trying to defend anybody.

Maria I. Salum, P.A.                    305 746-3079

Page 16

1      I'm telling the honest truth as to why
2      that was not reported.
3           In all honesty, that one did not
4      even come to my mind.  It did not even
5      register.  And I could appreciate the
6      members of this committee saying, "How
7      could a rule of a motion for sanctions
8      not register the need to report it?"  I
9      could certainly put my eyes in your
10     perspective and think why would that not
11     register.  And I'm not justifying it and
12     I'm telling you honestly it didn't, and I
13     will explain why it did not.
14          I have never dealt with that
15     attorney before in my life.  I don't know
16     her, so it couldn't have possibly been
17     something personal.  Her first
18     communication was this Rule 11 from the
19     very beginning.  She was threatening Rule
20     11 sanctions.  So it never -- my mind
21     never correlated to, "this is about me."
22     This was about her not understanding the
23     issues in the case, and ultimately I
24     moved for summary judgment on that exact
25     issue that she argued was frivolous and

Maria I. Salum, P.A.                    305 746-3079

Page 17

1    that's when the case settled.

2        I feel very strongly that that

3    motion for summary judgment would have

4    been granted if it didn't settle.

5        It was just not so personal to me

6    and I didn't know her and her arguments

7    were just about that issue that she

8    contended were frivolous, when really the

9    undisputed facts showed it should be --

10   that summary judgment was appropriate on

11   this issue.  It just never occurred to me

12   that I needed to report it.

13       But then when I got the notice of

14   the hearing, I'm thinking, "What could I

15   have possibly missed," and that case came

16   up, and I thought, let me cast as broad a

17   net as possible and disclose it.

18       MR. COHEN:  I appreciate the

19   context.

20       And the reason why I'm asking kind

21   of the questions on what you think your

22   obligations are and whether you think you

23   complied, one, have you complied with the

24   order?  That's obviously one point.  The

25   second point I'm trying to understand is

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 18

1    whether you, in your efforts of complying
2    with the order, if you're being
3    over-inclusive, are you being
4    under-inclusive?  Are you thinking about
5    the order?  When you get a motion or a
6    Rule 11 sanctions motion or something
7    like that, was the order triggered in
8    your mind, like, "Hey, I have this
9    compliance order that I need to comply
10   with"?  I'm just trying to understand
11   whether you have kind of sufficient
12   processes in place to comply, and the
13   reason why I ask that -- and I'm going to
14   let Garth chat about the Reddish case --
15   it does get to a topic of whether you are
16   sufficiently thinking about various
17   obligations, whether it be court orders,
18   scheduling orders and the like, and
19   that's kind of why I'm asking.  Maybe you
20   do have an issue with kind of the
21   definition, but that's kind of what I was
22   getting to with my line of questions.
23        I'm going to turn it over to Garth
24   in a second.
25        It's your testimony that you think

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 19

1    there's only been four instances that

2    have been missed in the 12 month

3    reporting period?

4         MR. KOZOLCHYK:  Before I got an

5    email from Mr. Hearon earlier today, I

6    thought there were only three.  If you

7    would have asked me the same question

8    without Mr. Hearon's email earlier today,

9    I would have said three.  I'm only

10   telling you what I think.  I don't know

11   for sure and I'm doing my best to comply.

12   I gain nothing from not complying.  I'm

13   only making my life harder by not

14   complying.

15        So if there's additional I missed,

16   it's not intentional.

17        MR. COHEN:  Understood.  Let's say

18   it is that those are the four only that

19   we have missed.  So we have 14 instances

20   of required reporting in a 12 month

21   period.  Go ahead.

22        MR. KOZOLCHYK:  You said 14.  I

23   assume you're saying the ten that I

24   counted and then you're counting four

25   more.  When I counted the ten, I was

Maria I. Salum, P.A.                    305 746-3079

Page 20

1  counting -- and I think those three were

2  in one email and I counted that as one as

3  well.

4      MR. COHEN:  So we can settle on ten

5  instances of required reporting during

6  the 12 month period.

7      MR. KOZOLCHYK:  Ten emails.  I sent

8  ten emails.  That one email was with

9  three cases and I completely misread it,

10 depending on how you do the math.  And I

11 frankly don't recall if one of my other

12 emails included two cases or not.

13     MR. COHEN:  For discussion purposes,

14 let's just say somewhere between ten and

15 14 instances of required reporting of

16 potentially problematic and

17 unprofessional behavior, correct, in a 12

18 month period.

19     MR. KOZOLCHYK:  Yeah, the number is

20 correct and when you say "potentially,"

21 I'm not trying to nit pick anything and

22 I'm certainly not trying to be defensive.

23 Any attorney can write anything in the

24 file.  It doesn't necessarily make it

25 true, you know, but I guess if you want

Maria I. Salum, P.A.                    305 746-3079

Page 21

```
1      to say it's potentially unprofessional,

2      then certainly.

3           MR. COHEN:  Understood.  And so, in

4      your opinion -- and I guess I will start

5      with the referral from the judges, the

6      complaints from the attorneys and the

7      like.  Ten instances seems like a

8      material amount.  My question would go

9      to, do you believe that your behavior, or

10     at least the alleged behavior has changed

11     from when you were first before the

12     subcommittee and the full committee to

13     now 12 months later?

14          MR. KOZOLCHYK:  Extremely,

15     tremendously.  Go through those

16     reportings and find an instance where I

17     was aggressively attacking the other

18     side.  I have -- as far as I know,

19     there's not an instance.  If you guys

20     find one, it's news to me.  I have

21     drastically -- I mean, I don't -- I am

22     constantly being attacked, which is why

23     I'm reporting, because every time I get

24     attacked I have to report it.  But I'm

25     not reciprocating.  I'm focusing on the
```

Maria I. Salum, P.A.                    305 746-3079

Page 22

 1     issues in the case.

 2          Just to point to an example of the

 3     Santiago case were the member of this

 4     committee, the former member of this

 5     committee, made these insinuations that

 6     were very personal to me, very personal

 7     attacks to me.  My response and again the

 8     motion for summary judgment reply, he

 9     also sent me a letter, which this is not

10     part of the reporting requirements, it's

11     another layer of context that I reported

12     and it gives more light to the situation.

13          He sent a letter to me before

14     threatening sanctions under the vexatious

15     litigation statute where he says that

16     this case is just a vehicle to turn more

17     attorney's fees.  And he made

18     insinuations to that effect in the motion

19     for summary judgment and the reply, which

20     were, you know -- anyway, I took it very,

21     very personally, but if you read my

22     response, I don't speak about -- I don't

23     even address it.  I don't even try to

24     defend the personal attacks.  I am just

25     discussing the issues material to summary

Maria I. Salum, P.A.                    305 746-3079

Page 23

```
 1    judgment that ultimately the judge ruled
 2    against him on.
 3          That's a real shining example where
 4    I didn't -- it was like he never even
 5    wrote it in my response.  And I have
 6    tried.  I have tried in all my filings to
 7    not fight back.  When I get attacked,
 8    when I get personally attacked, I don't
 9    reciprocate.  That is under my control.
10    I can't control when a defense
11    attorney -- and these cases are very
12    contentious.  They are very, very
13    contentious cases.
14          I can't control when a defense
15    attorney decides to attack me personally,
16    but I could certainly decide -- control
17    how I respond, and I think the way I
18    responded is tremendously different.
19          MR. COHEN:  Thank you.  I have no
20    further questions.
21          MR. HEARON:  Garth?
22          MR. YEARICK:  Good afternoon, Mr.
23    Kozolchyk.
24          I am going to ask you a few
25    questions about the Reddish case.  When I
```

Maria I. Salum, P.A.                    305 746-3079

Page 24

1    say the Reddish case, are you familiar

2    with what I'm talking about?

3          MR. KOZOLCHYK:  Yes.

4          MR. YEARICK:  It's a case that was

5    pending in front of Judge King and then

6    Judge Williams, right?

7          MR. KOZOLCHYK:  Yes.

8          MR. YEARICK:  And I'm going to ask a

9    couple of foundational questions first.

10         The committee's and Judge Altonaga's

11   eventual order approving the report and

12   recommendation of the committee that was

13   entered on October 28, 2022, did you take

14   that seriously when you received it?

15         MR. KOZOLCHYK:  Absolutely.

16         MR. YEARICK:  Did you make any

17   special procedures to make sure that you

18   complied with it in your office?

19         MR. KOZOLCHYK:  My firm manager and

20   I have been trying to look at everything

21   that comes in.  If something was missed

22   it is because we both missed it.

23         MR. YEARICK:  Did you view the terms

24   of that order as optional or mandatory?

25         MR. KOZOLCHYK:  Mandatory.

Maria I. Salum, P.A.                    305 746-3079

Page 25

1    MR. YEARICK:  And as part of
2    complying with that and specifically the
3    reporting requirements, would you view a
4    judge noting that you had missed,
5    repeatedly missed deadlines on behalf of
6    a client, would that qualify to you as
7    something that the order was describing
8    unprofessional misconduct by you?
9    MR. KOZOLCHYK:  Yes.
10    MR. YEARICK:  So in the Reddish
11    case, there's actually -- what Mr. Hearon
12    sent you this morning was a September 7,
13    2023 order by Judge Williams.
14    Are you familiar with that order?
15    MR. KOZOLCHYK:  Yes.
16    MR. YEARICK:  Have you read it today
17    since it was sent to you?
18    MR. KOZOLCHYK:  Only a paragraph or
19    two of it today.  I read it before when
20    it came in.  But today, I read a
21    paragraph or two of it.
22    MR. YEARICK:  Is it fair to say that
23    based on the language used in that order,
24    Judge Williams was refusing to vacate an
25    earlier order of hers that dismissed the

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 26

1    case based on the failure to prosecute?

2    Is that a fair description of that order?

3         MR. KOZOLCHYK:   Yes.

4         MR. YEARICK:   In that order, she

5    specifically notes numerous actions that

6    plaintiff -- and you were plaintiff's

7    counsel in that case, right?

8         MR. KOZOLCHYK:   Yes.

9         MR. YEARICK:   That plaintiff could

10   have taken to prosecute the case to deal

11   with any uncertainty about deadlines, to

12   move for clarification, all things that

13   you could have done for counsel of

14   Reddish in that case, right?

15        MR. KOZOLCHYK:   Are you asking me

16   what the court order says?

17        MR. YEARICK:   I'm asking you what

18   Judge Williams wrote in her order were

19   things -- were items that a plaintiff

20   could have -- actions that the plaintiff

21   could have taken in that case so that it

22   wouldn't have been dismissed against the

23   plaintiffs.

24        Do you remember Judge Williams

25   describing those type of actions that you

Maria I. Salum, P.A.                    305 746-3079

Page 27

1    could take?

2         MR. KOZOLCHYK:  I would like --

3    before I answer that, I would like to

4    read the order again.  I don't want to

5    take the committee's time to do that, but

6    I have the order in front of me now.

7         MR. YEARICK:  Okay.  Why don't you

8    take a look at it.  It's the first page

9    of the Westlaw Reporting.  It's the

10   second column, right-most column, the

11   last paragraph on that page.  It's

12   actually highlighted on the version that

13   was pulled up for you on the screen.

14        MR. KOZOLCHYK:  Can you scroll down,

15   please?  Up a little bit more.  There you

16   go.

17        That presupposes that I had

18   knowledge that there was an issue.  From

19   my vantage point, the case got

20   transferred.  There was a docket entry,

21   an ECF entry, that said that the

22   deadlines were terminated, and I had

23   reviewed other cases that had occurred at

24   the same time, other cases transferred to

25   Judge Williams, and in those cases she

Maria I. Salum, P.A.                    305 746-3079

Page 28

1    said -- she set a status conference as a
2    first thing to get the case set for her
3    deadlines.  That did not occur in this
4    case.  I was unaware that there was an
5    issue brewing that would cause, without
6    any notice, the case to just get
7    dismissed for lack of prosecution.  After
8    the case was transferred to her, I didn't
9    get any prior notice and the case was
10   dismissed for lack of prosecution.  I did
11   not know there were any of these problems
12   brewing.  I didn't know there were
13   deadlines being missed.  I thought when
14   it was transferred and the ECF entry said
15   that the deadlines were terminated that
16   she was going to set new deadlines that
17   we all had to comply with.
18        MR. YEARICK:  Mr. Kozolchyk, I
19   understand your arguments, but Judge
20   Williams rejected all those arguments,
21   right?
22        MR. KOZOLCHYK:  Yes.
23        MR. YEARICK:  And so, when you're
24   sitting there on September 7, 2023,
25   you've got an order from Judge Williams

Maria I. Salum, P.A.                    305 746-3079

Page 29

1    that says, "Hey, plaintiff's counsel, you

2    were unprofessional because you didn't do

3    certain things you should have.  You

4    should have complied with different

5    deadlines.  You didn't comply with them.

6    I'm dismissing your client's case.  And

7    by the way, your client's statute of

8    limitations is over."  That's something

9    that didn't occur to you to report to the

10   committee?

11       MR. KOZOLCHYK:  It didn't occur -- I

12   mean, I should have reported it.

13       MR. YEARICK:  I'm trying to

14   understand, Mr. Kozolchyk, why that

15   didn't occur to you to report that to the

16   committee at that time when you received

17   this order.  Can you explain that in any

18   way to me?

19       MR. KOZOLCHYK:  It didn't register

20   to me and it didn't register to my firm

21   manager.  I'm not disputing that I should

22   have reported it.  I absolutely should

23   have reported it.  It didn't even occur

24   to us.

25       MR. YEARICK:  I'm not asking you

Maria I. Salum, P.A.                    305 746-3079

Page 30

```
 1        about your firm manager.  I'm asking
 2        about you.
 3             When you read this order -- did you
 4        read it when it came in?
 5             MR. KOZOLCHYK:  Yes.
 6             MR. YEARICK:  Were you concerned by
 7        it?
 8             MR. KOZOLCHYK:  Very much so.
 9             MR. YEARICK:  You actually took an
10        appeal of the 11th Circuit, right?
11             MR. KOZOLCHYK:  Right.  But then
12        after I discussed with my client, we
13        decided not to proceed on that.
14             MR. YEARICK:  Did you send this
15        order to your client?
16             MR. KOZOLCHYK:  I discussed it with
17        my client.
18             MR. YEARICK:  You didn't send the
19        text of this order to your client?
20             MR. KOZOLCHYK:  No.  I don't usually
21        do that in my cases.
22             MR. YEARICK:  Did you describe the
23        reasons that Judge Williams ruled against
24        you to your client?
25             MR. KOZOLCHYK:  Yes.
```

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 31

1      MR. YEARICK:  What did you tell your

2   client about that?

3      MR. KOZOLCHYK:  I explained what the

4   substance of the order was.

5      MR. YEARICK:  Did you explain that

6   the judge was blaming your inaction and

7   the lack of prosecution of the case as

8   the reason for dismissing the case?

9      MR. KOZOLCHYK:  Yes.

10     MR. YEARICK:  In those frank of

11   words?

12     MR. KOZOLCHYK:  I believe so.

13     No one has worked harder on this

14   case than me.  No one has done more in

15   this case for my client than me.  And I

16   had to -- this case took so much

17   litigation.  What happened was really...

18     MR. YEARICK:  Judge Williams

19   describes it as a period of inactivity,

20   depending on how you read the order,

21   between 18 and 24 months of inactivity of

22   prosecuting this case.  Is that incorrect

23   in your view?

24     MR. KOZOLCHYK:  That's missing some

25   very important context.  May I provide

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 32

 1      that context?

 2           MR. YEARICK:   Sure.

 3           MR. KOZOLCHYK:   This case was set to

 4      go to trial before.   The defendants said

 5      they were going to file bankruptcy.   I

 6      agreed therefore to stay the case pending

 7      that.   That was a complete

 8      misrepresentation by defense counsel.

 9      They never did file bankruptcy.   I had

10      put a lot of time and research in this

11      case before that time.   We wanted to

12      still move forward with the case at the

13      time.   I since discussed it with my

14      client and he doesn't want to move

15      forward anymore and frankly neither do I.

16      I put a lot of blood, sweat and tears in

17      that case.   I worked very hard on that

18      case.

19           MR. YEARICK:   I understand and I

20      have no reason to doubt at the moment

21      your representation of the work that you

22      put into the case.   What does that have

23      to do with there not being record

24      activity or prosecution for the 18 to 24

25      months during the life of the case?

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 33

1      MR. KOZOLCHYK:  Because that was

2  stayed for the defendants to file

3  bankruptcy, which they never did.

4      MR. YEARICK:  There was also no

5  update given after the initial update

6  about the bankruptcy to either of the

7  judges who had that case for that 18 to

8  24 months, right?

9      MR. KOZOLCHYK:  Correct.

10     MR. YEARICK:  You talked about

11  failure to disclose this order of

12  September 7, 2023.  Were there any other

13  orders, to your knowledge, in the Reddish

14  case where the judge found that there was

15  a repeated failure to adhere to deadlines

16  set by the court by your client and you?

17     MR. KOZOLCHYK:  I know there was a

18  notice of lack of prosecution before.  I

19  don't recall if that occurred within the

20  reporting period of the order for which

21  this committee is here for.  I would need

22  to look it up and see, so I don't know if

23  that was part of this or not.  I mean, I

24  guess I can look right now.

25     MR. YEARICK:  I'll help you out with

Maria I. Salum, P.A.                305 746-3079

Page 34

1   that.

2        Mr. Kozolchyk, you understood when

3   you were here before in front of the

4   committee that the committee had a range

5   of options in terms of discipline that we

6   could consider, right?

7        MR. KOZOLCHYK:  Yes.

8        MR. YEARICK:  You understood that it

9   was a wide range of options that we could

10  consider, correct?

11       MR. KOZOLCHYK:  Yes.

12       MR. YEARICK:  And the committee has

13  made this report and recommendation and

14  it came up with a reporting period of 12

15  months for you, correct?

16       MR. KOZOLCHYK:  Yes.

17       MR. YEARICK:  That was lower than

18  some of the other disciplinary actions we

19  could have taken, right?

20       MR. KOZOLCHYK:  Yes.

21       MR. YEARICK:  Did you think it was

22  important to make sure that you complied

23  with the reporting period even though you

24  thought it was vague in some ways, but

25  specifically as to court orders, didn't

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 35

1    you think that was important?

2         MR. KOZOLCHYK:  Yes.

3         MR. YEARICK:  So what I wanted to

4    know is why, in addition to the September

5    7th order, there's actually referenced in

6    this order itself, this September 7th

7    order, is a January 25th order, docket

8    entry 113 that says -- it's Judge

9    Williams again -- it says, quote, "Having

10   reviewed the record in this case, the

11   court finds that the parties have

12   repeatedly failed to adhere to deadlines

13   set by the court and plaintiff has failed

14   to prosecute this case."

15        That wasn't reported to this

16   committee either, was it?

17        MR. KOZOLCHYK:  No.

18        MR. YEARICK:  That was January 15th,

19   2023, what, three months after the order,

20   almost three months after the order on

21   the report and recommendations?  Is that

22   about right?

23        MR. KOZOLCHYK:  I trust your math on

24   that.

25        MR. YEARICK:  What I'm trying to

Maria I. Salum, P.A.                    305 746-3079

Page 36

1    understand is, not even three months
2    after the order on report and
3    recommendations came out, you get this
4    order from Judge Williams and no red
5    flags go off in your head?
6        MR. KOZOLCHYK:  Not on this case,
7    but I reported on a lot of the other
8    cases.
9        MR. YEARICK:  I understand what you
10   reported about.  I read through the
11   stuff.
12       Not these orders from Judge
13   Williams, right?
14       MR. KOZOLCHYK:  I missed it and I
15   apologize.  I don't gain anything from
16   missing -- from missing it.  I'm not
17   trying to hide anything.
18       MR. YEARICK:  Do you know that this
19   September 7th order, the copy that was
20   sent to you this morning, was actually
21   reported on Westlaw, right?
22       MR. KOZOLCHYK:  I mean, I don't know
23   if it was reported in Westlaw or not.  I
24   don't monitor that at all, what's been
25   reported on Westlaw or not.

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 37

1      MR. YEARICK:  So you didn't check

2   Westlaw to determine if there were any

3   orders out there in the last 12 months

4   that you should be telling this committee

5   about?

6      MR. KOZOLCHYK:  No, honestly.  The

7   approach I had taken, as something comes

8   in, try to see if it's something that

9   needs to be reported.  I'm not looking on

10  Westlaw to see if something pertaining to

11  me should be reported.

12     MR. YEARICK:  Based on the materials

13  that you reported to the committee, there

14  are a number of -- I will just say they

15  are accusations by opposing counsel,

16  right, about actions that you took in

17  their cases; is that right?

18     MR. KOZOLCHYK:  Yeah, I guess so.

19  If we can go through them, I'd be happy

20  to respond to specific instances.

21     MR. YEARICK:  You already have to

22  certain questions and I'm sure we've read

23  the remainder.

24     What I want to know is, you said you

25  were broadening your searches in terms of

Maria I. Salum, P.A.                    305 746-3079

Page 38

1    what you wanted to report to the
2    committee, right?
3        MR. KOZOLCHYK:  Yes, I didn't want
4    anything to fall through the cracks.
5        MR. YEARICK:  And so you sent the
6    committee all these materials about
7    accusations that were made against you by
8    opposing counsel, correct?
9        MR. KOZOLCHYK:  Yes.
10        MR. YEARICK:  But you didn't report
11    these orders from judges in the Southern
12    District of Florida; is that correct?
13        MR. KOZOLCHYK:  I missed them, yes.
14        MR. YEARICK:  Is there anything else
15    you missed?
16        MR. KOZOLCHYK:  I really hope not.
17    I really, really hope not.
18        MR. YEARICK:  What did you do to
19    search for orders from the Southern
20    District of Florida regarding your
21    conduct in the last 12 months, other than
22    just watching ECF filings as they came
23    in?  Did you do anything?
24        MR. KOZOLCHYK:  In all honesty, I
25    thought really hard, because I thought --

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 39

```
 1    before the notice of this hearing, I
 2    didn't think there was even an issue.
 3         Once I got the notice of the
 4    hearing, I said, okay, maybe something
 5    has been missed, think about any possible
 6    thing that could have been missed.  And I
 7    thought of those three cases.
 8         MR. YEARICK:  Sir, you have a lot of
 9    cases in the Southern District of
10    Florida, right?
11         MR. KOZOLCHYK:  Yes.
12         MR. YEARICK:  Just a rough guess.
13    I'm not asking you for your sworn
14    testimony about the number, but over a
15    hundred pending cases?
16         MR. KOZOLCHYK:  Not over a hundred
17    pending, no.  I can look it up right now
18    and tell you.
19         MR. YEARICK:  No, just your best
20    estimate right now.
21         MR. KOZOLCHYK:  Between 20 and 50.
22    I can give you an exact number if you
23    give me a minute.
24         MR. YEARICK:  I don't really need an
25    exact number to make my point.
```

Maria I. Salum, P.A.                      305 746-3079

Electronically signed by Marla Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 40

1          Mr. Kozolchyk, do you rely on your
2    memory as the sole source of trying to
3    determine whether you're in compliance
4    with court orders?
5          MR. KOZOLCHYK:  No, we scheduled
6    deadlines, but this is any problematic
7    conduct, so I mean, I don't know -- I'm
8    not complaining about the mountain of
9    having to comply with it.  I'm trying the
10   best I can to comply with it.  But if
11   you're suggesting there's a black and
12   white foolproof system that I could have
13   followed to ensure compliance, I am
14   unaware of that, other than reading the
15   orders as they come in and making sure,
16   if they need to be reported, to report
17   them.
18         MR. YEARICK:  Do you have a document
19   data base that you're able to search for
20   pleadings and orders and cases?
21         MR. KOZOLCHYK:  No.  I have
22   something that searches through the
23   files.
24         MR. YEARICK:  What do you mean
25   "searches through the files"?

Maria I. Salum, P.A.                    305 746-3079

Page 41

1        MR. KOZOLCHYK:  Like a more robust
2    version of Windows search.
3        MR. YEARICK:  Did you use that to
4    try to determine whether you are in
5    compliance with your reporting
6    requirements?
7        MR. KOZOLCHYK:  Yes.  And if you do
8    a search for sanctions, a lot of court
9    orders threaten sanctions, so a lot of
10   things come just in standard orders.
11   It's not that sophisticated that it can,
12   you know, read if someone is critiquing
13   me.  I know with AI, you can like read --
14   the computers read stuff and
15   substantively analyze them, but that's
16   not what I have.  Mine's more like a
17   keyword search so a lot of keywords can
18   trigger false positives.
19       MR. YEARICK:  If you were to search
20   for "sanction" -- the word "sanction"
21   does appear in the Reddish decision by
22   Judge Williams on September 7th, 2023,
23   right?
24       MR. KOZOLCHYK:  Right.  It's in many
25   judges' standard orders that "failure to

Page 42

1    comply with any of the requirements of
2    this order may result in sanctions," so
3    it's part of the standard order in a lot
4    of judges' orders.
5         MR. YEARICK:  My last question is, I
6    think some of your emails to the chair
7    and some of your discussions here in
8    response to questions from Mr. Cohen, you
9    referred to the fact that one of your
10   opposing counsel was a former member of
11   this committee, right?
12        MR. KOZOLCHYK:  Right.
13        MR. YEARICK:  How is that relevant
14   to whether you complied with your
15   reporting requirements?
16        MR. KOZOLCHYK:  I felt that if I
17   didn't mention that it would be like I
18   was trying to hide the ball.  I feel like
19   I'm trying to not disclose something.  It
20   seemed like a detail -- for me not to
21   mention it, it's like I'm trying to hide
22   something.
23        MR. YEARICK:  What would you be
24   trying to hide in that situation?
25        MR. KOZOLCHYK:  I didn't want this

Maria I. Salum, P.A.                   305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 43

1    committee to think that I'm trying to

2    hide anything.

3         MR. YEARICK:   I have no further

4    questions.   I will turn it back to the

5    chair.

6         MR. HEARON:   Seth?

7         MR. MILES:   Thanks, Bill, just a few

8    questions.

9         You testified earlier that, I guess,

10   your particular practice area has a

11   tendency to be pretty contentious; is

12   that correct?

13        MR. KOZOLCHYK:   Very much so.

14        MR. MILES:   And in reading some of

15   the emails that you forwarded to the

16   committee -- and tell me if I'm

17   misreading this -- it seems to be your

18   belief that some of the things filed or

19   the allegations made against you are

20   tactical by your adversary counsel.

21        Is that a fair understanding of what

22   you believe?

23        MR. KOZOLCHYK:   Very much so, yes.

24        MR. MILES:   Is that something that

25   has historically happened in the practice

Maria I. Salum, P.A.                    305 746-3079

Page 44

1   to you specifically or do you think

2   that's something that's happened

3   subsequent to the first time you came

4   before this committee?

5       MR. KOZOLCHYK:   I think that's

6   always been there in these cases.  What's

7   different after everything that's been

8   going on with this committee is that I'm

9   not engaging in it.  I'm not

10  reciprocating the vitriol, the toxicity.

11  I'm sticking to the issues as best I can

12  and not providing oxygen to the personal

13  attacks against me.

14      MR. MILES:   I appreciate that and

15  that's obviously a good thing.

16      What I'm trying to understand is

17  whether you think that there's been some

18  sort of either increase in the

19  allegations that have been made against

20  you or change in the tenor of those

21  allegations as a result of the reporting

22  requirements that you have to this

23  committee, or do you think that's sort of

24  part and parcel of the line of work you

25  ended up in?

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 45

1          MR. KOZOLCHYK:  I mean, there's
2     definitely the instance of the Keefe case
3     that I am still dealing with even as of
4     last night, where I have the defense
5     attorney referencing the reporting
6     requirements, threatening to disbar me,
7     saying he will seek to disbar me and he
8     will do it for free.  So certainly he has
9     weaponized the order and is trying to use
10    it against me as much as he can.
11         If you're suggesting if there are
12    other attorneys who have done the same
13    thing, I can't say for sure.  Although
14    certainly he has.
15         MR. MILES:  You anticipated my
16    question, which is whether or not that's
17    been an isolated experience for you,
18    meaning whether this singular attorney
19    has threatened to weaponize this order
20    against you or others have specifically
21    referenced the order in making certain
22    allegations or seeking certain
23    concessions from you?
24         MR. KOZOLCHYK:  Well, and I'm being
25    a hundred percent honest and candid here,

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 46

1    okay, I question the motives of Eric

2    Gabrielle as well, but I don't mention

3    him with the same absolute black and

4    white is occurring as I do in the Keefe

5    case.

6         MR. MILES:  Did Mr. Gabrielle, or

7    anyone else for that matter, ever

8    specifically reference the order and your

9    reporting requirements to you?

10        MR. KOZOLCHYK:  Only the Keefe case.

11        MR. MILES:  So what I'm ultimately

12   trying to understand, to give you a

13   little bit of a preview, is you work in

14   an area of litigation that you described

15   as contentious, and from an outsider's

16   perspective that seems pretty accurate,

17   and you have this pending order that at

18   least one of your opposing counsel, in

19   your opinion, has weaponized -- and

20   perhaps others have, maybe not as

21   exclusively, right?

22        MR. KOZOLCHYK:  Right.

23        MR. MILES:  And the best that I have

24   heard thus far, the most detail I have

25   heard thus far in your steps that you

Maria I. Salum, P.A.                    305 746-3079

Page 47

1    have taken to comply with the order are

2    you and -- I can't remember if we refer

3    to them as a firm manager or case

4    manager, someone else --

5           MR. KOZOLCHYK:  Firm manager.

6           MR. MILES:  Firm manager.

7           Tell me what, if any, additional

8    procedure exists within your firm, other

9    than when an order or presumably a motion

10   comes in and you and/or -- you and your

11   firm manager reviewing it to see if it's

12   something that needs to be reported.

13          MR. KOZOLCHYK:  Are there any

14   additional steps?  Other than us

15   reviewing it, I mean, I honestly don't

16   know.  If there's something obvious out

17   there that you guys know I should have

18   been doing, please let me know.  I don't

19   know of any other system or procedure

20   that exists or that I should be doing

21   other than reading what comes in, and if

22   I believe it's within the scope of the

23   order, then reporting it.  I have a

24   second set of eyes.  What I am saying is

25   I have a second set of eyes, besides my

Maria I. Salum, P.A.                    305 746-3079

Page 48

1   own, doing it, so I thought that was a
2   good feature.
3           MR. MILES:  I get that and that's
4   why I wanted to know whether there was
5   anything extra.
6           I guess what confuses me a little
7   bit is that the outside, it looks like
8   we're reviewing a total of somewhere
9   between 10 and 14 allegations made
10  against you in approximately an eight
11  month period of time, right?
12          MR. KOZOLCHYK:  Okay.  If you're
13  looking at the number and you're
14  thinking, "Boy, what is wrong with this
15  guy, why is this happening," I don't
16  really view it like that, because this
17  litigation is so contentious.  What I
18  would be looking at is what has Elliot
19  actually done and not done?  Has my
20  conduct actually been bad?  I am telling
21  you I don't -- I don't reciprocate in the
22  vitriol anymore.  I am very, very focused
23  on the issues in every case.  If the
24  other side -- you know, like the motion
25  to dismiss that I reported where he said,

Maria I. Salum, P.A.                    305 746-3079

Page 49

1    "Plaintiff is trying to mislead the
2    court" -- if I can have like two minutes
3    to give some more context to give this
4    example.
5        He made that statement.  I will also
6    say there's two interstate commerce
7    requirements, one for enterprise and
8    individual coverage, separately
9    interstate commerce requirements.  He
10   cited a court opinion that literally had
11   subheadings, individual coverage,
12   enterprise coverage.  Within those
13   subheadings of those orders, there are a
14   few requirements.  One of them is
15   interstate commerce, which are different
16   for each one.  He accused me of trying to
17   -- he accused the plaintiff of trying to
18   mislead the court because of the
19   interstate commerce requirement for
20   enterprise coverage, but then he cited
21   the interstate commerce requirement
22   within the individual coverage section
23   that was explicitly identified in the
24   courts in that other authority that he
25   cited in.  This is under individual

Maria I. Salum, P.A.                    305 746-3079

Page 50

1    coverage.  He's arguing the wrong

2    standard for interstate commerce and then

3    saying I am trying to mislead the court

4    by citing what was actually the correct

5    standard.

6        And so that is one example.  If you

7    count that, that's just wrong.  It's just

8    not correct.  I was properly citing the

9    right order.  He is actually the one

10   trying to mislead the court and I show

11   that in my response.  So I mean if we're

12   going to -- if the committee is just

13   going to look at the number of reports

14   without going deeper into their

15   substance, I mean, any attorney can say

16   anything without regard of whether it's

17   right or wrong and it's just another

18   attack against me.

19       MR. MILES:  Here is the disconnect

20   for me and perhaps this gets to the heart

21   of the matter, at least as I see it at

22   the moment.

23       You seem very anxious to litigate

24   the merits of these accusations against

25   you and you may have good reason for

Maria I. Salum, P.A.                    305 746-3079

Page 51

1    that.  You may be right.  You may be
2    wrong.  You clearly feel that you're
3    right and I understand that.  But I don't
4    think that's what we're here for today.
5    What we are here for, at least as I
6    understand it, irrespective of the merits
7    of the accusations against you, you had a
8    requirement and a duty to report them to
9    this committee.  And what is clear is
10   that there is some relatively large
11   subset of documents containing these
12   allegations that didn't make its way to
13   this committee.  One possibility is that
14   you don't have processes in place to
15   ensure that each and every one of these
16   actually makes its way to the committee,
17   and that's a possibility, although that
18   seems unusual to me because although 10
19   to 14 in eight months seems like a large
20   number, it's certainly not an
21   insurmountable number that you and your
22   manager wouldn't be able to review and
23   produce to this committee.
24         Another possibility is for whatever
25   reason you thought you only had to

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 52

1      forward the allegations or accusations

2      that had some degree of merit or that you

3      didn't believe were completely and wholly

4      frivolous, and that's what you forwarded

5      to this committee, or something else, and

6      that's what I'm trying to get a handle

7      on, because I don't know what it is and

8      I'm curious from your perspective what

9      explains it.

10          MR. KOZOLCHYK:  I certainly didn't

11     think it was only those that I agreed

12     with I had to forward.  I knew I had to

13     forward everything.

14          I'm being as honest as I can as to

15     the reason why they weren't forwarded.

16     I'm not saying that these are good

17     reasons.  I'm saying they are the honest

18     reasons.

19          In the case with the motion to

20     dismiss, he said, "Plaintiff is trying to

21     mislead the court."  I thought well,

22     that's not me personally.  But then upon

23     further recollection after the notice of

24     hearing, I'm like, you know how that can

25     be interpreted and I need to cast as

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 53

1    broad a net, so I reported it.  I'm not
2    saying that's a good reason.  I'm saying
3    that's an honest reason why I didn't
4    report it at the time.  I certainly
5    wouldn't make that mistake again.
6         The second one in the Santiago case
7    with Eric Gabrielle, I thought the way he
8    chose his wording was sufficiently in the
9    abstract that it didn't trigger my
10   reporting requirement.  Upon further
11   reflection when I got the notice of
12   hearing, I'm like, let me cast this broad
13   net as possible, so let me include that
14   as well.
15        And the third case, the motion for
16   sanctions, it definitely should have been
17   reported.  It didn't register, and I
18   think what I'm trying to psychoanalyze
19   myself, "Well, why didn't it register,
20   Elliot?"  It's because from my own
21   psychoanalysis, why wouldn't that cause
22   me to want to report it -- not want to
23   report it, to register, "Oh, this is
24   something that I need to report," it's
25   because from the beginning of the case, I

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 54

1    didn't know this attorney, the first
2    communication was a motion for sanctions.
3    It was entirely focused on the issue of
4    the exemption.  It was so much about the
5    issues of the case and not about me
6    personally that my brain didn't make a
7    connection, this is something about me
8    that I need to report.  It was about the
9    exemption was -- whether the case was
10   frivolous because an exemption applied,
11   and so that's the honest reason why it
12   didn't occur to me to report it.  That's
13   the truth.  That's really, really why I
14   didn't report it.  It didn't register,
15   but again when I got the notice of the
16   hearing and I thought what is out there,
17   and that came to my mind, and so I
18   reported that, too.
19        And then Reddish, I completely
20   missed.  Completely, completely.  Before
21   the email that I got from Mr. Hearon
22   earlier today, it was not even on the tip
23   of my tongue.  Those are the real
24   reasons.  Those are the real reasons why
25   those were not reported.

Maria I. Salum, P.A.                    305 746-3079

Page 55

1          MR. MILES:  So if I'm understanding
2     you correctly, Reddish is an oversight, a
3     mistake, a moment of forgetfulness.  The
4     other three, you came into your office,
5     you and your manager reviewed them, you
6     looked at them with the order in mind and
7     you interpreted those particular briefs
8     for various different purposes not
9     requiring reporting to the committee, but
10    you went through that thought process?
11         MR. KOZOLCHYK:  Two of them, I went
12    through the thought process.  Again, the
13    Martinez case where they moved for
14    sanctions because the exemption applied.
15    That again was so not personal to me, it
16    didn't even trigger in my head.  So the
17    Martinez one as well did not even
18    register.
19         The Santiago case with Eric
20    Gabrielle and the motion to dismiss for
21    attempting to mislead the court, that did
22    register in my brain and with my firm
23    manager and we thought, "Well, the motion
24    to dismiss is talking about plaintiff,
25    it's not plaintiff counsel."  And in the

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 56

```
 1    Santiago case, I thought it was
 2    sufficiently abstract and I was
 3    incredulous as to believe that a member
 4    of the committee would have been -- the
 5    accusations were really baseless.
 6           MR. MILES:  For purposes of today,
 7    at least from my perspective, what you're
 8    saying is the orders came in, I'm sorry,
 9    the briefs came in, the motions came in,
10    you and your firm manager, aware of the
11    order, undertook the analysis and based
12    upon the analysis that you undertook at
13    the time, believed they were not
14    necessarily required to be reported.  In
15    retrospect, perhaps he would have chosen
16    or analyzed it differently?
17           MR. KOZOLCHYK:  You are ultimately
18    correct on those two and I did -- upon
19    further reflection, I did report them.
20           MR. MILES:  Thank you.
21           MR. HEARON:  Bridget?
22           MS. BERRY:  Sorry about that.
23           My name is Bridget Berry and I have
24    a question about the underlying import of
25    the order.  You have mentioned your
```

Maria I. Salum, P.A.                    305 746-3079

Page 57

1    office manager, and so I'm interested in

2    knowing who else you have at your law

3    firm in terms of hiring and handling the

4    underlying cases.  Because there seems to

5    be a repetitive theme of you kind of

6    doing things at the last minute and not

7    complying with the court orders.  So I'm

8    interested in knowing what are the

9    processes that you have in place in order

10   to comply with your obligations to the

11   clients.

12        In terms of -- for example, I'll

13   give you two specific examples.  One of

14   the examples of the information you

15   recently provided was that there had been

16   a dump of discovery right before trial

17   and then there was an issue relating to

18   the answers to interrogatories and you

19   not having the answers to interrogatories

20   verified, even though they had been

21   served back in April and here it was

22   September, those kinds of things.

23        What are the processes you have in

24   place to be able to comply with discovery

25   obligations and obligations to keep the

Maria I. Salum, P.A.                    305 746-3079

Page 58

1   cases moving forward, that kind of thing?

2       MR. KOZOLCHYK:  Okay.  The quote

3   "dump before trial" was documents

4   produced before depositions.

5       MS. BERRY:  No, no, I'm not

6   disputing that case.  I'm just interested

7   in what are the processes that you have

8   generally to make sure that you're

9   keeping cases moving forward and that you

10  are complying with deadlines.

11      MR. KOZOLCHYK:  Every deadline is

12  calendared and we review the deadlines on

13  a daily basis and forward -- obviously

14  forward deadlines and we manage my time

15  to address them as best as we can.  If

16  something needs more time, we move for an

17  extension of time.

18      I don't want to get into the weeds

19  if you don't want me to on those two

20  examples you gave, but I would like to

21  discuss them if I may.  But if you guys

22  are not interested in hearing that, then

23  I guess I won't.

24      MS. BERRY:  I'm more interested in,

25  you know, for example, what is your

Maria I. Salum, P.A.                    305 746-3079

Page 59

1    process on conferral?  I read a number of
2    times that people said, you know, they
3    tried to reach out to you, they tried to
4    confer with you, as we're all obligated
5    to do, under the rules of the Southern
6    District, and that they couldn't get in
7    touch with you.
8        What is your practice?  Do you
9    return calls within 12 hours, 24 hours,
10    what do you do?  What is your process?
11        MR. KOZOLCHYK:  I will return calls
12    when I'm available, when I can, as soon
13    as I can.  I've had several -- and you
14    guys would not be privy to this, because
15    it's not like you guys have all my
16    emails, but there are many times when I
17    get emails from opposing counsel that
18    say, "Hey, when can we schedule a time to
19    talk," and I'm like, "Call me right now.
20    We can talk right now."  I've done that
21    many times.
22        I try to respond as soon as I can
23    when I'm available.  There are days when
24    literally every moment of the day one
25    thing finishes and a whole other thing

Electronically signed by Maria Salum (001-186-132-3519)    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 60

1    starts.  I get a phone call and then I

2    get an email and then a filing comes in.

3    It's just nonstop every moment of the

4    day.

5         We try to respond to everything as

6    best we can.  If we need an extension of

7    time, we move for an extension of time.

8         MS. BERRY:  When you say "we," do

9    you have other attorneys that work with

10   you?

11        MR. KOZOLCHYK:  No.  My firm manager

12   helps manage my deadlines.  Not

13   necessarily do them, but manage me in

14   managing the deadlines.

15        MS. BERRY:  There are no other

16   attorneys in your office?

17        MR. KOZOLCHYK:  Correct.

18        MS. BERRY:  Thank you.

19        MR. HEARON:  Jennifer?

20        MS. WAHBA:  Yes.  I just have one

21   pretty quick question.

22        So you sent what's titled Exhibit A,

23   Draft Email in the Peter's Plumbing case.

24   Is there a reason why the email says sent

25   on that date even though it was a draft

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 61

1    that supposedly was not sent?

2         MR. KOZOLCHYK:  I'm telling you

3    right now it was not sent.  When I go

4    into Outlook, I went and put up that

5    draft and I printed it to PDF and that's

6    how it came out.  I'm representing to you

7    I did not send it.  It was an unfinished

8    draft.  The reason I included it was to

9    show you that I thought I had sent it on

10   that date even though it was not sent.

11   Just like I created the transfer link for

12   the documents on that date.  But it was

13   in the email that I thought was sent --

14   it was not sent.

15        What must have happened -- I'm

16   speculating, but probably what happened

17   was I was in the middle of working on it,

18   something else came up that demanded my

19   immediate attention and in my mind I had

20   thought I sent it and it never got sent.

21        MS. WAHBA:  I tried this myself.

22   When you send -- if it's just a draft

23   email and you try to print it, it would

24   not say sent on a certain date, right?

25   Are you representing that it was a draft

Maria I. Salum, P.A.                305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)            f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 62

1    but it was also not sent?

2        MR. KOZOLCHYK:  It was an unfinished

3    draft so the email was typed, saved, it

4    was not sent.  I don't know why Outlook

5    says sent on there.  I'm not pretending

6    that it was sent.  From the beginning

7    that I disclosed it to you, to Mr.

8    Hearon, I said it was a draft that did

9    not get sent.

10       MS. WAHBA:  And then the Dropbox

11   link, it says, "Sent 155 days ago" on the

12   transfer.  I don't have that Dropbox

13   transfer so you copied the link into the

14   email, but would that also say sent if it

15   actually was not sent to someone?

16       MR. KOZOLCHYK:  Right, the link was

17   generated.  It was generated that long

18   ago and then I copied it on the email.

19   So I took all these steps to create, you

20   know, this evidence 155 days ago, only to

21   not actually do it for this masterful

22   plan to hide the bong until the day

23   before the deposition, or I thought it

24   was sent and it didn't get sent.  And

25   that's what I'm trying to convey by

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

1    saying that I literally created the

2    links.  Because the motion makes it seem

3    like I'm doing this all strategically and

4    that's simply not the case.  I'm

5    operating in good faith.  I generated

6    that link 155 days from the date that I

7    reported it.  I was working on the emails

8    and for whatever reason that particular

9    email did not get sent with that link

10   inside of it.  The link was generated at

11   that time and the draft was generated at

12   that time.

13       MS. WAHBA:  And then the Britt's

14   Bow Wow case, I just want to know if you

15   have an explanation for why in the notice

16   of compliance you represented that the

17   discovery was served and it actually was

18   not verified at that time.

19       MR. KOZOLCHYK:  Because it -- I'm

20   not trying to defend what happened.  I

21   will never file another notice of

22   compliance saying discovery was served if

23   it included interrogatories that were

24   unverified.  That will never happen

25   again.  I did not believe that because

Maria I. Salum, P.A.                    305 746-3079

Page 64

1      they were unverified it did not mean I
2      did not send out the discovery.  We filed
3      discovery.  I wasn't able to get ahold of
4      my client who moved to Rhode Island at
5      the time, so she was not local here, so I
6      was not able to get her to sign.  But we
7      did send it out and I believed in good
8      faith that the notice of compliance was
9      complying with that, that we sent it out.
10             I will never make that mistake
11     again.  I will include a footnote that
12     makes it very clear that the
13     interrogatories are unverified so there's
14     no confusion.  I will obviously do
15     everything I can to ensure that the
16     interrogatories are verified.
17             MS. WAHBA:  Okay.  That's all I
18     have.  Thank you.
19             MR. HEARON:  Just for the record,
20     Jennifer, that case you were just talking
21     about was the Keefe case, right,
22     K-E-E-F-E?
23             MS. WAHBA:  Yes, Keefe versus
24     Britt's Bow Wow.
25             MS. SMITH:  Thank you very much.

Maria I. Salum, P.A.                    305 746-3079

Page 65

1      Good afternoon, Mr. Kozolchyk.  My
2  name is Alison Smith.
3      My question was -- and I think
4  Da'Morus asked my question earlier, but
5  unless I wasn't listening carefully, and
6  I think I was, I don't believe that you
7  answered it.  You said a lot of things,
8  but I don't think you directly answered
9  the question.
10      What method, and he said
11  "processes," but what method do you use
12  to notify, to be able to notify us, the
13  committee, when there's an issue that has
14  been -- that would bring the language of
15  the order into issue?  What method do you
16  use?  How do you figure out, "Okay, this
17  is what I'm going to tell the committee
18  or I need to let the committee know"?
19  What method do you use?
20      MR. KOZOLCHYK:  I read the filings
21  as they come in, as does my firm manager,
22  and if something catches our attention
23  that might be within the scope of the
24  order, we report it.
25      MS. SMITH:  I don't -- I've been

Maria I. Salum, P.A.                    305 746-3079

Page 66

1        practicing for just shy of two decades
2        now and I admittedly do not practice in
3        your area and I actually don't litigate
4        and I haven't for a decade, but it's sort
5        of eyebrow raising and alarming to me in
6        terms of sanctions, motions for sanctions
7        being filed, more than one being filed,
8        period, for the entirety of your
9        practice, but I'm taking your word for it
10       that this area just tends to lend itself
11       to that sort of behavior.  But if you
12       have the type of order that was rendered
13       in this case, why would you not paint it
14       with a broad brush?  I know you said it's
15       vague, the language is vague, but
16       wouldn't you want to err on the side of
17       caution more so than being conservative
18       in what you share?
19            MR. KOZOLCHYK:  I did report the
20       order in Keefe, right, Mr. Hearon, I
21       believe?
22            MR. HEARON:  Yes.
23            MR. KOZOLCHYK:  So that notice of
24       compliance where it was unverified, and
25       because of the unverified, I was

Maria I. Salum, P.A.                      305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 67

```
 1      sanctioned, and I tried to get it
 2      verified, but I couldn't get ahold of my
 3      client and coordinate it in time, I
 4      reported that to Mr. Hearon.
 5           I explained why the things I didn't
 6      report at the time, I ended up reporting
 7      later.  But I tried to be much more
 8      liberal -- and that's how I came up with
 9      those other three cases, so I wasn't
10      trying to hide anything.  It didn't occur
11      to me.  I felt two of those were outside
12      the scope.  The third didn't even
13      register.  When I got the notice of
14      hearing, I thought long and hard about --
15      as broad as possible, is there anything I
16      missed, and I came up with those three.
17           Reddish, until I got the email from
18      Mr. Hearon today, was not even on my
19      radar.
20           MS. SMITH:  So to that point about
21      the case where you said it referenced the
22      plaintiff, your perception is that if
23      something references the plaintiff, it's
24      not really talking about us even though
25      we're fighting on behalf of our clients
```

Maria I. Salum, P.A.                    305 746-3079

Page 68

1   and residing in their shoes?  You don't

2   see that as being the same thing?

3       MR. KOZOLCHYK:  I see it now.  I saw

4   it when I reported it after I got the

5   notice of hearing.  At the time that the

6   motion was filed that was my thought

7   process as to why I did not report it at

8   the time.  But then I cast a much broader

9   net when I got the notice of hearing and

10   I included that.  But at the time I'm

11   trying to decide is this about my --

12   Elliot's unprofessional or problematic

13   conduct, and it said the plaintiff, so I

14   thought that was a distinction to be

15   made.  I stopped making that distinction

16   and I reported it when I got the notice

17   of the hearing.

18       And certainly if there are future

19   reporting requirements, that distinction

20   will cease to exist.  Anything pertaining

21   to the plaintiff, I will include that

22   within the scope of me.

23       MS. SMITH:  Because I mean, we

24   are -- we are the parties, right?  We are

25   the ones that are filing everything.

Maria I. Salum, P.A.            305 746-3079

Page 69

1    They may give you the information but

2    it's you, we are accountable.

3          Again, to that point, who mentors

4    you?  Do you have a mentor?  Do you have

5    a person that you work with, outside of

6    your office manager, whom I'm assuming is

7    not an attorney, right?

8          MR. KOZOLCHYK:  She is not an

9    attorney.

10         MS. SMITH:  Not an attorney.

11         So which attorney are you sort of

12   aligned with, affiliated with who you can

13   throw ideas off of, even things like this

14   where it doesn't fit within the scope,

15   you're speaking to somebody who is not an

16   attorney.  My sister is not an attorney.

17   She is a physician.  I would not go to

18   her, even though she's smart, to ask her

19   questions about whether or not something

20   was legally to be reported based on an

21   order, because her eyes would cross over

22   reading it.

23         Who do you have as an attorney,

24   whether it's within a bar association,

25   some sort of voluntary association that's

Maria I. Salum, P.A.                    305 746-3079

Page 70

1   affiliated with attorneys or just a
2   friend, who do you have that you could go
3   to for this type of thing?
4        MR. KOZOLCHYK:  I mean, I have a
5   couple of colleagues, but it's not that
6   form of relationship and it never
7   occurred to me to consult with them on
8   the particular issue of the plaintiff,
9   whether I should have reported that.
10       I did report it later upon further
11  reflection when I cast as broad a net as
12  possible, but -- so I have colleagues
13  that sometimes I have a question I might
14  go to them for.
15       MS. SMITH:  I would venture to say
16  that this is vitally important, and this
17  is probably something that we will talk
18  about as a committee, but I want to say
19  to you, since this is probably one of my
20  few opportunities to chat with you, it's
21  vitally, vitally important for you to
22  align with someone who is senior to you
23  who understands the practice and the
24  importance of avoiding these types of
25  situations, particularly because you said

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

1   that you're in a contentious area of

2   practice, because you're going to

3   repeatedly find yourself in this

4   situation, and I'm not sure where it can

5   go from here, so I would just really,

6   really, really stress the importance of

7   aligning with someone.  There are people

8   far more senior to you who are aligned

9   with attorneys who can assist them.  I

10  work in a large law firm and we have a

11  ton of resources in the firm, even for

12  people who have been practicing for a

13  long time like myself.

14       The last thing I wanted to say, it's

15  a question but also a statement.  You

16  mentioned earlier that you don't have

17  anything to gain, you wouldn't have

18  willfully failed to disclose this

19  important information.  But in actuality

20  you do because if you don't disclose it,

21  then you don't have to come before us and

22  have this rather unpleasant experience of

23  having numerous people ask you all these

24  questions which you may find invasive.

25  There is some incentive.  It is to your

Maria I. Salum, P.A.                    305 746-3079

Page 72

1     benefit to not share information with us,

2     so it's not necessarily 100 percent

3     accurate in my viewpoint that you don't

4     gain anything by not disclosing the

5     information.

6          You don't necessarily have to

7     respond to that.  It's not so much a

8     question as it is a statement.  But I

9     wanted you to understand because I'm

10    quite sure that other committee members

11    are thinking the same thing.

12         MR. KOZOLCHYK:  These filings are a

13    matter of public record, and I certainly

14    don't think that the committee doesn't

15    have the ability to obtain them one way

16    or another.

17         I never for a moment thought, "Oh,

18    if I don't report this, they will never

19    find out."  I have always tried to report

20    what was within the scope.

21         I believe my best path in dealing

22    with you all is compliance.  That is the

23    approach I am taking.  That's what I'm

24    trying to do is comply.  I believe that

25    is what will best serve me and serve

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 73

1    everybody else.  I'm not trying to do

2    anything else other than to comply.

3         MS. SMITH:  Thank you.  I appreciate

4    it.  I don't have any further questions.

5    Thank you.

6         Thank you, Bill.

7         MR. HEARON:  Steve, do you want to

8    go next?

9         MR. DAVIS:  Sorry about that.  Yeah,

10   I don't have any questions.  Thank you,

11   Bill.

12        MR. HEARON:  Bily?

13        MS. FERNANDEZ:  I don't have any

14   questions.  Thank you, Bill.

15        MR. HEARON:  Andrew?

16        MR. FIGUEROA:  No questions.  Thank

17   you, Bill.

18        MR. HEARON:  Celeste?

19        MS. HIGGINS:  I just have a couple

20   of follow-up questions.

21        Mr. Kozolchyk, how many people total

22   do you have working at your office?

23        MR. KOZOLCHYK:  Does this include

24   contractors?

25        MS. HIGGINS:  Are they independent

Maria I. Salum, P.A.                    305 746-3079

Page 74

1    contractors or are they people that work

2    in your office?  I'm not asking for tax

3    purposes.  I'm asking how many people are

4    in your office that help you manage your

5    cases or do your investigations or do

6    your research, how many people in your

7    office?

8        MR. KOZOLCHYK:  Me and one other

9    person.

10       MS. HIGGINS:  What?

11       MR. KOZOLCHYK:  In my office are me

12   and one other person.  I'm sorry, I have

13   remote workers.  Is that including remote

14   workers?

15       MS. HIGGINS:  Yeah.

16       MR. KOZOLCHYK:  I'm not trying to

17   hide anything.

18       MS. HIGGINS:  Let me clarify that

19   now that the world has changed and we all

20   work remotely.

21       How many people are involved in the

22   management of your cases or overseeing

23   your cases or involved in working on your

24   cases either remotely or a person in your

25   office?

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 75

1    MR. KOZOLCHYK:  Me and one other

2    person work on my cases.  That's me and

3    my firm manager.  I have other staff that

4    answer the phone and deal with clients,

5    things of that sort.

6    MS. HIGGINS:  So you and your firm

7    manager are physically the ones that are

8    mostly there, but there are other people

9    involved in things like, I guess, filing

10   and -- I don't even know that we file

11   anymore, but --

12   MR. KOZOLCHYK:  Less than that.  I

13   have a remote receptionist contractor.  I

14   have two remote receptionist contractors

15   that basically just answer the phone.

16   MS. HIGGINS:  In reality, the people

17   monitoring your cases are you and your

18   office manager, that's it?  I think you

19   made reference to this person throughout

20   this hearing.

21   MR. KOZOLCHYK:  There's one other

22   person who does, again remotely, contract

23   work, does calendaring.

24   MS. HIGGINS:  Let's talk about that

25   person for a moment.  That calendaring

Maria I. Salum, P.A.                    305 746-3079

Page 76

1    individual, how do they calendar?  What

2    are they doing?  You said that things

3    come in and you're monitoring dates, and

4    you are monitoring things.  Is that

5    person also doing the same thing?

6         MR. KOZOLCHYK:  Yes.  Well,

7    deadlines, yes.  It's much less of a

8    substantive and more what date you need

9    something done by.

10        MS. HIGGINS:  How often are you in

11   touch with this person?  Is it daily,

12   multiple times a day, does that person

13   generate a calendar for you for the week?

14   How do you know what's coming up?  What

15   is your tickler system?

16        MR. KOZOLCHYK:  We have an online

17   database.  The calendar is in the

18   database.  I have access to the database.

19        MS. HIGGINS:  And you have access to

20   the database?  And what software program

21   is that, is that like Clio, is that

22   1Drive?  What is that?

23        MR. KOZOLCHYK:  Sales Force.

24        MS. HIGGINS:  Sales Force?

25        MR. KOZOLCHYK:  Uh-huh.

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 77

1          MS. HIGGINS:  Okay.  And would you
2     say you're proficient in being able to
3     maneuver that?
4          MR. KOZOLCHYK:  Uh-huh.
5          MR. HEARON:  Is that a yes?
6          MR. KOZOLCHYK:  Yes, I'm sorry, yes.
7     That's a yes.
8          MS. HIGGINS:  In the Reddish case,
9     you said you worked a lot on that case,
10    put a lot of energy in that case, leading
11    up to the time when the case was
12    ultimately dismissed.  Was that the one
13    that you were talking about in that
14    description that you gave us a little
15    earlier?
16         MR. KOZOLCHYK:  Right, so I put
17    blood, sweat and tears in the case.
18         MS. HIGGINS:  I thought you had said
19    that, but I was wondering if I was merely
20    remembering lyrics to a song.
21         Okay.  You put a lot of blood, sweat
22    and tears into that.
23         And then at some point you pulled
24    the brake on that case and you just,
25    according to the court's order, you just

Maria I. Salum, P.A.                    305 746-3079

Page 78

1   didn't prosecute it anymore.  Was that
2   because the defendant had announced that
3   they were going to go bankrupt and there
4   was no point in trying to work that case
5   up if you weren't going to be able to
6   recover anything?  Was that the reason?
7        MR. KOZOLCHYK:  Both my client and I
8   felt the same way that if they're going
9   to file bankruptcy, I'd rather they do it
10   before we spent the resources of a trial.
11        MS. HIGGINS:  I wasn't really sure
12   we had an answer as to why -- and the
13   court didn't, clearly, as Judge Williams
14   indicated that four months went by and
15   you didn't do this and you didn't do
16   that.
17        At some point, I guess it was
18   because you just didn't want to spend
19   your resources.  I'm not criticizing
20   that.  I'm just asking if that was the
21   reason.
22        MR. KOZOLCHYK:  My client and I did
23   not think it made sense if they were
24   going to file for bankruptcy to incur
25   more time and resources, assuming they

Maria I. Salum, P.A.                    305 746-3079

Page 79

1    were going to file for bankruptcy.
2         MS. HIGGINS:  All right.  And did
3    you have some sort of system in place to
4    check and see if the defendant had
5    actually filed bankruptcy?  I mean at
6    some point after a month goes by and they
7    didn't file bankruptcy, didn't something
8    alert you that there was something up?
9         MR. KOZOLCHYK:  No.  But both my
10   client and I were not pleased with the
11   case and it was a very long fought case.
12   It frankly -- it should have settled a
13   long time ago, but the defendants and
14   their attorney were -- the defendants had
15   three different attorneys.  They hired
16   one, not interested in resolution, fired
17   them, hired someone else or withdrew.
18   I'm not making the distinction between
19   firing or withdrawing.  But basically
20   they have hired three different attorneys
21   during the course of this litigation just
22   to keep fighting, fighting, fighting,
23   anything other than resolve it, so my
24   client and I were very disillusioned.
25   That's why at the very end they said they

Maria I. Salum, P.A.                    305 746-3079

1    were going to file bankruptcy and we

2    didn't believe it made sense to go to

3    trial.  And so we were both -- my client

4    was sick of the case and I could

5    certainly share his sentiment.

6          MS. HIGGINS:  I want to go back to

7    your office procedures.  Sorry, I think

8    you answered this once before in another

9    hearing.  Let me know now.  How many

10   cases do you carry total on any given

11   time on average?

12         MR. KOZOLCHYK:  Can I look it up so

13   I can give you a precise number?  It's

14   going to take me -- I could do it in

15   under a minute.

16         MS. HIGGINS:  Okay.

17         MR. KOZOLCHYK:  Currently I have 44

18   open cases.

19         MS. HIGGINS:  That's in federal

20   court or all together?  I mean, in

21   federal court or the Southern District of

22   Florida or all together everywhere?

23         MR. KOZOLCHYK:  In the Southern

24   District of Florida, which is 99.9

25   percent of my practice, that's not an

Page 81

```
 1      exact calculation.  It will accurately
 2      represent what we're talking about here.
 3      I pretty much almost practice exclusively
 4      in the Southern District of Florida.
 5           MS. HIGGINS:  I may not have
 6      understood correctly.  But one of the
 7      things that you said, I think, and I
 8      wasn't really sure with regard to which
 9      case, whether it was Reddish or something
10      else, that you didn't think you needed to
11      report it because the court's language
12      was directed at the plaintiff and not
13      necessarily plaintiff's counsel.
14           MR. KOZOLCHYK:  No, no, no.  The
15      motion to dismiss -- this was not a court
16      order.  The motion to dismiss.  If we're
17      talking about the same case, there's a
18      motion to dismiss where the defense
19      attorney said plaintiff is trying to
20      further mislead the court.  That's the
21      argument he put in his motion to dismiss.
22           MS. HIGGINS:  Once a person is
23      represented by counsel, it's kind of not.
24      Unless it's a specific reference to a
25      comment in a deposition or a specific
```

Maria I. Salum, P.A.                    305 746-3079

Page 82

1    answer of an interrogatory, and even

2    then, you would agree that once the

3    person is represented by counsel, those

4    comments of plaintiff is doing this,

5    defense is doing that, is really aimed at

6    an attorney, not the actual party of the

7    case, right?

8         MR. KOZOLCHYK:  I thought that would

9    be the case and that's why when I cast a

10   broader net, I reported it and I realized

11   that that could be something within the

12   scope and I reported it.

13        I'm not trying to argue with you

14   that I shouldn't have reported it.  I

15   didn't report it at the time because I

16   thought that was a meaningful

17   distinction.  Upon getting the notice of

18   hearing and thinking, is there anything I

19   missed, I thought, "You know what, that

20   particular case is probably not a

21   meaningful distinction, I should better

22   report it.  And I reported it."

23        MS. HIGGINS:  I think it might be a

24   distinction without a difference and the

25   committee would probably agree, I don't

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 83

1    know.

2         Mr. Kozolchyk, look, I just want to

3    let you know I'm a sole practitioner

4    myself, I imagine that if there's no

5    other attorney in your office and you are

6    the sole practitioner, notwithstanding

7    what your business manager is doing, but

8    I just think that -- so I'm aware of some

9    of the limitations that a sole

10   practitioner can have, but I think at

11   this point there might be some need for

12   maybe some oversight in your office so

13   these things don't go through the cracks.

14        At this point, I have nothing else

15   to say.  No further questions.

16        MR. HEARON:  Thank you, Celeste.

17        It's actually not a phrase in a

18   song, but the name of a musical group

19   from the '70s, as I recall, Blood, Sweat

20   and Tears.

21        Margot, you're up.

22        MS. MOSS:  Good afternoon.  My name

23   is Margot Moss.

24        Mr. Kozolchyk, and I apologize if

25   I'm not saying your name correctly, I

Maria I. Salum, P.A.                    305 746-3079

Page 84

1    appreciate that you have said that you
2    did not willfully miss sending orders or
3    accusations to the committee.  I am sure
4    you have gotten the sense throughout this
5    hearing that the committee members or
6    some committee members feel differently
7    about that.  Have you gotten that sense?
8         MR. KOZOLCHYK:  Yeah.
9         MS. MOSS:  And we've discussed with
10   you some of the methods that you have in
11   place and systems you have in place at
12   your firm that may not be sufficient
13   completely to catch all these things.
14        My question is.  Going forward, if
15   the committee should decide that they
16   need to extend this reporting period to
17   you, what would you do differently going
18   forward, and will you do anything
19   differently in order to catch these
20   things in order to send them to the
21   committee?
22        MR. KOZOLCHYK:  I have a request,
23   but it's probably not my place to request
24   anything.  I would ask that the order be
25   narrowed a little bit in its scope and --

Maria I. Salum, P.A.                    305 746-3079

Page 85

1    just a little less.  I think it's vague,
2    but I hope that doesn't offend the
3    committee to characterize it like that.
4    If there's something more black and white
5    about what precisely triggers it that is
6    not open to interpretation, I would
7    welcome that modification of the order.
8    If that's not available -- what I'm going
9    to be, emerging from this, is that -- I'm
10   going to be extremely, extremely careful
11   and if anything could remotely be
12   characterized within the scope, I'm going
13   to cast the broadest net possible.
14         I hope Mr. Hearon doesn't get tired
15   of receiving emails from me, because even
16   today -- today I got -- today, the
17   defendants in a case filed a response to
18   a statement of claim, where they accused
19   me of not complying with the court's
20   order because the court's order says to
21   provide all documents you have including
22   any time sheets and anything else.  I
23   provided what documents we had.  It
24   didn't have time sheets because my client
25   doesn't have time sheets, and so she put

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 86

1    in her response that I'm not complying

2    with the court's order.  So I will be

3    reporting that to Mr. Hearon, even though

4    under the FLSA it's not the defendant's

5    burden to maintain time records.

6    Plaintiff is not required to maintain

7    time records, the orders to desist,

8    whatever you have such as time records.

9    But now I'm being accused of not

10   complying with the court's order because

11   within what we produced, which is

12   everything we had, there were no time

13   records.

14        So Mr. Hearon -- Mr. Hearon is going

15   to be getting a lot more emails from me

16   because I'm going to be very, very broad

17   that there can't possibly be a

18   misunderstanding or that somehow I did

19   not report something that was within the

20   scope.

21        MS. MOSS:  What I'm hearing is that

22   these things that have been missed, is

23   that because there was a misunderstanding

24   or because you just missed them?

25        MR. KOZOLCHYK:  Two of the things

Maria I. Salum, P.A.                    305 746-3079

Page 87

1    were -- I'm aware of four examples.
2    There's the Reddish case, the Martinez
3    case, the Santiago case and that other
4    case where the guy filed a motion to
5    dismiss.
6          In the Reddish case, I completely
7    missed it.  Not even on my radar.  Didn't
8    even think about it until I got the email
9    from Mr. Hearon.
10          The Martinez case, it was a rule of
11    motion for sanctions.  At the time it did
12    not even register and I can explain again
13    if the committee would like to know why,
14    but when I got the notice of hearing I
15    thought long and hard if anything else
16    could be within that scope and it
17    occurred to me, "Oh, let me make sure I
18    include that," so it didn't register at
19    the time.  So those are the two that,
20    yes, I missed.  But then I reported the
21    second one.
22          The other two, I thought they were
23    not within the scope for various reasons.
24    Again, when I got the notice of hearing,
25    I'm like, let me cast as broad a net as

Maria I. Salum, P.A.                    305 746-3079

Page 88

1    possible and make sure I include those.

2        MS. MOSS:  So what I'm hearing again

3    is it's kind of a mixture of just missing

4    it and maybe not understanding the scope.

5        Again, going forward, it seems to me

6    that your answers are that you're going

7    to be much broader in how you interpret

8    the language of the order; is that right?

9        MR. KOZOLCHYK:  Broad and be more

10   careful.  I am going to do everything I

11   can to make sure they are never missed

12   again.

13       MS. MOSS:  And the committee can

14   discuss the language of the order if that

15   seems to be the issue, but will you reach

16   out, at least to Mr. Hearon and to the

17   committee if there's a question in your

18   mind about whether this should be

19   reported or not reported?

20       MR. KOZOLCHYK:  100 percent.  If I

21   have a question to any uncertainty, Mr.

22   Hearon will be hearing about it.

23       MS. MOSS:  I have nothing further.

24       MR. HEARON:  Thank you, Margot.

25       Tiffani?

Maria I. Salum, P.A.                    305 746-3079

1    MS. LEE:  Thanks, Bill.

2    I have two questions, Mr. Kozolchyk.

3 When Ms. Moss asked you what you would

4 like to see different, you first said you

5 would like the order language to be more

6 precise.  What more precise language

7 would help you not miss these reporting

8 obligations?

9    MR. KOZOLCHYK:  The word -- the word

10 "problematic" is very broad.  Look, this

11 is what I would like.  If the committee

12 doesn't agree with it, I respect the

13 committee's decision.  I'm not trying to

14 sound like I'm complaining or criticizing

15 anything.

16    What would I change from it?  You

17 know, if it says "sanctions," that's

18 pretty unambiguous.  If it says -- I'm

19 brainstorming here in real time.  I'm

20 just saying the term "sanctions" is black

21 and white.  "Problematic" is vague and

22 open to interpretation to some extent.

23 To some extent it's not.  That's just an

24 example.

25    So if it were up to me, which it is

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 90

1    absolutely not, I would make the scope

2    items that are black and white and

3    unambiguous and cannot be misinterpreted.

4         MS. LEE:  Thank you.

5         In terms of things that you missed,

6    you talked about the August 30th email

7    that you sent to Mr. Hearon reporting on

8    the order and motion for sanctions in the

9    Keefe case.  Do you remember that?

10        MR. KOZOLCHYK:  Yeah.

11        MS. LEE:  And then he responded to

12   you and asked you to confirm that you did

13   not forward and attach a discovery

14   memorandum in which sanctions were sought

15   against you.  Do you recall that?

16        MR. KOZOLCHYK:  Yeah, that was an

17   oversight.

18        MS. LEE:  So was that one that you

19   just completely missed, like the Reddish

20   case, or is that one that you determined

21   was outside the scope?

22        MR. KOZOLCHYK:  Absolutely missed.

23        MS. LEE:  I don't have any further

24   questions.

25        MR. HEARON:  Thank you.

Maria I. Salum, P.A.                    305 746-3079

Page 91

1          Devang?

2          MR. DESAI:  Thanks, Bill.  I don't

3    have any questions.

4          MR. HEARON:  Valencia?

5          MS. GALLON-STUBBS:  Thank you.  Mr.

6    Kozolchyk, I want to say your name

7    correctly.  Can you say your name for me?

8          MR. KOZOLCHYK:  Kozolchyk, but I'm

9    very happy to go by Elliot.

10         MS. GALLON-STUBBS:  Kozolchyk, I

11   will try it that way.

12         I have a question for you.  In

13   listening to you, what recommendations,

14   if you were the committee -- I mean, we

15   have gone through this at the first time,

16   but now we are at the second time around.

17   I'm asking your input of type of

18   recommendations in ensuring that you

19   comply with the court's order going

20   forward.

21         MR. KOZOLCHYK:  Extend the

22   probation.  I mean, this is my -- again,

23   this is my -- my opinions are irrelevant.

24   So I don't want it to be seemed to be

25   taken the wrong way by the committee.

Maria I. Salum, P.A.                    305 746-3079

Page 92

```
 1        But I would think extend the
 2   probation and narrow the language and
 3   make the language more unambiguous.
 4        MS. GALLON-STUBBS:  What about any
 5   thoughts as far as a mentor?  What are
 6   your thoughts on that?
 7        MR. KOZOLCHYK:  If I can sincerely
 8   ask you, what would the purpose of the
 9   mentor be?  If I can just have a couple
10   of minutes on that.
11        When the committee first saw me,
12   there were cases complained about where I
13   had very aggressively engaged in -- I
14   reciprocated what was done to me.  There
15   were tremendous attacks on me and I
16   reciprocated.
17        As I sit here before you today, I
18   have not engaged in any of that conduct.
19   So when defendants attack me personally,
20   I am not reciprocating.  I'm sticking to
21   the issues and staying professional in my
22   writing.
23        And so, if I lack the capability of
24   doing that, I guess a mentor might guide
25   me on that, but it seems here it's more a
```

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 93

1    function of is there some system you

2    desire me to employ that I'm not aware

3    of?  This is a subjective analysis of

4    every review, of every filing in the case

5    that my firm manager and I are

6    performing, there's not a mentor that is

7    going to want to look at all my filings.

8    And I'm making it very clear, if I have

9    any questions or uncertainty about

10   whether something should or should not be

11   included, it's going right to Mr. Hearon

12   moving forward.

13       MS. GALLON-STUBBS:  But a mentor,

14   someone that you can go to, right, when

15   you have these questions.  When you have

16   these contentious cases that come up,

17   almost an outlet, but an outlet in a

18   professional way, to kind of help guide

19   you along.  So that's my thoughts.  I'm

20   not speaking on behalf of the entire

21   committee, but from my standpoint, where

22   I'm coming from.

23       MR. KOZOLCHYK:  I have a couple of

24   people who I can call and ask questions

25   on how to proceed if I have questions on

Maria I. Salum, P.A.                    305 746-3079

Page 94

1    something.

2         MS. GALLON-STUBBS:  That have the

3    same type of cases and background in

4    which you practice.

5         MR. KOZOLCHYK:  Yes.

6         MS. GALLON-STUBBS:  As far as you've

7    already shared with us on several

8    occasions that there are two -- office of

9    two, outside are remote workers.  How are

10   you able to ensure that -- you know, you

11   referenced candidly that there are some

12   oversights, right, in reporting them to

13   the committee, so how are you going to

14   move forward and ensure that there is no

15   additional oversight and that we're not

16   right back at this juncture again?

17        MR. KOZOLCHYK:  There's two parts to

18   this.  There's whether something doesn't

19   register mentally when I'm reading

20   something.  The other thing is whether it

21   does register and I decide that might not

22   be within the scope.

23        Let me address the second one first.

24   To the extent anything can potentially be

25   interpreted as within the scope, I am not

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 95

1    going to split hairs.  If it could be

2    interpreted, it's going to Mr. Hearon for

3    reporting.

4         Regarding the first one, whether

5    something registers or not, I am going to

6    look at stuff as carefully as I can, and

7    I'm going to do the absolute best I can

8    to make sure nothing falls through the

9    cracks and what should be reported to

10   this committee, and I am optimistic that

11   that will not be an issue moving forward.

12        MS. GALLON-STUBBS:  I'm trying to

13   share with you -- and these are just my

14   thoughts.  You said about over 99 percent

15   of your practice is in federal court in

16   the Southern District and an office of

17   two, you being the sole lawyer, so you

18   have these active cases that are going

19   on.  It's quite a movement going in so to

20   ensure that nothing slips through the

21   cracks.  That's why I'm asking, you know,

22   other ways to help you, not to put

23   additional stress on you, "Oh, I got

24   this, I missed this one and I caught this

25   one."  Again, those are just my thoughts

Maria I. Salum, P.A.                    305 746-3079

Page 96

1    of something additional and different,

2    additional person, and I know we're

3    talking about the mentor, but someone

4    that can help ensure that nothing falls

5    through the cracks.

6         MR. KOZOLCHYK:  It's not for me to

7    ask questions but if this committee has

8    this for other attorneys, what do the

9    other attorneys do that the committee

10   approves of?

11        MR. HEARON:  You are right, that's

12   not a question that we're going to answer

13   for you.

14        Valencia?

15        MS. GALLON-STUBBS:  With that being

16   said, I don't have any further questions.

17        MR. HEARON:  Thank you.

18        Bernardo?

19        MR. LOPEZ:  Mr. Kozolchyk, I know

20   we've been going for a while, so let me

21   see if I can be quick and direct.  Let me

22   understand your practice again just to

23   make sure to kind of fine tune some of

24   the answers you've given.

25        In the cases you have in the federal

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 97

1    court, filing comes in, there's an order
2    or a filing from another party.  Do you
3    individually, do you yourself review each
4    and every filing as it comes in or does
5    your assistant review them and then hand
6    you the ones that she thinks are
7    important, or you get a stack of them and
8    then review them later on?  How does that
9    work?
10        MR. KOZOLCHYK:  We both review them
11   as they come in and she will bring to my
12   attention things that are important that
13   should be taken further action on as
14   well.
15        MR. LOPEZ:  Do you personally
16   review every filing and order that comes
17   in?
18        MR. KOZOLCHYK:  Yes.
19        MR. LOPEZ:  I think in your answer a
20   couple of things have come out, but I
21   want to make sure we clarify them and get
22   them on the record.
23        You thought that the language in the
24   order from the committee was vague and
25   ambiguous, right?  I'm not going to take

Maria I. Salum, P.A.                    305 746-3079

Page 98

1    that personally.  It seems very clear
2    from your answer that you thought that;
3    is that correct?
4        MR. KOZOLCHYK:  I thought it was
5    vague but I'm not complaining and --
6        MR. LOPEZ:  No, no, but you thought
7    the language was vague and ambiguous?
8        MR. KOZOLCHYK:  Particularly the
9    word "problematic."  I thought a lot of
10   things can fall under that without a
11   clear definition of it.
12       MR. LOPEZ:  Did you ever seek any
13   clarification from the committee or from
14   the court?
15       MR. KOZOLCHYK:  I don't recall.  I
16   don't know.  I don't think so.  I don't
17   know if when the order was first being
18   drafted I might have raised a concern
19   with Mr. Hearon.  I know I raised -- I
20   don't recall what concerns I might have
21   raised with Mr. Hearon.  I don't know if
22   that was one of them, so I can't say for
23   sure if that was one of them or not.
24       MR. LOPEZ:  As these filings were
25   coming in and you were having trouble

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

1   figuring out whether they are fitting

2   into the order or not, did you at that

3   time seek any clarification from the

4   committee?

5        MR. KOZOLCHYK:  No, I didn't think I

6   needed to, but it's very clear now that

7   if there's anything that could possibly

8   be interpreted within the scope that I

9   should absolutely report it.

10        MR. LOPEZ:  Thank you.  I think

11   you've said that a couple of times.  From

12   now on to the extent that there's any

13   kind of question as to whether it falls

14   within the scope or not, you will assume

15   it does and you will report it.

16        I think something else that comes

17   clear from your testimony today that that

18   didn't happen before.  If there was an

19   order or a filing that came in and it was

20   maybe close, but you weren't sure because

21   of the ambiguity of the language, that

22   your default was to not report it and

23   that happened at least four times; am I

24   correct?

25        MR. KOZOLCHYK:  No, I wouldn't frame

Electronically signed by Maria Salum (001-186-132-3519)        f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 100

1    it like that.  It's not that my default
2    was not reporting.  We made a judgment
3    call.  When I say I make a judgment call
4    in every filing, I mean, every filing, a
5    notice of compliance, any filing in every
6    single case, we make a judgment call.
7    And we thought that -- at the time we
8    thought, again, I said two of them didn't
9    even register.  So it was not even on our
10   radar.  The two that did we thought at
11   the time one was sufficiently abstract is
12   the word, sufficiently abstract, and its
13   insinuation that it put me outside the
14   scope of reporting it, and the other one
15   referred to the plaintiff and not me.
16   But I'm not defending the decisions I
17   made not to report those at the time I
18   made those decisions.  Ultimately I did
19   report them when I casted a broader net
20   and that is what I'm operating under now.
21   If there's any question, report it.
22        MR. LOPEZ:  And you cast that
23   broader net after you got the notice from
24   the committee; is that correct?
25        MR. KOZOLCHYK:  When I caught wind

Maria I. Salum, P.A.                    305 746-3079

Page 101

1    that there was a problem.

2         MR. LOPEZ:  The notice of the

3    hearing and all of a sudden you went back

4    and cast a broader net; is that correct?

5         MR. KOZOLCHYK:  Yeah.

6         MR. LOPEZ:  On the Reddish issue, I

7    had a question, too.  Ms. Higgins asked

8    you questions about the procedure you go

9    through for docketing deadlines and

10   everything like that.  I think you said

11   in the Reddish case when it got

12   transferred to Judge Williams, you

13   thought all the prior deadlines were

14   clear.  In other words, everything was

15   cleared and now you were waiting for new

16   deadlines from the judge, right, so

17   nothing happened in that case for years.

18   So what part of your system would catch

19   something like where in your view at

20   least there are no deadlines, but nothing

21   is happening in the case and nothing has

22   happened in the case for like a year, how

23   do you catch that with your system?

24        MR. KOZOLCHYK:  Well, we can see

25   whether there's been activity on the

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 102

1    docket in an open case or something like
2    that.  The case was on my mind.  And at
3    some point we were going to file
4    something if the judge didn't do --
5    there's an ECF filing that said that the
6    deadlines were terminated.  That's why we
7    thought we weren't liable for any
8    deadlines after the transfer.
9        And we had looked and seen that the
10   judge -- several cases were transferred
11   around the same time to the judge and we
12   saw that she set a hearing in the other
13   cases for a status conference.
14       It's not like this was going to go
15   indefinitely.  As far as the system, I
16   don't have an exact system for that but
17   it was on my mind and I had planned at
18   some point, if the judge was not going to
19   set a status conference, to file a motion
20   for a status conference.
21       MR. LOPEZ:  But nothing happened
22   within a year.  So is there anything that
23   you think you might be able to implement
24   so that you can catch those kind of
25   things?  Because in this case, it went to

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 103

```
 1        the detriment of your client.  The case
 2        was dismissed, dismissed with prejudice,
 3        and now your client has no case.
 4             Is there anything going forward that
 5        you can implement so that you can catch
 6        something like that?
 7             MR. KOZOLCHYK:  Yes.  If there
 8        hasn't been activity in a certain amount
 9        of time, to review the file again and
10        create activity.
11             MR. LOPEZ:  Just one last thing for
12        the record to make sure everything is
13        clear.
14             You are aware that Mr. Eric
15        Gabrielle was not part of the committee
16        when your case was brought to the
17        committee's attention, and that he in
18        fact had no part at all in any decision
19        regarding your case?  Are you aware of
20        that?
21             MR. KOZOLCHYK:  I'm not suggesting
22        otherwise.
23             MR. LOPEZ:  No, no, but are you
24        aware that he had no connection with your
25        case?
```

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 104

1          MR. KOZOLCHYK:  Right, I'm not

2     suggesting otherwise.

3          MR. LOPEZ:  No further questions,

4     Bill.

5          MR. HEARON:  Allison?  Allison?

6          MS. KAHN:  Hi, Mr. Kozolchyk.  I'm

7     Allison Kahn.  I feel like everyone has

8     kind of touched on it, but I want to know

9     the exact number of staff that you have

10    in your office.  You have your office

11    manager, correct, and you employee two

12    receptionists, correct?

13         MR. KOZOLCHYK:  I have three

14    part-time contractors.

15         MS. KAHN:  Do they work remote?

16         MR. KOZOLCHYK:  Yes.

17         MS. KAHN:  You have three part-time

18    contractors and your office manager and

19    that is it, correct?

20         MR. KOZOLCHYK:  Yes, currently.

21         MS. KAHN:  What do you mean by

22    currently?

23         MR. KOZOLCHYK:  Maybe like a year or

24    two ago, I had another remote worker, but

25    it was not recent.

Maria I. Salum, P.A.                    305 746-3079

Page 105

1          MS. KAHN:  Do the remote workers
2     work for anyone else or just you?
3          MR. KOZOLCHYK:  They work for others
4     as well.
5          MS. KAHN:  Do you handle mostly FLSA
6     cases?
7          MR. KOZOLCHYK:  Yes.
8          MS. KAHN:  Do you also have pending
9     EEOC and FCHR matters?
10          MR. KOZOLCHYK:  I don't even know
11     what an FCHR matter is, but no EEOC.
12          MS. KAHN:  It's the state
13     counterpart for EEOC.
14          MR. KOZOLCHYK:  No.
15          MS. KAHN:  Have you ever been
16     investigated by the bar?  I know it's a
17     little bit off topic, but I'm just
18     curious.
19          MR. KOZOLCHYK:  Are you asking
20     whether I had a Florida Bar complaint
21     against me?
22          MS. KAHN:  Have they ever opened an
23     investigation?
24          MR. KOZOLCHYK:  Yes.
25          MS. KAHN:  How many?

Maria I. Salum, P.A.                    305 746-3079

Page 106

1     MR. KOZOLCHYK:  You're talking about

2  like bar complaints, right?

3     MS. KAHN:  I'm talking about bar

4  complaints.  You seem to want to, you

5  know, parse out words during everyone's

6  questions.

7     I want to know how many times, not

8  just a bar complaint, but where a bar

9  opened a file and investigated you?

10    MR. KOZOLCHYK:  Off the top of my

11  head in the 13 years that I have been

12  practicing, maybe ten times, but that's a

13  very rough approximation.  And my sole

14  purpose in parsing, as you put it, is I

15  want to make sure that the answers I give

16  you are completely truthful and accurate.

17    MS. KAHN:  I think it's to qualify.

18  I find what you say very hard to swallow.

19  I don't think you take any personal

20  responsibility.  And, you know, I'm board

21  certified in labor and employment law.

22  These are not contentious cases.  FLSA

23  cases are easy, how many hours did they

24  work, how much were they paid.  You're

25  blaming everyone for picking on you,

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 107

1   personal attacks against you.  But do you

2   not understand that that's because you're

3   not filing -- you're not serving initial

4   disclosures, you're not serving verified

5   interrogatories, you're making incorrect

6   representations?  That was a question.

7       MR. KOZOLCHYK:  I mean, I

8   respectfully don't know how you can say

9   these are not contentious cases.  I have

10  a guy threatening to disbar me saying

11  that he's going to make it his mission to

12  disbar me and references this order --

13      MS. KAHN:  I'm going to stop you

14  there.  I'm sorry, I can't.  Because

15  you're just doing what I just told you.

16  You're making excuses.  I'm sorry.  I've

17  been doing this for 20 years and it

18  doesn't mean you don't ever have

19  contentious cases, but my point is, have

20  you considered that maybe you're the

21  difficult one because you're not doing

22  your work, and that's frustrating the

23  other side?  Have you considered that?

24      MR. KOZOLCHYK:  Yes, I have

25  considered that.

Maria I. Salum, P.A.                    305 746-3079

Page 108

1      MS. KAHN:  My personal view is --

2   this is not personal overall, what we've

3   seen, not a personal attack, but you are

4   not doing your work and they are calling

5   you out on it.

6      What do you do for continuing to

7   ensure that, you know, you know the

8   substantive law in terms of following

9   case updates and how do you keep track of

10   the changes in the law?

11      MR. KOZOLCHYK:  I research the

12   issues on a regular basis as they arise

13   and I read the Law 360 newsletter and I

14   read the 11th Circuit Court of Appeals

15   opinions.

16      MS. KAHN:  Every week?

17      MR. KOZOLCHYK:  Yeah, yes.

18      Am I being accused of making bad

19   arguments about the law?

20      MS. KAHN:  This is not your

21   opportunity to ask me questions.

22      I have nothing further.

23      MR. HEARON:  Thank you.

24      Richard?

25      MR. BARON:  Thank you, Bill.

Maria I. Salum, P.A.                    305 746-3079

Page 109

1          Mr. Kozolchyk, my name is Richard

2     Baron, and while in the past I have

3     defended a number of Fair Labor Standard

4     Act cases, have you and I ever had a

5     case?  I don't believe we have.

6          MR. KOZOLCHYK:  I don't believe so.

7     Not that I can recall.

8          MR. BARON:  When you first appeared

9     before this committee and the committee

10    entered an order to monitor you and have

11    you review your pleadings and anything

12    that you felt where anyone else might

13    have felt you were problematic, you were

14    supposed to report it, right?

15         MR. KOZOLCHYK:  Yes.

16         MR. BARON:  In reviewing that order,

17    did it ever cross your mind that if you

18    violated that order there might be very

19    serious repercussions?

20         MR. KOZOLCHYK:  Yes.

21         MR. BARON:  And you had stated that

22    99 percent of your cases are in the

23    federal -- Southern Federal District

24    Court.

25         MR. KOZOLCHYK:  Yes.  I would say a

Maria I. Salum, P.A.                    305 746-3079

Page 110

1    hundred percent.

2         MR. BARON:  Here's my point.

3    There's a disconnect for me.  A hundred

4    percent of your practice is in federal

5    court.  You are under an order that

6    requires you to monitor pleadings, that

7    requires you to filter pleadings that are

8    problematic, however, you may define it.

9    How is it that you weren't overly

10   reflective of that order and didn't just

11   report anything that could have been

12   interpreted, without you having to bounce

13   on the head of a pin to determine what we

14   want to see and what we don't want to

15   see?  Why didn't it just occur to you --

16   because it would have occurred to me --

17   that if I'm under the scrutiny of the

18   grievance committee that dictates whether

19   or not I will continue to practice in the

20   federal district court where all my

21   business is, I better be damn careful.

22   And that's the disconnect that I have

23   that that didn't connect with you.

24        And I want you to try to explain to

25   me, other than with BS, why that didn't

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 111

1    connect to you, why didn't you look at

2    every single piece of paper that came in

3    and your immediate thought was, "Does

4    this have to be reported," rather than

5    the other way around, which is what I'm

6    suspecting you did.  You read a pleading

7    -- and I'm not even sure I agree with

8    Allison -- that you reviewed the

9    pleading, I'm not a hundred percent sure

10   that a lack of a pleading on a motion to

11   dismiss, that's something that should

12   have been reported, you would have picked

13   it up, because I get the same sense

14   Allison gets, you have 44 cases, you're

15   overburdened, you're a sole practitioner

16   and you're waiting for the last minute

17   seeking extensions and deadlines and your

18   practice is really, sounds to me like

19   it's a disaster.  Am I wrong?  I mean, I

20   know FLSA work can be very rewarding

21   financially.  You get one or two big

22   cases a year and you get a big hit -- you

23   work on a contingency, right?

24        MR. KOZOLCHYK:  Yes.

25        MR. BARON:  Every case is a

Maria I. Salum, P.A.                          305 746-3079

Page 112

1    contingency, right?

2         MR. KOZOLCHYK:  Yes.

3         MR. BARON:  Without going into your

4    personal income, would you say that this

5    has been a good practice for you

6    financially?

7         MR. KOZOLCHYK:  I think it's an okay

8    practice.

9         MR. BARON:  So is this something

10   that you're willing to jeopardize, this

11   "okay practice," by not being a hundred

12   percent diligent in reviewing every

13   document and when there's a benefit of a

14   doubt turning it over to Mr. Hearon?

15        MR. KOZOLCHYK:  No.

16        MR. BARON:  What do we do with a guy

17   like you?  You say "extend my probation,"

18   I don't know if that's going to solve the

19   problem.  I see the problem is you're

20   overworked, understaffed and

21   overburdened.  And to me, that's a real

22   problem for the privilege of practicing

23   in federal court.  This is not all right.

24        MR. KOZOLCHYK:  I'm really sorry.

25        MR. BARON:  Let me follow up on

Maria I. Salum, P.A.                    305 746-3079

Page 113

1   something else that Allison said.  You

2   think you've had ten open bar complaints

3   in the last 13 years?

4        MR. KOZOLCHKY:  That is a rough

5   estimate.

6        MR. BARON:  Could there have been

7   more?

8        MR. KOZOLCHYK:  Possibly, but there

9   could have been less as well.

10        MR. BARON:  Have you ever been

11   disciplined by the Florida Bar?

12        MR. KOZOLCHYK:  Yes.

13        MR. BARON:  What was that

14   discipline?

15        MR. KOZOLCHYK:  In the Dahdouh case,

16   which I think the committee was aware of,

17   I had to attend a class.

18        MR. BARON:  There was a diversion?

19   In that little -- that little green spot

20   in the Florida Bar website that says

21   "discipline in the last ten years," is

22   yours green or red?

23        MR. KOZOLCHYK:  Mine is green.

24        MR. BARON:  So you haven't been

25   disciplined in the last ten years?

Maria I. Salum, P.A.                    305 746-3079

Page 114

```
 1          MR. KOZOLCHYK:  Oh, no.  But the
 2     letter that triggers this committee's
 3     oversight was also forwarded to the
 4     Florida Bar and they are dealing with
 5     that as well.
 6          MR. BARON:  That's pending?
 7          MR. KOZOLCHYK:  Yes.
 8          MR. BARON:  Do you have counsel for
 9     that?
10          MR. KOZOLCHYK:  No.
11          MR. BARON:  It might be a good idea
12     after today to have somebody assist you
13     through these times.  I mean, that's the
14     kind of judgment you're exhibiting to
15     this committee.  You don't have counsel
16     here, you just told us you don't have bar
17     counsel and there's a pending matter
18     before the Florida Bar.  Don't you think
19     it shows this committee a lack of
20     judgment, Abe Lincoln's old saying,
21     "Anyone who represents himself has a fool
22     for a client"?
23          MR. KOZOLCHYK:  I had an attorney at
24     the beginning of this.  It became
25     extremely, extremely expensive.  It's not
```

Maria I. Salum, P.A.                      305 746-3079

Page 115

1    a function of me not taking this

2    seriously.  I take this extremely

3    seriously.

4         MR. BARON:  I don't buy that.  I

5    think if you took it extremely seriously,

6    you wouldn't be back here today.  That's

7    really what I think.  And I'm a pussycat.

8    I am not one of the hard noses on this

9    committee, but I've been listening to you

10   for two hours now and I don't believe

11   hardly a word you're saying.  When you

12   say you do the very best you can, the

13   very best you can stinks.  The very best

14   you can got you in front of us again.

15        You had to be reminded by this board

16   to double check to make sure that you

17   reported everything and you're taking

18   credit for having reported, screw the

19   items, in retrospect and second thought,

20   maybe they should have been reported, so

21   I reported them.

22        The truth is you never would have

23   looked and never reported it if you never

24   would have gotten the email from Mr.

25   Hearon, correct?

Maria I. Salum, P.A.                    305 746-3079

Page 116

1      MR. KOZOLCHYK:  I was not aware of

2  an issue until -- I was not thinking "I'm

3  going to hide something" and then not

4  report it.

5      MR. BARON:  I believe that.  That's

6  one of the few things that I do believe.

7  I do believe that.

8      But what I can't believe is that you

9  didn't look at everything so carefully

10  that even the slightest of things, you

11  would have sent it to Mr. Hearon, because

12  you know that your livelihood may very

13  well depend on what this committee does.

14  How would you like a 60 day suspension,

15  for example, what would that do to your

16  career?

17      MR. KOZOLCHYK:  It would destroy my

18  practice.

19      MR. BARON:  You knew that, or should

20  have known going in that you needed to be

21  a hundred percent diligent and fully

22  compliant and you weren't.  And I can't

23  understand for the life of me why and

24  there's no excuse.  I don't think you can

25  tell us why, other than you're

Maria I. Salum, P.A.                    305 746-3079

Page 117

1    overworked, overburdened, understaffed.

2    Other than that, I can't think of any

3    reason why you wouldn't have made sure

4    that you wouldn't be sitting here again.

5         I have nothing further.

6         MR. KOZOLCHYK:  May I speak, please?

7         MR. HEARON:  Go ahead, Elliot.

8         MR. KOZOLCHYK:  I take

9    responsibility for not reporting the

10   things that I did not report.  I am sorry

11   and if I am permitted to practice and if

12   I'm on probation again for another year,

13   you can know that it will not happen

14   again.  It absolutely will not happen

15   again.  And I'm sorry and I take

16   responsibility.  And please give me the

17   opportunity and there won't be anything

18   even close of a failure to report.  I'm

19   really sorry for the ones that I missed.

20   It will not happen again.

21        MR. HEARON:  Are you done, Richard?

22        MR. BARON:  Not quite.

23        It isn't your failure to take

24   responsibility.  It's your failure to not

25   have done it in the first place.

Maria I. Salum, P.A.                    305 746-3079

Page 118

1          Let me say one last thing to you.
2     I've had a number of Fair Labor Standard
3     Act cases in my life and I've had them
4     with some guys that are well known to be
5     difficult lawyers, and none of them were
6     contentious.  And in the period of one
7     year, you reported ten to 14 complaints
8     or statements that you had made that
9     attacked you or your client based upon
10    your pleadings or your work, ten to 14 in
11    one year.  I've been practicing 53 years
12    and I don't think I've had two.
13         How do you explain ten since January
14    or since October of last year?  What is
15    going on that people are writing these
16    things about you that need -- that
17    require you to bring it to our attention?
18    I would have hoped last year that you
19    never would have had to send anything to
20    Bill.  That was my hope.
21         MR. KOZOLCHYK:  If I may, please.
22    I'm not trying to not take
23    responsibility, but if we can go through
24    a couple of the examples.  There was the
25    one that they filed a Rule 11 motion for

Maria I. Salum, P.A.                    305 746-3079

Page 119

1       sanctions because the defense attorney on
2       the other side believed the case was
3       frivolous because an exemption had
4       applied.  The exemption did not apply.
5            MR. BARON:  I'll give you the
6       benefit of the doubt on that one.  That's
7       one that you didn't send to the
8       committee.  A Rule 11, a request for Rule
9       11 for you filing an inappropriate
10      filing.  You didn't think it needed to go
11      to Bill?  I mean, that just doesn't
12      connect to me.  That wasn't on your
13      radar?  That doesn't connect with me.
14           MR. KOZOLCHYK:  I agree with you.
15      And I agree with you that it should have
16      been on my radar.
17           MR. BARON:  What I'm saying to you
18      is that from the get-go, you never really
19      took this seriously.
20           MR. KOZOLCHYK:  No, that's not true
21      at all.
22           MR. BARON:  Your actions prove that.
23      Listen, you could have gotten 50 letters
24      and sent all 50 to this committee and
25      this committee may have scratched their

Maria I. Salum, P.A.                    305 746-3079

Page 120

1    heads and said, "I wonder what the hell

2    is going on with Mr. Kozolchyk, but he's

3    been diligent in doing what he was told

4    to do."

5         I'm at a loss.  I really am.  And

6    I've been doing this a long time.  I've

7    sat on bar grievance committees.  I do a

8    lot of bar work representing people

9    before the bar.  I know about making

10   mistakes and I also know about second

11   chances, and you were given one.  You

12   were given one when you were put on

13   probation and asked to report any

14   negative comments or pleadings or other

15   filings and you failed, and I don't know

16   what we should do.  Because like I said

17   I'm a pussycat.  I don't want to destroy

18   your livelihood.  But I don't know what's

19   going to sink through that head of yours.

20   This is serious stuff.  You're

21   representing people's interests.  They

22   put their faith in you not to get their

23   cases dismissed with prejudice.  You let

24   it slip through the cracks.  That's

25   negligence.  We're not here debating your

Maria I. Salum, P.A.                    305 746-3079

Page 121

1    competency as an attorney or whether you
2    are negligent.  That is a clear example
3    on relying on nothing happening for
4    almost a year as everything is cool.
5    That's negligence and that gives me pause
6    about your ability to practice, as I'm
7    sure it does everyone in this room.  And
8    it starts with you not taking that order
9    seriously enough.
10           I'm done.
11           MR. HEARON:  Thank you, Richard.
12           Mr. Kozolchyk, this committee has a
13   number of things that it looks at.
14   Obviously, we're concerned about the
15   professionalisms of the lawyers in the
16   Southern District and that extends to
17   making sure that the lawyers are not
18   doing something that impairs their
19   clients' rights, so I think you're
20   getting a little bit of a flavor of that
21   in some of the questions.
22           Let me start off by noting you filed
23   a response to our proposed report and
24   recommendation on August 16th of 2022, at
25   which time you raised two issues with our

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 122

1      proposal in paragraph two.  The first was
2      that you wanted us to delete four court
3      filings by opposing counsel in part as I
4      recall because you felt these cases are
5      contentious and you didn't want to open
6      yourself up to having to report every
7      time one of your opposing counsels
8      complained about your behavior.  The
9      committee rejected that and then the
10     court adopted the order that we proposed
11     that included that language.
12            The only other objection you had in
13     your response to our proposed report and
14     recommendation had nothing to do with the
15     phrase "problematic" or "unprofessional
16     conduct."  Apparently back in August of
17     '22, you didn't have a problem with that
18     language.  But you had a problem with our
19     reporting time because we had originally
20     put in our proposal 42 business hours and
21     you wanted 72, to afford you more time,
22     and we agreed to that and we put in 72
23     hours.
24            I think you're starting to hear or
25     you've heard that the committee asked

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 123

1   questions about whether or not the way

2   your office is organized that you are

3   able to fulfill your requirements under

4   this order or able to do it, or if

5   there's an extended period of time that

6   the committee recommends to the court,

7   whether you can do it then.

8        Let me ask you about your cases.

9   You say you have 44 cases now.  What do

10  you think the maximum number of cases you

11  can handle is?

12       Since you're pausing, I have to

13  assume that you probably have never

14  considered that question.

15       MR. KOZOLCHYK:  I don't have a clear

16  answer to that.

17       MR. HEARON:  You're handling 44

18  cases now.  In the last year, what was

19  the maximum number of cases you handled?

20       MR. KOZOLCHYK:  At any given time, I

21  really don't run the numbers on that.  I

22  don't have an answer to that, because I

23  don't run the numbers on how many open

24  cases.  I haven't checked how many open

25  cases I have had -- I mean, as far as

Maria I. Salum, P.A.                    305 746-3079

Page 124

1    like the total number for some time, I
2    don't do a count on that on a regular
3    basis.  I think it's probably been around
4    this number.
5         MR. HEARON:  If you think of an
6    answer to my question as I'm continuing
7    to ask you, you can tell me, but I want
8    to ask some other questions.
9         Your office manager, is that Phoebe?
10        MR. KOZOLCHYK:  Yes.
11        MR. HEARON:  And if I recall
12   correctly Phoebe had some relationship to
13   you, she is the daughter of your former
14   fiancee?  Do I have that correct?
15        MR. KOZOLCHYK:  Yes.
16        MR. HEARON:  And when you're in
17   trial, as you were recently in your
18   communications with me, in the Bow Wow
19   case, who is reading the filings that are
20   coming in in order to comply with this
21   order within 72 hours?
22        MR. KOZOLCHYK:  There's the person
23   who does the calendaring.  There's me and
24   there's Phoebe.
25        MR. HEARON:  And if I brought the

Maria I. Salum, P.A.                    305 746-3079

Page 125

 1    person -- give me a name of the person
 2    who does the calendaring?
 3            MR. KOZOLCHYK:  Matthew Binder.
 4            MR. HEARON:  Where is Matthew Binder
 5    located?
 6            MR. KOZOLCHYK:  Michigan.
 7            MR. HEARON:  If I ask Matthew Binder
 8    if part of his job requirements was to
 9    read every filing and to see if there's a
10    claim about your professionalism, would
11    he agree that that was part of his job
12    description?
13            MR. KOZOLCHYK:  Yes, his focus is
14    more on exactly deadlines, but that would
15    be part of it as well.  It's not his
16    primary focus.  His primary focus is
17    deadlines.
18            MR. HEARON:  Well, it's either his
19    focus or it isn't, whether it's primary,
20    secondary, third on his list, fourth on
21    his list.  He either has responsibility
22    for doing that and to report to you or
23    not.
24            Maybe I should ask it this way.  If
25    I asked you to send me any emails that he

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 126

```
 1      sent you in the last year where he
 2      identified and reported to you that this
 3      was a filing or an order that he thought
 4      needed to be reported, would I have any
 5      of those e-mails?  Would you have any of
 6      those emails?
 7           MR. KOZOLCHYK:  No, there wouldn't
 8      be any.
 9           MR. HEARON:  Can we agree for the
10      purposes of my questioning of whether you
11      think he is doing that or not, he
12      probably is not?
13           MR. KOZOLCHYK:  He has brought
14      things to my attention before.  He does
15      primarily calendar.  He has said, "Hey,
16      by the way, make sure, consider this,
17      this was put in this order, this was put
18      in that order."  That's why I'm coming up
19      with that.  It's not a formal response.
20      If you want a black and white answer,
21      that is not unambiguously within the
22      scope of his responsibility.  He has from
23      time to time brought certain things to my
24      attention outside of calendaring that was
25      in an order or some filing to bring it to
```

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 127

1   my attention.  That's kind of where I'm

2   going with this.  It's not formal of the

3   specific point of reporting requirement.

4      MR. HEARON:  It may be that in

5   reviewing an order he brought something

6   to your attention but nothing having to

7   do with the order that we're dealing with

8   here.

9      MR. KOZOLCHYK:  Correct.

10      MR. HEARON:  And you wouldn't be

11   able to give me an email that you have

12   with him where you tell him that this is

13   part of his responsibility, would you?

14      MR. KOZOLCHYK:  Right.  And if you

15   want, for purposes of this hearing, I

16   will concede that it's not part of his

17   responsibility.  It's not that formal.

18   It's more casual.  His formal

19   responsibility is deadlines.

20      MR. HEARON:  Tell me now with regard

21   to Phoebe -- her last name is -- how do

22   you pronounce it?  Dauz?

23      MR. KOZOLCHYK:  Yeah, Dauz.

24      MR. HEARON:  D-a-u-z for the court

25   reporter.

Electronically signed by Maria Salum (001-186-132-3519)      f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 128

1          Every day she reviews all the
2     filings?
3          MR. KOZOLCHYK:  Almost every day,
4     yeah.
5          MR. HEARON:  Every two days, does
6     she review the filings?
7          MR. KOZOLCHYK:  It's usually every
8     day.
9          MR. HEARON:  When you were in trial,
10    did she have the sole responsibility to
11    make sure that you were in compliance
12    with this order?
13         MR. KOZOLCHYK:  She was in trial
14    with me and we both reviewed filings as
15    well when they came in.
16         MR. HEARON:  Is there any email or
17    employment agreement that details that
18    this is one of her responsibilities?
19         MR. KOZOLCHYK:  No.
20         MR. HEARON:  When she would report
21    these to you, would she do it by way of
22    an email and send you a copy of the
23    filing and say, "I think this is
24    something that you need to report to the
25    committee"?

Maria I. Salum, P.A.                    305 746-3079

Page 129

1        MR. KOZOLCHYK:  No, I don't think

2    there's going to be something like that.

3        MR. HEARON:  And in the flurry of

4    the ones that I have received in the last

5    two weeks, were those identified by you

6    or by her?

7        MR. KOZOLCHYK:  By me.

8        MR. HEARON:  All the filings that

9    you do in the Southern District, are they

10   all drafted by you or do others draft

11   them?

12       MR. KOZOLCHYK:  I draft them.

13       MR. HEARON:  Is that true of 100

14   percent of your filings in the last 12

15   months?

16       MR. KOZOLCHYK:  Yeah.

17       MR. HEARON:  In how many of the

18   orders that were entered, did your

19   clients suffer direct damages, either by

20   way of monetary sanctions or the

21   dismissal of their case in the last 12

22   months?

23       MR. KOZOLCHYK:  Please repeat that

24   question one more time, please?

25       MR. HEARON:  In the last 12 months,

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 130

1    how many of your clients have suffered
2    monetary sanctions by the court or had
3    their claims dismissed in part or totally
4    because of something that you did in the
5    case?
6        MR. KOZOLCHYK:   In Reddish and
7    Keefe, we were joined in the sanctions
8    because the interrogatories were not
9    verified, and there are two cases with
10   Judge Moore, and Judge Moore has a
11   practice where cases get dismissed
12   automatically and then you can move to
13   reopen them.   I don't even want to -- I
14   don't have the order in front of me and I
15   don't want to be accused of
16   misrepresenting the order.   There's a
17   certain requirement that I think you need
18   to like schedule something and that order
19   runs even if the defendant has not yet
20   made an appearance and the case gets
21   dismissed automatically.
22       MR. HEARON:   You're talking about
23   the two cases with Judge Moore.
24       MR. KOZOLCHYK:   Right, and he knows
25   that you can move to reopen the case.

Maria I. Salum, P.A.                    305 746-3079

Page 131

1      MR. HEARON:  In Reddish, the case
2  was thrown out and we'll come back to
3  that.  In Keefe, what was the monetary
4  damage your client had to pay, ballpark?
5      MR. KOZOLCHYK:  I think it was
6  $1,780.
7      MR. HEARON:  Did you have to pay the
8  same amount?
9      MR. KOZOLCHYK:  Yes.
10      MR. HEARON:  With regard to Judge
11  Moore's order, does it say that you have
12  to do something by a certain point in
13  time, but if it does, can you file
14  something with the court to let the court
15  know that you have been unable to serve
16  the defendant yet?
17      MR. KOZOLCHYK:  I don't want to
18  misstate the judge's order and that would
19  suggest that I am not being truthful, so
20  I would rather look up the order than go
21  off on memory.
22      MR. HEARON:  Send me the orders
23  you're talking about.  You can do it
24  after the hearing.
25      If a lawyer, not you, were looking

Maria I. Salum, P.A.                    305 746-3079

Page 132

1    at the circumstances of the Reddish case,

2    do you think that lawyer could reasonably

3    conclude that your lack of prosecution of

4    the case constituted malpractice?

5        MR. KOZOLCHYK:  I don't agree with

6    the judge's order.  That's why we filed

7    an appeal.  We were going to appeal it.

8    I discussed it with my client and we

9    mutually agreed to just not move forward

10    with it anymore.

11        MR. HEARON:  That was not really my

12    question, Mr. Kozolchyk.  Putting aside

13    that you dismissed the appeal -- and

14    we'll get to your client in a second.

15    The question I have is after that ruling

16    came out that you were asked about

17    earlier by Mr. Yearick, if that file was

18    taken to a lawyer who did malpractice, do

19    you think a reasonable interpretation of

20    the facts outlined in that ruling could

21    serve as a basis for pursuing a

22    malpractice claim against you?  I'm not

23    talking about whether or not they would

24    be successful or not, but whether a

25    reasonable lawyer can file such a

Electronically signed by Maria Salum (001-186-132-3519)    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 133

1    lawsuit.

2         MR. KOZOLCHYK:  I do not concede

3    that it would not be frivolous.  And so,

4    I can't agree to that because it could

5    very well be a frivolous lawsuit if that

6    should ever come.  I'm not ready to

7    concede and stipulate to that.  If I get

8    sued for malpractice under that case,

9    then it's not -- you're asking me to take

10   the position -- not that I think this is

11   going to occur in the future, but if it

12   were to occur in the future, potential

13   future litigation, and I'd have to look

14   at that lawsuit and make a decision at

15   that time, I'm not ready to say here

16   today that it would not be a frivolous

17   lawsuit.

18        MR. HEARON:  How much was your

19   client's claim in the case?

20        MR. KOZOLCHYK:  I'm going to look it

21   up right now.

22        The statement of claim filed at the

23   beginning of the lawsuit was for

24   $14,753.57.

25        MR. HEARON:  And that's the case

Maria I. Salum, P.A.                    305 746-3079

Page 134

1    that you in previous answers indicated

2    that you had spent an enormous amount of

3    time on?

4        MR. KOZOLCHYK:  Yeah, it's the

5    defendants -- sometimes defendants do

6    litigation where they refuse to settle

7    and they will incur any amount.  There's

8    at least one motion for summary judgment,

9    if not two.  There was a deposition in

10   the case.  A lot of defendants -- some

11   defendants incurred attorneys' fees

12   defending these cases and then -- you

13   know, what am I supposed to do other than

14   prosecute the case?

15       MR. HEARON:  I'm just asking the

16   question.  I'm not drawing any

17   conclusion.  I just wanted to know.

18       Prior to your client agreeing to not

19   pursue the appeal in the 11th Circuit,

20   can I assume, based upon your previous

21   answers, that you did not suggest to him

22   that he could take this matter to a

23   third-party lawyer to look at to see if a

24   third-party lawyer would consider that

25   your representation of him constituted

Maria I. Salum, P.A.                    305 746-3079

Page 135

1  malpractice?  Is that a correct

2  assumption by me?

3      MR. KOZOLCHYK:  Correct.  Was I

4  required to do that?  Is there a rule?

5      MR. HEARON:  I'm just asking the

6  question.  I read the judge's ruling and

7  then you testified earlier that it was a

8  joint decision by your client to not

9  pursue the appeal, and I'm trying to

10  understand what information you had

11  provided to your client that led to your

12  client's agreement to not pursue the

13  appeal?  That's why I asked the question.

14      MR. KOZOLCHYK:  I will be even more

15  detail with you when I say it was a joint

16  decision.  I will tell you exactly how

17  that conversation went.

18      I said that I can appeal it and he

19  said basically that I can appeal it if I

20  want to and that he's okay with not

21  moving forward.  He basically put it in

22  my court.  He basically left it to me.

23  That if I wanted to pursue the appeal,

24  that I am free to do it on his behalf.

25  If I didn't want to pursue the appeal, he

Maria I. Salum, P.A.                    305 746-3079

Page 136

1    was okay with not moving forward with the

2    appeal.

3         MR. HEARON:  If I took the

4    deposition of Ms. Dauz, would she testify

5    that she had been the source of locating

6    any of these rulings or motions that had

7    to be disclosed or did they all come from

8    you?

9         MR. KOZOLCHYK:  She would testify

10   that we both looked and that is what we

11   found.

12        MR. HEARON:  I appreciate you both

13   looked, but I'm trying to separate you

14   from her.  If I asked her how many she

15   found, what would her answer be?

16        MR. KOZOLCHYK:  I don't know.  I

17   know I found the ones that I reported

18   when the notice of hearing was issued.  I

19   know I found those.  Which ones she

20   found, beyond that, I don't recall and I

21   don't know what she would say on that.

22        MR. HEARON:  Do you recall her

23   finding any of them on her own that you

24   had not discovered?

25        MR. KOZOLCHYK:  I mean, the Keefe

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 137

```
 1    one, but like she would come to me,
 2    "Okay, we need to report it," and I would
 3    say, "I would agree."  We would both find
 4    it on our own.  As far as one that she
 5    found that I did not see first, I don't
 6    recall specifically.
 7         MR. HEARON:  Tell me what vacations
 8    you have taken in the last year.  I don't
 9    need to know where you went or where you
10    stayed.  I'm talking about the length of
11    any vacations you took since this order
12    was entered last October.
13         MR. KOZOLCHYK:  July.  You're asking
14    for the vacations, like how long was each
15    vacation?
16         MR. HEARON:  Yes, sir.
17         MR. KOZOLCHYK:  I sometimes take day
18    trips often, but in July, I took a ten
19    day vacation.  I usually take a vacation
20    in July.
21         MR. HEARON:  Who was monitoring the
22    filings during that ten day period?
23         MR. KOZOLCHYK:  I run a mobile
24    office.
25         MR. HEARON:  So the answer to the
```

Maria I. Salum, P.A.                          305 746-3079

Page 138

1    question is you were?

2         MR. KOZOLCHYK:  Yes.  I'm even

3    taking phone calls while I'm on vacation.

4    I'm even filing things when I'm on

5    vacation.  I even did a mediation while I

6    was on vacation.

7         MR. HEARON:  Let's go back to the

8    question you passed on.  What do you

9    think are the maximum number of cases

10   that you can handle with your present

11   staffing?

12        MR. KOZOLCHYK:  The truth is, I

13   don't think that the committee -- it's

14   going to satisfy the committee.  The

15   thing is my system and firm is always

16   evolving.  Maybe 70 or a hundred.  I

17   don't have an answer to that.  I'm not

18   trying to not answer your question.

19   You're saying open at any given time, not

20   in a year file, right?

21        MR. HEARON:  I'm talking about open

22   at any given time.

23        MR. KOZOLCHYK:  I would say 70 to a

24   hundred.

25        MR. HEARON:  I have no further

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 139

1   questions.

2        I would like you to send me copies

3   of those orders by Judge Moore that you

4   are referring to.  I'd like you to take a

5   look periodically since October of last

6   year to tell us the number of open cases

7   you had.  You testified today you have

8   44.  But I would like to know if you've

9   ever had more than 44 at any given time,

10  check two or three times, between October

11  and the end of the effectiveness of the

12  order.

13        The only other thing I want to do is

14  put on the record a number of disclosures

15  that you had while you were being asked

16  the questions.  According to my records,

17  the first disclosure you made was on

18  February 13 of '23, because you spent a

19  good amount of time during 2022

20  communicating with me about complying

21  with other portions of the court's order.

22  The first disclosure under paragraph two

23  that I could find was February 13, which

24  is about a month after the order that

25  Mr. Yearick indicated had been entered in

Electronically signed by Maria Salum (001-186-132-3519)                    f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 140

1   the Reddish case, I guess in January of

2   '23.  I had August 30th, September 5th,

3   October 13, October 19, October 31st and

4   then November 2nd, 3rd and 6th.  So if

5   there were any that I missed in there,

6   Mr. Kozolchyk, those are the ones that

7   were sent to the committee, and I thank

8   you for your time.

9        I will tell you procedurally

10  depending upon what the committee decides

11  to do.  More than likely, I will send you

12  a proposed report and recommendation,

13  which will trigger the procedure under

14  the rule for you to respond in 14 days,

15  okay, before we submit a final report to

16  the court.

17       Any questions about that?

18       MR. KOZOLCHYK:  Thank you and thank

19  the committee for your time.

20       MR. HEARON:  Okay, thank you.  You

21  can sign off, and Maribel, you can sign

22  off as well and we would like a copy of

23  the transcript.

24

25       (Thereupon, the proceedings was

Maria I. Salum, P.A.                    305 746-3079

Page 141

1      concluded at 5:35 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          CERTIFICATE OF REPORTER

Maria I. Salum, P.A.                    305 746-3079

Electronically signed by Maria Salum (001-186-132-3519)          f279bf55-d4f8-4c59-bee8-044d7c97ebdb

Page 142

```
1

2

3    STATE OF FLORIDA     :
                          : SS.
4    COUNTY OF MIAMI-DADE :

5

6        I, MARIA ISABEL SALUM, Registered
     Professional Reporter, do hereby certify that
7    I reported in shorthand the proceedings in the
     above-styled cause before the Ad Hoc
8    Committee, at the time and place as set forth;
     that the foregoing pages, numbered from 1 to
9    142, inclusive, constitute a true and correct
     record.
10
         I further certify that I am not an
11   attorney or counsel of any of the parties, nor
     related to any of the parties, nor financially
12   interested in the action.

13       WITNESS my hand and Official Seal in the
     City of Miami, County of Miami-Dade, this 20th
14   day of November, 2023.

15

16

17   MARIA ISABEL SALUM

18

19

20

21

22

23

24

25
```

Maria I. Salum, P.A.                    305 746-3079

Response - 1-9-24.pdf

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-MC-21879**

IN RE:

**ELLIOT ARI KOZOLCHYK**
**Florida Bar # 74791**

_____/

## RESPONSE TO PROPOSED SUPPLEMENTAL REPORT AND RECOMMENDATION

     I respectfully request the following revisions to the Proposed Supplemental Report and Recommendation ("PSR&R"):

1.    Change the reporting requirements to 5 business days instead of 72 business hours. The shorter reporting time increases the risk of unintentionally not complying. More time gives time to review filings and consider whether they need to be reported. If I have a week of trial, or back-to-back depositions, or multiple motions for summary judgment, that additional time could be very helpful.

2.    Please remove the public reprimand. My failure to report certain things was not intentional. The issues raised at the second hearing before the Committee were not the subject of the original letter of referral nor original report and recommendation. The original Report and Recommendation was published publicly and now so will the Committee's Supplemental Report and Recommendation. These are de facto public reprimands. I have already taken action to comply with the PSR&R by contacting The Florida Bar's Diversion/Discipline Consultation Service.

3.    At the bottom of page 2 and top of page 3 of the second PSR&R, adding an additional sentence explaining that I was unable to obtain my client's signature on the interrogatories because of the client's unavailability due to her living in a different state and having a job that frequently

THE FLORIDA BAR'S
EXHIBIT

9

required her to drive to different states. I take responsibility for my failure and acknowledge that I should have sought an extension of time or noted the lack of signature in the notice of compliance.

4.     At top of page 4, my failure to have counsel at the second hearing was solely a financial issue. At all times, beginning a half decade ago, I have considered this matter to be of utmost importance to my clients, myself, and my career.

Respectfully submitted,

Elliot Kozolchyk, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of January, 2024, a true and correct copy of this Response to Proposed Supplemental Report and Recommendation was served via email to William C. Hearon, Esq., Chair of the Committee, at bill@williamhearon.com, Catherin Wade at Catherine_Wade@flsd.uscourts.gov, and Todd Alfuth at Todd_Alfuth@flsd.uscourts.gov. This response was previously served on Mr. Hearon in email format on January 8, 2024.

Elliot Kozolchyk, Esq.

**William C. Hearon, P.A.**
Attorney at Law
3530 Mystic Pointe Drive
Unit 1909
Aventura, Florida 33180

(305) 579-9813
bill@williamhearon.com

January 25, 2024

*Via Email Only*

The Honorable Cecilia M. Altonaga
Chief Judge, United States District Court SDFL
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue, Room 13-3
Miami, Florida 33128

      In Re: Elliot Ari Kozolchyk (Fla. Bar #74791)
      Case No. 20-MC-21879
      Final Supplemental Report and Recommendation

Dear Judge Altonaga:

      Attached please find the Final Supplemental Report and Recommendation of the Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance (the "Committee") regarding the referral of Elliot Ari Kozolchyk to the Committee. This Final Supplemental Report and Recommendation pertains to the reporting requirement contained in Administrative Order 2022-94. Mr. Kozolchyk appeared before the Committee on November 9, 2023.

      Should Your Honor have any questions regarding the foregoing or the attached or should you need the Committee to be of further service with regard to this matter, please do not hesitate to contact me.

                  Sincerely,

                  William C. Hearon, *Chair*
                  *Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance*

WCH/mm
Enclosure
cc: Clerk's Office
    Elliot Ari Kozolchyk, Esq.
    David B. Rothman, Esq.

THE FLORIDA BAR'S EXHIBIT
10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-MC-21879

IN RE:

ELLIOT ARI KOZOLCHYK
Florida Bar # 74791

_____/

## FINAL SUPPLEMENTAL REPORT AND RECOMMENDATION

### THE AD HOC COMMITTEE ON ATTORNEY ADMISSIONS, PEER REVIEW, AND ATTORNEY GRIEVANCE FOR THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA

### BACKGROUND

THIS MATTER was initially referred to the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee") by then-Chief Judge K. Michael Moore at the request of Judge Donald M. Middlebrooks and Judge Robin L. Rosenberg by letter dated July 17, 2019 (the "Letter of Referral"), to investigate the conduct of Elliot Ari Kozolchyk, Esq. in multiple cases filed in the U.S. District Court for the Southern District of Florida and to conduct disciplinary proceedings. On May 10, 2022, Chief Judge Cecilia M. Altonaga granted the Committee's second request for an extension of time until September 7, 2022, to consider the matter and submit its final report and recommendation to the Court.

On August 17, 2022 the Committee submitted its Final Report and Recommendation to the Court. Mr. Kozolchyk accepted the recommendations of the Committee, and on October 28, 2022 the Court entered an order adopting the Committee's recommendations. (Administrative Order 2022-94).

Those recommendations consisted of four items, three of which Mr. Kozolchyk completed to the Committee's satisfaction.[1] (*See*, Committee's March 1, 2023 Report on Mr. Kozolchyk's Compliance with the October 28, 2022 Order).

The one requirement imposed by the Court that had a lengthy duration was contained in Paragraph 2. It stated:

> For a period of 12 months from entry of this Order, Mr. Kozolchyk must self-report to the Committee within 72 business hours of the entry of any order or court filing by opposing counsel alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk.[2]

At the time of the Committee's March 1, 2023 report, it noted that Mr. Kozolchyk had recently made a disclosure to the Committee on February 13, 2023. Thereafter, Mr. Kozolchyk did not make an additional disclosure until August 30, 2023.

The disclosure made by Mr. Kozolchyk on that date was an Order Granting in Part and Denying in Part Defendants' Motion for Discovery Sanctions in *Keefe v. Britt's Bow Wow Boutique, Inc.*, Case No. 22-cv-62138 on August 22, 2023 (D.E. 53). The Court granted attorneys' fees against Mr. Kozolchyk and his client (*Id.* at 7) in an amount determined later. (*See*, D.E. 66). The Court also took issue with the fact that Mr. Kozolchyk had filed a Notice of Compliance with

---

[1] Administrative Order 2022-94, *inter alia*, required Mr. Kozolchyk to attend anger management counseling for a minimum of 25 hours; a requirement that he has completed. The Committee noted that it has not received, nor seen in any of Mr. Kozolchyk's cases, any evidence that the previous behavior that led to this requirement has re-occurred.

[2] The Committee's Proposed Report and Recommendation contained a 48-hour reporting timeframe. In response, Mr. Kozolchyk requested that he only be required to self-report orders, that he not be required to self-report filings by opposing counsel that alleged problematic or unprofessional conduct, and that he be given 72 hours within which to self-report to the Committee. The Committee modified the time frame to give him 72 business hours, but rejected the other modification, believing that getting prompt notice of filings by opposing counsel would give the Committee timely information rather than waiting for the Court to rule at a later date.

regard to serving certain interrogatory answers, when, in fact, the interrogatory answers were not signed, and therefore not under oath as required under Rule 33. (*Id.* at 4-5).

In addition to failing to timely report the referenced order, Mr. Kozolchyk was asked to confirm that he had failed to self-report to the Committee the August 4, 2023 Defendants' Discovery Memorandum which sought the sanctions. (D.E. 47 at page 3).

In response, Mr. Kozolchyk wrote: "Correct.  If I was suppose [sic] to, I apologize."

The Sub-Committee assigned to Mr. Kozolchyk recommended that Mr. Kozolchyk appear again before the Committee so that the Committee could inquire into what was considered as a lack of candor to the Court in the *Keefe* case, in addition to his failure to properly and timely self-report.

On September 27, 2023, the Chair informed Mr. Kozolchyk that the Committee wanted him to appear again before the Committee, offering a selection of possible hearing dates. A Notice of Hearing was sent to Mr. Kozolchyk on October 10, 2023, setting a November 9, 2023 hearing.[3] Prior to being notified of the second hearing, Mr. Kozolchyk had only self-reported on February 13, August 30, and September 5, 2023. Thereafter, Mr. Kozolchyk started sending self-reporting emails to the Chair, dated October 13, October 19, October 31, November 2, November 3 (3 separate disclosures), and November 6, 2023.

Prior to the hearing Mr. Kozolchyk was asked to confirm that he had failed to self-report a dismissal for failure to prosecute in *Reddish v. Epoca Corp.*, Case No. 17-21206-CIV-WILLIAMS, 2023 WL 5831459 (S.D. Fla. Sept. 7, 2023) (J. Williams).   In response, Mr.

---

[3]  The transcript of the November 9, 2023 hearing shall be referenced as "Transcript at p. _____."

Kozolchyk wrote: "I confirm that I did not disclose it. It did not register in my mind to report it until the moment I read your email right now."

Mr. Kozolchyk appeared at the November 9 hearing which was held via video conference.

## THE NOVEMBER 9, 2023 HEARING

At the hearing Mr. Kozolchyk further admitted failing to self-report on several cases. (Transcript at page 7). One such example disclosed was *Martinez v. Durcon Construction, LLC*, 23-cv-60722, where a Motion for Sanctions under Rule 11 was filed on June 2, 2023 (D.E. 20), and not reported to the Committee. (Transcript at pp. 10-17). Even though the Motion for Sanctions sought sanctions against the Plaintiff and Mr. Kozolchyk, Mr. Kozolchyk testified "[t]hat again was so not personal to me, it didn't even trigger in my head [to report it]." (Transcript at page 55).

Mr. Kozolchyk admitted that he should have also reported the aforementioned ruling and other orders in *Reddish v. Epoca Corp.* (Transcript at page 29). He stated that "[h]e missed them." *Id.* at 38, 90.

In response to questions, Mr. Kozolchyk raised an issue with the broad and difficult to understand term "problematic" which caused him difficulties when determining what needed to be reported to the Committee.[4] (Transcript at pages 40, 68, 89-90, 109).

_____

[4] When Mr. Kozolchyk reviewed the Committee's Proposed Report and Recommendation, *supra* note 2, he never took issue with the use of "problematic." In a November 14, 2023 submittal to the Committee, post-hearing, Mr. Kozolchyk proposed the retention, at his cost, of David B. Rothman, Esq. to act as his mentor. As part of that proposal, Mr. Kozolchyk embraced a reporting procedure that was again tied to "problematic or unprofessional conduct." For these reasons the Committee dismissed his arguments that he was unclear as to what matters needed to be reported to the Committee.

4

Mr. Kozolchyk's testimony about his various failures to comply with the self-reporting requirements of the Court's Order disturbed many members, especially because he depends almost exclusively on his Federal Court practice for his livelihood. (Transcript at pages 80, 95, 109-112).

Numerous committee members asked questions about the office procedures utilized by Mr. Kozolchyk to comply with the Court's Order about self-reporting. Mr. Kozolchyk is a sole practitioner, with one non-lawyer assistant and three remote, part-time workers. It was clear to the Committee that the primary, if not sole, responsibility for identifying filings or orders that had to be self-reported fell upon Mr. Kozolchyk. The Committee overwhelmingly concluded that office management issues were the likely causes of Mr. Kozolchyk's failure to self-report, or self-report timely, and were quite possibly the reasons for his confrontational issues with opposing counsel due to his failure to address substantive matters and deadlines in his cases. (Transcript at pages 104-108).

Mr. Kozolchyk's answers about the number of his open cases and his opinion as to how many open, active cases his office could handle with his present staffing also raised concerns for the Committee. (Transcript at pages 80-81, 111, 138-139).

## CONCLUSIONS

The Committee reached the following conclusions, which serve as the basis for the Committee's recommendations:

i)    Mr. Kozolchyk failed to self-report to the Committee within 72 business hours of the entry of orders and court filings by opposing counsel alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk;

ii)   Mr. Kozolchyk failed to timely self-report to the Committee within 72 business hours of the entry of orders and court filings by opposing counsel alleging,

5

describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk;

iii)   Mr. Kozolchyk's conduct before the Court, especially in the areas of his compliance with court orders and the Local Rules, requires a further extension of the Committee's monitoring of his professional activities; and

iv)   Mr. Kozolchyk's law office management skills need to be reviewed and evaluated, not only for self-reporting purposes, but also for the protection of his clients and their cases. The Committee believes that law office management may better serve the needs identified by the Committee. Notwithstanding that the Committee is not recommending the mentoring process described in Mr. Kozolchyk's November 14, 2023 letter,[5] the Committee would urge him to nonetheless consider utilizing Mr. Rothman's services as outlined in his November 14, 2023 correspondence to the Committee.

The Committee makes no finding that Mr. Kozolchyk's failure to self-report and his failure to timely self-report, as outlined in (i) and (ii) above, were intentional. As indicated in Conclusion (iv) above, the Committee expects that Mr. Kozolchyk's self-reporting failures may be cured with improved and more competent law office management skills and procedures.

---

[5] As previously mentioned, after the hearing Mr. Kozolchyk offered to retain Mr. Rothman to serve as a mentor to review the transcript of the hearing and this Proposed Supplemental Order, to meet weekly to discuss his practice, to report to Mr. Rothman within 72 business hours of the entry of any order or court filing by opposing counsel alleging, describing, or relating to any problematic or unprofessional conduct by Mr. Kozolchyk and then mentor him on how to address the issue(s), etc.

## **RECOMMENDATIONS**[6]

1) Mr. Kozolchyk should be publicly reprimanded for his repeated failure to comply with this Court's October 28, 2022 Order. (Administrative Order 2022-94).[7] Mr. Kozolchyk should be required to appear before the Chief Judge on a date and time set by the Court in order to receive his reprimand.

2) For a period of 24 months, *nunc pro tunc* to October 29, 2023, Mr. Kozolchyk must self-report to the Committee within 3 business days of the entry of any order[8] describing or relating to any problematic or unprofessional conduct by Mr. Kozolchyk. A monthly report should also be provided to the Committee to ensure that no disclosures have been missed, and if so, an explanation should be provided concerning why the deadline was missed. When Mr. Kozolchyk is traveling or on vacation, such that he cannot fulfill the notification requirements of this section, he should be required to so inform the Committee in advance by requesting that the time frame for reporting

---

[6] On December 15, 2023 the Committee served Mr. Kozolchyk and his counsel with a copy of the Committee's Proposed Supplemental Report and Recommendation, as well as a copy of the transcript from the November 9, 2023 hearing. Mr. Kozolchyk was informed on the applicable time frame to review and comment. After an extension granted by the Committee, Mr. Kozolchyk submitted his response which was filed with the Court. The Committee has taken his comments into consideration and has made certain modifications to the Recommendation. Two of the items in his Response sought to raise issues that had been raised in the cases below, but were not relevant to the Committee's inquiry.

[7] Regardless of whether Mr. Kozolchyk's failure to properly self-report was intentional or not, he failed to have procedures in place to ensure that he could comply with this important court-ordered requirement.

[8] It was brought to the Committee's attention that Administrative Order 2022-94, available on the Court's website, which required Mr. Kozolchyk to self-report the allegations in the filings of opposing counsel, may have given opposing counsel an unfair opportunity to target Mr. Kozolchyk, and thus his clients. For that reason, the Committee decided to require self-reporting as to orders only.

commence upon his return.  At the request of the Committee, Mr. Kozolchyk shall appear before the Committee to answer questions regarding his compliance with this section.  At the end of 12 months, the Committee may recommend that the reporting requirements be modified, be discontinued or be extended.

3) Within 45 days Mr. Kozolchyk shall, at his cost, sign up and take part in The Florida Bar's Diversion/Discipline Consultation Service ("DDCS") which conducts administrative management reviews of law office processes and procedures as directed by a grievance committee.  Once retained, DDCS should communicate with the Committee so DDCS can fully understand the concerns of the Committee. The DDCS report shall be submitted to the Committee upon completion, and the Committee may make such other recommendations to the Court as it may determine to be necessary and beneficial to Mr. Kozolchyk's practice in the Southern District.

William C. Hearon, Esq.
Chair
*For the Committee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of January 2024, a true and correct copy of this Final Supplemental Report and Recommendation was served via e-mail upon Elliot Ari Kozolchyk, Esq. at ekoz@kozlawfirm.com; and upon David B. Rothman, Esq. at dbr@rothmanlawyers.com.

William C. Hearon, Esq.

8

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**ADMINISTRATIVE ORDER 2024-40
CASE NO. 20-MC-21879**

IN RE:  **ELLIOT ARI KOZOLCHYK
FLORIDA BAR # 74791**

_____/

FILED BY____tah____D.C.

**Jun 4, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

## ORDER ON FINAL SUPPLEMENTAL REPORT AND RECOMMENDATION

On October 28, 2022, following a regularly scheduled Judges' Meeting, the Court adopted

the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance's Final

Report and Recommendation of attorney Elliot Ari Kozolchyk, initiated by a letter of referral to

the Committee from then-Chief Judge Moore.   (*See* Administrative Order 2022-94 [ECF No. 12]).

The Order imposed certain obligations upon Mr. Kozolchyk, one which required a lengthy

reporting requirement to the Committee:

> For a period of 12 months from entry of this Order, Mr. Kozolchyk must self-report
> to the Committee within 72 business hours of the entry of any order or court filing
> by opposing counsel alleging, describing, or relating to any problematic or
> unprofessional conduct by Mr. Kozolchyk.

(*Id.* ¶ 2).

In a Committee Report [ECF No. 13] filed on March 1, 2023, the Committee informed the

Court that Mr. Kozolchyk had complied with the Order.   Following that Report, the Committee

was made aware that Mr. Kozolchyk failed to properly and timely self-report, and it required Mr.

Kozolchyk to appear for a hearing before the Committee on November 20, 2023.   After the

hearing, on December 15, 2023, the Committee issued a Proposed Supplemental Report and



THE FLORIDA BAR'S
EXHIBIT

11

Case 0:24-cv-60984-PAB   Document 101-4   Entered on FLSD Docket 01/09/2026   Page 358 of
362
Case 1:20-mc-21879   Document 20   Entered on FLSD Docket 06/04/2024   Page 2 of 4

Recommendation [ECF No. 15] giving Mr. Kozolchyk 14 days to respond in accordance with Rule 6(c)(2)(B)(ii) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys, Local Rules of the United States District Court for the Southern District of Florida. Mr. Kozolchyk filed a Response [ECF No. 16], and the Committee submitted a Final Supplemental Report and Recommendation [ECF No. 17] on January 25, 2024.

An Order to Show Cause [ECF No. 18] was issued on January 25, 2024, giving Mr. Kozolchyk an opportunity to respond to the Final Supplemental Report and Recommendation. Mr. Kozolchyk filed a Response [ECF No. 19] on February 12, 2024, accepting the Committee's findings and recommendations.

In accordance with Rule 6(c)(2)(B)(v), the undersigned submitted this matter to the Court for its consideration at a regularly scheduled Judges' Meeting held on May 16, 2024. Upon review of the Final Supplemental Report and Recommendation, by unanimous vote of all District Judges and Senior Judges eligible to vote in attendance at the meeting, the Court approved and adopted the Committee's Final Supplemental Report and Recommendation in full.

Given this background, in accordance with Rule 6(c)(2)(B)(v) and the Court's inherent power to regulate membership in its bar for the protection of the public interest, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it." (alteration added)),

**IT IS ORDERED** that the Committee's Final Supplemental Report and Recommendation is **ADOPTED**, and the matter is **CLOSED**.

**IT IS FURTHER ORDERED**, consistent with the Final Supplemental Report and Recommendation, as follows:

2

1. Mr. Kozolchyk is to be publicly reprimanded for his repeated failures to comply with the Court's October 28, 2022 Order.   Mr. Kozolchyk shall appear before the Chief Judge on a date and time set by the Court to receive the reprimand.

2. For a period of 24 months, *nunc pro tunc* to October 29, 2023, Mr. Kozolchyk must self-report to the Committee within 3 business days of the entry of any order describing or relating to any problematic or unprofessional conduct by Mr. Kozolchyk.   A monthly report should also be provided to the Committee to ensure that no disclosures have been missed and if so, an explanation should be provided concerning why the deadline was missed.   When Mr. Kozolchyk is traveling or on vacation, such that he cannot fulfill the notification requirements of this section, he is required to so inform the Committee in advance by requesting that the time frame for reporting commence upon his return.   At the request of the Committee, Mr. Kozolchyk shall appear before the Committee to answer questions regarding his compliance with this section.   At the end of 12 months, the Committee may recommend that the reporting requirements be modified, be discontinued, or be extended.

3. Within 45 days of this Order, Mr. Kozolchyk shall, at his cost, sign up and take part in The Florida Bar's Diversion/Discipline Consultation Service ("DDCS"), which conducts administrative management reviews of law office processes and procedures as directed by a grievance committee.   Once retained, DDCS should communicate with the Committee so DDCS can fully understand the concerns of the Committee.   The DDCS report shall be submitted to the Committee upon completion, and the Committee may make such other recommendations to the Court as it may determine to be necessary and beneficial to Mr.

3

Case 0:24-cv-60984-PAB  Document 101-4  Entered on FLSD Docket 01/09/2026  Page 360 of
362
Case 1:20-mc-21879  Document 20  Entered on FLSD Docket 06/04/2024  Page 4 of 4

Kozolchyk's practice in this District.

**DONE AND ORDERED** in Miami, Florida, this 3rd day of June, 2024.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

Copies furnished as follows:
c:     All South Florida Eleventh Circuit Court of Appeals Judges
       All Southern District of Florida District Judges, Bankruptcy Judges, and Magistrate Judges
       United States Attorney
       Circuit Executive
       Federal Public Defender
       Clerks of Court – District, Bankruptcy, and 11th Circuit
       Florida Bar and National Lawyer Regulatory Data Bank
       Library
       William C. Hearon, Chair, Ad Hoc Committee on Attorney Admissions, Peer Review,
          and Attorney Grievance
       David B. Rothman, Counsel for Elliot Ari Kozolchyk
       Elliot Ari Kozolchyk

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ADMINISTRATIVE ORDER 2024-50
CASE NO. 20-MC-21879

IN RE:  ELLIOT ARI KOZOLCHYK
FLORIDA BAR # 74791

_____/

FILED BY _____tah_____ D.C.

**Jul 9, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

ORDER

On June 4, 2024, following a regularly scheduled Judges' Meeting, the Court adopted the

Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance's Final

Supplemental Report and Recommendation regarding attorney Elliot Ari Kozolchyk. (*See*

Administrative Order 2024-40 [ECF No. 20]). The Order directed that:

> Mr. Kozolchyk is to be publicly reprimanded for his repeated failures to comply
> with the Court's October 28, 2022 Order. Mr. Kozolchyk shall appear before the
> Chief Judge on a date and time set by the Court to receive the reprimand.

(*Id.* ¶ 1).

The public reprimand relates to Mr. Kozolchyk's repeated failures to comply with the

following requirement of the Court's October 29, 2022 Order:

> For a period of 12 months from entry of this Order, Mr. Kozolchyk must self-report
> to the Committee within 72 business hours of the entry of any order or court filing
> by opposing counsel alleging, describing, or relating to any problematic or
> unprofessional conduct by Mr. Kozolchyk.

(Administrative Order 2022-94 ¶ 2 [ECF No. 12]).

Given this background,

**IT IS ORDERED** that Mr. Kozolchyk shall appear before the undersigned on Tuesday,

THE FLORIDA BAR'S
EXHIBIT

12

**August 20, 2024** at **8:30 a.m.** in Courtroom 13-3 to receive a public reprimand.

**DONE AND ORDERED** in Miami, Florida, this 9th day of July, 2024.

*Cecilia M. Altonaga*

CECILIA M. ALTONAGA
CHIEF UNITED STATES DISTRICT JUDGE

Copies furnished as follows:

c:    All South Florida Eleventh Circuit Court of Appeals Judges
      All Southern District of Florida District Judges, Bankruptcy Judges, and Magistrate Judges
      United States Attorney
      Circuit Executive
      Federal Public Defender
      Clerks of Court – District, Bankruptcy, and Eleventh Circuit
      Florida Bar and National Lawyer Regulatory Data Bank
      Library
      William C. Hearon, Chair, Ad Hoc Committee on Attorney Admissions, Peer Review,
          and Attorney Grievance
      David B. Rothman, counsel for Elliot Ari Kozolchyk
      Elliot Ari Kozolchyk